CASE NO. 22-1148

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

| | |
|---|---|
| EMINA GEROVIC, | ) |
| | ) |
| Plaintiff-Appellant, | ) |
| | ) |
| v. | ) |
| | ) |
| CITY AND COUNTY OF DENVER, *et al.* | ) |
| | ) |
| Defendants-Appellees. | ) |

On Appeal from the United States District Court
For the District of Colorado
The Honorable Magistrate Judge Raymond P. Moore
Civil Action No. 19-cv-03710-RM-NRN

**CITY DEFENDANTS-APPELLEES' CORRECTED SUPPLEMENTAL
APPENDIX, VOLUME I**

Respectfully submitted,

Shelby A. Felton, Esq.
Jonathan Saadeh, Esq.
Denver City Attorney's Office
201 W. Colfax Avenue, Dept. 1108
Denver, CO  80202
720-913-3125
shelby.felton@denvergov.org
jonathan.saadeh@denvergov.org

August 23, 2022

**1**

ALLMTN,APPEAL,JD1,TERMED

# U.S. District Court – District of Colorado
## District of Colorado (Denver)
## CIVIL DOCKET FOR CASE #: 1:19–cv–03710–RM–NRN

Gerovic v. City and County of Denver et al
Assigned to: Judge Raymond P. Moore
Referred to: Magistrate Judge N. Reid Neureiter
Case in other court:  USCA, 22–01148
Cause: 42:2000 Job Discrimination (Race)

Date Filed: 12/30/2019
Date Terminated: 01/04/2022
Jury Demand: Both
Nature of Suit: 442 Civil Rights: Jobs
Jurisdiction: Federal Question

**Plaintiff**

**Emina Gerovic**                          represented by   **Nathan Davidovich**
Davidovich Law Firm, LLC
501 South Cherry Street
Suite 1100
Denver, CO 80246–1325
303–825–5529
Fax: 720–409–3668
Email: nathandavidovich@talk–law.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**City and County of Denver**              represented by   **Natalia Solis Ballinger**
*a Body politic and corporate of the State*                 Denver City Attorney's Office–West
*of Colorado*                                               Colfax Avenue
*other*                                                     201 West Colfax Avenue
Department of General Services and                          Denver, CO 80202–5332
Facilities Management Operations                            720–913–4893
Fax: 720–913–8413
Email: natalia.ballinger@denvergov.org
*ATTORNEY TO BE NOTICED*

**Shelby Anne Felton**
Denver City Attorney's Office–West
Colfax Avenue
201 West Colfax Avenue
Denver, CO 80202–5332
720–913–3117
Email: shelby.felton@denvergov.org
*ATTORNEY TO BE NOTICED*

**Defendant**

**Leroy Lemos**                            represented by   **Natalia Solis Ballinger**
*in his official capacity as Facilities*                    (See above for address)
*Management Operations Supervisor at*                       *ATTORNEY TO BE NOTICED*
*the Deparetment of General Services*
**Shelby Anne Felton**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Leroy (I) Lemos**                        represented by   **Natalia Solis Ballinger**
*in his individual capacity*                                (See above for address)
*ATTORNEY TO BE NOTICED*

**Shelby Anne Felton**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Murphy Robinson**
*in his official capacity as Executive Director of General Services*

represented by **Natalia Solis Ballinger**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Shelby Anne Felton**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Murphy (I) Robinson**
*in his individual capacity*

represented by **Natalia Solis Ballinger**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Shelby Anne Felton**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**James E. Williamson**
*in his official capacity as Facilities Management Operations Director at the Department of General Services*

represented by **Natalia Solis Ballinger**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Shelby Anne Felton**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**James (I) E. Williamson**
*in his individual capacity*

represented by **Natalia Solis Ballinger**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Shelby Anne Felton**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Kevin O'Neill**
*in his official capacity as Facilities Management Operations Deputy Director at the Department of General Services*

represented by **Natalia Solis Ballinger**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Shelby Anne Felton**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Kevin (I) O'Neill**
*in his individual capacity*

represented by **Natalia Solis Ballinger**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Shelby Anne Felton**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Joel Womick**
*in his official capacity as Assistant Director of Operations of Facilities Management Operations at the Department of General Services*

represented by **Michael Alan Watts**
Retherford Mullen & Moore, LLC
2 North Cascade
Suite 500
Colorado Springs, CO 80903

719−884−2844
Fax: 719−884−2845
Email: mwatts@rmmattys.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Joel (I) Womick**                                      represented by **Michael Alan Watts**
*in his individual capacity*                            (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

**Defendant**

**Kyle Knoedler**                                       represented by **Michael Alan Watts**
*in his official capacity as DGS Facility*              (See above for address)
*Supervisor of HHS Inc.*                                *ATTORNEY TO BE NOTICED*

**Defendant**

**Kyle (I) Knoedler**
*in his individual capacity*

**Defendant**

**HSS, Inc.**                                           represented by **Michael Alan Watts**
*a Colorado Corporation, acting as a*                   (See above for address)
*hired agent by the City and County of*                 *ATTORNEY TO BE NOTICED*
*Denver, by and through their contingent*
*workers, Joel Womick, Kyle Knoedler,*
*and others*

| Date Filed | # | Docket Text |
|---|---|---|
| 12/30/2019 | 1 | COMPLAINT against All Defendants (Filing fee $ 400,Receipt Number COX093490)Attorney Nathan Davidovich added to party Emina Gerovic(pty:pla), filed by Emina Gerovic. (Attachments: # 1 Civil Cover Sheet)(Davidovich, Nathan) Modified on 1/9/2020 to correct receipt number (tsher, ). (Entered: 12/30/2019) |
| 12/30/2019 | 2 | Case assigned to Judge Raymond P. Moore and drawn to Magistrate Judge N. Reid Neureiter. Text Only Entry. (alave, ) (Entered: 12/31/2019) |
| 12/30/2019 | 3 | Magistrate Judge consent form issued pursuant to 28 U.S.C. 636(c). Summons not issued. (alave, ) (Entered: 12/31/2019) |
| 12/31/2019 | 4 | ORDER REFERRING CASE to Magistrate Judge N. Reid Neureiter. Pursuant to 28 U.S.C. § 636(b)(1)(A) and (B) and Fed. R. Civ. P. 72(a) and (b), this case is referred to the assigned United States Magistrate Judge to (1) convene a scheduling conference under Fed. R. Civ. P. 16(b) and enter a scheduling order meeting the requirements of D.C.COLO.LCivR 16.2, (2) conduct such status conferences and issue such orders necessary for compliance with the scheduling order, including amendments or modifications of the scheduling order upon a showing of good cause, (3) hear and determine pretrial matters, including discovery and other non−dispositive motions, (4) conduct a pretrial conference and enter a pretrial order, and (5) conduct hearings, including evidentiary hearings, and submit proposed findings of fact and recommendations for rulings on dispositive motions. Court sponsored alternative dispute resolution is governed by D.C.COLO.LCivR 16.6. On the recommendation or informal request of the magistrate judge or on the request of the parties by motion, this court may direct the parties to engage in an early neutral evaluation, a settlement conference, or another alternative dispute resolution proceeding. Entered by Judge Raymond P. Moore on 12/31/2019. (Text Only Entry) (rmsec ) (Entered: 12/31/2019) |
| 12/31/2019 | 5 | MINUTE ORDER: With the assignment of this matter, the parties are advised that throughout this case they are expected to be familiar and comply with not only the Local Rules of this District, but also Judge Raymond P. Moore's Civil Practice Standards, which may be found at: http://www.cod.uscourts.gov/JudicialOfficers/ActiveArticleIIIJudges/HonRaymondPMoore.aspx. SO ORDERED by Judge Raymond P. Moore on 12/31/2019. (Text Only Entry) (rmsec ) (Entered: 12/31/2019) |

| 12/31/2019 | 6 | ORDER Setting Scheduling Conference for 3/12/2020 09:30 AM in Courtroom C203 before Magistrate Judge N. Reid Neureiter, by Magistrate Judge N. Reid Neureiter on 1/31/2019. (jgonz, ) (Entered: 12/31/2019) |
|---|---|---|
| 01/16/2020 | 7 | AMENDED COMPLAINT against All Defendants, filed by Emina Gerovic.(Davidovich, Nathan) (Entered: 01/16/2020) |
| 01/23/2020 | 8 | MOTION to Continue *Scheduling Conference* by Plaintiff Emina Gerovic. (Davidovich, Nathan) (Entered: 01/23/2020) |
| 01/23/2020 | 9 | MEMORANDUM regarding 8 MOTION to Continue *Scheduling Conference* filed by Emina Gerovic. Motion referred to Magistrate Judge N. Reid Neureiter. Entered by Judge Raymond P. Moore on 1/23/2020. (Text Only Entry) (rmsec ) (Entered: 01/23/2020) |
| 01/23/2020 | 10 | NOTICE of Entry of Appearance by Shelby Anne Felton on behalf of City and County of Denver, Leroy Lemos, Leroy (I) Lemos, Kevin O'Neill, Kevin (I) O'Neill, Murphy Robinson, Murphy (I) Robinson, James E. Williamson, James (I) E. Williamson Attorney Shelby Anne Felton added to party City and County of Denver(pty:dft), Attorney Shelby Anne Felton added to party Leroy Lemos(pty:dft), Attorney Shelby Anne Felton added to party Leroy (I) Lemos(pty:dft), Attorney Shelby Anne Felton added to party Kevin O'Neill(pty:dft), Attorney Shelby Anne Felton added to party Kevin (I) O'Neill(pty:dft), Attorney Shelby Anne Felton added to party Murphy Robinson(pty:dft), Attorney Shelby Anne Felton added to party Murphy (I) Robinson(pty:dft), Attorney Shelby Anne Felton added to party James E. Williamson(pty:dft), Attorney Shelby Anne Felton added to party James (I) E. Williamson (pty:dft) (Felton, Shelby) (Entered: 01/23/2020) |
| 01/23/2020 | 11 | NOTICE of Entry of Appearance by Natalia Solis Ballinger on behalf of City and County of Denver, Leroy Lemos, Leroy (I) Lemos, Kevin O'Neill, Kevin (I) O'Neill, Murphy Robinson, Murphy (I) Robinson, James E. Williamson, James (I) E. Williamson Attorney Natalia Solis Ballinger added to party City and County of Denver(pty:dft), Attorney Natalia Solis Ballinger added to party Leroy Lemos(pty:dft), Attorney Natalia Solis Ballinger added to party Leroy (I) Lemos(pty:dft), Attorney Natalia Solis Ballinger added to party Kevin O'Neill(pty:dft), Attorney Natalia Solis Ballinger added to party Kevin (I) O'Neill(pty:dft), Attorney Natalia Solis Ballinger added to party Murphy Robinson(pty:dft), Attorney Natalia Solis Ballinger added to party Murphy (I) Robinson (pty:dft), Attorney Natalia Solis Ballinger added to party James E. Williamson(pty:dft), Attorney Natalia Solis Ballinger added to party James (I) E. Williamson (pty:dft) (Ballinger, Natalia) (Entered: 01/23/2020) |
| 01/23/2020 | 12 | WAIVER OF SERVICE Returned Executed by Emina Gerovic. Murphy Robinson waiver sent on 1/13/2020, answer due 3/13/2020. (Davidovich, Nathan) (Entered: 01/23/2020) |
| 01/23/2020 | 13 | WAIVER OF SERVICE Returned Executed by Emina Gerovic. Leroy Lemos waiver sent on 1/13/2020, answer due 3/13/2020. (Davidovich, Nathan) (Entered: 01/23/2020) |
| 01/23/2020 | 14 | WAIVER OF SERVICE Returned Executed by Emina Gerovic. Kevin O'Neill waiver sent on 1/13/2020, answer due 3/13/2020. (Davidovich, Nathan) (Entered: 01/23/2020) |
| 01/23/2020 | 15 | WAIVER OF SERVICE Returned Executed by Emina Gerovic. James E. Williamson waiver sent on 1/13/2020, answer due 3/13/2020. (Davidovich, Nathan) (Entered: 01/23/2020) |
| 01/23/2020 | 16 | WAIVER OF SERVICE Returned Executed by Emina Gerovic. City and County of Denver waiver sent on 1/13/2020, answer due 3/13/2020. (Davidovich, Nathan) (Entered: 01/23/2020) |
| 01/23/2020 | 17 | MINUTE ORDER granting 8 Motion to Continue Scheduling Conference by Magistrate Judge N. Reid Neureiter on 1/23/2020. The Scheduling Conference set on 3/13/2020 is VACATED. PLEASE READ ATTACHED MINUTE ORDER. (tsher, ) (Entered: 01/23/2020) |
| 01/27/2020 | 18 | MINUTE ORDER by Magistrate Judge N. Reid Neureiter on 1/27/2020. Scheduling Conference set for 4/21/2020 09:30 AM in Courtroom C203 before Magistrate Judge N. Reid Neureiter. (tsher, ) (Entered: 01/27/2020) |
| 02/13/2020 | 19 | SUMMONS Returned Executed by Emina Gerovic. Joel Womick served on 2/6/2020, answer due 2/27/2020. (Davidovich, Nathan) (Entered: 02/13/2020) |
| 03/04/2020 | 20 | *Defendant Joel Womick's* ANSWER to 7 Amended Complaint *and Jury Demand* Attorney Michael Alan Watts added to party Joel Womick(pty:dft), Attorney Michael Alan Watts added to party Joel (I) Womick (pty:dft) by Joel Womick, Joel (I) Womick.(Watts, Michael) (Entered: 03/04/2020) |

| 03/12/2020 | 21 | Partial MOTION to Dismiss by Defendants City and County of Denver, Leroy Lemos, Kevin O'Neill, Murphy Robinson, James E. Williamson. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Felton, Shelby) (Entered: 03/12/2020) |
|---|---|---|
| 03/12/2020 | 22 | *City Defendants' Partial* ANSWER to 7 Amended Complaint by City and County of Denver, Leroy Lemos, Kevin O'Neill, Murphy Robinson, James E. Williamson.(Felton, Shelby) (Entered: 03/12/2020) |
| 03/13/2020 | 23 | MEMORANDUM regarding 21 Partial MOTION to Dismiss filed by City and County of Denver, James E. Williamson, Murphy Robinson, Kevin O'Neill, Leroy Lemos. Motion referred to Magistrate Judge N. Reid Neureiter. Entered by Judge Raymond P. Moore on 3/13/2020. (Text Only Entry) (rmsec ) (Entered: 03/13/2020) |
| 03/25/2020 | 24 | MINUTE ORDER re: 21 Partial MOTION to Dismiss filed by City and County of Denver, James E. Williamson, Murphy Robinson, Kevin O'Neill, Leroy Lemos, by Magistrate Judge N. Reid Neureiter on 3/25/2020. Motion Hearing set for 6/2/2020 02:00 PM in Courtroom C203 before Magistrate Judge N. Reid Neureiter. PLEASE READ ATTACHED MINUTE ORDER. (tsher, ) (Entered: 03/25/2020) |
| 03/31/2020 | 25 | RESPONSE to 21 Partial MOTION to Dismiss filed by Plaintiff Emina Gerovic. (Davidovich, Nathan) (Entered: 03/31/2020) |
| 04/01/2020 | 26 | Joint MOTION for Leave to Appear *at Scheduling Conference by ZOOM* by Plaintiff Emina Gerovic. (Davidovich, Nathan) (Entered: 04/01/2020) |
| 04/01/2020 | 27 | MEMORANDUM regarding 26 Joint MOTION for Leave to Appear *at Scheduling Conference by ZOOM* filed by Emina Gerovic. Motion referred to Magistrate Judge N. Reid Neureiter. Entered by Judge Raymond P. Moore on 4/1/2020. (Text Only Entry) (rmsec ) (Entered: 04/01/2020) |
| 04/02/2020 | 28 | MINUTE ORDER denying 26 Motion to Conduct Scheduling Conference by Zoom by Magistrate Judge N. Reid Neureiter on 4/2/2020. PLEASE READ ATTACHED MINUTE ORDER. (tsher, ) (Entered: 04/02/2020) |
| 04/10/2020 | 29 | Unopposed MOTION for Extension of Time to File Response/Reply as to 21 Partial MOTION to Dismiss by Defendants City and County of Denver, Leroy Lemos, Kevin O'Neill, Murphy Robinson, James E. Williamson. (Felton, Shelby) (Entered: 04/10/2020) |
| 04/10/2020 | 30 | MEMORANDUM regarding 29 Unopposed MOTION for Extension of Time to File Response/Reply as to 21 Partial MOTION to Dismiss filed by City and County of Denver, James E. Williamson, Murphy Robinson, Kevin O'Neill, Leroy Lemos. Motion referred to Magistrate Judge N. Reid Neureiter. Entered by Judge Raymond P. Moore on 4/10/2020. Text Only Entry (cpear) (Entered: 04/10/2020) |
| 04/10/2020 | 31 | MINUTE ORDER granting 29 Motion for Extension of Time to File Reply by Magistrate Judge N. Reid Neureiter on 4/10/2020. PLEASE READ ATTACHED MINUTE ORDER. (tsher, ) (Entered: 04/10/2020) |
| 04/13/2020 | 32 | Proposed Scheduling Order by Plaintiff Emina Gerovic. (Davidovich, Nathan) (Entered: 04/13/2020) |
| 04/13/2020 | 33 | CONSENT to Jurisdiction of Magistrate Judge by Plaintiff Emina Gerovic All parties do not consent.. (Davidovich, Nathan) (Entered: 04/13/2020) |
| 04/16/2020 | 34 | Joint MOTION for Protective Order by Plaintiff Emina Gerovic. (Attachments: # 1 Proposed Order (PDF Only))(Davidovich, Nathan) (Entered: 04/16/2020) |
| 04/16/2020 | 35 | MEMORANDUM regarding 34 Joint MOTION for Protective Order filed by Emina Gerovic. Motion referred to Magistrate Judge N. Reid Neureiter. Entered by Judge Raymond P. Moore on 4/16/2020. (Text Only Entry) (rmsec ) (Entered: 04/16/2020) |
| 04/16/2020 | 36 | MINUTE ORDER granting 34 Motion for Protective Order by Magistrate Judge N. Reid Neureiter on 4/16/2020. The Stipulated Protective Order (Dkt. #34–1) is APPROVED and made an order of the court. (tsher, ) (Entered: 04/16/2020) |
| 04/16/2020 | 37 | STIPULATED PROTECTIVE ORDER by Magistrate Judge N. Reid Neureiter on 4/16/2020. (tsher, ) (Entered: 04/16/2020) |
| 04/21/2020 | 38 | COURTROOM MINUTES for proceedings held before Magistrate Judge N. Reid Neureiter: Telephonic Scheduling Conference held on 4/21/2020. Discovery due by 1/29/2021. Dispositive Motions due by 2/26/2021. Joint Status Report due by 11/2/2020. Final Pretrial Conference set for |

| | | |
|---|---|---|
| | | 3/16/2021 10:30 AM in Courtroom C203 before Magistrate Judge N. Reid Neureiter. FTR: Courtroom C203. (slibi, ) (Entered: 04/21/2020) |
| 04/21/2020 | 39 | SCHEDULING ORDER by Magistrate Judge N. Reid Neureiter on 4/21/2020. (slibi, ) (Entered: 04/21/2020) |
| 04/28/2020 | 40 | REPLY to Response to 21 Partial MOTION to Dismiss filed by Defendants City and County of Denver, Leroy Lemos, Kevin O'Neill, Murphy Robinson, James E. Williamson. (Felton, Shelby) (Entered: 04/28/2020) |
| 05/26/2020 | 41 | MINUTE ORDER The upcoming hearing in this matter shall be conducted via telephone. The parties are directed to call the conference line as a participant at (888) 398–2342, Access Code 5755390# at the scheduled time. The Court notes that the parties may hear the conclusion of a prior hearing at the time they call in, and are instructed to simply wait until their case is called. The Court thanks the parties in advance for their patience and flexibility as the Court implements this new technology. SO ORDERED, by Magistrate Judge N. Reid Neureiter on 5/26/2020. Text Only Entry. (slibi, ) (Entered: 05/26/2020) |
| 06/02/2020 | 42 | COURTROOM MINUTES for proceedings held before Magistrate Judge N. Reid Neureiter: Telephonic Motion Hearing held on 6/2/2020. ORDER taking under advisement 21 Motion for Partial Dismissal. FTR: Courtroom C203. (slibi, ) (Entered: 06/02/2020) |
| 06/05/2020 | 43 | MOTION to Amend/Correct/Modify 7 Amended Complaint by Plaintiff Emina Gerovic. (Attachments: # 1 Exhibit, # 2 Exhibit)(Davidovich, Nathan) (Entered: 06/05/2020) |
| 06/05/2020 | 44 | SUPPLEMENT/AMENDMENT to 43 MOTION to Amend/Correct/Modify 7 Amended Complaint by Plaintiff Emina Gerovic. (Davidovich, Nathan) Modified to correct event on 6/8/2020 (rvill, ). (Entered: 06/05/2020) |
| 06/05/2020 | 45 | MEMORANDUM regarding 43 MOTION to Amend/Correct/Modify 7 Amended Complaint filed by Emina Gerovic. Motion referred to Magistrate Judge N. Reid Neureiter. By Judge Raymond P. Moore on 6/5/2020. (Text Only Entry) (rmsec ) (Entered: 06/05/2020) |
| 06/08/2020 | 46 | MEMORANDUM regarding 44 MOTION to Amend/Correct/Modify filed by Emina Gerovic. Motion referred to Magistrate Judge N. Reid Neureiter. By Judge Raymond P. Moore on 6/8/2020. (Text Only Entry) (rmsec ) (Entered: 06/08/2020) |
| 06/26/2020 | 47 | RESPONSE to 43 MOTION to Amend/Correct/Modify 7 Amended Complaint , 44 MOTION to Amend/Correct/Modify filed by Defendant Joel Womick. (Attachments: # 1 Exhibit email correspondence, # 2 Exhibit correspondence)(Watts, Michael) (Entered: 06/26/2020) |
| 06/26/2020 | 48 | RESPONSE to 44 MOTION to Amend/Correct/Modify filed by Defendants City and County of Denver, Leroy Lemos, Kevin O'Neill, Murphy Robinson, James E. Williamson. (Felton, Shelby) (Entered: 06/26/2020) |
| 06/29/2020 | 49 | MINUTE ORDER by Magistrate Judge N. Reid Neureiter on 29 June 2020. It is HEREBY ORDERED that a telephonic Motion Hearing is set on July 16, 2020 at 2:30 p.m. The parties should be prepared to address Plaintiffs Opposed Motion for Leave to Amend the Complaint 44 . The parties are directed to call the conference line as a participant at (888) 398–2342, Access Code 5755390# at the scheduled time. PLEASE READ ATTACHED MINUTE ORDER. (cmadr, ) Modified to correct entry on 6/29/2020 (cmadr, ). (Entered: 06/29/2020) |
| 07/10/2020 | 50 | REPLY to Response to 44 MOTION to Amend/Correct/Modify *(Response by Womick)* filed by Plaintiff Emina Gerovic. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit)(Davidovich, Nathan) (Entered: 07/10/2020) |
| 07/10/2020 | 51 | REPLY to Response to 44 MOTION to Amend/Correct/Modify *(Response by City of Denver))* filed by Plaintiff Emina Gerovic. (Attachments: # 1 Exhibit)(Davidovich, Nathan) (Entered: 07/10/2020) |
| 07/16/2020 | 52 | COURTROOM MINUTES for proceedings held before Magistrate Judge N. Reid Neureiter: Telephonic Motion Hearing held on 7/16/2020. ORDERED granting 43 and 44 Opposed Motion for Leave to Amend the Complaint and File the ProposedSecond Amended Complaint and Jury Demand. The Second Amended Complaint [Docket No. 43–2] is DEEMED as filed as of todays date. FTR: Courtroom C203. (slibi, ) (Entered: 07/16/2020) |
| 07/16/2020 | 53 | SECOND AMENDED COMPLAINT AND JURY DEMAND against City and County of Denver, Leroy Lemos, Leroy (I) Lemos, Kevin O'Neill, Kevin (I) O'Neill, Murphy Robinson, Murphy (I) Robinson, James E. Williamson, James (I) E. Williamson, Joel Womick, Joel (I) |

**7**

| | | |
|---|---|---|
| | | Womick, Kyle Knoedler, Kyle (I) Knoedler, HSS, Inc., filed by Emina Gerovic.(slibi, ) (Entered: 07/16/2020) |
| 07/16/2020 | 54 | MINUTE ORDER by Magistrate Judge N. Reid Neureiter on 16 July 2020. The City Defendants are directed to submit, no later than July 21, 2020, a statement indicating whether they are adopting their Motion for Partial Dismissal 21 in response to the Amended Complaint 53 . In that event, the Court will treat the previously submitted motion as the City Defendants' response to the Second Amended Complaint and rule based on the previous briefing and argument. If Defendants do not wish to adopt their Motion for Partial Dismissal, they will be allowed to respond to the Amended Complaint in the time period allowed by the Federal Rules of Civil Procedure. PLEASE READ ATTACHED MINUTE ORDER. (cmadr, ) Modified to correct entry on 7/17/2020 (cmadr, ). (Entered: 07/17/2020) |
| 07/17/2020 | 55 | Renewed Motion for Partial Dismissal by Defendants City and County of Denver, Leroy Lemos, Leroy (I) Lemos, Kevin O'Neill, Kevin (I) O'Neill, Murphy Robinson, Murphy (I) Robinson, James E. Williamson, James (I) E. Williamson (Felton, Shelby) Modified to correct text entry and event on 7/17/2020 (rvill, ). (Entered: 07/17/2020) |
| 07/17/2020 | 56 | MEMORANDUM regarding 55 MOTION to Dismiss filed by Murphy (I) Robinson, City and County of Denver, Leroy (I) Lemos, James E. Williamson, Murphy Robinson, Kevin (I) O'Neill, Kevin O'Neill, Leroy Lemos, James (I) E. Williamson. Motion referred to Magistrate Judge N. Reid Neureiter. By Judge Raymond P. Moore on 7/17/2020. (Text Only Entry) (rmsec ) (Entered: 07/17/2020) |
| 08/06/2020 | 57 | *Partial* ANSWER to 53 Amended Complaint, by City and County of Denver, Leroy Lemos, Leroy (I) Lemos, Kevin O'Neill, Kevin (I) O'Neill, Murphy Robinson, Murphy (I) Robinson, James E. Williamson, James (I) E. Williamson.(Felton, Shelby) (Entered: 08/06/2020) |
| 08/06/2020 | 58 | *Defendant Joel Womick's* ANSWER to 53 Amended Complaint, *and Jury Demand* by Joel Womick.(Watts, Michael) (Entered: 08/06/2020) |
| 08/07/2020 | 59 | SUMMONS Returned Executed by Emina Gerovic. HSS, Inc. served on 7/31/2020, answer due 8/21/2020. (Davidovich, Nathan) (Entered: 08/07/2020) |
| 08/07/2020 | 60 | SUMMONS Returned Executed by Emina Gerovic. Kyle Knoedler served on 7/31/2020, answer due 8/21/2020. (Davidovich, Nathan) (Entered: 08/07/2020) |
| 08/20/2020 | 61 | *Defendant HSS, Inc.'s* ANSWER to 53 Amended Complaint, *and Jury Demand* Attorney Michael Alan Watts added to party HSS, Inc.(pty:dft) by HSS, Inc..(Watts, Michael) (Entered: 08/20/2020) |
| 08/20/2020 | 62 | *Defendant Kyle Knoedler's* ANSWER to 53 Amended Complaint, *and Jury Demand* Attorney Michael Alan Watts added to party Kyle Knoedler(pty:dft) by Kyle Knoedler.(Watts, Michael) (Entered: 08/20/2020) |
| 09/30/2020 | 63 | REPORT AND RECOMMENDATION ON CITY DEFENDANTS' RENEWED MOTION FOR PARTIAL DISMISSAL (Dkt. # 55 ) by Magistrate Judge N. Reid Neureiter on 30 September 2020. The Court RECOMMENDS that Defendant's Motion to Dismiss be GRANTED in part and DENIED in part. Specifically, the Court RECOMMENDS that Plaintiff's claim for hostile work environment be DISMISSED, that Plaintiff's Fourth Claim for Relief and all claims against Defendants O'Neill and Robinson be allowed to proceed. (cmadr, ) (Entered: 09/30/2020) |
| 09/30/2020 | 64 | Minute ORDER by Magistrate Judge N. Reid Neureiter on 30 September 2020. In light of the fact that a Second Amended Complaint and Jury Demand (Dkt. # 53 ), and City Defendant's Renewed Motion for Partial Dismissal (Dkt. # 55 ) were filed, the Motion for Partial Dismissal (Dkt. # 21 ) is DENIED as MOOT. PLEASE READ ATTACHED MINUTE ORDER. (cmadr, ) (Entered: 10/01/2020) |
| 11/02/2020 | 65 | Joint STATUS REPORT by Plaintiff Emina Gerovic. (Davidovich, Nathan) (Entered: 11/02/2020) |
| 11/06/2020 | 66 | Unopposed MOTION for Extension of Time to *Designate Experts* by Defendants City and County of Denver, HSS, Inc., Kyle Knoedler, Leroy Lemos, Kevin O'Neill, Murphy Robinson, James E. Williamson, Joel Womick. (Felton, Shelby) (Entered: 11/06/2020) |
| 11/06/2020 | 67 | MEMORANDUM regarding 66 Unopposed MOTION for Extension of Time to *Designate Experts* filed by City and County of Denver, Joel Womick, James E. Williamson, Murphy Robinson, Kyle Knoedler, Kevin O'Neill, Leroy Lemos, HSS, Inc. Motion referred to Magistrate Judge N. Reid Neureiter. By Judge Raymond P. Moore on 11/6/2020. (Text Only Entry) (rmsec ) |

| | | (Entered: 11/06/2020) |
|---|---|---|
| 11/06/2020 | 68 | Minute ORDER by Magistrate Judge N. Reid Neureiter on 6 November 2020. It is HEREBY ORDERED that Defendants' Unopposed Motion for Extension of Time to Designate Experts (Dkt. # 66 ) is GRANTED finding good cause shown.The deadline for Defendants to designate experts is extended to December 21, 2020. PLEASE READ ATTACHED MINUTE ORDER. (cmadr, ) (Entered: 11/06/2020) |
| 11/18/2020 | 69 | ORDER granting in part and denying in part 55 Motion to Dismiss; adopting Report and Recommendations re 63 Recommendation. By Judge Raymond P. Moore on November 18, 2020. (rvill, ) (Entered: 11/18/2020) |
| 11/19/2020 | 70 | Minute ORDER by Magistrate Judge N. Reid Neureiter on 19 November 2020. Per the request of the parties, it is hereby ORDERED that a Telephonic Discovery Hearing is set on November 24, 2020 at 1:00 p.m. The parties are directed to prepare and email to Chambers, Neureiter_Chambers@cod.uscourts.gov, by 12:00 NOON on November 23, 2020 a short (no longer than ten pages) joint statement setting forth each side's respective position concerning the dispute. The parties are advised that the joint statement will be attached to the courtroom minutes and made a part of the record. The parties are directed to call the conference line as a participant at (888) 398–2342, Access Code 5755390# at the scheduled time. PLEASE READ ATTACHED MINUTE ORDER. (cmadr, ) (Entered: 11/19/2020) |
| 11/24/2020 | 71 | COURTROOM MINUTES for proceedings held before Magistrate Judge N. Reid Neureiter: Telephonic Discovery Hearing held on 11/24/2020. FTR: Courtroom C203. (Attachments: # 1 Joint Discovery Statement) (slibi, ) (Entered: 11/24/2020) |
| 12/21/2020 | 72 | Unopposed MOTION for Extension of Time to *Provide Dr. Gundersen's Expert Report* by Defendants City and County of Denver, Leroy Lemos, Kevin O'Neill, Murphy Robinson, James E. Williamson. (Felton, Shelby) (Entered: 12/21/2020) |
| 12/21/2020 | 73 | JOINDER re 72 Unopposed MOTION for Extension of Time to *Provide Dr. Gundersen's Expert Report* by Defendants HSS, Inc., Kyle Knoedler, Joel Womick. (Watts, Michael) (Entered: 12/21/2020) |
| 12/22/2020 | 74 | MEMORANDUM regarding 72 Unopposed MOTION for Extension of Time to *Provide Dr. Gundersen's Expert Report* filed by City and County of Denver, James E. Williamson, Murphy Robinson, Kevin O'Neill, Leroy Lemos. Motion referred to Magistrate Judge N. Reid Neureiter. By Judge Raymond P. Moore on 12/22/2020. (Text Only Entry) (rmsec ) (Entered: 12/22/2020) |
| 12/22/2020 | 75 | Minute ORDER by Magistrate Judge N. Reid Neureiter on 22 December 2020. It is HEREBY ORDERED that the City Defendants' Unopposed Motion for a One–Day Extension of Time to Provide Dr. Gundersen's Expert Report, Dkt. # 72 , is GRANTED. The deadline for the City Defendants as well as Defendants, Joel Womick, Kyle Knoedler, and HSS, Inc. to submit the report for Dr. Gundersen is extended to December 22, 2020. PLEASE READ ATTACHED MINUTE ORDER. (cmadr, ) (Entered: 12/22/2020) |
| 01/06/2021 | 76 | Minute ORDER by Magistrate Judge N. Reid Neureiter on 6 January 2021. It is HEREBY ORDERED that a Telephonic Discovery Hearing is set on January 14, 2021 at 9:30 a.m. The parties are directed to prepare and email to Chambers by the close of business on January 12, 2021 a short (no longer than ten pages) joint statement setting forth each side's respective position concerning the dispute. The parties are advised that the joint statement will be attached to the courtroom minutes and made a part of the record. The parties are directed to call the conference line as a participant at (888) 398–2342, Access Code 5755390# at the scheduled time. PLEASE READ ATTACHED MINUTE ORDER. (cmadr, ) (Entered: 01/06/2021) |
| 01/07/2021 | 77 | MOTION to Amend/Correct/Modify 39 Scheduling Order by Plaintiff Emina Gerovic. (Davidovich, Nathan) (Entered: 01/07/2021) |
| 01/08/2021 | 78 | MEMORANDUM regarding 77 MOTION to Amend/Correct/Modify 39 Scheduling Order filed by Emina Gerovic. Motion referred to Magistrate Judge N. Reid Neureiter. By Judge Raymond P. Moore on 1/8/2021. (Text Only Entry) (rmsec ) (Entered: 01/08/2021) |
| 01/14/2021 | 79 | COURTROOM MINUTES for proceedings held before Magistrate Judge N. Reid Neureiter: Telephonic Discovery Hearing held on 1/14/2021. FTR: Courtroom C203. (Attachments: # 1 Joint Discovery Statement, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G, # 9 Exhibit H, # 10 Exhibit I, # 11 Exhibit J, # 12 Exhibit K, # 13 Exhibit L, # 14 Exhibit M) (slibi, ) (Entered: 01/14/2021) |

| 01/27/2021 | 80 | Proposed Scheduling Order *Revised* by Plaintiff Emina Gerovic. (Davidovich, Nathan) (Entered: 01/27/2021) |
|---|---|---|
| 02/02/2021 | 81 | Minute ORDER by Magistrate Judge N. Reid Neureiter on 2 February 2021. Finding good cause shown, it is HEREBY ORDERED that the Unopposed Motion to Amend Scheduling Order (Dkt. # 77 ) is GRANTED in part. The deadline for completion of discovery **includes depositions of all witnesses, lay and expert.** With that change, the parties' Proposed Amended Scheduling Order, Dkt. # 80 , is APPROVED and made an Order of the Court. PLEASE READ ATTACHED MINUTE ORDER. (cmadr, ) (Entered: 02/02/2021) |
| 02/02/2021 | 82 | SCHEDULING ORDER by Magistrate Judge N. Reid Neureiter on 2 February 2021. (cmadr, ) (Entered: 02/02/2021) |
| 02/06/2021 | 83 | TRANSCRIPT of Telephonic Discovery Hearing held on January 14, 2021 before Magistrate Judge Neureiter. Pages: 1–26. <span style="color:red">**NOTICE – REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.**</span> Transcript may only be viewed at the court public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (Patterson Transcription Company, ) (Entered: 02/06/2021) |
| 03/08/2021 | 84 | MINUTE ORDER by Magistrate Judge N. Reid Neureiter on 3/8/21. This matter is before the Court sua sponte. The Final Pretrial Conference set for 3/16/21 at 10:30 AM is VACATED and RESET to 6/3/2021 09:30 AM before Magistrate Judge N. Reid Neureiter. (nmarb, ) (Entered: 03/08/2021) |
| 05/03/2021 | 85 | Unopposed MOTION to Amend/Correct/Modify 39 Scheduling Order *Section 9(b)* by Defendants City and County of Denver, Leroy Lemos, Kevin O'Neill, Murphy Robinson, James E. Williamson. (Attachments: # 1 Proposed Order (PDF Only))(Ballinger, Natalia) (Entered: 05/03/2021) |
| 05/03/2021 | 86 | MEMORANDUM regarding 85 Unopposed MOTION to Amend/Correct/Modify 39 Scheduling Order *Section 9(b)* filed by City and County of Denver, James E. Williamson, Murphy Robinson, Kevin O'Neill, Leroy Lemos. Motion referred to Magistrate Judge N. Reid Neureiter. By Judge Raymond P. Moore on 5/3/2021. (Text Only Entry) (rmsec ) (Entered: 05/03/2021) |
| 05/04/2021 | 87 | Minute ORDER by Magistrate Judge N. Reid Neureiter on 4 May 2021. This matter comes before the Court on Defendants' Unopposed Motion to Amend Section 9(B) of the Scheduling Order. Dkt. # 85 . For the foregoing reasons, the Defendants' motion to delay expert depositions until after a decision on the yet to be filed dispositive motions is DENIED. Notwithstanding the denial of the Defendants' motion, recognizing that the Parties may have not predicted the denial of an unopposed scheduling motion, the Parties may have until June 1, 2021 to complete any expert depositions they do decide to take. PLEASE READ ATTACHED MINUTE ORDER. (cmadr, ) (Entered: 05/04/2021) |
| 05/10/2021 | 88 | MOTION for Extension of Time to *Submit Summary Judgment Motion and for Five−Page Enlargement of Page Limitation* by Defendants City and County of Denver, Leroy Lemos, Kevin O'Neill, Murphy Robinson, James E. Williamson. (Ballinger, Natalia) (Entered: 05/10/2021) |
| 05/11/2021 | 89 | ORDER granting 88 The City Defendants' Motion for Seven−day Extension of Time to Submit Summary Judgment Motion and for Five−page Enlargement of Page Limitation. SO ORDERED by Judge Raymond P. Moore on 5/11/2021. (Text Only Entry)(rmsec ) (Entered: 05/11/2021) |
| 05/12/2021 | 90 | MOTION for Extension of Time to *File Motion for Partial Summary Judgment* by Plaintiff Emina Gerovic. (Davidovich, Nathan) (Entered: 05/12/2021) |
| 05/12/2021 | 91 | ORDER granting in part and denying in part 90 Plaintiff's Motion for Seven−day Extension of Time to Submit Motion for Partial Summary Judgment Against Defendant, City and County of Denver, and the Individually Named City Employees. The Motion for Extension of Time to Submit Motion and Partial Summary Judgment Against Defendant, City and County of Denver, is GRANTED. The request for Forthwith Hearing is DENIED. It is further ORDERED that counsel shall serve the client in compliance with D.C.COLO.LCivR 6.1(c). Further requests for extensions or continuances may not be considered absent a showing of compliance with this Local Rule.SO ORDERED BY Judge Raymond P. Moore on 5/12/2021. (Text Only Entry)(rmsec ) (Entered: |

| | | 05/12/2021) |
|---|---|---|
| 05/14/2021 | 92 | MOTION for Summary Judgment by Defendants HSS, Inc., Kyle Knoedler, Joel Womick. (Watts, Michael) (Entered: 05/14/2021) |
| 05/14/2021 | 93 | STATEMENT *of Undisputed Material Facts* by Defendants HSS, Inc., Kyle Knoedler, James (I) E. Williamson, Joel Womick. (Attachments: # 1 Exhibit Ex 1 – Second Amended Complaint, # 2 Exhibit Ex 2 – HSS agreement highlighted, # 3 Exhibit Ex 3 – highlighted emails and BOLOs, # 4 Exhibit Ex 4 – highlighted plaintiff depo transcript_REVISED, # 5 Exhibit Ex 5 – highlighted Kyle Knoedler depo transcript_REVISED)(Watts, Michael) (Entered: 05/14/2021) |
| 05/14/2021 | 94 | STATEMENT re 92 MOTION for Summary Judgment *of Undisputed Material Facts* by Defendants HSS, Inc., Kyle Knoedler, Joel Womick. (Attachments: # 1 Exhibit Ex 1 – Second Amended Complaint, # 2 Exhibit Ex 2 – HSS agreement highlighted, # 3 Exhibit Ex 3 – highlighted emails and BOLOs, # 4 Exhibit Ex 4 – highlighted plaintiff depo transcript_REVISED, # 5 Exhibit Ex 5 – highlighted Kyle Knoedler depo transcript_REVISED)(Watts, Michael) (Entered: 05/14/2021) |
| 05/21/2021 | 95 | MOTION for Partial Summary Judgment by Plaintiff Emina Gerovic. (Davidovich, Nathan) (Entered: 05/21/2021) |
| 05/21/2021 | 96 | STATEMENT re 95 MOTION for Partial Summary Judgment *(Statement of Undisputed Material Facts)* by Plaintiff Emina Gerovic. (Attachments: # 1 Exhibit Affidavit of Emina Gerovic, # 2 Exhibit Notification of dismissal, # 3 Exhibit Facebook posts, # 4 Exhibit Excerpts from Lemos Deposition, # 5 Exhibit Excerpts of Gerovic deposition, # 6 Exhibit Excerpts of Carter deposition, # 7 Exhibit Excerpts of Howard Deposition, # 8 Exhibit Excerpts of Kevin O'Neil Deposition)(Davidovich, Nathan) (Entered: 05/21/2021) |
| 05/21/2021 | 97 | MOTION for Summary Judgment by Defendants City and County of Denver, Leroy Lemos, Kevin O'Neill, Murphy Robinson, James E. Williamson. (Felton, Shelby) (Entered: 05/21/2021) |
| 05/21/2021 | 98 | STATEMENT re 97 MOTION for Summary Judgment by Defendants City and County of Denver, Leroy Lemos, Kevin O'Neill, Murphy Robinson, James E. Williamson. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21, # 22 Exhibit 22, # 23 Exhibit 23, # 24 Exhibit 24, # 25 Exhibit 25, # 26 Exhibit 26, # 27 Exhibit 27, # 28 Exhibit 28, # 29 Exhibit 29, # 30 Exhibit 30, # 31 Exhibit 31, # 32 Exhibit 32, # 33 Exhibit 33, # 34 Exhibit 34, # 35 Exhibit 35, # 36 Exhibit 36, # 37 Exhibit 37, # 38 Exhibit 38, # 39 Exhibit 39, # 40 Exhibit 40, # 41 Exhibit 41, # 42 Exhibit 42, # 43 Exhibit 43, # 44 Exhibit 44, # 45 Exhibit 45, # 46 Exhibit 46)(Felton, Shelby) (Entered: 05/21/2021) |
| 05/27/2021 | 99 | Proposed Pretrial Order by Defendants City and County of Denver, Leroy Lemos, Kevin O'Neill, Murphy Robinson, James E. Williamson. (Attachments: # 1 Defendants' Exhibit List)(Felton, Shelby) (Entered: 05/27/2021) |
| 06/01/2021 | 100 | Unopposed MOTION for Extension of Time to File Response/Reply as to 97 MOTION for Summary Judgment by Plaintiff Emina Gerovic. (Davidovich, Nathan) (Entered: 06/01/2021) |
| 06/01/2021 | 101 | ORDER granting 100 Plaintiff's Unopposed Motion for Extension of Time to Respond to Motion for Summary Judgment Filed by Defendant, City and County of Denver, and the Individually Named City Employees. Plaintiff shall have up to and including June 28, 2021, in which to respond to the Motion for Summary Judgment 97 . SO ORDERED by Judge Raymond P. Moore on 6/1/2021. (Text Only Entry)(rmsec ) (Entered: 06/01/2021) |
| 06/03/2021 | 102 | BRIEF in Opposition to 92 MOTION for Summary Judgment filed by Plaintiff Emina Gerovic. (Davidovich, Nathan) (Entered: 06/03/2021) |
| 06/03/2021 | 103 | STATEMENT re 102 Brief in Opposition to Motion by Plaintiff Emina Gerovic. (Attachments: # 1 Exhibit Womick Depo Excerpts, # 2 Exhibit 2nd Amended Complaint, # 3 Magistrate Judge Consent Form Notice of change of Work Location, # 4 Exhibit Excerpts from Knoedler Deposition, # 5 Exhibit Excerpts of Gerovic deposition, # 6 Exhibit Memo of Expectations, # 7 Exhibit Emails re BOLO posters)(Davidovich, Nathan) (Entered: 06/03/2021) |
| 06/03/2021 | 104 | COURTROOM MINUTES for proceedings held before Magistrate Judge N. Reid Neureiter: Telephonic Final Pretrial Conference held on 6/3/2021. FTR: Courtroom C203. (slibi, ) (Entered: 06/04/2021) |

| 06/03/2021 | 105 | FINAL PRETRIAL ORDER by Magistrate Judge N. Reid Neureiter on 6/03/2021. (Attachments: # 1 Defendants Exhibit List) (slibi, ) (Entered: 06/04/2021) |
| 06/04/2021 | 106 | MINUTE ORDER: In light of the Final Pretrial Order (ECF No. 105), it is ORDERED that counsel shall jointly contact the Court's Judicial Assistant via email (Deanne_bader@cod.uscourts.gov) by the close of business on Tuesday, June 8, 2021, to obtain trial dates. SO ORDERED by Judge Raymond P. Moore on 6/4/2021. (Text Only Entry) (rmsec ) (Entered: 06/04/2021) |
| 06/10/2021 | 107 | ORDER Setting Case for Trial. This matter has been scheduled for a seven–day jury trial on the docket of Judge Raymond P. Moore in the U.S. District Court, Courtroom A601, 6th Floor, 901 19th Street, Denver, Colorado to commence on August 1, 2022 at 9:00 a.m. On the first day of trial to a jury, counsel are expected to be present at 8:30 a.m. to goover any final matters before the commencement of trial. A Trial Preparation Conference is set for July 14, 2022 at 10:00 a.m. Counsel who will try the case shall attend in person. ORDERED by Judge Raymond P. Moore on June 10, 2021. (rvill, ) (Entered: 06/10/2021) |
| 06/10/2021 | 108 | MOTION for Judgment on the Pleadings by Defendants City and County of Denver, Leroy Lemos, Kevin O'Neill, Murphy Robinson, James E. Williamson. (Felton, Shelby) (Entered: 06/10/2021) |
| 06/10/2021 | 109 | RESPONSE to 95 MOTION for Partial Summary Judgment filed by Defendants City and County of Denver, Leroy Lemos, Kevin O'Neill, Murphy Robinson, James E. Williamson. (Felton, Shelby) (Entered: 06/10/2021) |
| 06/10/2021 | 110 | RESPONSE *to Plaintiff's Statement of Undisputed Material Facts Contained in her Motion for Partial Summary Judgment* by Defendants City and County of Denver, Leroy Lemos, Kevin O'Neill, Murphy Robinson, James E. Williamson. (Attachments: # 1 Ex. A–1, # 2 Ex. A–2, # 3 Ex. A–3, # 4 Ex. A–4, # 5 Ex. A–5, # 6 Ex. A–6, # 7 Ex. A–7, # 8 Ex. A–8)(Felton, Shelby) (Entered: 06/10/2021) |
| 06/17/2021 | 111 | REPLY to Response to 92 MOTION for Summary Judgment filed by Defendants HSS, Inc., Kyle Knoedler, Joel Womick. (Watts, Michael) (Entered: 06/17/2021) |
| 06/17/2021 | 112 | REPLY to Response to 92 MOTION for Summary Judgment *Separate Statement of Undisputed Facts* filed by Defendants HSS, Inc., Kyle Knoedler, Joel Womick. (Watts, Michael) (Entered: 06/17/2021) |
| 06/24/2021 | 113 | REPLY to Response to 95 MOTION for Partial Summary Judgment filed by Plaintiff Emina Gerovic. (Davidovich, Nathan) (Entered: 06/24/2021) |
| 06/28/2021 | 114 | MOTION for Leave to File Excess Pages by Plaintiff Emina Gerovic. (Davidovich, Nathan) (Entered: 06/28/2021) |
| 06/28/2021 | 115 | BRIEF in Opposition to 97 MOTION for Summary Judgment *by Defendant, City & County of Denver* filed by Plaintiff Emina Gerovic. (Davidovich, Nathan) (Entered: 06/28/2021) |
| 06/28/2021 | 116 | STATEMENT re 115 Brief in Opposition to Motion *(OSUMF)* by Plaintiff Emina Gerovic. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit, # 11 Exhibit, # 12 Exhibit, # 13 Exhibit, # 14 Exhibit, # 15 Exhibit, # 16 Exhibit, # 17 Exhibit, # 18 Exhibit, # 19 Exhibit, # 20 Exhibit)(Davidovich, Nathan) (Entered: 06/28/2021) |
| 06/29/2021 | 117 | ORDER granting 114 Plaintiff's Motion for Four–page Enlargement of Page Limitation. SO ORDERED by Judge Raymond P. Moore on 6/29/2021. (Text Only Entry)(rmsec ) (Entered: 06/29/2021) |
| 06/30/2021 | 118 | Unopposed MOTION for Leave to *file a Surreply to* 112 Reply to Response to Motion by Plaintiff Emina Gerovic. (Davidovich, Nathan) (Entered: 06/30/2021) |
| 06/30/2021 | 119 | ORDER: This matter is before the Court on Plaintiff's unopposed Motion for Leave to File Surreply 118 , arguing that Defendants raised new arguments in their reply brief to which Plaintiffs seek leave to address in a surreply. The Court has considered the issue and finds that additional briefing is warranted. Accordingly, Plaintiff's Motion 118 is **GRANTED**. Plaintiff's surreply is limited to ten (10) pages and is due on or before July 14, 2021. SO ORDERED by Judge Raymond P. Moore on 6/30/2021. (Text Only Entry)(rmsec ) (Entered: 06/30/2021) |
| 06/30/2021 | 120 | Unopposed MOTION for Extension of Time to File Response/Reply as to 97 MOTION for Summary Judgment by Defendants City and County of Denver, Leroy Lemos, Kevin O'Neill, |

| | | Murphy Robinson, James E. Williamson. (Felton, Shelby) (Entered: 06/30/2021) |
|---|---|---|
| 07/01/2021 | 121 | RESPONSE to 108 MOTION for Judgment on the Pleadings filed by Plaintiff Emina Gerovic. (Davidovich, Nathan) (Entered: 07/01/2021) |
| 07/01/2021 | 122 | ORDER granting 120 City Defendants' Unopposed Motion for a 14–day Extension of Time To Submit the Reply in Support of their Motion for Summary Judgment. City Defendants shall have up to and including July 26, 2021, in which to file a reply. SO ORDERED by Judge Raymond P. Moore on 7/1/2021. (Text Only Entry)(rmsec) (Entered: 07/01/2021) |
| 07/07/2021 | 123 | SURREPLY re 92 MOTION for Summary Judgment *of DEFENDANTS JOEL WOMICK, KYLE KNOEDLER, AND HSS, INC.* filed by Plaintiff Emina Gerovic. (Davidovich, Nathan) (Entered: 07/07/2021) |
| 07/15/2021 | 124 | REPLY to Response to 108 MOTION for Judgment on the Pleadings filed by Defendants City and County of Denver, Leroy Lemos, Kevin O'Neill, Murphy Robinson, James E. Williamson. (Attachments: # 1 Exhibit A–1)(Felton, Shelby) (Entered: 07/15/2021) |
| 07/21/2021 | 125 | REPLY to Response to 97 MOTION for Summary Judgment filed by Defendants City and County of Denver, Leroy Lemos, Kevin O'Neill, Murphy Robinson, James E. Williamson. (Felton, Shelby) (Entered: 07/21/2021) |
| 07/21/2021 | 126 | STATEMENT re 125 Reply to Response to Motion *for Summary Judgment* by Defendants City and County of Denver, Leroy Lemos, Kevin O'Neill, Murphy Robinson, James E. Williamson. (Attachments: # 1 Exhibit 47, # 2 Exhibit 48, # 3 Exhibit 49, # 4 Exhibit 50, # 5 Exhibit 51, # 6 Exhibit 52, # 7 Exhibit 53, # 8 Exhibit 54, # 9 Exhibit 55, # 10 Exhibit 56, # 11 Exhibit 57)(Felton, Shelby) (Entered: 07/21/2021) |
| 07/25/2021 | 127 | MOTION for Leave to *file a Surreply to* 124 Reply to Response to Motion, by Plaintiff Emina Gerovic. (Davidovich, Nathan) (Entered: 07/25/2021) |
| 07/28/2021 | 128 | ORDER: This matter is before the Court on Plaintiff's opposed Motion for Leave to File Surreply 127 , arguing that Defendants raised new arguments in their reply brief to which Plaintiff seeks leave to address in a surreply. The Court finds no response is required before ruling. *See* D.C.COLO.LCivR 7.1(d) ("Nothing in this rule precludes a judicial officer from ruling on a motion at any time after it is filed."). The Court has considered the matter and finds that if any new arguments have been raised in the reply, the Court will not rely on them. *Pippin v. Burlington Res. Oil and Gas Co.*, 440 F.3d 1186, 1192 (10th Cir. 2006) ("If the district court does preclude a surreply, then the court can avoid error only by not relying on the new materials and arguments in the movants reply brief."). Accordingly, the Motion 127 is **DENIED**. SO ORDERED by Judge Raymond P. Moore on 7/28/2021. (Text Only Entry)(rmsec ) (Entered: 07/28/2021) |
| 01/04/2022 | 129 | ORDER granting 92 Motion for Summary Judgment, denying 95 Motion for Partial Summary Judgment, granting 97 Motion for Summary Judgment, granting 108 Motion for Judgment on the Pleadings. Judgment shall enter accordingly. Entered by Judge Raymond P. Moore on 1/4/2022. (cpear) (Entered: 01/04/2022) |
| 01/04/2022 | 130 | FINAL JUDGMENT pursuant to 129 Order. Entered by the Clerk of the Court on 1/4/2022. (cpear) (Entered: 01/04/2022) |
| 01/18/2022 | 131 | Proposed Bill of Costs by Defendants City and County of Denver, Leroy Lemos, Kevin O'Neill, Murphy Robinson, James E. Williamson. (Attachments: # 1 Proposed Document, # 2 Exhibit 1, # 3 Exhibit 2)(Felton, Shelby) (Entered: 01/18/2022) |
| 01/18/2022 | 132 | NOTICE by Clerk re: Bill of Costs Hearing re: 131 Proposed Bill of Costs. As set in the Proposed Bill, the hearing for this matter will be held on Feb. 1, 2022 at 9:30 a.m. MST. The hearing will be held IN PERSON – the parties are directed to have counsel asserting the Proposed Bill of Costs and opposing counsel presenting objections be physically present for the hearing. The hearing will be held in Courtroom A201 (2nd floor) of the Arraj U.S. Courthouse. DEFENDANTS ARE ALSO DIRECTED TO FILE AN AMENDED PROPOSED BILL OF COSTS – the Amended Bill must contain an Itemization Chart that follows the directions contained in the Guide to Bills of Costs hearings, attached. See p. 17 of the Guide. The Clerk reminds the parties that a Statement of Conferral must be filed no later than the day before the hearing in order to confirm the attempts to reach a settlement on either some or all of the requested costs, per local rule LCivR 54.1, and to confirm the parties have utilized the Clerk's Guide to Bills of Cost Hearings in their discussions. Finally, the Clerk strongly encourages the parties to reach an agreement as to individual costs items – or preferably – a global settlement, in light of the Rule One directive that the court and PARTIES work to secure the just, speedy, and inexpensive determination of every action and |

| | | |
|---|---|---|
| | | proceeding. (ashee) (Entered: 01/18/2022) |
| 01/25/2022 | 133 | Proposed Bill of Costs *Stipulated and Amended* by Defendants City and County of Denver, Leroy Lemos, Kevin O'Neill, Murphy Robinson, James E. Williamson. (Attachments: # 1 Exhibit A, # 2 Exhibit A−1, # 3 Exhibit A−2, # 4 Exhibit A−3, # 5 Exhibit A−4, # 6 Exhibit A−5, # 7 Exhibit A−6, # 8 Exhibit A−7, # 9 Exhibit A−8, # 10 Exhibit A−9)(Felton, Shelby) (Entered: 01/25/2022) |
| 01/26/2022 | 134 | Costs Taxed by Clerk in the amount of $6,980.52 against Plaintiff Gerovic and in favor of Defendant City & County of Denver, et al. Costs awarded pursuant to the parties' Stipulation (Docket No. 133). The hearing set for Feb. 1, 2022 is accordingly VACATED. (ashee) (Entered: 01/26/2022) |
| 02/01/2022 | 135 | MOTION to Amend/Correct/Modify 129 Order on Motion for Summary Judgment,, Order on Motion for Partial Summary Judgment,,,, Order on Motion for Judgment on the Pleadings, by Plaintiff Emina Gerovic. (Davidovich, Nathan) (Entered: 02/01/2022) |
| 02/16/2022 | 136 | RESPONSE to 135 MOTION to Amend/Correct/Modify 129 Order on Motion for Summary Judgment,, Order on Motion for Partial Summary Judgment,,,, Order on Motion for Judgment on the Pleadings, filed by Defendants City and County of Denver, Leroy Lemos, Kevin O'Neill, Murphy Robinson, James E. Williamson. (Attachments: # 1 Exhibit A)(Ballinger, Natalia) (Entered: 02/16/2022) |
| 03/01/2022 | 137 | REPLY to Response to 135 MOTION to Amend/Correct/Modify 129 Order on Motion for Summary Judgment,, Order on Motion for Partial Summary Judgment,,,, Order on Motion for Judgment on the Pleadings, filed by Plaintiff Emina Gerovic. (Davidovich, Nathan) (Entered: 03/01/2022) |
| 03/08/2022 | 138 | Unopposed MOTION for Leave to *File Sur−Reply in Opposition to* 135 MOTION to Amend/Correct/Modify 129 Order on Motion for Summary Judgment,, Order on Motion for Partial Summary Judgment,,,, Order on Motion for Judgment on the Pleadings, by Defendants City and County of Denver, Leroy Lemos, Kevin O'Neill, Murphy Robinson, James E. Williamson. (Felton, Shelby) (Entered: 03/08/2022) |
| 03/17/2022 | 139 | ORDER granting City Defendants' Unopposed Motion for Leave to File Surreply in Opposition to Plaintiff's Rule 59(e) Motion to Alter or Amend Judgment 138 . SO ORDERED by Judge Raymond P. Moore on 3/17/2022. (Text Only Entry)(rmsec ) (Entered: 03/17/2022) |
| 03/29/2022 | 140 | SURREPLY re 135 MOTION to Amend/Correct/Modify 129 Order on Motion for Summary Judgment,, Order on Motion for Partial Summary Judgment,,,, Order on Motion for Judgment on the Pleadings, filed by Defendants City and County of Denver, Leroy Lemos, Kevin O'Neill, Murphy Robinson, James E. Williamson. (Felton, Shelby) (Entered: 03/29/2022) |
| 04/05/2022 | 141 | ORDER denying 135 Motion to Alter or Amend Judgment. By Judge Raymond P. Moore on 04/05/2022.(sdunb, ) (Entered: 04/05/2022) |
| 05/03/2022 | 142 | NOTICE OF APPEAL by Plaintiff Emina Gerovic (Filing fee $ 505, Receipt Number BCODC−8437829) (Davidovich, Nathan) (Entered: 05/03/2022) |
| 05/04/2022 | 143 | LETTER Transmitting Notice of Appeal to all counsel advising of the transmittal of the 142 Notice of Appeal filed by Emina Gerovic to the U.S. Court of Appeals. ( Retained Counsel, Fee paid,) (Attachments: # 1 Docket Sheet, # 2 Preliminary Record)(sdunb, ) (Entered: 05/04/2022) |
| 05/04/2022 | 144 | USCA Case Number 22−1148 for 142 Notice of Appeal filed by Emina Gerovic. (sdunb, ) (Entered: 05/04/2022) |
| 05/16/2022 | 145 | TRANSCRIPT ORDER FORM re 142 Notice of Appeal *No Transcript Necessary* by Plaintiff Emina Gerovic (Davidovich, Nathan) (Entered: 05/16/2022) |
| 05/16/2022 | 146 | LETTER TO USCA and all counsel certifying the record is complete as to 142 Notice of Appeal filed by Emina Gerovic. A transcript order form was filed stating that a transcript is not necessary. ( Appeal No. 22−1148) Text Only Entry (sdunb, ) (Entered: 05/16/2022) |

# TABLE OF CONTENTS

City Defendants' Motion for Summary Judgment ....................................................7

City Defendants' Separate Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment.........................................................................33

Exhibit 1 to City Defendants' Separate Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment – Lemos Deposition...................56

Exhibit 2 to City Defendants' Separate Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment – Gerovic Deposition.................62

Exhibit 3 to City Defendants' Separate Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment – Robinson Declaration .............86

Exhibit 4 to City Defendants' Separate Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment – Lemos Declaration..................89

Exhibit 5 to City Defendants' Separate Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment – Career Service Rule 16 ...........95

Exhibit 6 to City Defendants' Separate Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment – Carter Declaration ................108

Exhibit 7 to City Defendants' Separate Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment – 9/21/15 email re: Verbal Reprimand ............................................................................................................114

Exhibit 8 to City Defendants' Separate Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment – 10/1/15 email re: Verbal Warning.................................................................................................................116

Exhibit 9 to City Defendants' Separate Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment – 6/13/16 memo re: Documented Counseling Conversation ......................................................................................117

Exhibit 10 to City Defendants' Separate Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment – Plaintiff's Response to City Defendants' Discovery Requests ...........................................................................118

Exhibit 11 to City Defendants' Separate Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment – 3/17/17 memo re: Documented Counseling Conversation ..........................................................................................133

Exhibit 12 to City Defendants' Separate Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment – 5/4/17 Written Reprimand ....134

Exhibit 13 to City Defendants' Separate Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment – Pollard Statement ..................142

Exhibit 14 to City Defendants' Separate Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment – Palin email ...........................149

Exhibit 15 to City Defendants' Separate Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment – Lorman Declaration ..............150

Exhibit 16 to City Defendants' Separate Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment – Gerovic time card .................152

Exhibit 17 to City Defendants' Separate Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment – Final Admission of Liability.161

Exhibit 18 to City Defendants' Separate Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment – Forsberg testimony ...............162

Exhibit 19 to City Defendants' Separate Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment – Facebook posts.....................167

Exhibit 20 to City Defendants' Separate Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment – 9/9/17 Notification of Contemplation of Disciplinary Action .................................................................175

Exhibit 21 to City Defendants' Separate Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment – Notice of Change in Work Location ...............................................................................................................180

Exhibit 22 to City Defendants' Separate Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment – 11/27/17 Notification of Dismissal ...........................................................................................................181

Exhibit 23 to City Defendants' Separate Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment – Lemos testimony...................190

Exhibit 24 to City Defendants' Separate Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment – O'Neil testimony ..................193

Exhibit 25 to City Defendants' Separate Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment – O'Neil Declaration................200

Exhibit 26 to City Defendants' Separate Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment – 9/22/17 memo re: Documented Conversation with Emina Gerovic.........................................................................203

Exhibit 27 to City Defendants' Separate Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment – 9/21/17 and 9/22/17 Statements re: Employee Meeting/Incident................................................................................204

Exhibit 28 to City Defendants' Separate Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment – Robinson testimony…. .........207

Exhibit 29 to City Defendants' Separate Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment – Carter deposition...................214

Exhibit 30 to City Defendants' Separate Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment – 9/22/17 Administrative Leave Action Notice ........................................................................................................220

Exhibit 31 to City Defendants' Separate Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment – Vander Kooy memo..............223

Exhibit 32 to City Defendants' Separate Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment – 9/22/17 BOLO ......................224

Exhibit 33 to City Defendants' Separate Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment – 10/3/17 Notice of Change in Work Location .......................................................................................................225

Exhibit 34 to City Defendants' Separate Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment – 9/21/17 Notice of Change in Work Location .......................................................................................................226

Exhibit 35 to City Defendants' Separate Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment – Incident Statement ................227

Exhibit 36 to City Defendants' Separate Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment – Escobedo testimony ..............230

Exhibit 37 to City Defendants' Separate Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment – Notification of Contemplation of Disciplinary Action .................................................................................................236

Exhibit 38 to City Defendants' Separate Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment – Williamson testimony….........245

Exhibit 39 to City Defendants' Separate Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment – Williamson declaration…......249

Exhibit 40 to City Defendants' Separate Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment – 11/21/17 Gerovic FMLA Leave Approval....................................................................................................................251

Exhibit 41 to City Defendants' Separate Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment – 12/15/17 Gerovic FMLA Leave Approval....................................................................................................................253

Exhibit 42 to City Defendants' Separate Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment – Charge of Discrimination .....255

Exhibit 43 to City Defendants' Separate Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment – Chacon Notification of Dismissal Disciplinary Action ...............................................................................261

Exhibit 44 to City Defendants' Separate Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment – Garcia Notification of Involuntary Demotion Disciplinary Action .........................................................269

Exhibit 45 to City Defendants' Separate Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment – Facilities Management Administrative Policies .............................................................................................277

Exhibit 46 to City Defendants' Separate Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment – email re: incident at Denver NE Dlo entrance ..........................................................................................................288

Certificate of Digital Submission and Privacy Redactions....................................290

Certificate of Service ............................................................................................291

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Case No. 19-cv-03710-RM-NRN

EMINA GEROVIC,

Plaintiff,

v.

CITY AND COUNTY OF DENVER, a Body politic and corporate of the State of Colorado,
acting by and through its DEPARTMENT OF GENERAL SERVICES and FACILITIES
MANAGEMENT OPERATIONS;
LEROY LEMOS, in his official capacity as Facilities Management Operations Supervisor at the
Department of General Services, and in his individual capacity;
MURPHY ROBINSON, in his official capacity as Executive Director of General Services, and
in his individual capacity;
JAMES E. WILLIAMSON, in his official capacity as Facilities Management Operations
Director at the Department of General Services, and in his individual capacity;
KEVIN O'NEIL, in his official capacity as Facilities Management Operations Deputy Director at
the Department of General Services, and in his individual capacity;
JOEL WOMICK, in his official capacity as DGS Contingent Worker at HSS Inc., and in his
individual capacity;
KYLE KNOEDLER, in his official capacity as DGS Facility Supervisor of HSS Inc., and in his
individual capacity; and
HSS, INC., a Colorado Corporation, acting as a hired agent by the City and County of Denver,
by and through their contingent workers, Joel Womick, Kyle Knoedler, and others,

Defendants.

---

**CITY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

---

Pursuant to Fed.R.Civ.P. 56, Defendants the City and County of Denver, the Department

of General Services and Facilities Management ("the City"), Leroy Lemos, Murphy Robinson,

James Williamson, and Kevin O'Neil (collectively, the "City Defendants") respectfully submit

their Motion for Summary Judgment seeking judgment in their favor on all claims asserted in this

action.

## I.    INTRODUCTION AND BACKGROUND

Plaintiff, a former custodian employed by the City & County of Denver, alleges the City Defendants discriminated against her based on her race/color (Caucasian) and retaliated against her for engaging in protected activity in violation of Title VII; discriminated against her in violation of 42 U.S.C. § 1981; and retaliated against her for taking FMLA leave.  Specifically, Plaintiff maintains Defendant LeRoy Lemos discriminated against non-Hispanic employees, and that the remaining City Defendants allowed him to carry out his agenda, culminating in Plaintiff's termination on November 27, 2017.

Contrary to Plaintiff's allegations, the undisputed record evidence establishes James Williamson terminated Plaintiff based on her violation of the City's Career Service Rules.  Significantly, Plaintiff's public Facebook page identified her profession as "Police Officer," identified her employer as the "Denver Police Department," and included photographs of Plaintiff wearing a shirt with the DPD emblem, wearing a DPD patrol hat, and wearing a sweatshirt with DPD insignia.  (MSUMF at ¶¶ 58-59.)  The City, which was alerted to these Facebook posts by a Caucasian employee (MSUMF at ¶ 28), deemed that misconduct to be dishonest, unprofessional, and dangerous.  In addition, the City found Plaintiff to have been untruthful in explaining these posts, deceptive in other statements to supervisors, and to have made negative and disruptive comments about other employees.  (MSUMF at ¶¶ 60-61.)  For these reasons, Mr. Williamson terminated Plaintiff, and did not consider Plaintiff's race in doing so.  (MSUMF at ¶¶ 51-52.)

Plaintiff faces numerous hurdles in justifying a trial in this matter. First, as an overarching matter, most of the allegedly discriminatory acts on which Plaintiff bases her claims are time-barred or are not adverse actions as a matter of law. Second, because this is a reverse-discrimination lawsuit, Plaintiff must proffer objective proof that the City is one of the rare

employers that engages in systemic discrimination against the majority. Third, Mr. Lemos, the alleged discriminator in this matter, served on the hiring committee for Plaintiff, recommended her hire to the City, and was not involved in the decision to terminate her. (MSUMF at ¶¶ 2, 53.) Finally, Plaintiff herself concedes that some of the City Defendants engaged in no wrongdoing, and that she would have been terminated absent engaging in any protected activity. (MSUMF at ¶¶ 5, 7, 56, 57.) Based on the foregoing, and because Plaintiff fails to proffer evidence supporting an inference of each element essential to her claims, City Defendants are entitled to summary judgment.

## II.    ARGUMENT

### A.    <u>Summary Judgment Standard</u>

The purpose of summary judgment is to "pierce the pleadings" and assess the proof to determine whether there is a genuine need for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A court shall grant summary judgment if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). A fact is material only if it might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). While the initial burden is on the moving party to demonstrate there are no genuine issues of material fact, this burden may be discharged by showing an absence of evidence to support an essential element of the non-movant's claim. *Celotex Corp. v. Cattrett*, 477 U.S. 317, 323 (1986).

The non-movant must proffer evidence demonstrating the existence of a *genuine* material issue of fact for trial. Fed.R.Civ.P. 56(e); *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly

3

**22**

supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."). "To avoid summary judgment, the nonmovant must establish, at a minimum, an inference of the presence of each element essential to the case." *Chawla v. Lockheed Martin Corp*., 69 F.Supp.3d 1107, 1123 (D.Colo. Sept. 22, 2014) (citation omitted).

**B.**     **The City Defendants Are Entitled to Summary Judgment on All of Plaintiff's Claims**.

Plaintiff alleges that the City Defendants discriminated against her in violation of Title VII, 42 U.S.C. § 1981 through 42 U.S.C. § 1983; and unlawfully retaliated against her for engaging in protected activities under Title VII and the FMLA. Where, as here, there is no direct evidence of discrimination, Plaintiff must rely on the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973) to prove the City's discriminatory animus with respect to each of these claims. *Chawla*, 69 F.Supp.3d at 1124 (applying *McDonnell Douglas* to Title VII discrimination claim); *Jackson v. City & County of Denver*, 628 F.Supp.2d 1275, 1284-85 (D.Colo. 2008) (applying *McDonnell Douglas* to Title VII retaliation claim); *Richmond v. ONEOK, Inc*., 120 F.3d 205, 208-09 (10th Cir. 1997) (analyzing FMLA retaliation claim under *McDonnell Douglas*); *Kendrick v. Penske Transp. Servs., Inc*., 220 F.3d 1220, 1225-26 (10th Cir. 2000) (applying *McDonnell Douglas* to 42 U.S.C. § 1981 and § 1983).

Under this framework, Plaintiff bears the initial burden of establishing a *prima facie* case of discrimination/retaliation. *Daniels v. United Parcel Serv., Inc*., 701 F.3d 620, 638 (10th Cir. 2012). If she does, the burden shifts to City Defendants to state a legitimate, non-discriminatory reason for the adverse action. *Id*. This is a burden of production, not of persuasion. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-55 (1981). If City Defendants articulate a non-discriminatory reason, the Court must grant summary judgment in their favor unless Plaintiff can show a genuine issue of material fact as to whether the stated reason for the adverse action is

4

pretextual.  The "ultimate burden" of proving intentional discrimination remains "at all times" with Plaintiff.  *Id.* at 253.

### 1.  Plaintiff's Title VII Discrimination Claim (Claim I) Fails as a Matter of Law.

Plaintiff alleges that the City discriminated against her based on her race/color (Caucasian/non-Hispanic).[1]  Because Plaintiff is Caucasian and not a member of a minority race, her claim is one for reverse race/color discrimination.  *Morgan v. Goodwill Indus. of Denver, Inc*., No. 12-cv-00274-WYD-CBS, 2013 WL 6728777, *8 (D.Colo. Dec. 20, 2013) (applying reverse discrimination analysis where the plaintiff alleged disparate treatment because she was "White, European/non-Hispanic").  Plaintiff's burden to establish a *prima facie* case under a reverse-discrimination theory "requires a stronger showing" than in traditional discrimination actions.  *Argo v. Blue Cross & Blue Shield of Kan., Inc*., 452 F.3d 113, 1201 (10th Cir. 2006).

To assert a *prima face* case of reverse race/color discrimination, Plaintiff must demonstrate: (1) background circumstances that support an inference that the City is one of those unusual employers who discriminates against the majority; (2) an adverse employment action; and (3) the challenged action took place under circumstances giving rise to an inference of discrimination.  *Mattioda v. White*, 323 F.3d 1288, 1292-93 (10th Cir. 2003).  Alternatively, Plaintiff must allege and produce evidence to support a reasonable probability that, but for her status as a Caucasian, the adverse employment action would not have occurred.  *Du Merac v. Colorado Sch. of Mines*,

---

[1] Although Claim I is styled as "Title VII Race and Color Discrimination," Plaintiff sprinkles her complaint with references to national origin (Bosnian) discrimination. Any national origin discrimination claim fails, however, because it was not administratively exhausted. Specifically, Plaintiff did not check the box on her EEOC charge indicating she was alleging national origin discrimination and her charge only states she was discriminated against as a "non-Latino." (MSUMF at ¶ 62).  *See Hankishiyev v. ARUP Labs*., 732 Fed.Appx. 673, 677-78 (10th Cir. Apr. 25, 2018). Even if Plaintiff had somehow exhausted a national origin discrimination claim, it would still fail because Plaintiff cannot establish circumstances giving rise to an inference of anti-Bosnian discrimination. *Sidlo v. Millercoors, LLC, 718 F. App'x 718, 726* (10th Cir. 2018) (setting forth elements of *prima facie* claim of national origin discrimination).  Nor, as set forth below, can Plaintiff demonstrate that the City's reasons for her termination are a mere pretext for anti-Bosnian discrimination.

104 F.Supp.3d 1240, 1249 (D.Colo. 2015); *Notari v. Denver Water Dep't*, 971 F.2d 585, 590 (10th Cir. 1992).

> i. There Is No Evidence That the City Discriminates Against Caucasians.

Plaintiff fails to establish background circumstances demonstrating that the City falls into the rare category of employers that discriminate against the majority. To this end, she has presented no evidence of a pattern of City-wide discrimination against Caucasians as a class. *See Mitchell v. City of Wichita, Kan.*, 140 Fed.Appx. 767, 781 (10th Cir. 2005). Nor has Plaintiff even alleged that the City harbors any anti-Caucasian animus; indeed, not a single allegation in the Second Amended Complaint accuses the City of bias against Caucasians, or attributes any anti-Caucasian statements to decision-makers made in connection with adverse actions.

To the contrary, Plaintiff identifies only two employees as alleged victims of anti-Caucasian discrimination: James Stigall and Keith Dochterman. (MSUMF at ¶¶ 65, 66.) Although Plaintiff speculates that Mr. Stigall "felt that he had no choice but to resign" because he was "treated differently because he was white" (MSUMF at ¶ 65), she offers nothing other than her own conjecture to support this assertion, which is insufficient to establish the background circumstances necessary for a reverse-discrimination claim. *Higgins v. Burlington N. & Santa Fe Ry.*, No. CIV 03-1176 RB/ACT, 2005 WL 8164342, *2-3 (D.N.M. Jan. 20, 2005) (plaintiff's own deposition testimony regarding employer's discrimination against the majority, and affidavit of representative of Hispanic employees stating that Hispanic employees were not disciplined as harshly constituted "mere conjecture and anecdotal incidents" insufficient to survive summary judgment). Similarly, Plaintiff's assertion that Mr. Dochterman was verbally harassed "for no legitimate reason other than discrimination" and resigned in 2016 "due to his fear of being improperly fired because of discriminatory motives" (MSUMF at ¶¶ 66-67) constitutes the type of

"speculation, conjecture, or surmise" that is not competent summary judgment evidence. *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004). These examples do not demonstrate that the City favors non-Caucasians in its employment practices.

The City terminated Plaintiff for the reasons cited in her termination letter, including her public Facebook posts stating that she was a Police Officer, her dishonesty surrounding those posts and other incidents, and her negative comments about other employees. (MSUMF at ¶¶ 58-61.) This misconduct was serious and violated the City's Career Service Rules. Plaintiff proffers no evidence that the City would not have terminated her, but for her status as a Caucasian. To the contrary, the evidence demonstrates that Viola Chacon, the sole custodian with a disciplinary history similar to Plaintiff's, who also had Mr. Lemos in her chain of command, and who – like Plaintiff – was found to have violated the Career Service Rule prohibiting dishonesty, was terminated. (MSUMF at ¶ 68.) Ms. Chacon was Hispanic. (MSUMF at ¶ 68.) For these reasons alone, Plaintiff fails to satisfy the burden imposed on a reverse-discrimination plaintiff in establishing a *prima facie* case.

> ii. Plaintiff's Discrimination Claim Is Limited to Her Termination.

The City concedes that Plaintiff's termination is an adverse action. Her termination, however, is the sole adverse action on which her Title VII claims may rest because the remaining allegedly adverse actions asserted in the Second Amended Complaint – *e.g.*, verbal warnings, written reprimands, the issuance of a Be On the Lookout ("BOLO") poster, and the transfer of

Plaintiff's work location (Doc. 53 ¶18a.-k.) – took place more than 300 days prior to the filing of the Charge of Discrimination with the EEOC and are therefore time-barred.[2]

An employee alleging discrimination must file an EEOC charge within 300 days of the discriminatory act as a prerequisite to filing suit in federal court. *See* 42 U.S.C. § 2000e-5(e)(1); *Hansen v. SkyWest Airlines*, 844 F.3d 914, 922 (10ᵗʰ Cir. 2016). A discrete act of discrimination occurs on the day it happened. *See National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116-17 (2002). Because Plaintiff filed her EEOC Charge on September 21, 2018 (MSUMF at ¶ 62), any allegedly adverse actions that occurred prior to November 25, 2017 are untimely for purposes of Plaintiff's Title VII claims.[3] Therefore, her termination is the only adverse action that is timely.

### iii. No Evidence Supports an Inference of Discrimination.

Finally, Plaintiff cannot demonstrate that her termination took place under circumstances supporting an inference of race discrimination. Generally, a Title VII plaintiff can satisfy this prerequisite by showing that similarly situated employees were treated differently. *Hysten v. Burlington N. & Santa Fe Ry. Co.*, 296 F.3d 1177, 1181 (10ᵗʰ Cir. 2002). In discriminatory discharge cases, this showing may also be made by demonstrating that the plaintiff was replaced

---

[2] Even if these actions were not time-barred, they are not adverse employment actions for purposes of a Title VII discrimination or retaliation claim as none resulted in a demotion, loss of pay, or any other material change in employment status or would otherwise be deemed materially adverse by a reasonable employee. (MSUMF at ¶¶ 9-13, 15, 17-26, 32, 39, 42-46.) *See, e.g., Rennard v. Woodworkers Supply, Inc.*, 101 Fed. Appx. 296, 307-08, *10 (10ᵗʰ Cir. June 9, 2004) (written reprimand was not adverse employment action); *Equal Emp. Opportunity Comm'n v. JBS USA, LLC*, 339 F.Supp.3d 1135, 1187 (D.Colo. 2018) (verbal warning was not adverse action); *Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 532 (10ᵗʰ Cir. 1998) (transfer of employee to another location was not adverse action); *Daniels*, 701 F.3d at 635-36 (reassignment from day shift to night shift was not adverse action). The BOLO was not an adverse employment action, as it did not constitute a significant change in employment status or cause a significant change in benefits. *Dick v. Phone Directories Co.*, 397 F.3d 1256, 1268 (10ᵗʰ Cir. 2005). (MSUMF at ¶ 44.) Finally, Plaintiff's contention that the BOLO was humiliating does not transform it into an adverse action. *See Braxton v. Nortek Air Solutions, LLC*, 769 Fed.Appx. 600, 605 (10ᵗʰ Cir. Apr. 23, 2019*).

[3] The dates of the untimely allegedly adverse actions are: (1) September 21, 2015 and October 1, 2015 (Doc. 53 ¶ 18(c) and (d)); (2) June 13, 2016 and March 17, 2017 (Doc. 53 ¶ 18(e) and (f)); (3) May 4, 2017 (Doc. 53 ¶ 18(g)); (4) September 20, 2017 (Doc. 53¶ 18(i)); and (5) September 22, 2017 (Doc. 53 ¶ 18(j)).

by a person from a non-protected category. *Longo v. Regis Jesuit High Sch. Corp.*, No. 02-CV-001957-PSF-OES, 2006 WL 197336, *14 (D.Colo. Jan. 25, 2006).  A plaintiff may also proffer evidence of discriminatory remarks by a decision-maker in connection with the challenged employment decision. *Plotke v. White*, 405 F.3d 1092, 1101 (10th Cir. 2005).  Plaintiff makes none of these showings.

First, there is no evidence that Plaintiff's purported comparators were similarly situated to her.  To make such a showing, Plaintiff must prove that the comparators are "similarly-situated in all respects," *i.e.*, had the same supervisor, were subject to the same standards, and engaged in the same misconduct without such differentiating circumstances that would distinguish their misconduct or the employer's treatment of them.  *Luke v. Hospital Shared Servs.*, No. 10-cv-03087-WJM-BNB, 2012 WL 1833425, *5 (D.Colo. May 21, 2012); *Brainard v. City of Topeka*, 597 Fed.Appx. 974, 979 (10th Cir. Jan. 13, 2015) (employee with same title but different responsibilities and experience was not similarly situated to the plaintiff).

Plaintiff's comparison to Danielle Garcia (Doc. 53, ¶18b) is unavailing.  Ms. Garcia was not a custodian, worked for the Utility Department, had been employed substantially longer, received less prior discipline, and did not engage in similar misconduct. (MSUMF at ¶¶ 69-70.) Plaintiff's comparison to Theresa Luyando (Doc. 53 ¶18b) is also ineffective.  Ms. Luyando was employed substantially longer than Plaintiff and no evidence supports that she engaged in misconduct of comparable seriousness.  (MSUMF at ¶ 71.)  Finally, Plaintiff's reliance on David Chavez (Doc. 53, ¶18b) is also misplaced.  Plaintiff does not allege Mr. Chavez engaged in similar misconduct but was not terminated.  Instead, Plaintiff claims he was paid $.50/hour more than she was at his time of hire. (Doc. 53, ¶18b.)  Not only is this unsupported, and not only does this ignore

9

**28**

Mr. Chavez's employment history, but this claim is also time-barred as Mr. Chavez was hired in March 2016. (MSUMF at ¶ 72.) None of these individuals is a proper comparator.[4]

Nor has Plaintiff established that she was terminated under circumstances giving rise to an inference of discrimination based on replacement by an individual in a different class. She cannot make this showing because, in fact, Plaintiff was not replaced by the City. (MSUMF at ¶ 54.) Finally, it is undisputed that Mr. Williamson made the decision to terminate Plaintiff (MSUMF at ¶ 51) and she has proffered no evidence of anti-Caucasian slurs made in connection with her termination (or even in connection with any of the other time-barred allegedly adverse actions). Because Plaintiff has proffered no evidence linking her termination with her race/color, a *prima facie* case of discrimination fails.

Plaintiff also faces an especially high hurdle in establishing an inference of discrimination in this lawsuit given the "strong presumption" against discriminatory intent that arises where the alleged discriminator was involved in the initial decision to hire the plaintiff. *Macieyovski v. City & County of Denver*, No. 06-cv-02580-WDM-BNB, 2008 WL 11515872, *6 (D.Colo. June 26, 2008); *see also Wayman v. AZ Auto. Corp.*, No. 04-2347-JWL, 2005 WL 3871600, *5 (D.Kan. July 27, 2005) (collecting cases). This action is based entirely on Plaintiff's position that Mr. Lemos discriminated against employees who were not Hispanic, and that the City allegedly allowed Mr. Lemos to carry out that discrimination. It is, however, undisputed that Mr. Lemos was on the three-person hiring committee for Plaintiff's employment, and that Mr. Lemos in fact recommended that the City hire Plaintiff. (MSUMF at ¶ 2.) There is a strong presumption that

---

[4] During discovery, Plaintiff identified other Hispanic employees that she alleged were treated better than she was: John Gandera, "Lucia," Yvonne Chavez, Annette Subia, and Sharon Romero. None of these employees, however, were similarly situated to Plaintiff. (MSUMF at ¶¶ 73-78.)

Mr. Lemos would not hire someone in Plaintiff's class only to discriminate against her later.  For all the above reasons, Plaintiff's discrimination claim fails as a matter of law.

          iv.   <u>Plaintiff Fails To Establish Pretext</u>.

Even assuming that Plaintiff had supported a *prima facie* case of reverse discrimination, the City has articulated legitimate, non-discriminatory reasons for Plaintiff's termination: namely, Plaintiff violated multiple Career Service Rules, including Rule 16-29(D) prohibiting "[a]ny act of dishonesty;"[5] Plaintiff falsely identified herself as a Denver Police Officer on her public Facebook page; Plaintiff told other falsehoods; and Plaintiff failed to follow protocols and was disruptive in the workplace.  (MSUMF at ¶¶ 28-30, 32, 34-36, 40-41, 47, 48, 58-61.)  These constitute legitimate reasons "in terms that are not facially prohibited by" anti-discrimination statutes.  *Etsitty v. Utah Transit Auth.*, 502 F.3d 1215, 1224 (10th Cir. 2007); *see also Murray v. City of Sapulpa*, 45 F.3d 1417, 1421 (10th Cir. 1995) (employees' rules violations constituted nondiscriminatory reasons for their terminations).

Because the City has articulated facially non-discriminatory reasons for Plaintiff's termination, the burden shifts back to Plaintiff to demonstrate that these reasons are pretextual.  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507-08 (1993).  To satisfy this burden, Plaintiff must present evidence of "such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Argo*, 452 F.3d at 1203.  "Mere conjecture that the employer's explanation is a pretext for intentional discrimination is an insufficient basis

---

[5] Plaintiff had also received a written reprimand for dishonesty four months earlier.  (MSUMF at ¶¶ 18-26.)

for denial of summary judgment" and "a plaintiff's allegations alone will not defeat summary judgment." *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323-24 (10th Cir. 1997).

Plaintiff has proffered no objective proof that the City's reasons for her termination are a mere pretext for anti-Caucasian discrimination. *Hall v. Interstate Brands Corp.,* No. 08-2073-EFM, 2009 WL 2043570 (D. Kan. July 13, 2009), *aff'd,* 395 F. App'x 519 (10th Cir. 2010) (no pretext where for each adverse action against employee, he had violated company policy or improperly performed his job); *Debord v. Mercy Health Sys. of Kan., Inc.*, 860 F.Supp.2d 1263 (D.Kan. 2012), *aff'd,* 737 F.3d 642 (10th Cir. 2013) (no pretext where employer terminated employee based on posts on a social networking site and employee denied making those posts). As there is no evidence of pretext, summary judgment must enter in favor of the City Defendants.

## 2. **Plaintiff's Title VII Retaliation Claim (Claim II) Fails as a Matter of Law.**

Plaintiff's claim of Title VII retaliation fares no better. To establish a *prima facie* case of retaliation, a plaintiff must show: (1) she engaged in a protected activity;[6] (2) a reasonable employee would have found the challenged action materially adverse; and (3) a causal connection exists between the protected activity and the materially adverse action. *Argo*, 452 F.3d at 1202. Plaintiff's termination clearly satisfies the second prerequisite.[7] However, the lack of objective evidence linking her termination with protected activity defeats this claim as a matter of law.

Plaintiff bears an especially onerous burden in establishing the necessary nexus because "Title VII retaliation claims must be proved according to traditional principles of but-for

---

[6] Although all the testimonial and documentary evidence in this action (with the exception of Plaintiff's testimony) demonstrates that Plaintiff did not report that Mr. Lemos was treating her unfairly *because of her race/color*, the City will not dispute this point solely for purposes of this Motion.

[7] As with Plaintiff's Title VII discrimination claim, Plaintiff's termination is the only adverse action that is not time-barred, that constitutes an adverse action, and that can support her claim of retaliation.

causation." *University of Tex. S.W. Med. Ctr. v. Nassar*, 133 S.Ct. 2517, 2533 (2013). Evidence of the requisite but-for causation "must be based on more than mere speculation, conjecture, or surmise." *Ward v. Jewell*, 772 F.3d 1199, 1202 (10th Cir. 2014). Here, Plaintiff proffers no evidence of a causal connection – let alone a "but for" causal connection – between her alleged protected activity and Mr. Williamson's decision to terminate her employment. Specifically, there is no evidence of unlawful intent on the part of Mr. Williamson to terminate her based on her alleged prior complaints about Mr. Lemos. During her deposition, Plaintiff could not even say whether Mr. Williamson retaliated against her, and in fact asserted that only Mr. Lemos - who did not terminate her - had retaliated against her. (MSUMF at ¶¶53, 57.) Plaintiff further admitted she believes she would have received the Notification of Dismissal even if she had not made any purported complaints about Mr. Lemos. (MSUMF at ¶ 56.) Plaintiff conceded she believes that only Mr. Lemos retaliated against her, on the basis that she has "a great relationship with the police department and he doesn't." (MSUMF at ¶ 57.) Having a great relationship with the police department is not protected conduct.

Further defeating a showing of causation is the fact that a retaliation plaintiff must demonstrate that the decision-maker knew of her purported protected activity. *See Hinds v. Sprint/United Mgmt.*, 523 F.3d 1187, 1203 (10th Cir. 2008). Here, Plaintiff has neither alleged nor proved that Mr. Williamson knew of her alleged complaints to others about Mr. Lemos. Although Plaintiff claims that she complained to Mr. Williamson himself about Mr. Lemos, she identifies the timing of that complaint as "the Fall of 2016" and perhaps May of 2017, over one year prior and approximately six months prior to her November 27, 2017 termination, respectively. (MSUMF at ¶ 14.) Where, as here, the adverse action is not very closely connected in time to the protected activity, Plaintiff must rely on additional evidence to establish causation. *Anderson v.*

*Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999).  No such additional evidence has been proffered, defeating Plaintiff's retaliation claim.

Finally, even assuming that Plaintiff could make out a *prima facie* case of retaliation, she cannot demonstrate that the City's articulated reasons for her termination are pretextual.  Summary judgment in favor of the City on Plaintiff's Title VII claims is, therefore, warranted.

**3.  Plaintiff's Third Claim Should Be Dismissed as Duplicative.**

Plaintiff's Third Claim is titled, "Deprivation of Civil Rights Under Color of Law, 42 U.S.C. § 1981, Denial of Equal Protection, under the Fourteenth Amendment" and it is brought against the individual City Defendants, Robinson, Williamson, O'Neil, and Lemos. Doc. 53, p. 17. Plaintiff's Fourth Claim for Relief is titled "Deprivation of Civil Rights Under Color of Law, 42 U.S.C. § 1983, Denial of Equal Protection, under the Fourteenth Amendment Against all Defendants." Doc. 53, p.19.  However, in responding to City Defendants' earlier motion to dismiss, Plaintiff explained that her "Fourth Claim for Relief is **based on** allegations of **violations of** 42 U.S.C. **§1981**, although it is brought pursuant to §1983. Section 1981 does not provide a cause of action against state actors; instead, claims against state actors or allegations of § 1981 violations must be brought pursuant to § 1983." Doc. 25, p. 15 (emphasis added).  Therefore, Plaintiff's Third and Fourth claims are both §1981 claims and the only difference is that the Third Claim is against the individual City Defendants and the Fourth Claim is against all of the City Defendants.  Because Plaintiff's Third Claim is completely subsumed by her Fourth Claim, [8] her Third Claim should be

---

[8] It is evident that the Third Claim is subsumed by the Fourth Claim because the paragraphs under each of the claims are almost identical, *e.g.*, Doc. 53, ¶¶ 29 and 40; 30 and 42; 31 and 43; 32 and 44; 33 and 45; 34 and 46; 35 and 47; 36 and 48.

dismissed as duplicative.[9] *Masad v. Nanney*, No. 14-cv-00577-MJW, 2014 WL 4265848, at *1 (D.Colo. Aug. 27, 2014) (duplicative constitutional claims dismissed).

  **4. Plaintiff's Fourth Claim Fails as a Matter of Law.**

  As stated above, although the Fourth Claim refers to 42 U.S.C. §1983,[10] this claim is based on alleged violations of 42 U.S.C. §1981 for race discrimination[11] against all City Defendants. Doc. 25, p. 15. This claim is essentially the same as Plaintiff's First Claim under Title VII, including that this is a reverse discrimination case, and the elements are the same. *Baca v. Sklar*, 398 F.3d 1210, 1218 n. 3 (10th Cir. 2005), *Reynolds v. Sch. Dist. No. 1*, Denver, Colo., 69 F.3d 1523, 1534 (10th Cir. 1995). Therefore, this claim should be dismissed for the reasons stated in Section II.B.1. above, and for the separate reasons set forth below.[12]

  i. <u>Robinson and O'Neil Should be Dismissed for Lack of Personal Participation</u>.

  Both Mr. Robinson and Mr. O'Neil should be dismissed from this case for lack of personal participation, an essential element of an individual liability claim under §1981 against a government official. *Mitchell v. Maynard*, 80 F.3d 1433, 1441 (10th Cir. 1996). Because Plaintiff

---

[9] In the alternative, because Plaintiff's Third Claim is a duplicate of her Fourth Claim, it should be dismissed for the same reasons set forth as to the Fourth Claim.

[10] If Plaintiff's Fourth Claim for relief was brought pursuant to 42 U.S.C. § 1983 alone, it would be barred by the two-year statute of limitations. *Allstate Sweeping, LLC v. City & Cty. of Denver*, 838 F.Supp.2d 1135, 1142 (D.Colo. 2011) (the statute of limitations for § 1983 claims which do not assert violations of § 1981, is two-years). Even if Plaintiff could bring a §1983 claim, it would fail for the same reasons as her §1981 claim.

[11] It is unclear if Plaintiff is attempting to assert a claim for race harassment separate from her claim for disparate treatment. Doc. 53 ¶¶45, 46. The elements of a harassment/hostile environment claim are the same under 42 U.S.C. §1981 or Title VII. *Payan v. United Parcel Serv.*, 905 F.3d 1162, 1170 (10th Cir. 2018). This Court dismissed Plaintiff's Title VII harassment/hostile environment claim for failure to state a claim. Doc. 63 p. 14; Doc. 69. For the same reasons, if Plaintiff is asserting such a claim under §1981, it should be dismissed.

[12] Plaintiff's §1981 claims regarding discipline that occurred on September 21, 2015 (Doc. 53 ¶18c) and October 1, 2015 (Doc. 53 ¶18d) are barred by the four-year statute of limitations as Plaintiff did not file her original complaint (Doc. 1) until December 30, 2019. *Parker Excavating, Inc. v. Lafarge W., Inc.*, No. 14-CV-01534-LTB-MJW, 2015 WL 122691, at *1 (D.Colo. Jan. 8, 2015).

admitted that Mr. Robinson did not discriminate against or discipline her (MSUMF at ¶¶ 7, 16, 53, 57) and because Plaintiff admitted that Mr. O'Neil did not discriminate against her (MSUMF at ¶¶ 5, 16, 53, 57), these defendants should be dismissed from this action.

<div align="center">

ii.  <u>The Individual City Defendants Are Entitled to Qualified Immunity</u>.

</div>

The individual City Defendants are entitled to qualified immunity from Plaintiff's claims. Once a defendant asserts qualified immunity, the plaintiff bears the burden of satisfying a "strict two-part test." *McBeth v. Himes*, 598 F.3d 708, 716 (10th Cir. 2010), *Roska v. Sneddon*, 437 F.3d 964, 971 (10th Cir. 2006). To overcome qualified immunity, Plaintiff must show (1) these defendants violated her rights under §1981, and (2) those rights were clearly established at the time defendants acted. *Dasgupta v. Harris*, 407 F.App'x 325, 328 (10th Cir. 2011). To this end:

> A right is clearly established when every reasonable official would understand that what he is doing violates that right. The key is whether  the specific conduct  has  been clearly established as  a constitutional violation. Accordingly, we usually require an applicable Supreme Court or Tenth Circuit opinion or the clear weight of authority from other courts treating the conduct as unconstitutional. Although we do not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate.

*Davis v. Unified Sch. Dist. No. 512*, 799 F.App'x 566, 569 (10th Cir. 2019) (internal quotations and citations omitted).  Plaintiff cannot make the requisite showing.

A *prima facie* reverse discrimination claim requires the existence of an adverse action. City Defendants are entitled to summary judgment because, as set forth in Section II.B.1, n. 3 above, Plaintiff's documented counseling conversations[13] (Doc. 53, ¶¶18e, f) and her written reprimand

---

[13]  Summary judgment should be granted regarding Plaintiff's documented counseling for not having her cell phone or voice mail set up because she admitted it was unrelated to being non-Hispanic. (MSUMF at ¶ 16.)  Defendants Robinson and O'Neil should be dismissed because Plaintiff stated they were not involved.  (*Id.*)

(Doc. 53, ¶18g) do not constitute adverse actions. Plaintiff admits none of those actions had any effect on her future employment prospects. (MSUMF at ¶ 80.) Additionally, Messrs. Robinson, Williamson, and O'Neil should be dismissed for lack of personal participation as Mr. Lemos is the only individual defendant allegedly involved in these actions.[14] (Doc. 53 ¶18e-g.)

Even if Plaintiff's written reprimand was somehow an adverse action, the individual City Defendants are entitled to qualified immunity because there is no evidence the reprimand was the result of "intentional or purposeful[]" discrimination. *Dasgupta v. Harris*, 407 F. App'x 325, 328 (10th Cir. 2011) (internal quotation omitted). In fact, the only individual defendant Plaintiff has accused of intentional discrimination is Mr. Lemos. Doc. 53 ¶18e-g. In determining whether alleged discrimination was intentional, courts examine not what may have actually happened, but rather what the individual defendants honestly believed happened at the time they acted. *Young v. Dillon Cos. Inc.,* 468 F.3d 1243, 1250 (10th Cir. 2006) ("[T]he relevant inquiry is not whether the employer's proffered reasons were wise, fair or correct, but whether it honestly believed those reasons and acted in good faith upon those beliefs." (internal quotation omitted)).

Here, Plaintiff received the written reprimand for violations of the City's rules because she let a member of the public into a secure building before hours, was dishonest about what transpired, spent work time interrupting other employees to talk about the incident, was untruthful about talking to those other employees, and failed to provide a written statement of the incident. (MSUMF at ¶¶ 16-26.) Multiple witness statements confirmed Plaintiff committed these violations. (MSUMF at ¶¶ 22-24.) While Plaintiff denies everything stated in the written reprimand, that is immaterial to a qualified immunity analysis. What is material is that Messrs.

---

[14] Solely for purposes of this motion only, City Defendants do not dispute Mr. Lemos' involvement in these actions.

Williamson, O'Neil, and Lemos[15] relied on the information in the multiple witness statements and honestly believed Plaintiff violated the conduct rules. (MSUMF at ¶ 79.) Because there is no evidence to the contrary, these Defendants are entitled to qualified immunity.

Plaintiff's allegation that the City Defendants discriminated against her by changing the location where she performed her custodial duties[16] (Doc. 53 ¶18i) also fails for lack of an adverse action. *Hillig v. Rumsfeld*, 381 F.3d 1028, 1031 (10th Cir. 2004) (an inconvenience or alteration of job responsibilities is not an adverse employment action), *Watson v. Norton*, 10 F.App'x 669, 678 (10th Cir. 2001) (a lateral transfer is not an adverse action). Plaintiff's duties, shift, and pay did not change as a result of the transfer and, in fact, the move put her closer to home. (MSUMF at ¶46.) Therefore, the individual City Defendants are entitled to qualified immunity on this claim as well.

Being placed on paid administrative leave[17] (Doc. 53 ¶18i) is also not an adverse action for purposes of this claim. "[N]either [the 10th Circuit] nor other circuits have established any clear guidance on where to draw the line between adverse and non-adverse paid administrative leave. Without any guidance, [the court does] not regard placement on paid administrative leave as a clearly established adverse employment action." *Lincoln v. Maketa*, 880 F.3d 533, 542 (10th Cir. 2018). If paid administrative leave was not a clearly established constitutional violation in 2018, then it certainly was not established when Plaintiff was placed on leave in September 2017, and the individual City Defendants are entitled to qualified immunity.

---

[15] Mr. Robinson was not employed and, therefore, should be dismissed for lack of personal participation. (MSUMF at ¶ 6.) For purposes of this motion only, City Defendants do not contest Mr. Lemos' authority to sign a written reprimand.

[16] This decision was made by Mr. O'Neil. (MSUMF at ¶33.) Therefore, Messrs. Robinson, Williamson, and Lemos should be dismissed for lack of personal participation. Plaintiff's reaction to the change in location is in the termination letter. (MSUMF at ¶32.)

[17] Plaintiff was placed on administrative leave with pay for nine days from September 22, 2017, through October 3, 2017, and then was returned to her duties as a custodian on the same shift with the same pay. (MSUMF at ¶45.)

Plaintiff asserts she reacted emotionally to moving her location and was asked to undergo a psychological fitness for duty evaluation while she was on paid administrative leave. (Doc. 53 ¶¶18i.) There is no Supreme Court or Tenth Circuit decision clearly establishing that a fitness for duty exam is an adverse action and, therefore, the individual City Defendants are entitled to qualified immunity.[18] There is also no evidence of personal participation by the individual City Defendants in ordering the exam.

The individual City Defendants are entitled to qualified immunity from Plaintiff's claim that the BOLOs posted with her picture on them constitute a discriminatory act. Doc. 53 ¶18j. There are no published Supreme Court or Tenth Circuit decisions holding that the posting of a BOLO is unconstitutional. Plaintiff's claim fails even if she is generally alleging that the BOLO caused her "humiliation" (Doc. 53 ¶18j) in violation of her constitutional rights. The Tenth Circuit held that an allegation of "humiliation" is not enough to clearly establish an adverse employment action. *Braxton*, 769 F. App'x at 605.

Plaintiff's §1981 reverse discrimination claim as to her termination fails for the same reasons her Title VII claim fails, as set forth previously in Section II.B1. *Heno v. Sprint/United Mgmt. Co.*, 208 F.3d 847, 852 (10th Cir. 2000) (liability under Title VII is coextensive with liability under §1981). In addition, Robinson, O'Neil, and Lemos should be dismissed from this claim for lack of personal participation because Mr. Williamson is the one that made the decision to

---

[18]   Other circuits have made this decision. *See Freelain v. Village of Oak Park*, 888 F.3d 895, 903-04 (7th Cir. 2018) (requiring fitness-for-duty psychological evaluation was not a materially-adverse employment action), and *Schoffstall v. Henderson*, 223 F.3d 818, 825 (8th Cir. 2000). The closest decision within the Tenth Circuit is in *Garcia v. Dep't of Health & Soc. Servs.*, No. 19-CV-159-SWS, 2020 WL 5629784, *12 (D.Wyo. Aug. 25, 2020), which held that a fitness-for-duty evaluation does not constitute an adverse employment action.

terminate Plaintiff.[19] (MSUMF at ¶¶ 51, 53, 54.)  Plaintiff admits she has no evidence that either Mr. Robinson or Mr. O'Neil were involved in her termination.  (MSUMF at ¶53.)

The individual City Defendants are also entitled to qualified immunity as to Plaintiff's §1981 claim regarding her termination. Qualified immunity is based on what the individual City Defendants honestly believed to have happened at the time they acted.  *Young,* 468 F.3d at 1250. Even if Plaintiff denies all of the conduct cited in her termination letter; even if it is true that the Facebook posts[20] of Plaintiff wearing police attire were just a joke, or that someone else made these posts on Facebook, the claim fails. The individual City Defendants honestly believed that Plaintiff committed the violations in her termination letter (MSUMF at ¶¶ 28-30, 32, 34-36, 40-41, 47, 48, 58-61) and are, therefore entitled to qualified immunity.  (MSUMF at ¶ 79.)

### iii.  Plaintiff Failed to Establish Municipal Liability.[21]

Even if the above conduct amounted to adverse actions or Plaintiff could establish pretext, Defendant City and County of Denver is entitled to summary judgment. "[T]o prevail on [a] claim for damages against [a governmental entity], [plaintiff] must show that the violation of [her] right to make contracts provided by §1981 was caused by a custom or policy within the meaning of *Monell [v. New York City Dept. of Social Services]*, 436 U.S. 658, [ ] (1978)." *Randle v. City of*

---

[19]  Even where an individual defendant "may have had the power to approve, veto or concur with the [supervisor's] decision to terminate plaintiff [it] is insufficient to impose *individual* liability on the defendant." *Lee v. Bd. of Cnty. Comm'rs of Arapahoe Cnty., Colo.*, 18 F.Supp.2d 1143, 1163 (D.Colo. 1998), citing *Langley v. Adams Cnty., Colorado*, 987 F.2d 1473, 1479-1480 (10ᵗʰ Cir. 1993) (emphasis in original).

[20]  Plaintiff asserts her Facebook posts were lawful under Colorado's lawful activities statute and, therefore, she could not be terminated for them. (Doc. 53 ¶18h, C.R.S. § 24-34-402.5.) However, Plaintiff did not assert a separate cause of action for such a claim, nor could she because "she did not exhaust administrative remedies by receiving a right to sue notice from the CCRD, which is required by §§ 24–34–306(14)–(15)." *Jeffers v. Denver Pub. Sch., No.* 16-CV-02243-CMA-MJW, 2017 WL 2001632, at *9 (D. Colo. May 11, 2017), report and recommendation adopted, No. 16-CV-02243-CMA-MJW, 2017 WL 5441612 (D. Colo. June 1, 2017).

[21]  Suing both the municipality and municipal official in an official capacity under the same theory of recovery is "duplicative" and warrants dismissal of the official capacity claim. *Leadholm v. City of Commerce City*, No. 16-cv-02786-MEH, 2017 WL 1862313, at *5 (D. Colo. May 9, 2017).

*Aurora*, 69 F.3d 441, 446 n. 6 (10ᵗʰ Cir. 1995) (internal quotation omitted). Plaintiff must prove that: (1) a municipal employee committed a constitutional violation, and (2) a municipal policy or custom was the moving force behind the constitutional deprivation. *Myers v. Oklahoma Cty. Bd. of Cty. Comm'rs*, 151 F.3d 1313, 1316 (10ᵗʰ Cir. 1998).  As set forth above, Plaintiff has not established any constitutional violations by any municipal employees and, therefore, the City is entitled to summary judgment.

Even if Plaintiff could prove any constitutional violations, the City is not liable because it does not have a policy of discriminating based on race. Plaintiff has not alleged (Doc. 53, ¶43-50), nor is there any evidence that her supposed discrimination was caused by a legislative action or by an official whose acts may fairly be said to be those of the municipality itself.  "An unconstitutional deprivation is caused by a municipal policy if it results from decisions of a duly constituted legislative body or an official whose acts may fairly be said to be those of the municipality itself." *Carney v. City & County of Denver*, 534 F.3d 1269, 1274 (10ᵗʰ Cir. 2008) (internal quotation omitted).  There is no evidence that the City has a policy of discriminating against non-Hispanic employees or white employees from Bosnia. Nor is there evidence of any person with policy-making authority who imposed a policy or directive that resulted in discrimination against Plaintiff.  Consequently, Plaintiff has failed to establish municipal liability against the City.

The City also does not have a custom of discriminating. A custom is an act "that, although not formally approved by an appropriate decision maker, has such widespread practice as to have the force of law." *Id.*  "In order to establish a custom, the actions of the municipal employees must be 'continuing, persistent and widespread.'" *Id.* (internal quotation omitted). To prove this, "plaintiffs most commonly offer evidence suggesting that similarly situated individuals were

mistreated by the municipality in a similar way." *Id.*  As set forth at pages 9-10 above, Plaintiff has failed to identify such individuals and, therefore, her municipal liability claim fails.

Even if a written reprimand rose to the level of an adverse action, qualified immunity fails, or if Plaintiff could prove a policy or custom, Plaintiff's municipal liability claim as to her written reprimand fails because, as set forth above, City Defendants had legitimate non-discriminatory reasons for the discipline and Plaintiff cannot establish pretext. Even if qualified immunity fails or if Plaintiff could prove a policy or custom, her municipal liability claim as to her termination fails because, as set forth above, the City Defendants established legitimate non-discriminatory reasons for Plaintiff's termination and Plaintiff cannot prove pretext.

### 4.  Plaintiff's FMLA Retaliation Claim Fails as a Matter of Law.

i.  <u>Plaintiff's FMLA Retaliation Claim Is Time-Barred</u>.

Plaintiff contends the City terminated her in retaliation for taking FMLA leave. Doc. 53 ¶¶ 53-55.  "Generally, a FMLA claim 'may be brought under this section not later than 2 years after the date of the last event constituting the alleged violation for which the action is brought.'" *Bass v. Potter*, 522 F.3d 1098, 1103 (10th Cir. 2008), 29 U.S.C. § 2617(c)(1).  Plaintiff's FMLA claim is barred by the statute of limitations because her November 27, 2017 termination "was the last event constituting" her FMLA claim (Doc. 53 ¶56) but her original complaint was filed on December 30, 2019 (Doc. 1), over one month beyond the two-year statute of limitations.

In apparent recognition of this obstacle, Plaintiff attempts to trigger the FMLA's three-year statute of limitations by alleging the City's decision to terminate her was "willful."  Doc. 53 ¶56, 29 U.S.C. § 2617(c)(2). Because the FMLA does not define "willful," courts rely on interpretations of a similar provision of the Fair Labor Standards Act for guidance. Under that standard, "a plaintiff must show that the employer either knew or showed reckless disregard for the matter of

whether its conduct was prohibited by the statute." *Bass*, 522 F.3d at 1103 (internal quotation omitted). Plaintiff must show more than mere negligence and even if "an employer acts unreasonably, but not recklessly, in determining its legal obligation," its conduct is not willful. *Id.* (internal quotation omitted).

The Second Amended Complaint contains no factual allegations regarding Plaintiff's claim of willfulness. (Doc. 53 ¶¶16, 51-57.) Where, as here, a plaintiff relies solely on unsubstantiated conclusory allegations that a defendant acted willfully, the two-year limitations period applies. *Ellis v. J.R.'s Country Stores, Inc.*, 779 F.3d 1184, 1201 (10th Cir. 2015); *Bones*, 366 F.3d at 875. As a result, Plaintiff's FMLA claim is untimely.[22]

> ii. Plaintiff Fails to State a Cognizable FMLA Retaliation Claim.

Even if Plaintiff's claim were timely, she fails to state a claim for FMLA retaliation. An FMLA retaliation claim differs from a FMLA interference claim "with respect to the timing of the adverse action." *Campbell v. Gambro Healthcare, Inc.*, 478 F.3d 1282, 1287 (10th Cir. 2007). Retaliation claims are limited to instances where "the employee successfully took FMLA leave, was restored to her prior employment status, and was adversely affected by an employment action based on incidents **post**-dating her **return** to work." *Id*. at 1287-88 (emphasis added). Here, while Plaintiff began her concurrent workers' compensation/FMLA leave on October 20, 2017, ***she never returned to regular work status before her termination*** on November 27, 2017. (MSUMF at ¶55.) Because Plaintiff "was never restored to [her] prior employment status" after taking FMLA

---

[22] While it does not appear that the Tenth Circuit has issued a specific decision on this issue, other circuits have. *See Mejia v. Roma Cleaning, Inc.*, 751 F. App'x 134, 136 (2nd Cir. 2018) (dismissing FMLA retaliation claim as untimely for failure to provide evidence of willfulness on summary judgment); *Williams v. Tarrant Cty. Coll. Dist.*, 717 F. App'x 440, 449 (5th Cir. 2018) (same); *Crugher v. Prelesnik*, 761 F.3d 610, 617 (6th Cir. 2014) (granting motion to dismiss FMLA retaliation claim for failure to provide factual allegations of willfulness).

leave, and her termination was based entirely on incidents that pre-dated her October-November leave (MSUMF at ¶¶28-32, 34, 35, 36, 40, 41, 47, 48, 58-61.), Plaintiff fails to state a cognizable FMLA retaliation claim. *Janczak v. Tulsa Winch, Inc.*, 621 F.App'x 528, 535 (10th Cir. 2015).

Even if Plaintiff had stated a cognizable FMLA retaliation claim, the absence of evidence linking her use of FMLA leave with her termination is fatal to the claim's requirement for a causal connection. *Chavez v. Colorado Dep't of Educ.*, 244 F.Supp.3d 1106, 1136 (D.Colo. 2017) (elements of Title VII and FMLA retaliation are the same). Plaintiff received her first Contemplation of Discipline letter on September 19, 2017, and her revised Contemplation of Discipline letter on October 18, 2017, both of which put Plaintiff on notice that the City had started the disciplinary process, which could result in possible discipline. (MSUMF at ¶¶ 31, 49.) It was not until October 20, 2017, however, that Plaintiff reopened her workers' compensation claim and was placed on concurrent workers' compensation/FMLA leave. (MSUMF at ¶55.) Because Plaintiff's performance problems began before this leave, and because the City notified her of possible discipline before she took this leave, there is no inference of retaliation and, therefore, no causal connection. *See Argo*, 452 F.3d at 1203 (inference of retaliation defeated where performance concerns predated internal complaint). Plaintiff herself confirmed the lack of a causal connection between her FMLA use and her termination when she testified that she would have been terminated irrespective of her use of FMLA leave. (MSUMF at ¶ 56.)

It is unclear whether Plaintiff is also basing her retaliation claim on her earlier use of concurrent workers' compensation/FMLA leave from July 24, 2017 through August 14, 2017. (MSUMF at ¶ 27.) Even if this prior leave did form the basis for Plaintiff's claim, a retaliation claim would still be defeated by the lack of temporal proximity between her July-August leave and her ultimate termination. Specifically, over three months separate Plaintiff's return on August 15,

2017 from her November 27, 2017 termination. *See Richmond*, 120 F.3d at 209 ("a period of three months between the protected activity and the adverse action, standing alone, is not sufficient to establish causation").  Additionally, Plaintiff has proffered no additional evidence of causation as required in the absence of temporal proximity.  Most significantly, a retaliation claim based on the earlier FMLA leave fails in the face of Plaintiff's admission that she would have been terminated regardless of her use of FMLA.  (MSUMF at ¶ 56.)

Finally, even if Plaintiff could establish a *prima facie* case of retaliation, the City Defendants have articulated non-discriminatory reasons for Plaintiff's termination (including her violation of Career Service Rules) and Plaintiff proffers no evidence that these reasons are pretextual.  *Metzler*, 464 F.3d at 1172.  Absent some objective evidence of pretext, summary judgment must enter on behalf of the City Defendants.

## III.    CONCLUSION

For the foregoing reasons, the City Defendants respectfully request the Court to enter summary judgment in their favor on all claims Plaintiff alleges against them in this action.

Respectfully submitted this 21st day of May, 2021.

SHELBY A. FELTON
NATALIA S. BALLINGER
Assistant City Attorneys

s/  Shelby A. Felton
Denver City Attorney's Office
201 W. Colfax Avenue, Dept. 1108
Denver, Colorado 80202
(720) 913-3125
E-mail:  shelby.felton@denvergov.org
E-mail:  natalia.ballinger@denvergov.org
E-mail: dlefiling.litigation@denvergov.org
*Attorneys for the City Defendants*

25

**CERTIFICATE OF SERVICE**

I hereby certify that on the 21st day of May, 2021, a true and correct copy of the foregoing **CITY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** was filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following email address:

Nathan Davidovich
Davidovich Law Firm, LLC
501 S. Cherry St., Suite 1100
Denver, Colorado 80246
nathandavidovich@talk-law.com

Michael A. Watts
Retherford, Mullen & Moore
2 N. Cascade, Suite 500
Colorado Springs, Colorado 80903
mwatts@rmmattys.com


*s/ Kimberly Berridge*
Denver City Attorney's Office

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 19-cv-03710-RM-NRN

EMINA GEROVIC,

Plaintiff,

v.

CITY AND COUNTY OF DENVER, a Body politic and corporate of the State of Colorado, acting by and through its DEPARTMENT OF GENERAL SERVICES and FACILITIES MANAGEMENT OPERATIONS;
LEROY LEMOS, in his official capacity as Facilities Management Operations Supervisor at the Department of General Services, and in his individual capacity;
MURPHY ROBINSON, in his official capacity as Executive Director of General Services, and in his individual capacity;
JAMES E. WILLIAMSON, in his official capacity as Facilities Management Operations Director at the Department of General Services, and in his individual capacity;
KEVIN O'NEIL, in his official capacity as Facilities Management Operations Deputy Director at the Department of General Services, and in his individual capacity;
JOEL WOMICK, in his official capacity as DGS Contingent Worker at HSS Inc., and in his individual capacity;
KYLE KNOEDLER, in his official capacity as DGS Facility Supervisor of HSS Inc., and in his individual capacity; and
HSS, INC., a Colorado Corporation, acting as a hired agent by the City and County of Denver, by and through their contingent workers, Joel Womick, Kyle Knoedler, and others,

Defendants.

---

**CITY DEFENDANTS' SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

---

Pursuant to Fed.R.Civ.P. 56 and the Court's Practice Standards – Civil Actions, IV.C.2, Defendants the City and County of Denver, the Department of General Services and Facilities Management, Leroy Lemos, Murphy Robinson, James Williamson, and Kevin O'Neil

**46**

(collectively, the "City Defendants"), respectfully provide this Separate Statement of Undisputed

Material Facts in Support of Their Motion for Summary Judgment.

*[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]*

| | Moving Party's Statement of Undisputed Material Facts ("MSUMF") & Supporting Evidence | Opposing Party's Response and Additional Facts and Supporting Evidence (OSUMF") | Moving Party's Reply and Supporting Evidence ("RSUMF") |
|---|---|---|---|
| 1. | Plaintiff, a Caucasian female of Bosnian ethnicity, worked as a Custodian in the Facilities Management Department of the Department of General Services for the City and County of Denver from August 11, 2014 through November 27, 2017. Second Amended Complaint, Doc. 53, ¶¶ 4, 13. | | |
| 2. | Leroy Lemos (Hispanic), the Operations Supervisor at General Services during Plaintiff's tenure with the City (Doc. 53, ¶ 6), served on the three-person hiring committee who unanimously decided to offer Plaintiff a position with the City. Lemos Deposition, **Ex. 1** at 24:10. | | |
| 3. | At the time of Plaintiff's employment with the City, James Williamson (African-American) was the Director of Facilities Management. Doc. 53, ¶8; Plaintiff Deposition, **Ex. 2**, 25:12-14. | | |
| 4. | At the time of Plaintiff's employment with the City, Kevin O'Neil (Caucasian) was the Deputy Director of Facilities Management.  Doc. 53, ¶ 9. | | |
| 5. | Plaintiff testified that Mr. O'Neil did not discriminate against her. **Ex. 2**, 26:14-15. | | |
| 6. | Murphy Robinson (African American) became the Executive Director of General Services on September 11, 2017.  Robinson Declaration, **Ex. 3** at ¶ 1. | | |

**48**

| | Moving Party's Statement of Undisputed MaterialFacts ("MSUMF") & Supporting Evidence | Opposing Party's Response and Additional Facts and Supporting Evidence (OSUMF") | Moving Party's Reply and Supporting Evidence ("RSUMF") |
|---|---|---|---|
| 7. | Plaintiff testified she saw/interacted with Mr. Robinson only twice during her tenure with the City (**Ex. 2**, 24:10-13) and that he did not in any way discriminate against her or discipline her (**Ex. 2**, 23:25-24:2, 24:25-25:1). | | |
| 8. | As the Operations Supervisor, Mr. Lemos lacked authority to issue any formal discipline independently; while he was authorized to sign written reprimands (and nothing higher), he could not issue a written reprimand absent approval from his Director James Williamson.  **Ex. 1,** 42:3-14; Lemos Declaration, **Ex. 4**, at ¶ 2. | | |
| 9. | Under the City's Career Service Rules, a written reprimand is the least severe form of discipline that may be issued (Career Service Rule 16-42(B), **Ex. 5**) and does not result in a loss of pay or any other change in employment status (Anne Carter Declaration, **Ex. 6,** ¶ 30). | | |
| 10. | The Career Service Rules do not recognize verbal counselling sessions, reprimands, or warnings as forms of discipline; and they do not result in a demotion, loss of pay, or any other change in employment status. **Ex. 5, Ex. 6** at ¶ 29). Only Mr. Williams and Mr. Murphy, when he became employed, could issue discipline above a written reprimand to General Services employees. **Ex. 6** ¶ 31. | | |

| | Moving Party's Statement of Undisputed Material Facts ("MSUMF") & Supporting Evidence | Opposing Party's Response and Additional Facts and Supporting Evidence (OSUMF") | Moving Party's Reply and Supporting Evidence ("RSUMF") |
|---|---|---|---|
| 11. | On September 21, 2015, Plaintiff received a "Verbal reprimand" from Custodial Supervisor James Stigall (Caucasian) for not wearing her safety shoes (**Ex. 7**) which did not result in a pay change, change in job duties, or any other change in employment status. Doc. 53, ¶18c; **Ex. 2**, 62:15-19. | | |
| 12. | On October 1, 2015, Plaintiff received a Verbal Warning from Custodial Supervisor Tony Rios (Hispanic) for receiving a poor to fair inspection report rating. Doc. 53, ¶18d, **Ex. 8**. | | |
| 13. | On June 13, 2016, Mr. Lemos gave Plaintiff a documented counseling conversation regarding her personal use of her City-issued cell phone. Doc. 53, ¶18e; **Ex. 9**. Plaintiff admitted during her deposition that her use of the work phone was a "mistake." **Ex. 2**, 76:19-25. | | |
| 14. | Plaintiff alleges she complained to Mr. Williamson about unfair treatment in the Fall of 2016 (**Ex. 10**, p. 11) and she may have complained to him in May of 2017 (**Ex. 2**, 115:23-116:5). | | |
| 15. | On March 17, 2017, Plaintiff received a documented counseling conversation from Mr. Rios regarding her failure to answer her phone when Mr. Lemos called and the fact that her voice mail did not work.  Doc. 53, ¶18f; **Ex. 2**, 88:6-89:1; **Ex. 11**. | | |

|  | Moving Party's Statement of Undisputed MaterialFacts ("MSUMF") & Supporting Evidence | Opposing Party's Response and Additional Facts and Supporting Evidence (OSUMF") | Moving Party's Reply and Supporting Evidence ("RSUMF") |
|---|---|---|---|
| 16. | Plaintiff testified that the March 17, 2017 documented counseling had nothing to do with her not being Hispanic (**Ex. 2**, 90:16-18) and that Mr. Robinson and Mr. O'Neil were not involved in this action (**Ex. 2**, 89:24-90:7). |  |  |
| 17. | On May 4, 2017, Mr. Lemos issued Plaintiff a revised Written Reprimand Disciplinary Action. **Ex. 12**. |  |  |
| 18. | The May 4, 2017 reprimand states: "On Monday, March 16, 2017, I, LeRoy Lemos, FM Operations Supervisor, received a phone call from an irate Denver Motor Vehicles (DMV) office customer Brian J. who was calling on his phone with Daniel G. (witness to incident) standing next to him so that he could hear the complaint to verify and correct anything Brian was saying." **Ex. 12**. |  |  |
| 19. | The reprimand states, that "Brian" (African American)  told Mr. Lemos that "he entered the Arie P. Taylor Building (APT) via the unlocked East entrance;" "proceeded down the stairs to the 1st floor lobby to await the DMV office to open, where he encountered Daniel G. also waiting." **Ex. 1**, 52:10-53:10; **Exs. 4** at ¶¶ 4-5, 12. |  |  |
| 20. | The reprimand states, "Daniel said that he got lucky and the nice city worker [Plaintiff] let him in" the building. **Ex.1**, 52:10-53:10; **12**. |  |  |

| | Moving Party's Statement of Undisputed MaterialFacts ("MSUMF") & Supporting Evidence | Opposing Party's Response and Additional Facts and Supporting Evidence (OSUMF") | Moving Party's Reply and Supporting Evidence ("RSUMF") |
|---|---|---|---|
| 21. | The written reprimand states that Plaintiff then "came into the lobby" and "told [Brian] the building was not yet open and he needed to wait outside;" which led to a verbal exchange that was overheard by several witnesses. **Ex. 12**. | | |
| 22. | Stanford Pollard, an HSS security agent, submitted a written statement referred to in the written reprimand, which stated that he gave Mr. Lemos' phone number to Brian and that Plaintiff tried to talk to Mr. Pollard during the day. **Exs. 12, 13**. | | |
| 23. | Sequoya Palin, another HSS security agent, submitted a written statement referred to in the written reprimand, which said that Plaintiff told her that she let Daniel into the building, accused Mr. Stanford of stabbing her in the back for giving Mr. Lemos' phone number to Daniel, and complained to Ms. Palin about the incident throughout the day. **Exs. 4** at ¶ 8, 12, 14. | | |
| 24. | As stated in the written reprimand, Jerrick Perkins, another City employee, was interviewed and reported that Plaintiff told him she was worried she was going to get into trouble for letting Daniel into the building and that Mr. Pollard betrayed her and stabbed her in the back by giving out her supervisor's phone number. **Ex. 12**. Anne Carter interviewed him. **Ex. 6** ¶5. | | |

|  | Moving Party's Statement of Undisputed MaterialFacts ("MSUMF") & Supporting Evidence | Opposing Party's Response and Additional Facts and Supporting Evidence (OSUMF") | Moving Party's Reply and Supporting Evidence ("RSUMF") |
|---|---|---|---|
| 25. | The written reprimand states that Ms. Carter and Mr. Lemos met with Plaintiff about the incident on March 17, 2017, and Plaintiff told them that she did not let Daniel into the building, that she did not talk to any HSS employees about the incident and that she did not talk to Jerrick Perkins about the incident; and they asked Plaintiff to draft a written statement, which she never did. **Exs. 4** at ¶10, **6** at ¶ 8, 12. |  |  |
| 26. | The written reprimand states that a report of the "security camera footage" showed Brian coming through the unlocked door, but not Daniel, which matches the information that Plaintiff let Daniel in through the other door.  **Exs. 4** at ¶ 11, 12. |  |  |
| 27. | Plaintiff was originally injured at work and placed on concurrent workers' compensation leave/FMLA leave from July 24, 2017 through August 13, 2017. The City paid Ms. Gerovic wage replacement benefits during that period of time. Lorman Declaration, **Ex.  15**; **Ex. 16**, CCD_0269; **Ex. 17**. |  |  |

| | Moving Party's Statement of Undisputed MaterialFacts ("MSUMF") & Supporting Evidence | Opposing Party's Response and Additional Facts and Supporting Evidence (OSUMF") | Moving Party's Reply and Supporting Evidence ("RSUMF") |
|---|---|---|---|
| 28. | Anna Forsberg (Caucasian), a City employee, testified under oath during Plaintiff's administrative appeal of her termination that in September of 2017, Ms. Forsberg was told by her daycare provider that a City Custodian, Plaintiff, was representing herself as a Denver Police Officer on her public Facebook page and Ms. Forsberg took a screenshot of the page and sent it to Anne Carter. **Ex. 18**. | | |
| 29. | Mr. Lemos thereafter viewed Plaintiff's Facebook page, which listed her occupation as "Police Officer" and her employer as "Denver Police Department,"  (**Ex. 19**, CCD_5331-5333); and included pictures of Plaintiff wearing a t-shirt with a "DPD" emblem (**Ex. 19**, CCD_5337), wearing a DPD patrol person's hat (**Ex. 19**, CCD_5334-35); her DPD-issued access card that also features a DPD badge (**Ex. 19**, CCD_5336); and her wearing a hooded sweatshirt with a "DPD" emblem (**Ex. 19**, CCD_5338); **Ex. 4** at ¶ 13. | | |
| 30. | In the comments section of these photographs with Plaintiff wearing the police hat, a commenter refers to Plaintiff as a "policewoman" in Bosnian. **Ex. 6 at ¶** 12; **Ex. 19**, CCD_5334-35. | | |
| 31. | Plaintiff was issued a Contemplation of Discipline letter on September 19, 2017 setting a Contemplation of Discipline meeting to take place on September 28, 2017. **Ex. 6** at ¶ 15, 20. | | |

**54**

| | Moving Party's Statement of Undisputed MaterialFacts ("MSUMF") & Supporting Evidence | Opposing Party's Response and Additional Facts and Supporting Evidence (OSUMF") | Moving Party's Reply and Supporting Evidence ("RSUMF") |
|---|---|---|---|
| 32. | On September 20, 2017, Mr. Lemos provided Plaintiff a Notice of Change in Work Location letter stating she was being assigned to the Castro Building and her shift would be 1:30 p.m. to 10:00 p.m. (**Ex. 21**). Information regarding this meeting is included in Plaintiff's termination letter (**Ex. 22**, p. 5) and Mr. Lemos testified under oath about that meeting during Plaintiff's administrative appeal hearing of her termination (**Ex. 23**); **Ex. 4** at ¶ 15. | | |
| 33. | Kevin O'Neil testified under oath during Plaintiff's administrative appeal hearing that he was the one that decided to change Plaintiff's location. **Ex. 24**, CCD_2042:8-20, O'Neil Declaration, **Ex. 25**, ¶3. | | |
| 34. | Plaintiff met with Kevin O'Neil on September 21, 2017, regarding the location and shift change. Mr. O'Neil prepared a statement regarding this meeting (**Exs. 25**, ¶4, **26**), information from that statement is referred to in Plaintiff's termination letter (**Ex. 22**, pp. 5-6), and Mr. O'Neil testified under oath about that meeting during Plaintiff's administrative appeal hearing of her termination (**Ex. 24**, CCD_2043-46). | | |

55

|  | Moving Party's Statement of Undisputed MaterialFacts ("MSUMF") & Supporting Evidence | Opposing Party's Response and Additional Facts and Supporting Evidence (OSUMF") | Moving Party's Reply and Supporting Evidence ("RSUMF") |
|---|---|---|---|
| 35. | Plaintiff then went to Mr. Robinson's office. Mr. Robinson prepared a statement regarding this meeting (**Ex. 3** at ¶ 9, **27**), some information from that statement is included in the termination letter (**Ex. 24**, p.6), and Mr. Robinson testified under oath about that meeting during Plaintiff's administrative appeal hearing of her termination (**Ex. 28**). |  |  |
| 36. | During her meeting in Mr. Robinson's office, Plaintiff admitted to Mr. Murphy that she had made a mistake with her Facebook posts.  **Ex. 2**, 157:2-4. |  |  |
| 37. | Plaintiff testified that while she was in Mr. Robinson's office, she was "crying" and said something to the effect of "even if I am killing myself... even if I killed myself to" prove how good I'm working.  **Ex. 2**, 155:20-156:11. |  |  |
| 38. | Mr. Robinson heard Plaintiff say she was going to kill herself, which caused him to fear for her safety.  **Exs. 3** at ¶ 7, **27**. |  |  |
| 39. | As a result, on September 22, 2017, Plaintiff was placed on paid administrative leave and she was scheduled for a fitness for duty exam. **Ex. 6** at ¶ 22; **Ex. 29**, 105:24-106:8; **Ex. 30**. |  |  |
| 40. | The Administrative Leave Action Notice stated Plaintiff should not report to the workplace and Anne Carter instructed her the same. **Ex. 6** at ¶ 21; **Ex. 29**, 110:18-20; **Ex. 30**. |  |  |

| | Moving Party's Statement of Undisputed MaterialFacts ("MSUMF") & Supporting Evidence | Opposing Party's Response and Additional Facts and Supporting Evidence (OSUMF") | Moving Party's Reply and Supporting Evidence ("RSUMF") |
|---|---|---|---|
| 41. | Despite that, Plaintiff entered her workplace, a secure area, on the morning of September 22, 2017 and was discovered by her supervisor. **Ex. 1**, 79:19-80:10; **Exs. 4** at ¶ 18, **6** at ¶ 21; **Ex. 29**, 119:4-10; **Ex. 31**. | | |
| 42. | Therefore, the City asked HSS to create a Be-on-the-Lookout Poster ("BOLO") so Plaintiff's department could be aware of when she was entering City facilities during her administrative leave. **Ex. 1**, 80:1-10; **Ex. 29**, 110:20-25. | | |
| 43. | The BOLO is directed to "HSS Employees in ALL Buildings" and states "[i]f [Plaintiff] is seen entering ANY Building, contact your supervisor immediately." **Ex. 32**, September 22, 2017 BOLO. | | |
| 44. | The BOLO did not result in any demotion, reduction in pay, or other significant change in job status. **Ex. 6** at ¶ 21. | | |
| 45. | Plaintiff was placed on administrative leave with pay for nine days from September 22, 2017, through October 3, 2017, and then was returned to her work as a custodian on the same shift with the same pay and no other change in benefits. **Ex. 2**, 167:11-22; **Ex. 6** at ¶ 24; **Ex. 16**, p. 6. | | |

| | Moving Party's Statement of Undisputed Material Facts ("MSUMF") & Supporting Evidence | Opposing Party's Response and Additional Facts and Supporting Evidence (OSUMF") | Moving Party's Reply and Supporting Evidence ("RSUMF") |
|---|---|---|---|
| 46. | On or about October 3, 2017, Plaintiff received a Notice of Change in Work Location (**Ex. 33**) which amended the manager's name on her September 21, 2017, Notice of Change in Work Location (**Ex. 34**)  which changed her schedule back to 6:00 a.m. to 2:30 p.m.  **Ex. 4** at ¶ 19, **Ex. 34**. Plaintiff testified this change did not affect her duties, shift, or pay (**Ex. 2**, 167:16-22) and, in fact, put her closer to home (**Ex. 2**, 138:16-23). | | |
| 47. | On October 5, 2017, City employee Amber Escobedo told Mr. Lemos that she had concerns about Plaintiff and he directed her to share her concerns with the City's HR Department. **Ex. 4** at ¶ 20. | | |
| 48. | Ms. Escobedo told Anne Carter with HR that she had worked with Plaintiff on a number of occasions and that Plaintiff's attitude and language were generally quite inappropriate, vulgar, and offensive. **Ex. 6** at ¶ 26.  Ms. Escobedo signed a written statement (**Ex. 35**) which was used for Plaintiff's termination letter (**Ex. 22**, p. 7) and Ms. Escobedo testified under oath during Plaintiff's administrative appeal hearing of her termination (**Ex. 36**). | | |

| | Moving Party's Statement of Undisputed MaterialFacts ("MSUMF") & Supporting Evidence | Opposing Party's Response and Additional Facts and Supporting Evidence (OSUMF") | Moving Party's Reply and Supporting Evidence ("RSUMF") |
|---|---|---|---|
| 49. | The Contemplation of Discipline letter of September 19, 2017, was subsequently revised and re-issued on October 18, 2017, to include additional information regarding the Facebook posts, Plaintiff's 9/20/17 meeting with Mr. Lemos, Plaintiff's 9/21/17 meeting with Mr. O'Neil, her 9/21/17 meeting with Mr. Robinson, her 9/22/17 appearance at Police District 5, and the information relayed by Ms. Escobedo.  **Ex. 6** at ¶ 27; **Ex. 29**, 124:12-20; **Ex. 37**. Plaintiff admitted that the October 18, 2017 Notification of Contemplation of Disciplinary Action letter was not issued because of complaints she had filed.  **Ex. 2**, 191:24-192:2. | | |
| 50. | In accordance with the Career Service Rules, a contemplation of discipline meeting was held on October 31, 2017, where Plaintiff was represented by an attorney and had the opportunity to discuss everything in the Contemplation of Discipline Letter. **Ex. 6** at ¶ 28. | | |
| 51. | After the contemplation meeting, Defendant Williams made the determination to terminate Plaintiff and testified under oath to that effect at Plaintiff's administrative appeal hearing of her termination. **Ex. 38**, CCD_2129, 2144:16-2145:2. | | |
| 52. | The decision was not based in any way on Plaintiff's race, color, national origin, ethnicity, or ancestry.  Williams Declaration, **Ex. 39**, ¶3. | | |

| | Moving Party's Statement of Undisputed MaterialFacts ("MSUMF") & Supporting Evidence | Opposing Party's Response and Additional Facts and Supporting Evidence (OSUMF") | Moving Party's Reply and Supporting Evidence ("RSUMF") |
|---|---|---|---|
| 53. | Mr. Lemos was not involved in the decision to terminate Plaintiff. **Ex. 1**, 76:23-77:2; **Ex. 4** at ¶ 21; **Ex. 39**, ¶3. Plaintiff testified that she has no evidence that either Defendant Robinson or O'Neil were involved in her termination. **Ex. 2**, 201:13-18 | | |
| 54. | On November 27, 2017, Mr. Williams issued a Notification of Dismissal to Plaintiff. **Ex. 22**. Plaintiff was never replaced by the City. **Ex. 4** at ¶ 27. | | |
| 55. | Ms. Gerovic went back on concurrent workers' compensation leave/FMLA leave for the same injury on October 20, 2017 (**Ex. 40**) through December 6, 2017 (**Ex. 41**). **Ex. 15** ¶4, **Ex. 16**, CCD_275-277. Ms. Gerovic was not released to return to full duty by her medical provider until December 6, 2017 and received workers' compensation wage replacement benefits from the City until that time. **Exs. 16**, ¶7, **17**.  Because Ms. Gerovic was not released to full duty by her medical provider until after her termination, she never returned from concurrent workers' compensation leave/FMLA leave and never returned to her custodial position. **Ex. 15, ¶**6. | | |
| 56. | Plaintiff testified that she believes she would have received the Notification of Dismissal even if she had not taken FMLA leave and even if she had not filed complaints. **Ex. 2**, 199:21-200:5. | | |

**60**

| | Moving Party's Statement of Undisputed MaterialFacts ("MSUMF") & Supporting Evidence | Opposing Party's Response and Additional Facts and Supporting Evidence (OSUMF") | Moving Party's Reply and Supporting Evidence ("RSUMF") |
|---|---|---|---|
| 57. | Plaintiff testified that Mr. Robinson did not retaliate against her, Mr. O'Neil did not retaliate against her, that she "can't say now" whether Mr. Williamson retaliated against her, and that "[o]nly Leroy Lemos" retaliated against her and only because "she has a great relationship with the police department and he doesn't." **Ex. 2**, 207:5-23. | | |
| 58. | The Notification of Dismissal states: "Your [Facebook] profile is of concern as you list the Denver Police Department as your employer and list your occupation as 'Police Officer.' . . . [Y]ou also posted several pictures in 2015 showing yourself wearing a sweatshirt with a Denver Police Department embroidered badge, wearing a patrolman's hat, wearing a t-shirt with an embroidered DPD patch and a close-up photo of your DPD-issued access card that also features a DPD badge." (**Ex. 22**, pp. 3-4). | | |

| | Moving Party's Statement of Undisputed MaterialFacts ("MSUMF") & Supporting Evidence | Opposing Party's Response and Additional Facts and Supporting Evidence (OSUMF") | Moving Party's Reply and Supporting Evidence ("RSUMF") |
|---|---|---|---|
| 59. | The Notification of Dismissal further states: "Falsely identifying yourself to the public as a police officer is both troubling and unacceptable.  In your position as a custodian, you routinely interact with members of the public.  Be wearing clothing items that have police badges, posting pictures of yourself in police issued clothing and posting a copy of your police building access card, you can create public confusion regarding your role, responsibilities and duties.  It can also be dangerous to you and the public, should someone need police assistance or intervention and come to you for help.  Representing yourself as a police officer, as a joke or to impress others, is not only deceitful, but could be perceived as impersonating a police officer, which is a serious offense."  (**Ex. 22**, pp. 4-5). | | |
| 60. | The Notification of Dismissal reports Plaintiff's conduct with Mr. Lemos on September 19, 2017 (**Ex. 22**, p. 5), with Mr. O'Neil (*Id.*, pp. 5-6), and Mr. Robinson (*Id.*, p. 6) on September 21, 2017; at DPD District 5 on September 22, 2017 (*Id.*), emails received (*Id.*), and an employee report that Plaintiff's "attitude and language was very inappropriate on a consistent basis" (*Id.*, p. 7). | | |

| | Moving Party's Statement of Undisputed Material Facts ("MSUMF") & Supporting Evidence | Opposing Party's Response and Additional Facts and Supporting Evidence (OSUMF") | Moving Party's Reply and Supporting Evidence ("RSUMF") |
|---|---|---|---|
| 61. | The Notification of Dismissal states: "Your activities do not follow protocols, were not completely truthful and were disrespectful to FM management.  Your use of worktime and involving others in your personnel matters was disruptive to the workplace.  You have been advised of this inappropriate activity in the past yet continued to take worktime to spread rumors and complaint about your management team." **Ex. 22,** p. 7. | | |
| 62. | Plaintiff filed her EEOC Charge on September 21, 2018, and checked the boxes for "retaliation," "race," and "color," but did not check the box for "national origin discrimination." **Ex. 2**, 22:20-23:4; **Ex. 42**. | | |
| 63. | Plaintiff's EEOC Charge does not reference discrimination based on incidents involving comparators "Lucia," Annette Subia, or Sharon Romero. **Ex. 42**. | | |
| 64. | During her employment, at least two of Plaintiff's four direct supervisors were Caucasian, James Stigall and Russ Vander Kooy. **Ex. 2**, 27:2-20, 29:14-16. | | |

| | Moving Party's Statement of Undisputed MaterialFacts ("MSUMF") & Supporting Evidence | Opposing Party's Response and Additional Facts and Supporting Evidence (OSUMF") | Moving Party's Reply and Supporting Evidence ("RSUMF") |
|---|---|---|---|
| 65. | Plaintiff alleges that Mr. Lemos discriminated against James Stigall (Caucasian), a Supervisor, by holding a meeting with him every Tuesday, after which Mr. Stigall would return crying (**Ex. 2**, 31:15-24), and that Mr. Stigall was given "bogus write-ups" and was "treated differently because he was white," such that "he felt that he had no choice but to resign, which he did in 2015" (**Ex. 10**, pp. 4-5). | | |
| 66. | Plaintiff alleges Mr. Lemos discriminated against Keith Dochterman (Caucasian) (**Ex. 10**, pp. 4-5); but testified that she did not know whether Mr. Dochterman was ever disciplined (**Ex. 2**, 35:8-10), other than Mr. Dochterman telling her he was (*Id*. 35:19-22). | | |
| 67. | Plaintiff alleges that Mr. Dochterman was "verbally harassed by Leroy Lemos frequently, for no legitimate reasons other than discrimination, and due to his fear of being improperly fired because of discriminatory motives, he decided to voluntarily resign from employment in 2016." **Ex. 10**, p.5. | | |
| 68. | Viola Chacon (Hispanic) was a custodian who was found to have violated five Career Service Rules, including Rule 16-29(D), prohibiting any act of dishonesty, resulting in her termination by Mr. Williamson. **Ex. 4** at ¶24; **Ex. 43**, June 15, 2017 Notification of Dismissal Disciplinary Action. | | |

**64**

| | Moving Party's Statement of Undisputed MaterialFacts ("MSUMF") & Supporting Evidence | Opposing Party's Response and Additional Facts and Supporting Evidence (OSUMF") | Moving Party's Reply and Supporting Evidence ("RSUMF") |
|---|---|---|---|
| 69. | Plaintiff identifies Danielle Garcia (Hispanic) as a similarly-situated employee. Doc. 53, ¶ 17(b), **Ex. 10**, p.6. She was actually a Utility Worker who Mr. Williamson demoted to the position of custodian she violated the Career Service Rules. **Ex. 4** at ¶25; **Ex. 44**, June 2, 2017 Notification of Involuntary Demotion Disciplinary Action. | | |
| 70. | Unlike Plaintiff, at the time of her demotion, Ms. Garcia had only received one verbal reprimand in 2014. **Ex. 4** at ¶25; **Ex. 44**, p. 6. Unlike Plaintiff, Ms. Garcia did not misrepresent herself as a police officer, behave dishonestly, or enter a City building without prior authorization on administrative leave. **Ex. 44**. | | |
| 71. | Plaintiff identified "Teresa" [Luyando] as another similarly-situated comparator. (Doc. 53, ¶ 17(b); **Ex. 10**, p.6) on the basis that Ms. Luyando, who worked for the City for 15 or 20 years, had many problems and write-ups at work, but was not terminated (**Ex. 2**, 53:10-19; 54:14-21). There is no such evidence. | | |
| 72. | Plaintiff asserts that a co-worker named David Chavez was making 50 cents more per hour than her at the time he started working for the City in March of 2016. Doc. 53, ¶18(b), **Ex. 2**, 58:6-7). At the time Mr. Chavez was hired by the City, he had been a Facilities Manager at DPS for 22 years. **Ex. 4** at ¶23. | | |

| | Moving Party's Statement of Undisputed MaterialFacts ("MSUMF") & Supporting Evidence | Opposing Party's Response and Additional Facts and Supporting Evidence (OSUMF") | Moving Party's Reply and Supporting Evidence ("RSUMF") |
|---|---|---|---|
| 73. | Plaintiff identified John Gandara as a similarly-situated comparator (**Ex. 10**, p.5) on the basis that both she and Mr. Gandara did not wear  required safety shoes, yet she was the only one who received a verbal reprimand from Mr. Stigall (Caucasian) on September 21, 2015.  **Ex. 2**, 37:6-17. | | |
| 74. | Plaintiff testified that Mr. Gandara was treated differently because when she was on light duty with a workers' compensation injury in October of 2017, she had to work near Mr. Lemos, while Mr. Gandara worked in the rec center.  **Ex. 2**, 37:20-25; 39:1, 13-16. | | |
| 75. | Plaintiff alleges that a "half Hispanic" Custodian named Lucia was treated differently "over three years ago" because she (Plaintiff) had to strip and wax Lucia's floor, at a time when Lucia had been employed by the City for 20 or 25 years. **Ex. 2**, 40:1-2, 16-23; 41:5-8. | | |
| 76. | Plaintiff alleges that Yvonne Chavez, a Supervisor in the Utility Department, was treated differently from her because Ms. Chavez performed a white-gloved inspection of Plaintiff's floor and stairs in the Police Administration Building. **Ex. 2**, 41:13-42:2; 43:23; 44:3-7; **Ex. 10**, p.6). | | |

| | Moving Party's Statement of Undisputed MaterialFacts ("MSUMF") & Supporting Evidence | Opposing Party's Response and Additional Facts and Supporting Evidence (OSUMF") | Moving Party's Reply and Supporting Evidence ("RSUMF") |
|---|---|---|---|
| 77. | Plaintiff alleges that custodian Annette Subia was treated differently because Ms. Subia was responsible for only half a floor in the Police Administration Building while Plaintiff was responsible for three floors and the trash. **Ex. 2**, 42:11-25. | | |
| 78. | Plaintiff identified Sharon Romero as a comparator (**Ex. 10**, p.6), alleging she was treated differently in "May or June" of 2017 because Ms. Romero came to District 5 and started "harassing me about the trash in [the] parking lot," and Mr. Lemos "didn't do anything." **Ex. 2**, 44:20-45:24. | | |
| 79. | Messrs. Williamson, O'Neil, and Lemos relied on the information in the multiple witness statements and honestly believed Plaintiff violated the conduct rules identified in the May 2017 Written Reprimand and the individual City Defendants honestly believed that Plaintiff committed the rule violations in her termination letter. **Exs. 3** ¶ 10; **4** ¶¶ 12, 21; **25** ¶¶ 2, 6; **39** ¶¶ 2, 4. | | |
| 80. | Plaintiff admits her verbal reprimand, verbal warning,  documented counseling, and written reprimand, had any effect on her future employment prospects. **Ex. 2**, 62:15-19; 69:13-15; 89:12-23, 95:21-96:1. | | |

Submitted May 21, 2021.

SHELBY A. FELTON
NATALIA S. BALLINGER
Assistant City Attorneys

*s/  Shelby A. Felton*
Denver City Attorney's Office
201 W. Colfax Avenue, Dept. 1108
Denver, Colorado 80202
(720) 913-3125
E-mail:  shelby.felton@denvergov.org
E-mail:  natalia.ballinger@denvergov.org
E-mail:  dlefiling.litigation@denvergov.org
*Attorneys for the City Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on May 21, 2021, a true and correct copy of the foregoing **CITY DEFENDANTS' SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT** was filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following email address:

Nathan Davidovich
Davidovich Law Firm, LLC
501 S. Cherry St., Suite 1100
Denver, Colorado 80246
nathandavidovich@talk-law.com

Michael A. Watts
Retherford, Mullen & Moore
2 N. Cascade, Suite 500
Colorado Springs, Colorado 80903
mwatts@rmmattys.com

*s/ Kimberly Berridge*
Denver City Attorney's Office

CONFIDENTIAL - Leroy Lemos - April 27, 2021

```
 1              IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLORADO
 2

     Civil Action Number 1:19-cv-03710-RM-NRN
 3

     EMINA GEROVIC,
 4
 5          Plaintiff,
 6   vs.
 7   CITY AND COUNTY OF DENVER, a Body politic and corporate
     of the State of Colorado, acting by and through its
 8   DEPARTMENT OF GENERAL SERVICES and FACILITIES
     MANAGEMENT OPERATIONS; LEROY LEMOS, in his official
 9   capacity as Facilities Management Operations Supervisor
     at the Department of General Services, and in his
10   individual capacity; MURPHY ROBINSON, in his official
     capacity as Executive Director of General Services, and
11   in his individual capacity; JAMES E. WILLIAMSON, in his
     official capacity as Facilities Management Operations
12   Director at the Department of General Services, and in
     his individual capacity; KEVIN O'NEIL, in his official
13   capacity as Facilities Management Operations Deputy
     Director at the Department of General Services, and in
14   his individual capacity; JOEL WOMICK, in his official
     capacity as DGS Contingent Worker at HSS Inc., and in
15   his individual capacity; KYLE KNOEDLER, in his official
     capacity as DGS Facility Supervisor of HSS Inc., and in
16   his individual capacity; and HSS, INC., a Colorado
     Corporation, acting as a hired agent by the City and
17   County of Denver, by and through their contingent
     workers, Joel Womick, Kyle Knoedler, and others.
18
            Defendants.
19
     ----------------------------------------------------
20     CONFIDENTIAL VIDEO VIDEOCONFERENCED DEPOSITION OF
                            LEROY LEMOS
21                         April 27, 2021
     ----------------------------------------------------
22
23
24
25
                                                  Page 1
```

EXHIBIT 1
**69**

Leroy Lemos (Redacted) - April 27, 2021

| | |
|---|---|
| 1      A.  I want to say yes, there was a | 1 that same verbal -- verbal warning? |
| 2 development -- I can't think of the name now -- | 2      A.  No.  No.  It was -- it was the |
| 3 individual development plan, where my -- there was a | 3 exclamation point that I needed to mind my responses. |
| 4 need to -- I didn't have any performance issues.  There | 4      Q.  Now, you know Emina Gerovic, right, the |
| 5 was a need to improve my image, personality and | 5 plaintiff in this case? |
| 6 popularity-wise. | 6      A.  I do. |
| 7      Q.  When was this, approximately? | 7      Q.  When did you first meet her? |
| 8      A.  Right around the same time. | 8      A.  It would have probably been during the |
| 9      Q.  And who gave you that verbal? | 9 interview process when she was brought on board. |
| 10      A.  Kevin O'Neil. | 10      Q.  Were you a part of the interviewing of |
| 11      Q.  What kind of complaints did he have | 11 whoever was -- decided to hire her? |
| 12 about your image and personality, if any? | 12      A.  Yes, I was.  She was the first hire once |
| 13           MS. FELTON:  Object to form. | 13 I received my promotion. |
| 14      A.  My normal face is this.  So I'm not | 14      Q.  When you interviewed her, did you |
| 15 generally a smiley person.  And we interact a lot with | 15 interview her by yourself or with anybody else? |
| 16 the public and other employees.  And so people | 16      A.  We always do interviews with the |
| 17 perceived this permanent line on -- I don't know if you | 17 committee. |
| 18 can see it, but it's a permanent line -- | 18      Q.  So, like, how many people would be |
| 19      Q.  (By Mr. Davidovich)  Can't. | 19 interviewing Ms. Gerovic at that time? |
| 20      A.  -- perceived that as a scowl or that I | 20      A.  Three or four.  I believe it was three. |
| 21 was mad or upset or, you know, I could have been | 21 It might have been four, because I was new.  So I -- I |
| 22 thinking about the birds in the trees.  But for | 22 probably had HR in there to help me, to help guide me |
| 23 whatever reason, this line is there, and my face | 23 through the process and then to put my direct reports, |
| 24 isn't -- | 24 who are -- who the custodians report to.  So the |
| 25      Q.  Can't do anything about that. | 25 custodial supervisors, I would have had at least two of |
| Page 22 | Page 24 |
| 1      A.  -- an inviting one.  Right.  So I tried | 1 them with me. |
| 2 to smile more. | 2      Q.  Okay.  And do you remember the date of |
| 3      Q.  Was any part of that verbal -- did that | 3 that event? |
| 4 have anything to do with anything you actually said to | 4      A.  I don't. |
| 5 any member of the public or any employee? | 5      Q.  Do you remember -- |
| 6      A.  Yes. | 6      A.  It was 2014. |
| 7      Q.  What was alleged that you said that he | 7      Q.  Okay.  Um-hum.  During the time of |
| 8 didn't like? | 8 Ms. Gerovic's employment, from 2014 until her |
| 9      A.  I needed credentials for an event that | 9 termination in 2017, who were your supervisors?  What |
| 10 was highly secure, and there was a single point of | 10 was the chain of command above you? |
| 11 contact for those, and they arbitrarily decided that I | 11      A.  The entire time above me was Kevin |
| 12 and my assistant were not going to get credentials. | 12 O'Neil, up until he retired last year.  I think that |
| 13 And so my response was, Well, I haven't needed you to | 13 was in October. |
| 14 accomplish my job -- to complete my job in the past; I | 14      Q.  Okay.  Who was above Kevin O'Neil at |
| 15 don't need it today either. | 15 that time, if you know? |
| 16      Q.  Who did you make that comment to? | 16      A.  James Williamson was the director of |
| 17      A.  It was an appointee in the mayor's | 17 facilities.  Kevin was the deputy director. |
| 18 office. | 18      Q.  Okay.  During that same period of time, |
| 19      Q.  Yeah, you don't want to mess with the | 19 who did you supervise? |
| 20 mayor's office; right? | 20      A.  I managed -- at that point, there were |
| 21      A.  Well, you know, you live and learn. | 21 four custodial supervisors.  I had building and grounds |
| 22 That was a great learning and training opportunity for | 22 supervisor, which is the technical or the |
| 23 me. | 23 classification for the utility team supervisor. |
| 24      Q.  Okay.  Any other critiques of any verbal | 24      Q.  Would you give me the names -- would you |
| 25 things that you might have said to anybody during -- in | 25 give me the names as you go through these, please. |
| Page 23 | Page 25 |

7 (Pages 22 - 25)

Leroy Lemos (Redacted) - April 27, 2021

| | |
|---|---|
| 1 number of documents that I've reviewed, they are not | 1 their work in the background, and then generally I'll |
| 2 included. If you can do that, I would appreciate it. | 2 receive an email with a formal document with |
| 3     Q. (By Mr. Davidovich) You said that if you | 3 instructions on, you know, sign and serve, sign and |
| 4 went beyond the documented verbal, and beyond that you | 4 make a meeting plan for a Contemplation of Discipline |
| 5 send it up to your supervisor. Is that what you said? | 5 meeting, things like that. |
| 6     A. HR and -- and then my -- my manager, | 6     So I get my instructions at that point, |
| 7 yes. | 7 because as the manager, the final document becomes -- I |
| 8     Q. Do you then drop out of the picture, or | 8 become the owner of the final document. |
| 9 are you involved in that decision-making process as to | 9     Q. Okay. Was it ever a part of your job |
| 10 whether or not to issue a written reprimand? | 10 during Ms. Gerovic's employment to tell her immediate |
| 11     A. That happens mostly in the background, | 11 supervisors to write up some kind of discipline, either |
| 12 but -- and the process has changed over the years, but | 12 verbal or -- or submit for a written -- |
| 13 back then I was responsible for assisting in the | 13     A. Yeah. We always -- |
| 14 draft -- the drafting of any documents. | 14     Q. I'm sorry. |
| 15     Q. So you were able to put your -- give | 15     A. Yeah. Absolutely. We always talked |
| 16 your input into HR about what needed to be done, what | 16 about -- I always counseled and talked with my |
| 17 you thought needed to be done; is that correct? | 17 supervisors about personnel issues. Absolutely. |
| 18     A. I was -- again, I drafted the -- you've | 18     Q. And have there been occasions where you |
| 19 seen the format for written reprimands or written | 19 might have observed something, but the supervisor |
| 20 discipline. So there's a lot of language that goes in | 20 didn't, and nonetheless, you would tell the supervisor |
| 21 there. And so for the most part, HR does a lot of | 21 to do some kind of a verbal communication to the |
| 22 that. But as far as the specifics of the | 22 employee? |
| 23 transgression, if you will, or the incident or the | 23     A. If I seen it and the supervisor didn't, |
| 24 problem that's being documented, then I have -- I have | 24 then I would do it myself, if it is in that context. |
| 25 to contribute a narrative. | 25     Q. Okay. When you would make a |
| <div align="right">Page 42</div> | <div align="right">Page 44</div> |
| 1     Q. Would it be accurate to say that you are | 1 recommendation about discipline for an employee, in the |
| 2 tasked with doing the -- or you were tasked -- doing | 2 context of a documented verbal, correct me if I'm |
| 3 the first draft, and then HR looks at that and makes | 3 wrong, I understand that then goes to HR to do a |
| 4 changes? | 4 written. Am I right or not? |
| 5     A. I do a narrative on the incident, and | 5     A. No. Can you say that again? No, that |
| 6 then that is put into a format by HR into the whole | 6 doesn't sound right. |
| 7 bigger document, right, because it has to have all | 7     Q. I want to make sure I got the steps |
| 8 these different sections and, you know, note previous | 8 right. At one point, you said it leaves your hand, and |
| 9 reprimands or discipline incidents, things like that. | 9 you have to send it up to HR. What point is that? |
| 10     So it -- you know, there's multiple | 10     A. So at the point that an event or |
| 11 people that are involved in the drafting. And so my | 11 transgression has taken place that rises to above what |
| 12 piece of it is the narrative of whatever violation or | 12 I perceive as potentially above the level of verbal, |
| 13 the incident or the issue at hand. | 13 then that's when, you know, I have a responsibility to |
| 14     Q. Okay. In addition to the written | 14 report to managers and HR whatever that event was or |
| 15 narrative, do you also have discussions with somebody | 15 the transgression was. And then at that point, HR and |
| 16 with HR about the particular problem at hand? | 16 management made a determination how to move forward. |
| 17     A. You mean do I talk to HR about personnel | 17     Q. Who ultimately determines whether or not |
| 18 issues? | 18 to move forward with a written discipline-type |
| 19     Q. I mean, let's say you want a -- one | 19 document? |
| 20 of these written -- you want a written reprimand. You | 20     A. Those would be the executive managers |
| 21 want HR to issue one, and you've done the narrative | 21 and HR. |
| 22 part. Is there a process where you would then talk to | 22     Q. In your practice over the years that |
| 23 HR about what you've written, or they talk to you? How | 23 Ms. Gerovic was employed, did you find that HR would |
| 24 does that work? | 24 normally follow your recommendation as to whether or |
| 25     A. I submit the narrative, and then they do | 25 not further discipline was needed for an employee? |
| <div align="right">Page 43</div> | <div align="right">Page 45</div> |

<div align="right">12 (Pages 42 - 45)</div>

Leroy Lemos (Redacted) - April 27, 2021

| | |
|---|---|
| 1       A.  No.  I have no reason to believe that | 1       A.  No, unless it was her supervisor. |
| 2   she was lying. | 2       Q.  Okay.  Do you recall an incident that |
| 3       Q.  Okay.  So if she -- if you had no reason | 3   occurred in March of 2017 regarding two people who |
| 4   to believe she was lying, and she's telling you that | 4   entered the building that she was custodian at and |
| 5   the boots make her feet -- her toes bleed, why did you | 5   being involved in some kind of a confrontation with |
| 6   require her to put her boots on and write her | 6   Ms. Gerovic? |
| 7   discipline for not doing so? | 7       A.  Yeah, I recall that incident. |
| 8       A.  Because all custodians are required to | 8       Q.  Tell me what you recall about it, |
| 9   report for duty in full uniform, which include safety | 9   please. |
| 10   boots, and there's a separate process, both with HR and | 10       A.  I received a phone call from a |
| 11   our interactive accommodation process, to be given | 11   gentleman, who was there at Arie P. Taylor.  With him |
| 12   light duty, for example, where during the time that | 12   on speakerphone was another gentleman, and they were |
| 13   she's convalescing, that her feet are healing so that | 13   reporting that the person that was on speakerphone had |
| 14   she can wear her boots on a daily basis. | 14   been let into the building to get warm, or to warm up, |
| 15       During that time, they will assign her | 15   prior to the building opening by Emina. |
| 16   to an office to do copying or stapling or some function | 16       And the person who was calling was irate |
| 17   where she can wear a more comfortable shoe, be out of | 17   and upset, because that person had also gained access |
| 18   her Facilities Management-required uniform and then | 18   into the building through a different route.  And when |
| 19   convalesce prior to coming back to full duty.  Because, | 19   Emina saw that person with the first person that she |
| 20   again, all custodians and utility workers are required | 20   had let in, demanded that the second person leave but |
| 21   to wear their safety boots at all times when they're on | 21   that the first person didn't need to leave. |
| 22   duty.  If they can't do that, they're not able to | 22       And so the caller was very upset.  The |
| 23   report. | 23   person on speakerphone also was upset but more, you |
| 24       Q.  Did you explain to her that those were | 24   know, upset for the person that was calling and wanting |
| 25   her options? | 25   to verify that person's accounting of what had just |
| Page 50 | Page 52 |
| 1       A.  Absolutely.  She was well aware. | 1   transpired. |
| 2       Q.  What was her response to you when you | 2       I took notes and then reached out to |
| 3   told her that you could try to get an accommodation not | 3   Emina but didn't get a response on her cell phone.  And |
| 4   to work or do something -- to work in a different area? | 4   so then let Kevin know of the phone call as well. |
| 5   How did she respond to that, if at all? | 5       Q.  With regard to the -- these two people, |
| 6       A.  She started wearing her boots.  There | 6   you say the first one entered by permission of |
| 7   wasn't a request for -- on her behalf from her to | 7   Ms. Gerovic.  She let him in? |
| 8   participate in the interactive process. | 8       A.  Um-hum. |
| 9       Q.  During that same meeting where you | 9       Q.  Is that correct? |
| 10   observed her not wearing her safety boots -- excuse | 10       A.  Correct. |
| 11   me -- did you observe another employee at the same time | 11       Q.  And the second one, as far as you know, |
| 12   who was not wearing the appropriate uniform? | 12   did not enter with any permission; is that correct? |
| 13       MS. FELTON:  Object to form. | 13       A.  Well, so Arie P. Taylor is a complex. |
| 14       A.  Not that I recall. | 14   It includes Police District 5 on the north end of the |
| 15       Q.  (By Mr. Davidovich)  Did you notice | 15   complex, which is where Emina was assigned.  And then |
| 16   during that meeting a Hispanic employee who also was | 16   on the -- what would be the basement or what we call |
| 17   not wearing the work boots? | 17   the first floor, because the west entrance is lower |
| 18       A.  I did not see another employee not | 18   than the east entrance.  So the west entrance comes in |
| 19   wearing work boots. | 19   on the ground floor, which we call 1.  The east |
| 20       Q.  Do you recall asking Ms. Gerovic to | 20   entrance comes in on the second floor, at that ground |
| 21   report to you after the meeting, during that meeting? | 21   level. |
| 22       A.  Yes. | 22       So the way this incident happened at the |
| 23       Q.  And do you recall during that meeting | 23   east -- excuse me -- the incident happened at the west |
| 24   asking another employee to report to you after the | 24   entrance, at the ground level, the lower level, which |
| 25   meeting? | 25   is the entry for DMV, Department of Motor Vehicles. |
| Page 51 | Page 53 |

14 (Pages 50 - 53)

Leroy Lemos (Redacted) - April 27, 2021

| | |
|---|---|
| 1    A.  She did. | 1  the PAB team or our floaters.  Back then we had a |
| 2    Q.  To your knowledge, did Internal Affairs | 2  larger team, so we had floaters available.  And so |
| 3  Bureau find that she had done anything wrong from a | 3  generally we were just assigned somebody, that didn't |
| 4  criminal standpoint? | 4  have a permanent assignment, over to cover folks, |
| 5    MS. FELTON:  Object to form. | 5  because we -- almost every day we have folks out on |
| 6    A.  No, they didn't charge her criminally. | 6  either PTO, sick, vacation, FML, whatever it happens to |
| 7  They basically came to a conclusion that she was not in | 7  be. |
| 8  possession of any police uniforms. | 8    Q.  What consideration was made by you or by |
| 9    Q.  (By Mr. Davidovich)  Did they make any | 9  HR, to your knowledge, as to what kind of discipline |
| 10  comments about whether or not she felt that the whole | 10  should be given to Emina for these Facebook posts? |
| 11  thing was done as a joke? | 11    MS. FELTON:  Form. |
| 12    MS. FELTON:  Object to form. | 12    A.  I didn't -- I didn't have input into the |
| 13    A.  They reported what she told them, so | 13  final decision.  That was HR.  I couldn't answer for |
| 14  that was in there.  Yeah.  I mean, they -- they | 14  them. |
| 15  documented their discussion with her. | 15    Q.  (By Mr. Davidovich)  Did you write up |
| 16    Q.  (By Mr. Davidovich)  Did you have any | 16  one of these documents you referred to earlier, |
| 17  discussion with anybody from the Internal Affairs | 17  documented verbal consultation? |
| 18  Bureau yourself? | 18    A.  No. |
| 19    A.  No. | 19    Q.  Were you aware of whether or not there |
| 20    Q.  This question about the Facebook post | 20  was any discussion made of suspending Ms. Gerovic for a |
| 21  took place in September.  You said September 11th, I | 21  short period of time rather than terminating her? |
| 22  believe? | 22    A.  No.  I'm not aware of those discussions. |
| 23    A.  The initial discussion where I was | 23    Q.  Did HR or anybody from HR ask your |
| 24  notified of the Facebook post was September 11th, yes. | 24  opinion about whether you thought she should be |
| 25    Q.  And your discussion with her was also in | 25  terminated or whether she should be given another |
| Page 74 | Page 76 |

| | |
|---|---|
| 1  September 2017? | 1  chance? |
| 2    A.  Yes. | 2    A.  No.  They didn't ask my opinion. |
| 3    Q.  At the time of the conversation with her | 3    Q.  Do you know whether or not there was any |
| 4  about the Facebook posts, were you aware that she had | 4  consideration as to whether she should be given another |
| 5  been approved for FMLA leave? | 5  chance and not be terminated? |
| 6    A.  No.  Yeah, I don't believe so. | 6    MS. FELTON:  Object to form.  Asked and |
| 7    Q.  Do you know what FMLA leave is? | 7  answered. |
| 8    A.  Yeah, but if she was there, then she -- | 8    A.  I wasn't part of any of those |
| 9  if we were having meetings, and I was able to interact | 9  discussions.  That's all HR and upper management. |
| 10  with her, have her ride over for a meeting and so | 10    Q.  (By Mr. Davidovich)  Who ultimately made |
| 11  forth, she wasn't on FML.  So at that point, no, she | 11  the decision to terminate her? |
| 12  wasn't on FML. | 12    A.  I believe that was James Williamson. |
| 13    Q.  Had you -- had you -- were you aware of | 13  All terminations have to come from the director, so -- |
| 14  the fact that she had taken FML leave before this | 14  because it's such a high level of discipline.  So I |
| 15  September date? | 15  couldn't imagine anybody else making that decision. |
| 16    A.  Emina had had a couple of different | 16    Q.  Are you aware of whether or not a |
| 17  accidents, and so she had been in and out for both | 17  recommendation is made to Mr. Williamson by HR or |
| 18  workplace injuries and non-workplace injuries. | 18  anybody else regarding whether an employee should be |
| 19    Q.  What kind of -- excuse me.  I caught | 19  terminated or a different type of discipline imposed? |
| 20  your cough. | 20    A.  No.  Those -- those conversations are |
| 21    What kind of problems, staffing | 21  siloed.  I'm not a -- I'm not a party to them, nor I |
| 22  problems, did that present to you when she was out on | 22  don't think they care what I think.  So I don't -- I'm |
| 23  FMLA leave, in terms of having somebody else cover her | 23  not -- I don't know. |
| 24  work? | 24    Q.  Did you ever tell your supervisor or |
| 25    A.  We just reassigned somebody from either | 25  anybody at HR that you felt she should be terminated |
| Page 75 | Page 77 |

20 (Pages 74 - 77)

Leroy Lemos (Redacted) - April 27, 2021

1 for this action with the Facebook?
2        A. Absolutely not.
3        Q. Let me move to another subject for a few
4 moments -- few moments.
5            Can you tell me what BOLO posters are?
6        A. BOLO means be on the lookout.
7        Q. And what are they? What are they used
8 for?
9        A. So when we have threats against
10 buildings, against people, we have folks that are going
11 through personnel issues and are needing to be
12 monitored, if they're in our public facilities, as well
13 as ensuring that they're not accessing nonpublic areas
14 of the facilities because, you know, we're a public
15 entity, and people can come and do business with the
16 City of Denver as needed, but accessing private areas
17 is not allowed. So we make sure that we monitor those
18 individuals.
19        Q. What is the procedure that you're
20 familiar with as to how they're monitored, via the BOLO
21 process?
22        A. Each BOLO has instructions for
23 communication or procedure.
24        Q. Does the BOLO contain a picture of the
25 person you're concerned about?

Page 78

1        A. Absolutely.
2        Q. And to your knowledge, where are these
3 BOLO posters kept?
4        A. Each facility is a little different, but
5 generally there's a three-ring binder that is kept by a
6 control room or a security desk that's doing the kind
7 of overall larger monitoring of a facility.
8        Q. Would this be the type of security desk
9 that a visitor to a building might encounter as they go
10 into the building?
11            MS. FELTON: Object to form.
12        A. Yeah. Most information and security
13 desks are inside of buildings and accessible to
14 visiters.
15        Q. (By Mr. Davidovich) Did you ever
16 authorize a BOLO poster to be issued for Emina Gerovic?
17        A. Yes.
18        Q. When did you authorize that and why?
19        A. Back in 2017, there was a BOLO issued
20 because she had been placed on administrative leave and
21 instructed -- when folks are put on paid administrative
22 leave, they're basically assigned to their home. And
23 so they're to be accessible and able to communicate
24 with them readily at their home as needed for the
25 administrative leave.

Page 79

1        So the day after she was put on
2 administrative leave and given the instructions to not
3 enter any City facilities, she was observed first thing
4 the following morning inside the secure area of Police
5 District 5, violation of that administrative leave
6 order and directive, as well as she was in a secured
7 area of the facility, which also causes concern.
8        And so we needed to place the BOLO so
9 that we would know when she was entering a facility and
10 then be able to monitor that activity.
11        Q. Was there more -- was there more than
12 one BOLO that you authorized?
13        A. There's -- no. A BOLO gets revised, but
14 it's the -- basically the -- the BOLO, like, evolves,
15 but it's just the original BOLO.
16        Q. Were you aware of whether or not the
17 first BOLO that you issued stated that she was no
18 longer employed by the City?
19            MS. FELTON: Can you speak up just a
20 little bit for me, please?
21            MR. DAVIDOVICH: Sure.
22            MS. FELTON: Thank you.
23        Q. (By Mr. Davidovich) Do you know whether
24 or not the first BOLO that you authorized contained any
25 language relating to whether or not she was still

Page 80

1 employed by the City?
2        A. No. It didn't indicate anything like
3 that. It said to call her -- call the supervisors, had
4 a communication chain.
5        Q. Did any of the BOLOs, to your knowledge,
6 indicate that her employment had been terminated by the
7 City? Or let me rephrase that.
8        Did any of the BOLOs, that you're aware
9 of, regarding Ms. Gerovic indicate that she had been
10 terminated?
11        A. The final version I'm sure would have
12 indicated.
13        Q. But the prior versions would not have?
14        A. Correct.
15        Q. How did you go about issuing -- getting
16 this BOLO to issue it? Who did you talk to and tell
17 them to issue it?
18        A. As a contract manager, I interact with
19 the program manager from HSS. So Joel Womick.
20        Q. That's the security department?
21        A. He is the -- security is handled by a
22 contractor, HSS, and so he was the contract manager on
23 the HSS side. So basically we were counterparts. I
24 was the City representative; he was the contract
25 representative. And so we communicated at that level.

Page 81

21 (Pages 78 - 81)

Emina Gerovic - January 13, 2021

```
 1              IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLORADO
 2
     Civil Action No. 19-cv-03710-RM-NRN
 3   _____
 4   EMINA GEROVIC,
 5            Plaintiff,
 6   v.
 7   CITY AND COUNTY OF DENVER, a Body politic and corporate of
     the State of Colorado, acting by and through its DEPARTMENT
 8   OF GENERAL SERVICES and FACILITIES MANAGEMENT OPERATIONS;
     LEROY LEMOS, in his official capacity as Facilities
 9   Management Operations Supervisor at the Department of
     General Services, and in his individual capacity;
10   MURPHY ROBINSON, in his official capacity as Executive
     Director of General Services, and in his individual
11   capacity;
     JAMES E. WILLIAMSON, in his official capacity as Facilities
12   Management Operations Director at the Department of General
     Services, and in his individual capacity;
13   KEVIN O'NEILL, in his official capacity as Facilities
     Management Operations Deputy Director at the Department of
14   General Services, and in his individual capacity; and,
     JOEL WOMICK, in his official capacity as Assistant Director
15   of Operations of Facilities Management Operations at the
     Department of General Services, and in his individual
16   capacity,
17            Defendants.
     _____
18
                  VIDEOCONFERENCED DEPOSITION OF
19
                         EMINA GEROVIC
20
                   APPEARING REMOTELY FROM
21
                      ARVADA, COLORADO
22
                     January 13, 2021
23
     _____
24
25
                                              Page 1
```

Emina Gerovic - January 13, 2021

1 keep sharing my screen.
2        MR. DAVIDOVICH:  I'm trying to help to
3 refresh my screen.  Hopefully it will work.
4        MS. FELTON:  If not, you will be able to
5 see it.
6        MR. DAVIDOVICH:  I don't see it on the
7 screen.  My screen is refreshed.
8        MS. FELTON:  Okay.  It's not -- it hasn't
9 come up yet.
10        MR. DAVIDOVICH:  Oh, okay.
11        MS. FELTON:  All right.  Exhibit 4 should
12 be in the marked exhibits folder now.
13        MR. DAVIDOVICH:  Nope.  Not yet.
14        MS. FELTON:  All right.  I'm sharing my
15 screen.
16     Q.   (By Ms. Felton)  Ms. Gerovic, do you see
17 there Exhibit 4?
18        (Exhibit Number 4 was marked.)
19     A.   Yes.
20     Q.   Do you recognize Exhibit 4?  It says
21 "Welcome Emina" at the top.
22     A.   I see "Welcome Emina" and -- yes.
23     Q.   All right.  And do you see where this
24 document states that your Charge of Employment
25 Discrimination was filed on September 21, 2018?
                                        Page 22

1 at all?
2     A.   No.
3     Q.   Did he retaliate against you?
4     A.   Explain to me.
5     Q.   Did he do anything -- did he do anything
6 after you filed -- after you were on FMLA leave, did he do
7 anything to you?
8     A.   Mr. Robinson is a really short time
9 with -- with me.
10     Q.   Okay.  So he didn't do anything to you
11 during the short time that he was there?
12     A.   Mr. Robinson, I saw him only one time.
13 Actually, I saw him two times.
14     Q.   Okay.  What were those two times?
15     A.   The first time I saw him when he -- when
16 he start to working and come to the all staff meeting.
17     Q.   Okay.
18     A.   And the --
19     Q.   And then you had one meeting with him as
20 well; right?
21     A.   Yes.
22     Q.   Okay.  Did Mr. Robinson discipline you at
23 all in that short time?
24     A.   I saw him only one time.
25     Q.   Okay.  So did he discipline you?
                                        Page 24

1     A.   Yes.
2     Q.   Do you have any information that your EEOC
3 charge was filed on any other date?
4     A.   No, I don't.
5     Q.   Do you know who Murphy Robinson is?
6     A.   Yes, I do.
7     Q.   Who is Murphy Robinson?
8     A.   He is a -- right now safety -- safety
9 manager in the Denver Police Department.
10     Q.   What was his position when you were
11 employed?
12     A.   He is the director of the facility
13 management.
14     Q.   Was he the director of General Services?
15     A.   Yes.
16     Q.   And facilities management was under General
17 Services?
18     A.   Yes.
19     Q.   Do you know what Mr. Robinson's race is?
20     A.   Can you explain to me, please?
21     Q.   Is Mr. Robinson black?
22     A.   Yes.
23     Q.   Is he African American?
24     A.   I can't say that.
25     Q.   Did Mr. Robinson discriminate against you
                                        Page 23

1     A.   No.
2     Q.   Are you aware of whether he discriminated
3 against white people?
4     A.   I don't know him very -- I don't know him.
5     Q.   Okay.  All right.  Do you remember James
6 Williamson?
7     A.   Yes, I do.
8     Q.   What was Mr. Williamson's job while you
9 were employed?
10     A.   He's the -- I think he's the manager of
11 the facility.
12     Q.   Right.  Do you know, is Mr. Williamson
13 black?
14     A.   Yes.
15     Q.   Did Mr. Williamson discriminate against
16 you?
17     A.   When I talk to him, I had a meeting with
18 him and he just -- he didn't tell me nothing about
19 discrimination.
20     Q.   Okay.  Did he treat you different because
21 you're white?
22     A.   I had a meeting with him, and he is tell
23 me he can do nothing.  Leroy Lemos make decision.  That's
24 all I know.
25     Q.   Did Mr. Williamson discipline you?
                                        Page 25

7 (Pages 22 - 25)

Stevens-Koenig Reporting, A Veritext Company
303-988-8470

Emina Gerovic - January 13, 2021

**Page 26**

1    A.  He signed papers.  I never -- he signed
2 the papers when I -- for my termination.
3    Q.  Okay.  Do you remember Kevin O'Neil?
4    A.  Yes, I do.
5    Q.  During your employment, what were
6 Mr. O'Neil's duties?
7    A.  I am not sure.  He's a supervisor or
8 manager.  I'm not sure what -- he's the boss and...
9    Q.  Okay.  Is Mr. O'Neil white?
10    A.  Yes.
11    Q.  Do you know what authority Mr. O'Neil had
12 to discipline employees?
13    A.  No, I don't.
14    Q.  Did Mr. O'Neil discriminate against you?
15    A.  No, it's -- no, he didn't.  He didn't.
16    Q.  Okay.
17    A.  Nothing about -- he -- I just tried to
18 file a complaint to Mr. O'Neil.
19    Q.  Okay.  And that was during the meeting that
20 you had with him in May.
21    A.  I went to Mr. O'Neil like a few times --
22    Q.  Okay.
23    A.  -- to complain about Leroy Lemos, he's
24 harassing me, and he didn't change anything.
25    Q.  Okay.  Who was your supervisor when you

**Page 27**

1 were at District 5?
2    A.  The name on District 5 for first my
3 supervisor is Tony Rios.
4    Q.  Is Tony Rios white?
5    A.  No.
6    Q.  Is Tony Rios Hispanic?
7    A.  Yes.
8    Q.  You said he was the first one.  Who was the
9 next one you had while you were at District 5?
10    A.  My first one is James Stigall.
11    Q.  Mr. Stigall is white?
12    A.  Yes.
13    Q.  So you had Mr. Stigall at District 5 and
14 then you had Tony Rios at District 5.
15    A.  Yes.  And I had the third supervisor,
16 Russ.
17    Q.  At District 5?
18    A.  Yes.
19    Q.  That is Russ VanderKooy?
20    A.  Yes.  He is a short time.
21    Q.  Okay.  Anybody else while you were at
22 District 5?
23    A.  No.
24    Q.  Mr. Lemos wasn't your direct supervisor
25 when you were at District 5; correct?

**Page 28**

1    A.  Can you explain to me what do you mean?
2 Hello?
3       THE COURT REPORTER:  Ms. Felton is frozen.
4 Let's go off the record.
5       (Recess from 9:21 a.m. to 9:22 a.m.)
6       (The requested portion was read back by
7 the reporter.)
8    Q.  (By Ms. Felton)  Did Mr. Lemos give you
9 your duties, your day-to-day duties when you were at
10 District 5?
11    A.  Nobody is giving me day by day my duties.
12    Q.  Did you see Mr. Lemos on a day-to-day basis
13 at District 5?
14    A.  I've never seen Mr. Lemos come any police
15 department.
16    Q.  Okay.
17    A.  Never.
18    Q.  Okay.  But you saw Tony Rios at District 5.
19    A.  I saw Tony Rios in District 5 only two
20 times for two years.
21    Q.  All right.  And Mr. Stigall would be at
22 District 5?
23    A.  I saw him two.  Maybe two times.  Neither
24 one don't have any reason to come.  He always tell me he
25 don't have any reason to come.

**Page 29**

1    Q.  Okay.  Who was your supervisor when you
2 were at the Castro Building?
3    A.  Ed -- Ed --
4    Q.  Ed Ortiz?
5    A.  I don't know his last name.  I'm sorry.
6    Q.  Do you think it was Edward Ortiz or you
7 just don't know his last name?
8    A.  I think Edward Ortiz.
9    Q.  Okay.  Is he Hispanic?
10    A.  Yes.
11    Q.  Did you have any other supervisors when you
12 were at Castro?
13    A.  No.
14    Q.  Who was your supervisor when you were at
15 PAB?
16    A.  Tony Rios and James Stigall.
17    Q.  What were Mr. Lemos' duties while you were
18 employed?
19       MR. DAVIDOVICH:  You might want to
20 rephrase that question because I don't think she knows
21 what his total duties are.  She might know what she
22 observed his duties to be.
23       MS. FELTON:  She can answer if she
24 understands the question, and let me know if she doesn't.
25    Q.  (By Ms. Felton)  Ms. Gerovic, do you know

8 (Pages 26 - 29)

Emina Gerovic - January 13, 2021

| | |
|---|---|
| 1 what Mr. Lemos' duties were while you were employed? | 1 show us email and I'm not -- on the top of my head, I am |
| 2    A.  He's the supervisor, I guess.  I don't | 2 not remembering email about what.  Some -- I remember |
| 3 know. | 3 one -- when John Venezuela, that he passed away, when he |
| 4    Q.  He wasn't your supervisor, though; right? | 4 parked the car and he move -- went outside, move car from |
| 5    A.  He's everybody's supervisor, even mine, | 5 parking, James Stigall has verbal or writing from Leroy |
| 6 too. | 6 Lemos. |
| 7    Q.  Wasn't he the supervisor over Tony Rios and | 7    Q.  Okay.  So Mr. Stigall received a verbal |
| 8 James Stigall and Russ VanderKooy and Edward Ortiz? | 8 discipline? |
| 9    A.  I think yes.  I am not -- he's the | 9    A.  Yes.  For somebody -- some Hispanic person |
| 10 supervisor to everybody. | 10 go outside and parking and move the car from parking to |
| 11    Q.  Okay.  Do you know what authority Mr. Lemos | 11 parking, and he didn't approve that. |
| 12 had to discipline employees? | 12    Q.  Mr. Lemos didn't approve it? |
| 13    A.  Explain to me what authority.  What does | 13    A.  No, Mr. Stigall did not approve the |
| 14 that mean? | 14 employee to go move the car from the parking to parking. |
| 15    Q.  Did he ever -- did Mr. Lemos ever give you | 15    Q.  Okay.  Do you have a copy of that |
| 16 any discipline? | 16 discipline? |
| 17    A.  Yes. | 17    A.  No.  Why I have to?  He has copies. |
| 18    Q.  Did he ever suspend you? | 18    Q.  Do you have a copy of any of those emails? |
| 19    A.  I am not suspend. | 19    A.  No. |
| 20    Q.  Do you know if he could have suspended you? | 20    Q.  All right.  Any other examples of how |
| 21    A.  I believe, yes. | 21 Mr. Lemos discriminated against Mr. Stigall? |
| 22    Q.  Why do you believe that? | 22    A.  I'm not remember right now.  I'm sorry. |
| 23    A.  I believe because whoever I go file the | 23       Mr. Stigall -- Mr. Stigall been forced to |
| 24 complaint, Mr. Lemos, he's harassing me, and nobody don't | 24 quit the job.  I know that.  He retired.  He being |
| 25 want to listen to me.  James -- James Williamson, he tell | 25 forced.  He has a pay cut, and he's been suspend.  He has |
| Page 30 | Page 32 |
| 1 me, Leroy Lemos, he make the decision.  Sorry, we can't | 1 a pay cut and he being forced to quit the job before |
| 2 do anything, and I believe he can do. | 2 he -- before he get fired and he decide to retired. |
| 3    Q.  You never worked with Mr. Lemos regarding | 3    Q.  Okay.  Who are the Hispanic supervisors |
| 4 your FMLA leave; is that right? | 4 while Mr. Stigall was employed? |
| 5    A.  I've never -- explain.  I'm sorry. | 5    A.  Explain to me, who is that? |
| 6    Q.  Okay.  Did you ever talk to Mr. Lemos about | 6    Q.  Mr. Stigall was a supervisor; right? |
| 7 your FMLA leave? | 7    A.  Yes. |
| 8    A.  Did I ever talk to him? | 8    Q.  Okay.  Who were the other supervisors with |
| 9    Q.  About your FMLA leave. | 9 him that were Hispanic? |
| 10    A.  I'm not remember who I talked to. | 10    A.  Tony Rios. |
| 11    Q.  Did you ever talk to him about being gone | 11    Q.  All right.  Any others? |
| 12 because of your work injury, being away from work? | 12    A.  At that time, no. |
| 13    A.  Yes.  No.  No.  I'm sorry.  I didn't talk | 13    Q.  Okay.  All the other supervisors at that |
| 14 to him to be gone from the work.  No. | 14 time were white? |
| 15    Q.  Okay.  Did Mr. Lemos discriminate against | 15    A.  No. |
| 16 James Stigall? | 16    Q.  Were they black? |
| 17    A.  Yes. | 17    A.  No, just -- just Leroy Lemos -- just Tony |
| 18    Q.  How? | 18 Rios and James Stigall. |
| 19    A.  He is a -- James Stigall is showing us | 19    Q.  They were the only two supervisors? |
| 20 email every single day to all employees, it's not only | 20    A.  In this building that I work. |
| 21 me, he show us every single day emails and James Stigall | 21    Q.  Okay. |
| 22 has to go to have a meeting with Leroy Lemos every single | 22    A.  I'm talking about building where I work. |
| 23 Tuesday and he coming back from the -- from the | 23    Q.  Oh, okay.  Which building was that? |
| 24 building -- from the meeting crying. | 24    A.  Administration building in downtown. |
| 25       Leroy Lemos is come after him for -- he | 25    Q.  PAB? |
| Page 31 | Page 33 |

9 (Pages 30 - 33)

Emina Gerovic - January 13, 2021

| | |
|---|---|
| 1    A.  Yes. | 1  going to quit the job.  He work -- he work at that |
| 2    Q.  All right.  Was Tony Rios treated different | 2  time -- he's worked, I don't know, five years in the |
| 3  than Mr. Stigall by Mr. Lemos? | 3  City. |
| 4    A.  Tony Rios, he work from 6 in the morning | 4    Q.  What building was he at, do you know? |
| 5  and James Stigall and myself and few employees work from | 5    A.  He's worked before in District 5. |
| 6  10:30. | 6    Q.  But you don't know what building he was in |
| 7    Q.  So you didn't work with -- you and | 7  at that time. |
| 8  Mr. Stigall didn't work with Mr. Rios. | 8    A.  No.  I am in District 5, and I believe |
| 9    A.  The half a day, we -- we have the same | 9  he's in downtown where James Stigall been or he may be. |
| 10  shift half a day.  He is first shift and we are not. | 10    Q.  Were there Hispanic supervisors that worked |
| 11    Q.  Okay.  During that time when you | 11  with Mr. Dochterm? |
| 12  overlapped, did you see Mr. Rios be treated better than | 12    A.  I don't know who's worked with him.  I |
| 13  Mr. Stigall by Mr. Lemos? | 13  don't know.  I work by myself for two years in District |
| 14    A.  I am not remember that.  I don't have any | 14  5. |
| 15  time to go. | 15    Q.  Do you remember John Gandara? |
| 16    Q.  Okay.  Who is Keith Dochterm? | 16    A.  Yes. |
| 17    A.  He is a custodian of the -- | 17    Q.  Do you know if he is Hispanic? |
| 18    Q.  Not -- was he a supervisor? | 18    A.  Yes. |
| 19    A.  He didn't be a supervisor.  He tried to be | 19    Q.  How do you know he's Hispanic? |
| 20  to my -- he -- he wanted to be a supervisor, and I don't | 20    A.  He told -- he told me he is Hispanic. |
| 21  know that he is a supervisor or not.  He tell us he's a | 21    Q.  When did he tell you that? |
| 22  supervisor. | 22    A.  In the first day I start work. |
| 23    Q.  Keith Dochterm said he was a supervisor? | 23    Q.  Where did Mr. Gandara work? |
| 24    A.  We heard that.  Yes -- | 24    A.  He is work before he work in the PAB. |
| 25    Q.  Was -- go ahead. | 25    Q.  You worked with him at the PAB? |
| Page 34 | Page 36 |

| | |
|---|---|
| 1    A.  Yes, he say he is a supervisor. | 1    A.  Yes. |
| 2    Q.  Was Keith your supervisor? | 2    Q.  Was he a supervisor or a custodian? |
| 3    A.  No. | 3    A.  He's a custodian. |
| 4    Q.  Where was he a supervisor? | 4    Q.  How long did you work with him at the PAB? |
| 5    A.  Somewhere in downtown. | 5    A.  Maybe a year. |
| 6    Q.  Not in your building? | 6    Q.  Was Mr. Gandara treated different than you? |
| 7    A.  No. | 7    A.  Yes. |
| 8    Q.  Was he ever disciplined? | 8    Q.  How? |
| 9    A.  Was he ever disciplined?  I don't know. | 9    A.  On a staff meeting -- on a staff meeting, |
| 10  He didn't show me he disciplined. | 10  I wear the regular shoes and John Gandara, they wear the |
| 11         He come to the building and he crying.  He | 11  regular shoes too and Leroy Lemos come to me and James |
| 12  come to the District 5 and crying to people how Leroy | 12  Stigall and say you both need to come to my office.  And |
| 13  Lemos isn't treating him and he's forcing him to quit the | 13  I get verbal.  I don't have any safety shoes. |
| 14  job, he's come after him all the time for some reason. | 14         And my question for Leroy Lemos, why I |
| 15         THE DEPONENT:  No.  Leave it.  That's my | 15  have a verbal and John Gandara don't get verbal for not |
| 16  dog. | 16  wearing shoes.  And he tell me, I am the supervisor -- I |
| 17    Q.  (By Ms. Felton)  Okay. | 17  am the boss.  Don't ask me question. |
| 18    A.  Sorry.  Pulling my slippers. | 18    Q.  What was the date of this? |
| 19    Q.  So you don't know if Mr. Lemos disciplined | 19    A.  I am not remember the date.  I'm sorry. |
| 20  Mr. Dochterm. | 20    Q.  Any other way that Mr. Gandara was treated |
| 21    A.  Mr. Dochterm, he say yes he is, and I | 21  different than you? |
| 22  didn't see it. | 22    A.  When I had -- when I'm -- when I get |
| 23    Q.  Okay. | 23  injure and I am on a light duty, I be put by Leroy Lemos, |
| 24    A.  And he cry, he cry like a little baby. | 24  like a 5 feet away from him to work and John Gandara be |
| 25  And he come to District 5 and tell that he has to -- he's | 25  put in a rec center. |
| Page 35 | Page 37 |

Stevens-Koenig Reporting, A Veritext Company
303-988-8470

Emina Gerovic - January 13, 2021

| | |
|---|---|
| 1    Q.   Are you saying Mr. Gandara was injured? | 1    Q.   Is Lucia Hispanic? |
| 2    A.   When he get injured before -- before. | 2    A.   She says she's half Hispanic. |
| 3    Q.   What was he doing in the rec center? | 3    Q.   She told you she was half? |
| 4    A.   Just sitting and scanning the cards. | 4    A.   Yes. |
| 5    Q.   Were there any open positions at the rec | 5    Q.   What building did she work in? |
| 6 center when you were injured? | 6    A.   PAB. |
| 7    A.   Yes. | 7    Q.   Did you work with her at PAB? |
| 8    Q.   How do you know that? | 8    A.   I -- I -- she work at -- on 6 in the |
| 9    A.   I know so many -- so many people over | 9 morning and I start at 10:30 in the afternoon. And half |
| 10 there. | 10 a day, yes. |
| 11    Q.   Who told you there were open positions? | 11    Q.   How long did you work with her? |
| 12    A.   The girl, I think I believe -- I believe | 12    A.   A year. I stay -- I stay maybe year, |
| 13 it's her name Nicole. I believe. I'm not remember | 13 maybe over a year, I'm not exactly sure, in the PAB. |
| 14 exactly. And she is the lead. | 14    Q.   Was she a custodian or a supervisor? |
| 15    Q.   Which rec center? | 15    A.   She was a custodian. |
| 16    A.   I don't know the address. | 16    Q.   Was she treated different than you? |
| 17    Q.   Not the address. What's the name? | 17    A.   Yes. |
| 18    A.   I don't know neither one, what's the name. | 18    Q.   How? |
| 19 I'm sorry. | 19    A.   Her floor has to be strip and wax and the |
| 20    Q.   Do you remember anything that it's located | 20 Leroy Lemos sent me and John Venezuela and -- no, me and |
| 21 near? | 21 James Stigall to strip and wax the floor. She don't know |
| 22    A.   No. | 22 how. And she's employed for the Denver City, 20 -- 20 |
| 23    Q.   When was this that you wanted to work at | 23 years, at that time, 20, 25 years. |
| 24 the rec center? | 24       And my question, why I have to leave my |
| 25    A.   When I get injured and -- | 25 floor and go to do her floor? She don't know how? She |
| Page 38 | Page 40 |
| 1    Q.   Okay. What month? | 1 should learn. And he's yelled at me and tell me you have |
| 2    A.   I -- it's September. I believe it's a | 2 to do it. Don't ask me question. And my -- my |
| 3 September. I believe it's September. I'm not -- | 3 question -- why I have to know, I work one year and |
| 4    Q.   Do you think it would have been August or | 4 somebody who is working 25 years, you don't have to. |
| 5 November? | 5    Q.   When did this occur? |
| 6    A.   No. No. I -- I'm not sure the month and | 6    A.   When I work in downtown. It's -- I'm not |
| 7 I -- I think it's a September. No. No. No, I'm | 7 remember days. I didn't write down anything. And I not |
| 8 wrong. | 8 remember. It's like over three years ago. |
| 9    Q.   Are you looking at something, Ms. Gerovic? | 9    Q.   Any other ways she was treated different |
| 10    A.   No. | 10 than you? |
| 11    Q.   Okay. I didn't know if you were looking at | 11    A.   It's so many ways, and I not remember. |
| 12 a calendar? | 12 It's so many ways. |
| 13    A.   No. No. No. No. No. I think it's in | 13    Q.   Did you work with Yvonne Chavez? |
| 14 October. | 14    A.   No, I didn't work with her. |
| 15    Q.   Okay. | 15    Q.   Was she a custodian? |
| 16    A.   October. | 16    A.   No, she's the supervisor. |
| 17    Q.   Any other way that you were treated | 17    Q.   Is she Hispanic? |
| 18 different than Mr. Gandara? | 18    A.   Yes. |
| 19    A.   I am not remember. Has a lot of stuff and | 19    Q.   How do you know she's Hispanic? |
| 20 I... | 20    A.   She says she's Hispanic. |
| 21    Q.   Do you remember a custodian named Lucia? | 21    Q.   Was she treated different than you? |
| 22    A.   Yes. | 22    A.   Yes. |
| 23    Q.   Do you know what her last name is? I'm | 23    Q.   How? |
| 24 sorry. Did you say -- did you say no? | 24    A.   She's come to do inspection on a PAB and |
| 25    A.   No. No. I don't know what... | 25 she's inspect my floor, my floor and my stairs, and she |
| Page 39 | Page 41 |

11 (Pages 38 - 41)

Emina Gerovic - January 13, 2021

1  used the white gloves to inspecting my -- my -- my floor
2  and my stairs and she didn't inspect --
3        When I show her, point her to Annette
4  Subia -- Annette Subia, she's the second floor, when I
5  point her to her stairs, I am in trouble. And when I go
6  to Leroy Lemos to file a complaint, why she's doing this
7  because I -- I complain to Tony Rios and I complain to
8  James Stigall, and both has been like surprised. What
9  she doing? When I go to Leroy Lemos, he's telling me,
10 she has rights, she's the supervisor.
11       Q.  Who is Annette -- what did you say her last
12 name was?
13       A.  Annette Subia.
14       Q.  Subia.
15       A.  Subia. Subia. She's work in the PAB in
16 the second floor. She has only half a -- she has only
17 half a floor and I have three. I have first floor,
18 two -- and B1 and B-2 and outside the trash on the
19 building. And she's Hispanic. She's Hispanic, and she's
20 been treated differently than me.
21       Q.  Annette was treated different than you.
22       A.  Yes.
23       Q.  And she was treated different than you by
24 Yvonne.
25       A.  By Leroy Lemos.

Page 42

1        A.  I don't know how to explain to you. You
2  know --
3        Q.  So Yvonne Chavez is a supervisor in the
4  utility department.
5        A.  Yes.
6        Q.  Not your department.
7        A.  No.
8        Q.  Okay. And Sharon Romero was not a
9  supervisor in your department.
10       A.  No.
11       Q.  What department was Sharon Romero in?
12       A.  I am not remember what -- what department
13 she is. I think -- I -- I am not remember what
14 department she is.
15       Q.  Was she located at District 5?
16       A.  No. Nobody located District 5 besides
17 Gary Martinez.
18       Q.  Is Gary Martinez Hispanic?
19       A.  Yes.
20       Q.  Do you know what building Sharon Romero
21 worked in?
22       A.  No, I don't. She works somewhere in
23 downtown.
24       Q.  So she was a supervisor in a downtown
25 building?

Page 44

1        Q.  Was Yvonne Chavez one of your supervisors?
2        A.  No.
3        Q.  Do you know why she was doing an inspection
4  at the PAB?
5        A.  She say she have to.
6        Q.  Did you work with Sharon Romero?
7        A.  She's come to the District 5.
8        Q.  Did you work with her at District 5?
9        A.  No. No. No.
10       Q.  Is she Hispanic?
11       A.  Yes, she is.
12       Q.  How do you know?
13       A.  Because she's -- she say she is Hispanic.
14       Q.  She told you?
15       A.  Yes.
16       Q.  She was the supervisor at District 5 but
17 you never worked with her?
18       A.  No, she's not the supervisor in District 5
19 when I work. No, she's not the supervisor. And the --
20 she's supervisor in different department.
21       Q.  A different department at District 5?
22       A.  No, different -- she's not in -- with work
23 with -- Yvonne Chavez is in utility, utility department,
24 and Sharon Romero, she's some different.
25       Q.  Okay. I'm going to go back a second.

Page 43

1        A.  Yes. I don't know which building.
2        Q.  Do you know anything about what work she
3  did, what her job duties were?
4        A.  She's a supervisor, and I don't know where
5  in -- and what -- she -- what work, I don't know.
6        Q.  Was she treated different than you?
7        A.  Yes.
8        Q.  How?
9        A.  She come to the District 5 and start to
10 harassing me about the trash in parking lot. I call the
11 Leroy Lemos on the phone and he tell me, she is the
12 supervisor, she has right. And she called him and she
13 laugh on the phone. She laugh on the phone. And she
14 said, oh, I get her.
15       And he didn't do anything. When I
16 filed -- when I called and filed a complaint, he didn't
17 do anything, just answer, she is the supervisor, she can
18 do.
19       Q.  When did this occur?
20       A.  Before my injury in the summertime.
21       Q.  The summer before your injury?
22       A.  Yes. May or June. I am not really sure
23 the month. It is before my injury when she tell me I
24 have to pick up pretty much trash from the street.
25       She's harass me around. And like cross

Page 45

12 (Pages 42 - 45)

Stevens-Koenig Reporting, A Veritext Company
303-988-8470

Emina Gerovic - January 13, 2021

| | |
|---|---|
| 1 she show me appealing with her, and she show me the<br>2 suspension and she show me the pay cut, 25 cents.<br>3     Q. So you think that the only discipline that<br>4 she received was suspension and a 25 cent pay cut.<br>5     A. She didn't get fired.<br>6     Q. Okay. But I'm asking, the only discipline<br>7 that you think she received was suspension and a 25 cent<br>8 pay cut.<br>9     A. I didn't talk more. I can't say, but I'm<br>10 not sure. I didn't talk -- I -- that time -- that time,<br>11 I tell -- I remember I tell her, I don't want to talk. I<br>12 don't want to get in trouble. And I know for sure she<br>13 has a suspension is appealed and she has a pay cut.<br>14     Q. Did you actually look at any documents?<br>15     A. She show me the pay cut and suspension.<br>16     Q. Who disciplined Ms. Garcia?<br>17     A. Leroy Lemos.<br>18     Q. Why do you think it was Leroy?<br>19     A. Maybe my -- my is losing that connection.<br>20 Kevin O'Neil and Leroy Lemos and James<br>21 Williamson.<br>22     Q. That's who disciplined her?<br>23     A. Anne Carter.<br>24     Q. Okay. How do you know that those were the<br>25 people that disciplined her?<br>                            Page 50 | 1     A. Yes.<br>2     Q. Was she a custodian or some other position?<br>3     A. She's a custodian.<br>4     Q. Where was she located? What building?<br>5     A. Everywhere.<br>6     Q. How do you know she worked everywhere?<br>7     A. You work in -- she work in PAB for, like,<br>8 a month and nobody don't want her and supervisor move her<br>9 to different building. She work in police department<br>10 District 4, and District 4 don't want her. She fight<br>11 with the supervisor -- the -- what's her position?<br>12 Sharon, Sherry, she work in District 5. She's<br>13 administration lady in police department, District 4, she<br>14 fight with her and move her from District 4 to District<br>15 5. She has so many problems in District 5, District 5<br>16 don't want her. He move her pretty much everywhere and<br>17 last location I remember she is in Castro Building.<br>18     Q. Who was the supervisor that moved her to<br>19 all those different places?<br>20     A. Leroy Lemos talked to her, and I'm pretty<br>21 sure Tony Rios move her.<br>22     Q. Was she employed during the entire time<br>23 that you were?<br>24     A. Yes.<br>25     Q. Did you work with her at the PAB?<br>                            Page 52 |
| 1     A. She's showing -- she is showing the papers<br>2 to everybody. It's not only me.<br>3     Q. Did she have any discipline before that?<br>4     A. I don't know.<br>5     Q. Did she lie to anybody about what occurred<br>6 during that incident?<br>7     A. I don't know.<br>8     Q. How long had Ms. Garcia been employed at<br>9 that time?<br>10     A. I don't know.<br>11     Q. Did you ever work with a custodian named<br>12 Theresa?<br>13     A. Yes.<br>14     Q. Did you work with more than one Theresa or<br>15 just one?<br>16     A. At that time there was only one Theresa.<br>17 Theresa Yolanda -- or I'm not really sure. Did I say it<br>18 correct, the last name?<br>19     Q. Yes.<br>20     Is Theresa Hispanic?<br>21     A. Yes, she is.<br>22     Q. How do you know?<br>23     A. Because she's a Hispanic and everybody say<br>24 she's Hispanic and she says she's Hispanic.<br>25     Q. She told you she was Hispanic?<br>                            Page 51 | 1     A. I work with her in PAB for maybe month.<br>2     Q. Did you work with her at District 5?<br>3     A. No.<br>4     Q. Did you work with her at Castro?<br>5     A. Yes. Maybe I work in Castro for two<br>6 weeks. I am injured at that time.<br>7     Q. Okay. Was she treated different than you?<br>8     A. Yes.<br>9     Q. How?<br>10     A. She is -- she has so many problems in the<br>11 buildings, so many problems in the building, and even<br>12 Leroy yelled -- even Leroy tell her from -- even Leroy<br>13 Lemos tell her on a meeting we have at the custodian<br>14 meeting and even he tell her how many -- how many times<br>15 I'm going to write you up, you know? And she has so many<br>16 write-up and she laugh, you know. She has so many<br>17 write-up and she's never get fired? And she's just doing<br>18 pretty much whatever she want. Even complain -- even she<br>19 has a complaint. There's nothing change.<br>20     Q. What do you mean she has a complaint?<br>21     A. Complaint about -- about not doing good<br>22 job, fighting with people, yelling with people, you know.<br>23     Q. Did you see any of her write-ups?<br>24     A. Well, one time. She show us one time.<br>25     Q. What was the write-up for?<br>                            Page 53 |

14 (Pages 50 - 53)

Emina Gerovic - January 13, 2021

| | |
|---|---|
| 1    A. Because she wasn't the buttoned shirt. | 1    Q. Where was he located? |
| 2    Q. She got written up because the buttons on | 2    A. He is work with me in PAB. |
| 3  her shirt weren't -- | 3    Q. Was he with you the entire time you were at |
| 4    A. All the shirt is unbuttoned, you know what | 4  PAB? |
| 5  I mean? | 5    A. For -- yes. |
| 6    Q. Yes. | 6    Q. When you left the PAB, was he still there? |
| 7    A. All unbutton. | 7    A. Yes. I assume, yes. |
| 8    Q. Okay. How many write-ups did she have | 8    Q. Do you know if he went anywhere else? |
| 9  total? | 9    A. Yes. |
| 10    A. I don't know. She's tell -- tell | 10    Q. Where did he go? |
| 11  us -- she showed that day, she showed -- I didn't see her | 11    A. He go to the Denver Police Department |
| 12  very often, you know, and she showed that day about the | 12  District 3. |
| 13  write-up he give her about unbutton shirt. And she said, | 13    Q. Do you know if he went anywhere else? |
| 14  I don't care, you know. He can do nothing for me. I | 14    A. After that, he -- I -- I think he is go to |
| 15  work 20 years, or something like that. | 15  the -- he's working with the -- with Yvonne Chavez. |
| 16    Q. She had been at the City for 20 years? | 16    Q. So did his -- when he went to work with |
| 17    A. It's like that. She say like that. | 17  Yvonne, did his job change? He wasn't a custodian |
| 18    Q. Theresa said she had been at the City for | 18  anymore? |
| 19  20 years? | 19    A. No. |
| 20    A. Yeah. Like 15, 20 years. And I don't | 20    Q. No, he wasn't a custodian? |
| 21  know how long she's worked. I don't know. | 21    A. No, he's not. He went -- he got to work |
| 22    Q. All right. Other than the write-up about | 22  with Yvonne Chavez maybe a year ago. Something like |
| 23  buttoning her shirt, do you have any information about | 23  that. |
| 24  other write-ups? | 24    Q. When is the last time -- when is the last |
| 25    A. She told -- she told us she has four | 25  time -- sorry. You go ahead. |
| Page 54 | Page 56 |
| 1  or five and I'm not -- I didn't ask about what, you know. | 1    A. Maybe -- maybe two years. I am not really |
| 2  I left. | 2  sure, you know. |
| 3    Q. What do you mean you left? | 3    Q. When is the last time you talked to |
| 4    A. I left -- I left to do my work because | 4  Mr. Chavez? |
| 5  she's just show -- show me one, and I didn't ask how many | 5    A. I talked to him when his daughter passed |
| 6  and she said -- she's talking to the other people and she | 6  away. |
| 7  says she has four or five. And she's -- she's telling us | 7    Q. He passed away? |
| 8  she don't care. That -- | 8    A. His daughter. |
| 9    Q. Go ahead. | 9    Q. Oh, his daughter. Okay. |
| 10    A. That mean she can do whatever she want and | 10    When is the last time -- when was that |
| 11  she's not in trouble. | 11  that you talked to him? |
| 12    Q. Do you know if she was disciplined other | 12    A. I'm not sure how long ago. Maybe a year |
| 13  than write-ups? | 13  ago, maybe something like that. I'm not sure. I don't |
| 14    A. No. No. Leroy... | 14  know how long ago. I don't know how long ago. |
| 15    Q. Were you going to say something? | 15    Q. Did Mr. Chavez start working for Denver |
| 16    A. No. | 16  after you did or before? |
| 17    Q. Okay. Did you work with David Chavez? | 17    A. He start one year after me. |
| 18    A. Yes, I did. | 18    Q. After you. Do you know what his job was |
| 19    Q. Is Mr. Chavez Hispanic? | 19  before he came to Denver? |
| 20    A. Yes. | 20    A. He has been custodian. |
| 21    Q. How do you know? | 21    Q. Do you know where? |
| 22    A. He's tell me. | 22    A. I think it's -- he worked for Denver |
| 23    Q. What was his job? Was he a custodian? A | 23  Public School or -- I'm not really sure. I know he |
| 24  supervisor? | 24  work -- I guess for some school he told me. I -- I not |
| 25    A. Custodian. | 25  remember everything. |
| Page 55 | Page 57 |

15 (Pages 54 - 57)

Emina Gerovic - January 13, 2021

| | |
|---|---|
| 1    Q.  Do you know how long he had been a<br>2 custodian there?<br>3    A.  No.<br>4    Q.  How was he -- or was he treated different<br>5 than you?<br>6    A.  When he start, he get 50 cents more than<br>7 me.<br>8    Q.  Do you know if he had been a custodian<br>9 longer than you?<br>10    A.  No.<br>11    Q.  You don't know?<br>12    A.  No.<br>13    Q.  Do you know if he had any licenses, like,<br>14 for HVAC or maintenance?<br>15    A.  No.<br>16    Q.  Do you know if he had maintenance<br>17 certifications?<br>18    A.  No.<br>19    Q.  Or if he had heating and air cooling<br>20 certificates?<br>21    A.  No.<br>22    Q.  Do you need to take a break?<br>23    A.  No, it's okay.  Maybe I can go use the<br>24 bathroom.<br>25      MS. FELTON:  Absolutely.  Yeah.  That's<br>Page 58 | 1    Q.  What are you seeing?<br>2    A.  I see --<br>3      MR. DAVIDOVICH:  There's a yellow sticker<br>4 on the bottom of the first page that says Exhibit 5.<br>5      THE DEPONENT:  Does it say Exhibit 5?<br>6      MR. DAVIDOVICH:  Exhibit 0005.<br>7      THE DEPONENT:  It's not letting me to<br>8 open.<br>9      MR. DAVIDOVICH:  Are you pressing on the<br>10 PDF button for number 5?<br>11      THE DEPONENT:  Yes.  And open, it make it<br>12 that small, that little.<br>13    Q.  (By Ms. Felton)  Ms. Gerovic, I will<br>14 continue to share my screen.<br>15    A.  I wish I can show you what I did.<br>16    Q.  That's okay.  That's okay.<br>17      Ms. Gerovic, are you able to see my<br>18 screen?<br>19    A.  Yes, I do.<br>20    Q.  Are you able to see the document that's on<br>21 my screen?<br>22    A.  Yes.<br>23    Q.  And it is marked Exhibit 5, you see there<br>24 at the bottom?<br>25    A.  Yes.<br>Page 60 |
| 1 why I asked.  We've been going for a while.  So do you<br>2 need a break?<br>3      THE DEPONENT:  Yes, a few minutes.<br>4      MS. FELTON:  Okay.  Let's take a break<br>5 for, I don't know, I -- I've never done this virtually<br>6 so...<br>7      MR. DAVIDOVICH:  Take ten minutes, five or<br>8 ten minutes.<br>9      MS. FELTON:  All right.  We will take a<br>10 ten-minute break.  Thank you.<br>11      THE COURT REPORTER:  We're off the record.<br>12      (Recess from 10:11 a.m. to 10:23 a.m.)<br>13      THE COURT REPORTER:  We're back on the<br>14 record.<br>15    Q.  (By Ms. Felton)  Ms. Gerovic, we're back on<br>16 the record.  Are you understanding all of my questions?<br>17    A.  Some if I not understand, I will ask<br>18 explain to me.<br>19    Q.  Excellent.<br>20      All right.  I've put Exhibit 5 into the<br>21 folder, if you could open that, please.  Do you see<br>22 Exhibit 5 in the folder?<br>23      (Exhibit Number 5 was marked.)<br>24    A.  Yeah, I see.  And, my gosh, I keep messing<br>25 up everything.<br>Page 59 | 1    Q.  All right.  I will scroll up.  Do you<br>2 recognize -- I'm showing you right now just the first part<br>3 of this document.  Do you recognize it?<br>4    A.  Yes, I do.<br>5    Q.  Okay.  And then I will scroll down a little<br>6 more to the next half of the document.  Do you still<br>7 recognize the document?<br>8    A.  Yes, I do.<br>9    Q.  And then there's a second page, do you<br>10 recognize the second page of the document?<br>11    A.  Yes, I do.<br>12    Q.  Okay.  What is Exhibit 5, Ms. Gerovic?<br>13    A.  It's about my safety shoes.<br>14    Q.  And what about your safety shoes?<br>15    A.  I'm not following the rules.<br>16    Q.  Is this the safety shoe issue that you were<br>17 talking about earlier?<br>18    A.  Yes.<br>19    Q.  How is Exhibit 5 related to you being<br>20 Bosnian.<br>21    A.  How is it relate to me being a Bosnian?<br>22    Q.  How is that related -- Exhibit 5 related to<br>23 you being Bosnian?<br>24    A.  It's not -- it's not say to relate to<br>25 being Bosnian.<br>Page 61 |

16 (Pages 58 - 61)

Emina Gerovic - January 13, 2021

| | |
|---|---|
| 1    Q.  It's not related to you being Bosnian? | 1    A.  I'm not sure when. |
| 2    A.  It's related to me -- John Gandara, he's | 2    Q.  Was it -- so Exhibit 5 is dated |
| 3 Hispanic and he didn't get verbal notice.  I get the | 3 September 21 of 2015.  Did you buy your second pair of |
| 4 verbal notice for not wearing the safety shoes.  Even I | 4 safety shoes before that or after that? |
| 5 give the Leroy Lemos notice from the -- note from the | 5    A.  I am not sure.  I'm not remember. |
| 6 doctor.  I can't wear that type of safety shoes because | 6    Q.  Now, Mr. O'Neil wasn't involved with |
| 7 of my health condition. | 7 Exhibit 5; right? |
| 8    Q.  Okay.  So this Exhibit 5 is related to you | 8    A.  That time, the only Leroy Lemos. |
| 9 not being Hispanic. | 9    Q.  Okay.  And Mr. Robinson wasn't even |
| 10    A.  Yes. | 10 employed at this time, was he? |
| 11    Q.  Okay. | 11    A.  No. |
| 12    A.  I -- | 12    Q.  And at this time in 2015, you hadn't |
| 13    Q.  Did you have something else? | 13 submitted any complaints against Mr. Lemos; correct? |
| 14    A.  No. | 14    A.  I -- after -- before that, no.  I not |
| 15    Q.  Okay.  After you got Exhibit 5, did your | 15 remember.  I am not remember before that. |
| 16 pay change? | 16    Q.  All right.  I have introduced Exhibit 6. |
| 17    A.  No. | 17 Ms. Gerovic, do you see here that I've introduced |
| 18    Q.  Did your job duties change? | 18 Exhibit 6? |
| 19    A.  No. | 19        (Exhibit Number 6 was marked.) |
| 20    Q.  This Exhibit 5 is from James Stigall; | 20    A.  Yes. |
| 21 right? | 21    Q.  All right.  Do you recognize Exhibit 6? |
| 22    A.  Yes. | 22 And tell me if I need to make it bigger for you. |
| 23    Q.  So James Stigall gave this Exhibit 5 to | 23    A.  That's fine.  I can read.  Yes. |
| 24 you, not Mr. Lemos. | 24    Q.  All right.  You recognize all of Exhibit 6? |
| 25    A.  Mr. Lemos called me to come on a safety | 25    A.  Yes. |
| Page 62 | Page 64 |

| | |
|---|---|
| 1 meeting, all staff meeting, he called me and James | 1    Q.  What is Exhibit 6 about? |
| 2 Stigall.  James Stigall is my supervisor, the -- first my | 2    A.  About some inspection, the floor. |
| 3 supervisor and he call James Stigall to come to his | 3    Q.  Do you recall this incident about the |
| 4 office from the all staff meeting and he tell James | 4 floor? |
| 5 Stigall to give me the verbal notice.  And James Stigall | 5    A.  No, I don't know about this incident. |
| 6 asked him why he has to give me the verbal notice.  I | 6    Q.  All right.  It -- it's talking about -- |
| 7 have a doctor's note. | 7 does it -- is it talking about an inspection report? |
| 8    Q.  You were given a voucher for a different | 8    A.  Yes.  Yes.  Yes. |
| 9 pair of safety shoes, right, so you could purchase a | 9    Q.  Does that help you remember what this was |
| 10 different pair? | 10 about, this incident? |
| 11    A.  Yes. | 11    A.  No. |
| 12    Q.  Did you purchase that second pair of safety | 12    Q.  Okay.  Is it also about responding to |
| 13 shoes? | 13 requests for service? |
| 14    A.  Yes. | 14    A.  It is -- a request for salaries? |
| 15    Q.  Yes? | 15    Q.  Do you see the language that I'm talking |
| 16    A.  Yes, it's a composed shoes. | 16 about in the second paragraph? |
| 17    Q.  And you were able to wear those. | 17    A.  Yes. |
| 18    A.  No. | 18    Q.  Where it's talking about requests for |
| 19    Q.  Why were you not able to wear the second | 19 service? |
| 20 pair of shoes? | 20    A.  Yeah. |
| 21    A.  I had -- I had an infection on my toe. | 21    Q.  Okay.  Do you see the language after that, |
| 22 The safety shoes is rubbing and I pull all my -- all my | 22 after the request for service? |
| 23 toenails. | 23    A.  By bringing the -- the tools. |
| 24    Q.  When did you buy the second pair of safety | 24    Q.  Do you recall an incident in which you |
| 25 shoes? | 25 didn't bring someone the tools -- or that you brought |
| Page 63 | Page 65 |

17 (Pages 62 - 65)

Emina Gerovic - January 13, 2021

---

**Page 66**

1 someone the tools they needed to complete a task rather
2 than --
3     A. No.
4     Q. -- let me -- let me --
5     A. No.
6     Q. Let me finish.
7       -- rather than completing the task
8 yourself?
9     A. No, that's not true.
10     Q. Okay.
11     A. That's not true.
12     Q. Okay. Do you remember that?
13     A. No.
14       MR. DAVIDOVICH: Excuse me. Scroll up a
15 little bit so she can see the date in the first part of
16 it.
17     Q. (By Ms. Felton) Do you see the date,
18 Ms. Gerovic?
19     A. October 1. No, I am not remembering that.
20 I'm never -- I never bring the tools to nobody. I try to
21 make everybody happy.
22     Q. And what kind of discipline is Exhibit 6?
23     A. It's like I --
24     Q. Is it -- is it stated on the document what
25 kind of discipline it is?

---

**Page 67**

1     A. I -- I bring somebody tools to do some
2 work.
3     Q. Do you see the subject of -- the subject
4 line of Exhibit 6?
5     A. Yes.
6     Q. And does it indicate in the subject line
7 what kind of discipline it is?
8     A. Verbal warning.
9     Q. Okay. How is Exhibit 6 related to you
10 being Bosnian?
11     A. I don't know about this one. I am not
12 remember I bring anybody anything and I can't -- I can't
13 answer the question how to be relate to me if I'm not
14 remember. I don't know.
15     Q. Okay. And you don't remember an inspection
16 report where you received a rating score of poor to fair?
17     A. A rating score from who?
18     Q. I'm -- if you don't remember, you don't
19 remember. That's fine.
20     A. I remember only inspection Yvonne Chavez
21 did and --
22     Q. Go ahead.
23     A. And she's the one who rate me poor.
24     Q. Do you think Exhibit 6 is related to that
25 inspection that Yvonne did?

---

**Page 68**

1     A. I think.
2     Q. You think yes?
3     A. I think yes.
4     Q. Okay. Do you remember receiving any kind
5 of discipline after Yvonne's inspection?
6     A. Yes.
7     Q. Do you think Exhibit 6 is that discipline?
8     A. I think.
9     Q. After you received Exhibit 6, did you have
10 any change in pay?
11     A. Is a change -- is a -- no pay, no.
12     Q. Did your pay decrease after Exhibit 6?
13     A. No.
14     Q. Did your duties change after Exhibit 6?
15     A. Yes.
16     Q. How did your duties change?
17     A. Add more stuff on me.
18     Q. What more stuff did you get?
19     A. I get the -- the trash can, I have to pick
20 up the trash around the Arie P. Taylor and I have to go
21 to sweep the street or the sidewalk.
22     Q. Okay. Sweep the street or sweep the
23 sidewalk? Which one?
24     A. Sidewalk. I'm sorry. I'm not say
25 correctly. It's not street. Sidewalk.

---

**Page 69**

1     Q. Okay. Was that part of the duties listed
2 in your job description?
3     A. No. It's not part of my duty to go
4 outside and sweep sidewalk and street, clean up the
5 street.
6     Q. Why do you say it's not part of your job?
7     A. Nobody has never told me on the first time
8 I start, I have to -- that's my -- my job to go sweep the
9 street and clean up -- sweep the sidewalk and clean up
10 the street. I -- I've been told to clean up the
11 building, vacuum, sweep and wax and cleaning the windows
12 and the stuff inside.
13     Q. Okay. Were you still a custodian after you
14 received Exhibit 6?
15     A. Yes.
16     Q. Mr. O'Neil was not involved in Exhibit 6;
17 correct?
18     A. No.
19     Q. He was not involved.
20     A. No.
21     Q. And Mr. Robinson, again, wasn't even
22 employed in 2015; right?
23     A. No, he's not.
24     Q. Was there any inspection of the toilets
25 related to Exhibit 6, if you remember?

---

18 (Pages 66 - 69)

Emina Gerovic - January 13, 2021

1      A.  I spoke to the safety manager Corrine that
2  time about my safety shoes.  She come to the PAB to talk
3  to me about safety shoes, and she tell me Leroy Lemos
4  need to send me somewhere to work that I don't have to
5  wear the safety shoes until my toes heal.
6      Q.  What is Corrine's last name?
7      A.  I -- I'm not remember her last name.
8  She's a safety -- she's a safety manager.
9      Q.  Was she a safety manager within risk
10  management?
11      A.  She's working in a -- in the same building
12  with Leroy.  I don't know what --
13      Q.  Okay.  And when did that occur?
14      A.  He come to me after the -- after the
15  safety shoes, I get the verbal.
16      Q.  After you got your verbal warning.
17      A.  Yes.
18      Q.  Okay.
19      A.  I'm sorry.
20      Q.  You're fine.
21          All right.  I have introduced Exhibit
22  Number 7.  Do you see Exhibit Number 7, Ms. Gerovic?
23          (Exhibit Number 7 was marked.)
24      A.  Yes.
25      Q.  All right.  Do you see the date on

Page 74

1      A.  Little bit more bigger.
2      Q.  A little bigger?  Okay.
3          And maybe I should rephrase the question.
4          Do you remember if Exhibit 7 was about
5  using your work cell phone or your personal cell phone?
6      A.  Yes.
7      Q.  What was Exhibit 7 about?
8      A.  It's about using the work phone.
9      Q.  The work cell phone.
10      A.  Yes.
11      Q.  So the City -- the City gave you a work
12  cell phone?
13      A.  Yes.
14      Q.  Okay.  And what -- do you recall the
15  incident why you received Exhibit 7?
16      A.  Because I use the phone.
17      Q.  Because you used the work phone.
18      A.  Yes.
19      Q.  Okay.  What was wrong with the way you used
20  the work phone?
21      A.  I make mistake to use the work phone.
22      Q.  What mistake did you make?
23      A.  To -- I tried to be nice and help the --
24  the person, and I use the work phone, and I make mistake,
25  and I admit it.

Page 76

1  Exhibit 7?
2      A.  June 13, 2016.
3      Q.  All right.  Have you see here where -- for
4  some reason the exhibit sticker now is in a different
5  direction, but do see it's Exhibit 7?
6      A.  Yes.
7      Q.  If you'll read Exhibit 7, please.
8      A.  Yes.
9      Q.  What is Exhibit 7 about?
10      A.  Me using the work phone.
11      Q.  Using your work cell phone?
12      A.  Yes.
13      Q.  Or is it about using your personal cell
14  phone?
15      A.  I can't -- I can't read everything from
16  the left side.  Hold on.
17      Q.  Let me make it bigger.
18      A.  No, it's big enough and my --
19      Q.  Oh, I'm sorry.  Am I making it too big?
20      A.  Yes.
21      Q.  Sorry.  Is that better?
22      A.  Just a little bit more.
23      Q.  A little smaller?
24      A.  Bigger.
25      Q.  Little bigger.

Page 75

1      Q.  Who were you trying to help?
2      A.  Yes.
3      Q.  No.  Who were you trying to help?
4      A.  The coworker.
5      Q.  Do you remember the coworker's name?
6      A.  Chris.
7      Q.  Okay.  Were you using the work phone for
8  personal calls?
9      A.  It's not -- it's -- it's kind of the
10  personal phone calls.  He -- at the time he need the
11  money, he didn't have food, he didn't have any nothing
12  and me and James Stigall help him bring him the food and
13  some clothes, some stuff and I use the phone.
14      Q.  So you used your work phone for personal
15  reasons.
16      A.  Yes.
17          MR. DAVIDOVICH:  Sorry to interrupt, but I
18  think, perhaps, you might want to read her the third
19  paragraph because she's not answering what the third
20  paragraph is about, and I think it's a problem with
21  comprehending what's on that third paragraph.
22      Q.  (By Ms. Felton)  Ms. Gerovic, can you read
23  the third paragraph of Exhibit 7?  The paragraph beginning
24  "Specifically."
25      A.  Yeah, I -- I read that.

Page 77

20 (Pages 74 - 77)

Emina Gerovic - January 13, 2021

1    Q.  (By Ms. Felton)  How do you know that Janet
2  did not receive any discipline?
3        A.  Because -- I know because she's tell me
4  she -- she tell me she has to take the phone from her
5  husband.  She don't want to get in trouble.
6    Q.  When did she tell you that?
7        A.  When I get in trouble for the phone.
8    Q.  So in June of 2016, she told you that?
9        A.  I am not saying exactly same day.
10   Q.  Okay.  I didn't say same day.  Did she tell
11  you this in June of 2016?
12       A.  Yes.
13   Q.  Does Janet still work for Denver?
14       A.  I don't know.
15   Q.  I thought you were friends?
16       A.  I am not three years work for Denver and
17  Janet is still working for -- for City.
18   Q.  Okay.  I thought you said you didn't know.
19  Is Janet still working for the City?
20       A.  She is still employed, City employee.
21   Q.  Okay.  Did you ask Janet if she got
22  disciplined for giving her work phone to her husband?
23       A.  No, she hasn't told me.
24   Q.  Did you ask her?
25       A.  No.

Page 86

1    Q.  Did she tell you she did not receive
2  discipline for the cell phone?
3        A.  Yes, she has.
4    Q.  Have you talked to Janet about your lawsuit
5  against the City?
6        A.  No.
7    Q.  Okay.  I have introduced Exhibit 8.  Do you
8  see Exhibit 8, Ms. Gerovic?
9        (Exhibit Number 8 was marked.)
10       A.  No, it's too small.
11   Q.  Too small.  Okay.  How's that?  Still too
12  small?  How's that?
13       A.  That's okay.
14   Q.  Okay.  Tell me when you need me to scroll
15  down.
16       A.  Okay.
17       MR. DAVIDOVICH:  I'm not sure if it's my
18  screen or everybody's, but the right side is -- has the
19  pictures of everybody and cuts part of the wording.  I
20  don't know if that's just me or not.
21       MS. FELTON:  Is that any better?
22       MR. DAVIDOVICH:  Yes.  Thank you.
23       A.  Okay.  You can scroll down, please.  Yes.
24   Q.  (By Ms. Felton)  All right.  Can you see
25  there that it's marked Exhibit 8?

Page 87

1        A.  Yes.
2    Q.  What's the date of Exhibit 8?
3        A.  March 17, 2017.
4    Q.  Who is it from?
5        A.  Tony Rios.
6    Q.  And can you tell me what Exhibit 8 is
7  about?
8        A.  About not answering the phone calls from
9  Leroy Lemos.
10   Q.  About -- say that again?
11       A.  About the -- my cell phone and not
12  answering Leroy Lemos.
13   Q.  Not answering him on your work phone; is
14  that right?
15       A.  Yes.
16   Q.  And this is while you were working at
17  District 5?
18       A.  Yes.
19   Q.  Did you have your work cell phone on that
20  day?
21       A.  Yes, I do.
22   Q.  All right.  Had your voicemail been
23  activated?
24       A.  I exchange the phone and my -- my
25  voicemail didn't -- like day before, I exchanged the

Page 88

1  phone and my voicemail is -- didn't work.
2    Q.  Did you talk to tech services about making
3  your voicemail work?
4        A.  Yes, I did call them like after the Tony
5  Rios talked to me.
6    Q.  You called tech services after March 17,
7  2017?
8        A.  Right.  Yes.
9    Q.  After -- what kind of discipline is
10  Exhibit 8, if any?  Is Exhibit 8 discipline?
11       A.  The -- the conversation.
12   Q.  It's a documented counseling conversation?
13       A.  Yes.
14   Q.  Was that discipline?
15       A.  No.  Conversation.
16   Q.  It's just a conversation?  Is that yes or
17  no?
18       A.  Conversation.
19   Q.  After you received Exhibit 8, did you have
20  any change in your pay?
21       A.  No.
22   Q.  Were you still a custodian?
23       A.  Yes.
24   Q.  Mr. O'Neil was not involved in Exhibit 8,
25  was he?

Page 89

23 (Pages 86 - 89)

Emina Gerovic - January 13, 2021

| | |
|---|---|
| 1 A. No. | 1 we didn't have any good service in District 5. |
| 2 Q. And Mr. Robinson still wasn't employed; | 2 Q. And when did Division Chief Thomas send |
| 3 right? | 3 that email? |
| 4 A. No, I don't know. No. | 4 A. After that. I think it's after March 17. |
| 5 Q. Was Mr. Robinson involved in Exhibit 8 at | 5 Q. Do you have a copy of that email? |
| 6 all? | 6 A. I'm pretty sure I have. |
| 7 A. No. | 7 Q. Have you given that email to your attorney? |
| 8 Q. Were you able to -- or I'm sorry. | 8 A. I think -- I think I give it to the |
| 9 Did you talk to Mr. Lemos on your City | 9 Carolyn in the camp previous. |
| 10 cell phone on that day, on March 16? | 10 Q. Your previous lawyers. |
| 11 A. Yes, I call him. I go outside and call | 11 MS. FELTON: Oh, her name -- I can't think |
| 12 him back. | 12 of her name. I will get it to you. Is it Karla? |
| 13 Q. Okay. How did you know he called you? | 13 THE DEPONENT: Karla, yes. Karla |
| 14 A. Tony Rios called me on -- in the police | 14 Carrigan. |
| 15 department and call me on my -- my private cell phone. | 15 THE COURT REPORTER: Karla Carrigan. |
| 16 Q. Does Exhibit 8 have anything to do with not | 16 Thank you. |
| 17 being Hispanic? | 17 Q. (By Ms. Felton) Okay. I have introduced |
| 18 A. No. | 18 Exhibit 9 now. Exhibit 9 is really long, so I'm not going |
| 19 Q. Did you report poor cell coverage to | 19 to go through the whole thing. Do you see the beginning |
| 20 Mr. Lemos? | 20 part here of Exhibit 9, Ms. Gerovic? |
| 21 A. Yes, I did. | 21 (Exhibit Number 9 was marked.) |
| 22 Q. When? | 22 A. Yes. |
| 23 A. Actually, I report to Mr. Lemos when I | 23 Q. Do you see it? |
| 24 work in downtown. | 24 A. Yes. |
| 25 Q. When you worked at the PAB. | 25 Q. Okay. What's the date for Exhibit 9? |
| Page 90 | Page 92 |
| 1 A. Yes. | 1 A. May 2, 2017. |
| 2 Q. Not when you worked at District 5. | 2 Q. And then what's the date above that? |
| 3 A. Yes, I did. | 3 A. The May 4. 4th. |
| 4 Q. Okay. When did you tell Mr. Lemos about | 4 Q. And does it identify for you what kind of |
| 5 poor cell coverage at District 5? | 5 discipline it is? Do you see where my arrow is pointing? |
| 6 A. Before that he is -- before this | 6 A. Yes. |
| 7 conversation, we are -- talk and I -- I tell them, if you | 7 Q. Okay. What kind of discipline does |
| 8 need reach me, call the police department and the -- the | 8 Exhibit 9 state that it is? |
| 9 police officer is going to find me. I'm in the building. | 9 A. The writing. |
| 10 If I don't have any cell service at District 5. | 10 Q. Does it say it's a written reprimand? |
| 11 Q. When did that conversation with Mr. Lemos | 11 A. Yes. |
| 12 occur? | 12 Q. And you can see here at the bottom of that |
| 13 A. It's about Christmastime. | 13 first page that it's marked Exhibit 9. |
| 14 Q. Christmas before Exhibit 8? | 14 A. Yes. |
| 15 A. Yes. | 15 Q. And I'm going to scroll to the -- scrolling |
| 16 Q. Who else was present in that -- during that | 16 to page 3. Can you see the paragraph beginning on Monday, |
| 17 conversation? | 17 March 16, 2017? |
| 18 A. Tony Rios. | 18 A. Yes, I see. |
| 19 Q. Did Division Chief Ron Thomas have any | 19 Q. Okay. Can you read what you can see on the |
| 20 communications that you know of with Mr. Lemos about poor | 20 screen to yourself and then let me know and then I will |
| 21 cell coverage? | 21 scroll down. |
| 22 A. Yes, he has. | 22 A. Yes. |
| 23 Q. How do you know that? | 23 Q. Can you see now the rest of page 3? |
| 24 A. He talk -- I told him tell him what | 24 A. Yes. |
| 25 happened and he send the email to Leroy Lemos to explain | 25 Q. Let me know when you're done. |
| Page 91 | Page 93 |

24 (Pages 90 - 93)

Emina Gerovic - January 13, 2021

| | |
|---|---|
| 1    A.  Yes. | 1    A.  Yes, I am.  I had -- |
| 2    Q.  All right.  I've scrolled down to the next | 2    Q.  Go ahead. |
| 3  page, and you can see here at the bottom it says it's | 3    A.  I get so much punishment. |
| 4  page 4. | 4    Q.  Exhibit 9 is the punishment that you got; |
| 5    A.  Yes. | 5  is that right? |
| 6    Q.  Have you read the -- let me know when | 6    A.  After the Exhibit 9, I had so much |
| 7  you've read those first three paragraphs there. | 7  punishment from Mr. Leroy Lemos. |
| 8    A.  Okay. | 8    Q.  Okay.  What punishment did you receive from |
| 9    Q.  All right.  Do you remember this incident | 9  Leroy after Exhibit 9? |
| 10  at the Arie P. Taylor building on March 16? | 10    A.  I had been pulled from District 5 and he |
| 11    A.  Yes, I do. | 11  send me to the PAB to do -- to pick up the -- the little |
| 12    Q.  Do you recall receiving a written reprimand | 12  rocks around the building, the little rocks to pick up |
| 13  for that incident on March 16? | 13  around the building. |
| 14    A.  Can you explain to me pretty please? | 14    Q.  How long were you sent to the PAB? |
| 15    Q.  Do you remember being disciplined -- | 15    A.  A month. |
| 16    A.  Yes. | 16    Q.  And then you went back to District 5? |
| 17    Q.  -- for this incident? | 17    A.  Yes. |
| 18    A.  Yes. | 18    Q.  Who saw you picking up the little rocks |
| 19    Q.  Is Exhibit 9 the discipline that you | 19  around the building? |
| 20  received? | 20    A.  Everybody.  James Stigall.  The Tony Rios, |
| 21    A.  Yes. | 21  he come to me outside and he told me that's not fair. |
| 22    Q.  Here is the first page.  And then you saw | 22  Tony Rios. |
| 23  the second page lists the violations and you saw most of | 23    Q.  Did you do your regular custodian duties |
| 24  the fourth page.  So do you recall receiving all eight | 24  while you were at the PAB for that month? |
| 25  pages of that document? | 25    A.  Yes. |
| Page 94 | Page 96 |

| | |
|---|---|
| 1    A.  Yes. | 1    Q.  Was anybody -- any other custodians at the |
| 2    Q.  What does Exhibit 9 have to do with you | 2  PAB with you during that month? |
| 3  being Bosnian? | 3    A.  Everybody who is assign in a PAB is over |
| 4    A.  What is Exhibit 9 have to be -- to be a | 4  there. |
| 5  Bosnian. | 5    Q.  Who is that? |
| 6    Q.  Yes.  Does this -- was this given to you -- | 6    A.  Annette, Rosita, John Gandara. |
| 7  was Exhibit 9 given to you because you are Bosnian? | 7    Q.  John Gandara. |
| 8    A.  I can say yes. | 8    A.  Yes. |
| 9    Q.  How can you say yes?  Why do you think it's | 9    Q.  What is Rosita's last name? |
| 10  because you are Bosnian? | 10    A.  I don't know what is her last name. |
| 11    A.  Because I didn't do anything wrong.  I | 11    Q.  And the Annette is the same Annette we |
| 12  didn't do anything wrong.  And my boss Leroy Lemos, he | 12  talked about before? |
| 13  don't want to listen to me.  He didn't want to listen to | 13    A.  Yes. |
| 14  me.  And he tell me I don't know how to explain and it's | 14    Q.  Kevin O'Neil was not involved in Exhibit 9; |
| 15  my fault. | 15  is that correct? |
| 16    Q.  So are you saying that it's because you are | 16    A.  Kevin O'Neil should be involved on this 9. |
| 17  Bosnian or it's because you are not Hispanic? | 17    Q.  But he was not. |
| 18    A.  Because -- I can say both. | 18    A.  It does not say his name. |
| 19    Q.  Okay.  I -- | 19    Q.  You didn't see his name? |
| 20    A.  I feel -- I can say both. | 20    A.  No. |
| 21    Q.  After you received Exhibit 9, did you have | 21    Q.  And you didn't meet with him about |
| 22  a decrease in pay? | 22  Exhibit 9? |
| 23    A.  No. | 23    A.  Yes, I did. |
| 24    Q.  Did you -- were you still a custodian after | 24    Q.  And that was actually the same day, wasn't |
| 25  you received Exhibit 9? | 25  it? |
| Page 95 | Page 97 |

25 (Pages 94 - 97)

Stevens-Koenig Reporting, A Veritext Company
303-988-8470

Emina Gerovic - January 13, 2021

| | |
|---|---|
| 1    A. I -- | 1 voicemail to employees around. |
| 2    Q. Or the next day? | 2        Q. All right. Do you recall talking to |
| 3    A. I think it's next day. I'm not sure the | 3 security agent Sequoia Palin about this incident? |
| 4 date. | 4    A. Yes. |
| 5    Q. I think it's the next day. | 5        Q. Do you know what color Ms. Palin is or what |
| 6        And, again, Mr. Robinson wasn't employed | 6 national origin she is? |
| 7 at this time; right? | 7    A. She is the black girl. |
| 8    A. No. | 8        Q. She is black. Okay. And do you know that |
| 9    Q. I'm sorry. Did you say no? | 9 Ms. Palin did a written statement about this incident; |
| 10    A. Yes, I say no. | 10 right? |
| 11    Q. So in this incident, the white man said | 11    A. Yes. |
| 12 that you let him into the building; is that right? | 12    Q. And did you read it? |
| 13    A. No. | 13    A. Yes. |
| 14    Q. He didn't say that? | 14    Q. And she said that in that written |
| 15    A. No, that's not right. | 15 statement, that you told her you let the white man into |
| 16    Q. Okay. I understand that you may disagree | 16 the building; right? |
| 17 with what he said. I'm asking you, what did he say? Did | 17    A. Yes. |
| 18 he say you let him in? | 18    Q. Did you get along well with Ms. Palin? |
| 19    A. Yes. | 19    A. Yes. |
| 20    Q. And did the black man say that he came in | 20        MR. DAVIDOVICH: Sorry. I was on mute. |
| 21 through a different unlocked door? | 21        I was going to object to asking a question |
| 22    A. Yes. | 22 about something that's not in front of her. You can ask |
| 23    Q. And did you get into a yelling argument | 23 her what Ms. -- |
| 24 with the black man? | 24        MS. FELTON: She said she read the |
| 25    A. I didn't yell to nobody. | 25 statement. |
| Page 98 | Page 100 |
| 1    Q. You did not report this incident to | 1        MR. DAVIDOVICH: Yes, but you're asking |
| 2 Mr. Lemos when it happened; correct? | 2 her now to speak from memory about what is in the |
| 3    A. Mr. Lemos called me ten minutes later. | 3 statement, and you can't do that. That's improper. I |
| 4    Q. You didn't report it to him; correct? | 4 object to the form. |
| 5    A. No, I didn't have time. | 5        MS. FELTON: If she -- if she doesn't |
| 6    Q. And the black man filed a complaint against | 6 recall, she will tell me. |
| 7 you for this incident. | 7    Q. (By Ms. Felton) Did you also work with a |
| 8    A. Mr. Lemos tell me the black man call him | 8 security agent named Stanford Pollard? |
| 9 by the phone. | 9    A. He's work in the same building where I |
| 10    Q. Okay. To complain about the incident? | 10 work. |
| 11    A. Yes. | 11    Q. So you worked with him in that building? |
| 12    Q. And his complaint was that you told him to | 12    A. Yes. |
| 13 leave the building but not the white man; correct? | 13    Q. In the Arie P. Taylor building. |
| 14    A. Yes. Correct. | 14    A. Yes. |
| 15    Q. And when Mr. Lemos called you on your City | 15    Q. Do you know what color or national origin |
| 16 cell phone, you didn't answer; correct? | 16 Mr. Pollard is? |
| 17    A. Yes. | 17    A. He's a black. |
| 18    Q. Can you say correct or am I incorrect? | 18    Q. Did you know that Mr. Pollard gave the |
| 19    A. It's correct. | 19 black man a phone number so that he could call and make a |
| 20    Q. Okay. And at that time, you did not have | 20 complaint? |
| 21 your voicemail set up. | 21    A. No. |
| 22    A. Correct. | 22    Q. Did Mr. Pollard tell you he gave the black |
| 23    Q. What Hispanic employees didn't have their | 23 man a phone number? |
| 24 voicemail set up at that time? | 24    A. No. He -- he's tell me he ask him. |
| 25    A. I don't know. I didn't check the | 25    Q. What did Mr. Pollard ask? |
| Page 99 | Page 101 |

26 (Pages 98 - 101)

Stevens-Koenig Reporting, A Veritext Company
303-988-8470

Emina Gerovic - January 13, 2021

| | |
|---|---|
| 1   Q.  And it's dated May 3, 2017? | 1   Hispanic; correct? |
| 2   A.  Yes. | 2      A.  Yes, it's not correct.  I told James |
| 3   Q.  And do you recall when you actually met | 3   Williamson and Kevin O'Neil, Leroy Lemos need to stop |
| 4   with them? | 4   harassing me and treating me differently than other |
| 5      A.  I did met with them, and I don't know | 5   people.  And I talk to them about this incident, what I |
| 6   when. | 6   get and Williamson, he tell me, I feel sorry for you, we |
| 7   Q.  Okay. | 7   can't do anything.  Leroy Lemos make decision. |
| 8   A.  I not remember. | 8      Q.  Okay.  You said you -- you were being |
| 9   Q.  Now, Exhibit 12 doesn't say anything about | 9   treated differently, but you didn't say you were being |
| 10  you being discriminated against. | 10  treated different because you weren't Hispanic; correct? |
| 11     A.  If I know to write down email, it's going | 11     A.  I told Kevin O'Neil and James Williamson, |
| 12  to be a lot more, and I don't know how to write down. | 12  the Leroy Lemos need to stop to harassing me.  He need to |
| 13  I'm sorry. | 13  stop harassing me. |
| 14  Q.  Did you ask someone else to draft an email | 14  Q.  Okay.  That's not what I asked. |
| 15  for you? | 15     Did you say anything about not being |
| 16     A.  No.  That day I didn't ask nobody. | 16  Hispanic? |
| 17  Q.  During that meeting that you had with James | 17  A.  Yes. |
| 18  and Kevin, they told you that you could file a grievance | 18  Q.  All right.  What did you say? |
| 19  if you disagreed with the written reprimand; right? | 19     A.  I told them he is need to stop harassing |
| 20  A.  Yes. | 20  me and he come after me because I am not Hispanic. |
| 21  Q.  This was the only time that you ever met | 21     Q.  And you never submitted a written complaint |
| 22  with and complained to James; right? | 22  to either James or Kevin; correct? |
| 23  A.  Not really sure that's only time.  I had a | 23  A.  Yes. |
| 24  meeting with -- with the James and Kevin before. | 24  Q.  Yes, you did? |
| 25  Q.  Okay.  When was that meeting? | 25  A.  No, I don't. |
| Page 114 | Page 116 |
| 1   A.  I write to -- | 1   Q.  All right.  Let me ask that a different |
| 2   Q.  So this email you wrote, do you see it | 2   way.  Did you ever submit a written complaint to either |
| 3   again? | 3   Kevin or James? |
| 4   A.  Yes. | 4      A.  No, I didn't, because I don't know how to |
| 5   Q.  Okay.  It's dated May 3, 2017. | 5   write down email. |
| 6   A.  Yes. | 6   Q.  Okay.  Could you have had someone write it |
| 7   Q.  When else did you have a meeting with | 7   down for you on a piece of paper? |
| 8   James? | 8   A.  Yes. |
| 9      A.  I called Kevin O'Neil and ask him for the | 9   Q.  Could you have written it down on a piece |
| 10  meeting to talk to him and James Williamson.  And I -- | 10  of paper? |
| 11  Kevin tell me to come -- come to downtown.  James | 11  A.  I don't know how. |
| 12  Williamson, he's never show up.  He's busy. | 12  Q.  Could your daughters have helped you? |
| 13  Q.  Okay.  That meeting was much later; | 13  A.  Yes. |
| 14  correct?  That meeting happened in September. | 14  Q.  All right.  So you received the written |
| 15     A.  I don't know when.  I not remember.  I | 15  reprimand in March -- or I'm sorry -- in May of 2017 -- |
| 16  just telling you, it's not only meeting I had with them. | 16  A.  Yes. |
| 17  Q.  Okay.  Prior to May 3 of 2017, you had | 17     Q.  -- and you met with James and Kevin in May |
| 18  never met with James; right? | 18  of 2017.  And then you were injured on the job in July of |
| 19  A.  I not remember, yes or no. | 19  2017; right? |
| 20  Q.  Do you have any documentation that would | 20  A.  Yes. |
| 21  help you remember? | 21  Q.  And after you were injured, you had to take |
| 22  A.  No. | 22  a leave of absence from work. |
| 23  Q.  All right.  During this meeting that you | 23  A.  Yes. |
| 24  had with James and Kevin in May of 2017, you didn't say | 24  Q.  And that was because your injuries were |
| 25  anything about being treated different because you are not | 25  such that you couldn't perform your custodial duties; |
| Page 115 | Page 117 |

30 (Pages 114 - 117)

Emina Gerovic - January 13, 2021

1    A.    Why nobody else has been change location
2  besides me.  For three years, I pretty much work
3  everywhere in the City.  Every building.  Every building.
4  Even police department or not police department, I work
5  everywhere.  And people who is working forever, don't
6  know where is the building.
7        Q.    Didn't Danielle Garcia's location change to
8  the Castro Building?
9        A.    Yes.
10       Q.    And that was after she was disciplined;
11  correct?
12       A.    Yes.
13       Q.    And she's Hispanic; correct?
14       A.    Yes.
15       Q.    You told Mr. Lemos and -- you told Russ and
16  Leroy that you were looking forward to working at the
17  Castro Building because it was closer to home.
18       A.    I told Leroy Lemos, I have to work.
19  Doesn't matter where he is sending me.  He's the boss.
20  Doesn't matter which building he send me.  I have to
21  work.  And that he -- I tell him, you send me to Castro
22  Building, it's more -- it's much closer to my house.  I
23  live in Arvada 64th and Sheridan.  It's not far for me.
24       Q.    Were you moved to the Castro Building
25  because you used FMLA?

Page 138

1    A.    I don't know.  I'm not sure.
2        Q.    Were you moved to Castro because of a
3  complaint you made?
4        A.    I'm pretty sure.
5        Q.    Okay.  What complaint?
6        A.    That Leroy Lemos need to stop harassing
7  me.  Every single -- can I -- can I say something?
8        Q.    You can answer the question that's asked.
9        A.    Yes.
10       Q.    Okay.  So you think you were moved because
11  of a complaint you made and the complaint was that Leroy
12  needed to stop harassing you.
13       A.    Yes.
14       Q.    Who did you make that complaint to?
15       A.    I made the complaint to Kevin O'Neil.
16       Q.    And when did you make that complaint?
17       A.    I make a few times complaint to Kevin
18  O'Neil.
19       Q.    But you don't remember any of the dates.
20       A.    No.  No.
21       Q.    And you don't have anything in writing.  Do
22  you have anything in writing?
23       A.    Maybe I can find.  I'm not sure.
24       Q.    All right.  If you have anything in
25  writing, have you already given it to your lawyer?

Page 139

1    A.    I pretty much give it to staff of the
2  previous lawyer.
3        Q.    You gave everything to the previous lawyer?
4  I'm sorry, did you --
5        A.    Yes.
6        Q.    Was Kevin O'Neil involved in moving you to
7  the Castro Building?
8        A.    No.
9        Q.    Was Kevin O'Neil involved in changing your
10  shift?
11       A.    No.
12       Q.    Was Murphy Robinson involved in moving your
13  location?
14       A.    No.
15       Q.    Was he involved in changing your shift?
16       A.    Explain to me how you -- what you mean.
17       Q.    Was Murphy Robinson involved in changing
18  your shift from 6 a.m. to 1:30 p.m.?
19       A.    No.
20       Q.    Was he involved in changing your shift from
21  1:30 p.m. to 6 a.m.?
22       A.    Yes.
23       Q.    And changing your shift from 1:30 p.m. to
24  6 a.m. was something you requested.
25       A.    Excuse me?

Page 140

1    Q.    Did you request -- did you ask Murphy to
2  change your shift from 1:30 p.m. to 6 a.m.?
3        A.    From 6 a.m. to 2:30 p.m.
4        Q.    Sorry.  Sorry.
5        A.    I know -- I know --
6        Q.    Sorry.
7        A.    I know what you mean.  It's okay.
8        Q.    Was -- so Murphy was involved.  He changed
9  your shift from 1:30 p.m. back to 6 a.m.
10       A.    Yes.
11       Q.    Why do you think that it was Murphy that
12  changed your shift?
13       A.    Because he told me.
14       Q.    And that was because you asked for that
15  change.
16       A.    Yes.
17       Q.    Did you attempt to file a complaint at any
18  time with Anne Carter?
19       A.    Yes.
20       Q.    When?
21       A.    I tried to file a complaint, Anne Carter
22  and Christina Howard --
23       Q.    Okay.  And I know that, but I want to
24  concentrate first on Anne Carter, then we will talk about
25  Christina.  So first I want to talk about Anne.

Page 141

36 (Pages 138 - 141)

Emina Gerovic - January 13, 2021

| | |
|---|---|
| 1    A.  Yes. | 1  killed myself proving how good I am working, is never |
| 2    Q.  So then you met with Kevin on September 21 | 2  going to be change.  And why he's changing my shift and |
| 3  at 9 a.m.; right? | 3  I'm so upset and Murphy tell me, sit down and let me -- |
| 4    A.  Yeah. | 4  explain to me what is going on.  When I tell Murphy, even |
| 5    Q.  All right.  And he said that he would talk | 5  if I killed myself to proving how good I'm working. |
| 6  to Leroy about moving you back to first shift at Castro? | 6  Murphy left the office and say, wait for me and later on |
| 7    A.  He will see what he can do. | 7  I see James Williamson, I see Anne Carter, I see the |
| 8    Q.  Okay.  And then you told him that you | 8  police officer.  And for no reason, just a |
| 9  wanted to meet with James and Murphy. | 9  misunderstanding.  I say even if I kill -- even if I kill |
| 10    A.  Yes. | 10  myself to proving how good I am.  That's only I met with |
| 11    Q.  And he told you to go make an appointment | 11  the... |
| 12  with Terrie Gathron. | 12    Q.  Okay.  You did not tell Murphy that you had |
| 13    A.  He told me I can't -- the -- actually, | 13  just left Kevin O'Neil's office; right? |
| 14  I -- the day I have a meeting with Kevin and James and | 14    A.  May -- yes.  I talk -- I tell him -- I |
| 15  James never show up. | 15  tell Murphy, I talk to Kevin O'Neil and he tell me, I |
| 16    Q.  Okay.  Right. | 16  will see what I can do. |
| 17    A.  He never show up. | 17    Q.  You told Murphy you talked to Kevin that |
| 18    Q.  Right.  So then Kevin -- go ahead. | 18  day. |
| 19    A.  I am not important person for James | 19    A.  I didn't say that day.  I tell him, I talk |
| 20  Williamson, and he don't have any time for me. | 20  to Kevin O'Neil.  He tell me, I will see what I can do. |
| 21    Q.  So then Kevin told you to go make an | 21  I didn't mention I talked to him today or yesterday or |
| 22  appointment with James and Murphy with Terrie Gathron. | 22  any day. |
| 23    A.  No.  He declined.  Kevin O'Neil declined | 23    Q.  And you called Murphy brother. |
| 24  and I went to Murphy's office by myself. | 24    A.  That's not true. |
| 25    Q.  What do you mean Kevin declined? | 25    Q.  And you tried to hug him. |
| Page 154 | Page 156 |

| | |
|---|---|
| 1    A.  He tell me I can't make -- I can't make | 1    A.  That's not true. |
| 2  appointment with James Williamson and Murphy.  I have to | 2    Q.  You admitted to Murphy that you made a |
| 3  go from the chain of the command and who is the chain of | 3  mistake with your Facebook posts? |
| 4  the command.  I went to the -- I went to the Kevin | 4    A.  Yes, I did. |
| 5  O'Neil, I -- when I talked to James and Kevin, James' | 5    Q.  You did not say to Murphy that you were |
| 6  schedule is meeting, and he never show up.  I am not | 6  being treated different because you were not Hispanic. |
| 7  important person and what he wants me to do. | 7    A.  Yes, I did. |
| 8    Q.  Did he tell you why he was saying you | 8    Q.  You told Murphy that he would be getting |
| 9  couldn't meet with them? | 9  calls from City Council. |
| 10    A.  No.  I'm not remember he say why. | 10    A.  No.  Why is the City Council going to call |
| 11    Q.  So you went to talk to Murphy.  And you | 11  him. |
| 12  didn't tell Murphy that you had just met with Kevin. | 12    Q.  Because you used to clean Thomas Herndon's |
| 13    A.  I don't know.  I went to talk to Murphy. | 13  office; correct? |
| 14  I remember I am really, really upset because Kevin O'Neil | 14    A.  Yes. |
| 15  tell me, oh, I'm sorry, I will see what I can do, you | 15    Q.  And you called Thomas Herndon and you told |
| 16  know.  And I tell Murphy, like I guess you are my last | 16  him what was going on; correct? |
| 17  option.  You tell us on the all staff meeting you have an | 17    A.  No, that's not correct.  That's not true. |
| 18  open door policy, and I tell him, you are my last option | 18    Q.  All right.  So you didn't tell Murphy that |
| 19  to come. | 19  he would be getting a call from City Council people. |
| 20          So he asked me what is going on and I am | 20    A.  No. |
| 21  crying because nobody don't want to listen to me what I | 21    Q.  And you didn't tell Murphy that the police |
| 22  have to say.  So I'm crying and tell Murphy, my boss, | 22  department commanders were going to call him. |
| 23  Leroy Lemos, he is -- he's not treating me -- he's not | 23    A.  Yes, I did. |
| 24  treating me right.  He's harassing me all the time. | 24    Q.  Did you tell him that the manager of safety |
| 25          And even if I am killing -- even if I | 25  was going to call him? |
| Page 155 | Page 157 |

Stevens-Koenig Reporting, A Veritext Company
303-988-8470

Emina Gerovic - January 13, 2021

| | |
|---|---|
| 1    Q.  Do you see that for September 22? | 1    A.  A memo of expectations. |
| 2    A.  Yes. | 2    A.  Yeah. |
| 3    Q.  And September 25? | 3    Q.  You do remember that? |
| 4    A.  Yes. | 4    A.  Yes. |
| 5    Q.  And all the way through October 3. | 5    Q.  And Mr. Lemos met with you to go over that |
| 6    A.  Yes. | 6  memo; right?  It was Mr. Lemos and Mr. O'Neil, Josh |
| 7    Q.  And then on October 4, you log in at | 7  Montour, Edward Ortiz. |
| 8  5:59 a.m. | 8    A.  Yes. |
| 9    A.  Yes. | 9    Q.  You do remember that meeting? |
| 10    Q.  All right.  On September 21 through | 10    A.  Yes. |
| 11  October 3, do you see how it doesn't say FMLA? | 11    Q.  And you remember Mr. Lemos reading the memo |
| 12    A.  On September 4? | 12  of expectations to you? |
| 13    Q.  September 21. | 13    A.  Yes. |
| 14    A.  Yes. | 14    Q.  All right.  I brought up the BOLO.  The DHS |
| 15    Q.  Okay.  So there's no FMLA from the 21st of | 15  employees that you said were talking about you, were they |
| 16  September through October 3.  Do you see that? | 16  security employees? |
| 17    A.  Yes. | 17    A.  No. |
| 18    Q.  So what's the basis for your statement that | 18    Q.  Who were they? |
| 19  you were on FMLA? | 19    A.  Employees from the building.  I don't know |
| 20    A.  I don't know. | 20  where is the people. |
| 21    Q.  Do you have any documentation that you were | 21    Q.  You didn't ask their names? |
| 22  on FMLA from September 21 to October 3? | 22    A.  No. |
| 23    A.  No, I don't.  If somebody has a calendar. | 23    Q.  You said that they took you over to the |
| 24    Q.  And then on October 4, you log in again at | 24  security desk. |
| 25  5:59 a.m. | 25    A.  No.  I didn't say that. |
| Page 166 | Page 168 |

| | |
|---|---|
| 1    A.  Yes. | 1    Q.  Okay.  So the people -- the women that you |
| 2    Q.  You log out for lunch at noon; right? | 2  overheard talking, did they tell you where the BOLO was |
| 3    A.  Yes. | 3  located? |
| 4    Q.  You log back in at 12:30 after lunch. | 4    A.  Yes, she is. |
| 5    A.  Yes. | 5    Q.  Where did they say it was located? |
| 6    Q.  And you log out for the day at 2:30 p.m.; | 6    A.  They told me behind the desk in security |
| 7  correct? | 7  area. |
| 8    A.  Yes. | 8    Q.  And then did she show you where the |
| 9    Q.  And the same thing happens on October 5. | 9  security area was? |
| 10    A.  Yes. | 10    A.  I know where is the secure area. |
| 11    Q.  All right.  So do you agree, then, that you | 11    Q.  All right.  Was the security area on the |
| 12  were on paid administrative leave from September 21 | 12  first floor? |
| 13  through October 3?  Ms. Gerovic, did you answer and I | 13    A.  Yes.  In the lobby. |
| 14  missed it? | 14    Q.  Had you seen the BOLO before? |
| 15    A.  No.  I agree. | 15    A.  No. |
| 16    Q.  All right.  When you moved to the Castro | 16    Q.  Did you know what a BOLO was? |
| 17  Building, you were still a custodian; right? | 17    A.  You mean -- sorry.  Your question, did I |
| 18    A.  Yes. | 18  see BOLO picture before mine or somebody else? |
| 19    Q.  And you had the same pay; right? | 19    Q.  Anybody's.  Had you ever seen a BOLO |
| 20    A.  Yes. | 20  before? |
| 21    Q.  And the same shift? | 21    A.  Yes. |
| 22    A.  Yes. | 22    Q.  All right.  What BOLO had you seen before? |
| 23    Q.  You received a memo of expectations.  Do | 23    A.  I see the BOLO picture on downtown in a |
| 24  you remember that? | 24  police -- in administration building, be a look around |
| 25    A.  What did I receive? | 25  for some bad person who is drug dealing or training |
| Page 167 | Page 169 |

43 (Pages 166 - 169)

Emina Gerovic - January 13, 2021

| | |
|---|---|
| 1  Q.  You didn't go talk to Murphy about the | 1  filed? |
| 2  BOLO, though? | 2      A.  No. |
| 3      A.  No. | 3      Q.  Ms. Gerovic, I have introduced Exhibit 23. |
| 4      Q.  All right.  I have introduced Exhibit 22. | 4  Let me know when you can see that. |
| 5  Let me know when you get it. | 5          (Exhibit Number 23 was marked.) |
| 6          (Exhibit Number 22 was marked.) | 6      A.  Yes, I see that. |
| 7      A.  Okay. | 7      Q.  Okay.  These are the BOLOs that your |
| 8      Q.  If you'll scroll through it and see if you | 8  attorney has.  So if you'll look at the first two pages, |
| 9  recognize that document. | 9  are either of those the photographs that you took? |
| 10      A.  Yes. | 10      A.  No, neither one.  No. |
| 11      Q.  Did you receive Exhibit 22? | 11      Q.  And you're sure that you gave that |
| 12      A.  Yes. | 12  photograph to your lawyer. |
| 13      Q.  Did you receive Exhibit 22 because of the | 13      A.  I give it to Karla I am sure and I have |
| 14  FMLA leave that you took in July? | 14  one.  I have one. |
| 15          MR. DAVIDOVICH:  I'm going to object to | 15      Q.  I will ask that your -- you give that to |
| 16  the form of the question.  Are you asking similar | 16  Mr. Davidovich, and I reserve the right to continue this |
| 17  questions but she can't really determine what's the mind | 17  deposition to ask questions about that photograph. |
| 18  of the person who issued it. | 18          MR. DAVIDOVICH:  Counsel, please, when the |
| 19          MS. FELTON:  Mr. Davidovich, I'm going to | 19  deposition is over, just send me an email of what you |
| 20  ask you to stop making speaking objections because they | 20  think you need because I'm not going to remember. |
| 21  coach your client.  If you have an objection to form, | 21          THE DEPONENT:  I will send you. |
| 22  please state that. | 22          MR. DAVIDOVICH:  No.  Counsel will send |
| 23          MR. DAVIDOVICH:  I have an objection to | 23  it, please. |
| 24  form.  I just stated what it was. | 24          THE DEPONENT:  Oh, okay.  I think you tell |
| 25          MS. FELTON:  All I need to hear is that | 25  me.  I'm sorry. |
| Page 190 | Page 192 |
| 1  you object to the form.  Thank you. | 1      Q.  (By Ms. Felton)  Going back to Exhibit 22, |
| 2          Could you please read back my last | 2  can you go back to that exhibit?  If you push the previous |
| 3  question? | 3  file arrow or you can pull it back again. |
| 4      A.  Excuse me. | 4      A.  Okay. |
| 5      Q.  (By Ms. Felton)  I was talking to the court | 5      Q.  When you look at Exhibit 22, does it have a |
| 6  reporter. | 6  sticker on it? |
| 7          (The requested portion was read back by | 7      A.  No. |
| 8  the reporter.) | 8          MS. FELTON:  Deanna, do you see an exhibit |
| 9      Q.  (By Ms. Felton)  Ms. Gerovic, did you | 9  sticker on Exhibit 22? |
| 10  take -- I'm sorry.  Do you think you received Exhibit 22 | 10          THE COURT REPORTER:  Let me go to Exhibit |
| 11  because you took FMLA leave? | 11  Share.  Nobody speak.  Give me a second here.  No, I do |
| 12      A.  I'm not sure. | 12  not see it on any of the pages, no. |
| 13      Q.  Did you receive Exhibit 22 because of any | 13          MS. FELTON:  Probably user error.  We will |
| 14  complaints that you filed? | 14  probably have to pick that up at the end, then. |
| 15          MR. DAVIDOVICH:  Objection to form. | 15      Q.  (By Ms. Felton)  Ms. Gerovic, sorry for |
| 16      Q.  (By Ms. Felton)  I'm sorry.  What did you | 16  that.  On Exhibit 22, was Mr. O'Neil involved in |
| 17  say, Ms. Gerovic? | 17  Exhibit 22? |
| 18      A.  I didn't say nothing. | 18      A.  No. |
| 19      Q.  Oh, I'm sorry.  Okay. | 19      Q.  Was Mr. Robinson involved in Exhibit 22? |
| 20          MR. DAVIDOVICH:  I -- | 20      A.  No. |
| 21      Q.  (By Ms. Felton)  Did you receive -- | 21      Q.  All right.  Exhibit 22 is dated October 18. |
| 22          MR. DAVIDOVICH:  I objected to form. | 22  Do you see that?  Are you seeing Exhibit -- |
| 23          MS. FELTON:  Yes. | 23          MR. DAVIDOVICH:  Look on the first page. |
| 24      Q.  (By Ms. Felton)  Ms. Gerovic, did you | 24      Q.  (By Ms. Felton)  Are you able to get to |
| 25  receive Exhibit 22 because of any complaints that you | 25  Exhibit 22, Ms. Gerovic? |
| Page 191 | Page 193 |

49 (Pages 190 - 193)

Emina Gerovic - January 13, 2021

| | |
|---|---|
| 1    Q.   And the doctor said you could not do your | 1   late. |
| 2  custodial duties. | 2        Q.   (By Ms. Felton)  Would you -- would you |
| 3    A.   Yes. | 3  have been terminated even though you say you filed |
| 4    Q.   And when you were on that modified duty, | 4  complaints? |
| 5  you were -- the four hours that you did not work every | 5        A.   Yes. |
| 6  day, that was FMLA leave; right? | 6        MR. DAVIDOVICH:  Again, I will interpose a |
| 7    A.   When I have a doctor's appointment. | 7  form objection.  I didn't have time to say it before she |
| 8    Q.   Unless you had a doctor's appointment? | 8  answered. |
| 9    A.   Yes. | 9        Q.   (By Ms. Felton)  Do you have any |
| 10    Q.   Okay.  Otherwise it was FMLA leave? | 10  information that Mr. Lemos made the decision to terminate |
| 11    A.   Four hours, yes. | 11  you? |
| 12        MS. FELTON:  My computer must be getting | 12        A.   Do I have any information? |
| 13  tired.  It's having a hard time uploading the next | 13        Q.   Let me rephrase. |
| 14  exhibit. | 14        So if you'll look at the second to the |
| 15        Q.   (By Ms. Felton)  All right.  I have | 15  last page of this document, Mr. Williamson signed it; |
| 16  uploaded the next exhibit.  It's Exhibit 24.  Let me know | 16  right? |
| 17  when you can see it. | 17        A.   Yeah. |
| 18        (Exhibit Number 24 was marked.) | 18        Q.   Mr. -- is Mr. Williamson the one who |
| 19        A.   I see that. | 19  decided to terminate you? |
| 20        Q.   This is your termination letter dated | 20        A.   I don't know. |
| 21  November 22.  If you'll scroll through it, do you remember | 21        Q.   Who do you think made the decision to |
| 22  receiving this document? | 22  terminate you? |
| 23        A.   I never received that personally.  I | 23        A.   Make decision? |
| 24  received the email. | 24        Q.   Who made the decision to terminate you? |
| 25        Q.   You received Exhibit 24 by email? | 25        MR. DAVIDOVICH:  Form.  Objection.  Form. |
| Page 198 | Page 200 |
| 1    A.   Yes. | 1  First of all, your question was fine.  When you repeated |
| 2    Q.   Okay.  But you've seen Exhibit 24. | 2  it, it's a form objection. |
| 3    A.   I see that. | 3        Q.   (By Ms. Felton)  Go ahead, Ms. Gerovic.  Do |
| 4    Q.   Okay.  Was Exhibit 24 attached to the email | 4  you know who made the decision to terminate you? |
| 5  that you received? | 5  Ms. Gerovic, are you there? |
| 6    A.   Can you explain to me your question?  I'm | 6        A.   Yes, I am. |
| 7  sorry.  I'm just confused. | 7        Q.   Did you answer? |
| 8    Q.   Okay.  Go to the very last page. | 8        A.   No. |
| 9    A.   Yeah. | 9        Q.   Okay.  Do you know who made the decision to |
| 10    Q.   All right.  Do you see on that last page | 10  terminate you? |
| 11  that it says your email address? | 11        A.   I don't know who make decision, and I |
| 12    A.   Yes. | 12  believe -- I believe it's Leroy Lemos. |
| 13    Q.   This document went to your email address. | 13        Q.   Do you know if Mr. O'Neil was involved in |
| 14    A.   Yes. | 14  the decision to terminate you? |
| 15    Q.   Okay.  Did you receive this document, so | 15        A.   I don't know. |
| 16  this termination letter, because you took FMLA? | 16        Q.   Was Mr. Robinson involved in the decision |
| 17        MR. DAVIDOVICH:  Object to the form. | 17  to terminate you? |
| 18    Q.   (By Ms. Felton)  Do you understand the | 18        A.   I don't know.  I'm sorry.  It's not -- |
| 19  question, Ms. Gerovic? | 19  it's not -- I don't know.  I can't answer who is.  I'm |
| 20    A.   Can you repeat, please, pretty please? | 20  not sure who is.  You know, I believe Leroy Lemos is -- I |
| 21    Q.   Yes.  Yes. | 21  believe it's retaliation against me because I filed a |
| 22        Would you have received this termination | 22  complaint against him.  After the complaint, he start |
| 23  letter if you hadn't taken FMLA? | 23  harassing me more. |
| 24    A.   I believe so. | 24        Q.   I thought you didn't know what retaliation |
| 25        MR. DAVIDOVICH:  Object to the form a drop | 25  meant.  What does retaliation mean? |
| Page 199 | Page 201 |

51 (Pages 198 - 201)

Emina Gerovic - January 13, 2021

| | |
|---|---|
| 1 you in, could you have parked there? | 1    Q.  Okay. |
| 2       A.  No. | 2    A.  -- one of the reason -- one of the reason. |
| 3       Q.  How does someone park there?  Do you have | 3    Q.  What were the others?  I'm sorry, the other |
| 4 to have a card? | 4 reasons. |
| 5       A.  If you work, if you work in the PAB, you | 5    A.  I'm telling you one of the reason he |
| 6 can open the door. | 6 retaliation because I am -- I have a great relationship |
| 7       Q.  When you worked at the PAB, did you -- | 7 with whole police departments, with everybody, and the -- |
| 8 could you -- could you park there? | 8 because he -- it's retaliation, it's against me, I |
| 9       A.  No.  If you have a badge, PAB, you can -- | 9 believe.  I believe it's retaliation because we are not |
| 10 you can go in and out. | 10 the same color, me and him. |
| 11       Q.  So how did Lieutenant Gavito know you were | 11    Q.  Has any doctor told you that you are not |
| 12 there? | 12 capable physically of returning to work? |
| 13       A.  I just explained to you.  He has a camera | 13    A.  What do you mean?  The doctor from the -- |
| 14 and you push the button -- | 14    Q.  Are you physically able to work? |
| 15       Q.  Uh-hmm. | 15    A.  No. |
| 16       A.  -- and talk to the -- talk to who is in. | 16    Q.  Why? |
| 17 And I ask -- Lieutenant Vince Gavito ask me -- and I ask | 17    A.  Because of my stress, and I am afraid. |
| 18 him, can I park for five minutes?  I don't have any $25 | 18 I'm afraid I'm going to see Leroy Lemos again in |
| 19 or $15 to pay parking, just to return uniform, and I'm | 19 different company. |
| 20 leaving. | 20    Q.  How would you see Leroy Lemos in a |
| 21       Q.  Okay.  Now I understand. | 21 different company? |
| 22       A.  I'm sorry.  It's really hard for me to | 22    A.  It doesn't mean it's Leroy Lemos, the |
| 23 explain and... | 23 person.  It's like a -- it's going to act like a Leroy |
| 24       Q.  No.  No.  I wasn't understanding.  You told | 24 Lemos.  You know what I mean? |
| 25 me that he saw you through a camera. | 25    Q.  Has any doctor told you that you can't go |
| Page 206 | Page 208 |

| | |
|---|---|
| 1       Other than Anne Carter and Christina, did | 1 back to work? |
| 2 you complain to anyone else in HR? | 2    A.  Yes. |
| 3       A.  I don't know nobody else in HR besides | 3    Q.  What doctor? |
| 4 Christina and Anne Carter. | 4    A.  The psychologist told me, Dr. -- |
| 5       Q.  Okay.  So you were talking about Leroy | 5    Q.  What psychologist. |
| 6 retaliating against you.  Did Murphy Robinson retaliate | 6    A.  Dr. Dorothy Hanson. |
| 7 against you? | 7    Q.  She said you can't work anymore? |
| 8       A.  No, I don't -- I didn't see that. | 8    A.  Yes. |
| 9       Q.  I'm sorry.  You cut out there for a second. | 9    Q.  When did she say that? |
| 10       A.  No. | 10    A.  When I see her -- I see her weekly.  And |
| 11       Q.  Okay. | 11 also the doctor -- the psychologist, you schedule meeting |
| 12       A.  My dog keeping barking like... | 12 me with her, and she's told me, I'm not going to be able |
| 13       Q.  Did Mr. Williamson retaliate against you? | 13 to return to work to be a custodian ever again. |
| 14       A.  I talk to Mr. Williamson just the two | 14    Q.  Did you read her report? |
| 15 times. | 15    A.  No.  I read -- I read her report and some |
| 16       Q.  Okay.  Did he retaliate against you? | 16 of it I can't understand and some of them, I can. |
| 17       A.  I can't say now. | 17    Q.  But you think that Dr. Gunderson told you |
| 18       Q.  Did Kevin O'Neil retaliate against you? | 18 you can't go back to work. |
| 19       A.  No.  Only Leroy Lemos. | 19    A.  I am not think.  I know for sure what she |
| 20       Q.  Okay. | 20 told me. |
| 21       A.  Retaliation, Leroy Lemos is because I have | 21    Q.  Have you applied for Social Security |
| 22 a great relationship with police department and he | 22 Disability? |
| 23 doesn't. | 23    A.  Yes. |
| 24       Q.  That's why Leroy retaliated against you? | 24    Q.  Where are you in that process? |
| 25       A.  I believe -- | 25    A.  It's pending. |
| Page 207 | Page 209 |

53 (Pages 206 - 209)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 19-cv-03710-RM-NRN

EMINA GEROVIC,

Plaintiff,

v.

CITY AND COUNTY OF DENVER, et al.

_____

**DECLARATION OF MURPHY ROBINSON PURSUANT TO 28 U.S.C. § 1746**
_____

Pursuant to 28 U.S.C. § 1746, Declarant, Murphy Robinson states upon personal knowledge as follows:

1.      I am an African-American/Latino male.   I became employed with the City and County of Denver ("CCD") on September 11, 2017 as the Executive Director of General Services. I held that position until August 2019 when I became CCD's Chief Operating Officer ("COO"). From January 2020 until May 2020, I was the Interim Executive Director for CCD's Department of Public Safety as well as the COO. In May 2020, I became the Executive Director for CCD's Department of Public Safety.

2.      In my role as the Executive Director for General Services, I supervised Defendant James E. Williamson who was, at all relevant times, the Director of Facilities Management for the Department of General Services; and the supervisor of Defendant Kevin O'Neil, Facilities Administrative Officer, who had supervisory authority over Defendant Leroy Lemos, who was Ms. Gerovic's second-level supervisor.

3.      On Thursday, September 21, 2017 at approximately 09:30 hours I was sitting in my office when Emina Gerovic came into my office and said, "Hey boss I just wanted to come on and

**99**

chat with you, how are you doing brother." Ms. Gerovic came in and took a seat in one of my chairs.

4.     This was my first real interaction with Ms. Gerovic, and I had not had a conversation with her prior to that day, so I thought that the interaction was quite odd. I asked her where she worked and what her name was.

5.     Ms. Gerovic went on to explain how she felt that she has been treated unfairly.

6.     Knowing that Ms. Gerovic was facing discipline based on the September 19, 2017, contemplation of discipline letter she received, I told Ms. Gerovic, that I was sorry she felt that way, but that is why we have defined processes to assure that all employees are treated fairly. I told Ms. Gerovic that she would have an opportunity to address all the issues she was concerned about during the disciplinary process.

7.     Ms. Gerovic then went on to describe how she was so upset about what was happening. Ms. Gerovic told me she went to the ER because of stress. Then, she started to cry and said, "I can't do this anymore, it makes me want to kill myself." I asked Ms. Gerovic what she meant by that statement. Ms. Gerovic told me, "it hurts so much, that I just feel like killing myself." I told Ms. Gerovic, that her safety was my number one concern, and that I was going to go find someone from the Office of Human Resources to speak to her so that we could ensure that she stays safe.

8.     Anne Carter with the Office of Human Resources responded to the situation as did members of the Denver Police Department. The police officers spoke with Ms. Gerovic and determined she was not an immediate threat to herself or others but recommended that she go home for the rest of the day. We sent her home.

9.    At the time, I prepared a statement of what occurred that day. Ex. 27, CCD_5473-74, 5294.

10.    Based on the evidence presented in the contemplation of discipline letter and the response by Ms. Gerovic and her attorney during her contemplation of discipline meeting (Ex. 22), I honestly believe Ms. Gerovic (a) was holding herself out as a police officer, (b) posted her occupation as police officer and lied about how that got on her Facebook page, (c) posted the pictures of herself in police attire and lied about them being a joke, (d) posted the picture and lied about the badge on her clothes being a sticker, (e) posted the pictures of her in the police hat and lied about being "told" to put it on, (f) posted the picture of her police access badge, (g) was insubordinate when Defendant Lemos told her her location would change, (h) lied that she was promised a permanent post, (i) lied that she was promised first shift, (10) lied that no one ever went over the policies with her, (j) lied that her grandson had a brain tumor, (k) lied to me about meeting with Mr. O'Neil, (l) ignored the paid administrative leave directive and went to District 5, (m) lied when she claimed that she went to District 5 to pick up personal items, (n) lied to Councilperson Herndon that she had been fired, (o) spoke in a derogatory manner telling two male employees they were not doing enough work, (p) gossiped about a management team losing their jobs, (q) gossiped about Mr. Lemos, and (r) used vulgar vocabulary with another employee including "F-bombs."

I declare on this ____ day of May, 2021, under penalty of perjury that the contained herein is true and correct.

Murphy Robinson

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 19-cv-03710-RM-NRN

EMINA GEROVIC,

Plaintiff,

v.

CITY AND COUNTY OF DENVER, et al.

---

**DECLARATION OF LEROY LEMOS PURSUANT TO 28 U.S.C. § 1746**

---

Pursuant to 28 U.S.C. § 1746, Declarant, LeRoy Lemos states upon personal knowledge as follows:

1.      I am a Hispanic male.   I became employed with the City and County of Denver on December 5, 2011 as an Administrative Support Assistant IV with the Facilities Management Division, General Services.   On June 19, 2014, I was promoted to my current position of Operations Supervisor.   In this role, I supervise the custodial supervisors.

2.      As the Operations Supervisor, I lack authority to issue any formal discipline independently; while I am authorized to sign written reprimands (and nothing higher than a written reprimand), I could not issue a written reprimand absent approval from the Director.   During Ms. Gerovic's employment that was James Williamson.

3.      I was on the three-person hiring committee who decided to extend a job offer to Ms. Gerovic.   I recommended that the City hire Ms. Gerovic.

4.      On Monday, March 16, 2017, I received a phone call from Brian J. (African-American; an irate Denver Motor Vehicles (DMV) office customer) who was calling on his phone with Daniel G. (Caucasian; witness to incident) standing next to him so that Daniel could hear Brian's complaint to verify and correct anything Brian was saying.

5.      Brian told me he entered the Arie P. Taylor Building (APT) via the East entrance which had been unlocked. He proceeded down the stairs to the first-floor lobby to await the DMV office to open, where he encountered Daniel also waiting.   Daniel said that Ms. Gerovic let him into the building.

6.       Brian told me, and Daniel did not disagree, that moments later, Mr. Gerovic came into the lobby and told Brian the building was not open yet and he needed to wait outside, but she did not say the same to Daniel. Brian explained that a heated exchange occurred between Ms. Gerovic and him, which was overheard by several witnesses.

7.      Brian told me after he and Daniel left the building, he requested and received my number from an HSS security guard, Stanford Pollard, and that is how he called me.

8.      I was told that Ms. Gerovic told Sequoya Palin, a security agent, and Jerrick Perkins, a City employee, that she let Daniel into the building, and she kept complaining to them throughout the day. I asked Ms. Palin to provide a written statement and she did. Ex. 14. I also asked Stanford Pollard, the other security agent involved in the incident, for a written statement, which he provided. Ex. 13.

9.      Anne Carter with HR interviewed Mr. Perkins.

10.      Anne Carter and I met with Ms. Gerovic about the incident on March 17, 2017.   I believe Ms. Gerovic was untruthful in stating that she did not let Daniel into the building, in stating that she did not talk to any HSS employees about the incident, and in stating that she did not talk to Jerrick Perkins about the incident. Ms. Gerovic's statements were contrary to all of the other witnesses and, therefore, were not credible.   We asked Ms. Gerovic for a written statement regarding the incident, but she never provided one.

11.     I found Ms. Gerovic's statement that she did not let Daniel in the building to be incredible because the only other way that Daniel could have gotten into the building was through the same door that Brian used. However, a report based on the available video stated that Daniel did not come through that door. Therefore, the only way that Daniel could have entered the building was because Ms. Gerovic let him in, as he confirmed and as Ms. Gerovic told Ms. Palin and Mr. Perkins.

12.     This incident led to Ms. Gerovic receiving a written reprimand for violations of the City's published internal rules. I believed that Ms. Gerovic improperly let Daniel into a secure building before business hours, lied about doing it, spent work time interrupting the work time of other employees to talk to them about the incident, lied about talking to those other employees, treated one of those employees disrespectfully, and failed to provide a written statement of the incident.   Ex. 12.

13.     In September 2017, I was notified that Ms. Gerovic was representing herself as a police officer on her public Facebook page.   Mr. O'Neil directed that I investigate the issue and I reviewed Ms. Gerovic's Facebook page using my son's password because I was blocked from viewing her page.   On her Facebook page, Ms. Gerovic listed her occupation as "Police Officer" and her employer as "Denver Police Department," (Ex. 19, CCD_5331-5333).   She also posted pictures of herself wearing a t-shirt with a "DPD" emblem (Ex. 19, CCD_5337), wearing a DPD patrol person's hat (Ex. 19, CCD_5334-35); a picture of her DPD-issued access card that also features a DPD badge (Ex. 19, CCD_5336); and her wearing a hooded sweatshirt with a "DPD" emblem (Ex. 19, CCD_5338).   I printed these pages.

14.     Back in 2015, I had given Ms. Gerovic a verbal warning for wearing a gray DPD sweatshirt that said POLICE in large letters on the back.   She was wearing this while performing

her custodial duties at the Police Administration Building.   Because it was not part of her uniform, it could create problems if she was misidentified as a Police Officer.   Despite that, she posted pictures of herself identifying herself as a DPD Police Officer.

15.     On September 20, 2017, I met with Ms. Gerovic and provided her a Notice of Change in Work Location letter explaining that she was being assigned to the Castro Building and her shift would be 1:30 p.m. to 10:00 p.m.   Ex. 21.

16.     During that meeting, Ms. Gerovic stated, "NO, you can't do this! Why are you taking my station?" She stated, "No, I can't do it, I need to pick up my grandchild from school." I told her that I understood she would have logistics to be addressed, but that is why we gave her a week to make the changes. She stated, "I won't do it," and "We'll see!" and she stormed out of the room.

17.     The policies that all employees, including Ms. Gerovic, signed state that changes in locations and shifts can be made with 48-hours' notice. Ex. 45.

18.      Ms. Gerovic was placed on paid administrative leave on September 21, 2017. She was told not to enter her workplace. Ex. 30. Despite that, Ms. Gerovic entered her workplace, a secure area, on the morning of September 22, 2017 and was discovered by her supervisor. Ex. 31. Therefore, a Be On the Lookout ("BOLO") was issued so it would be known when Ms. Gerovic entered a City facility.

19.     On or about October 3, 2017, I gave Ms. Gerovic a Notice of Change in Work Location (Ex. 33) which amended the manager's name on her September 21, 2017, Notice of Change in Work Location which changed her schedule back to 6:00 a.m. to 2:30 p.m. (Ex. 34).

20.     On October 5, 2017, City employee Amber Escobedo told me that she had concerns about Ms. Gerovic and I directed her to share her concerns with the City's HR Department.

21.     While I wasn't involved in the decision to terminate Ms. Gerovic, based on the evidence presented in the contemplation of discipline letter and the response by Ms. Gerovic and her attorney during her contemplation of discipline meeting (Ex. 22), I honestly believe that Ms. Gerovic: (a) was holding herself out as a police officer, (b) posted her occupation as police officer and was dishonest about how that got on her Facebook page, (c) posted the pictures of herself in police attire and was dishonest in stating they were a joke or just for fun, (d) posted the picture and was dishonest about the badge on her clothes being a sticker, (e) posted the pictures of her in the police hat and was not "told" to put it on, (f) posted the picture of her police access badge, (g) was insubordinate when I told her her location would change, (h) was dishonest in saying that she was promised a permanent post, (i) was dishonest in stating that she was promised first shift, (10) was dishonest in stating that no one had gone over the policies with her, (j) was dishonest in saying that her grandson had a brain tumor, (k) was not truthful to Mr. Robinson about meeting with Mr. O'Neil, (l) ignored the paid administrative leave directive and went to District 5 without authorization, (m) was dishonest in claiming that she went to District 5 to pick up personal items, (n) was not truthful in telling Councilperson Herndon that she had been fired, (o) spoke in a derogatory manner telling two male employees they were not doing enough work, (p) gossiped about a management team losing their jobs, (q) gossiped about me, and (r) used vulgar vocabulary with another employee including "F-bombs."

22.     During Ms. Gerovic's employment, the City did not employ anyone by the name of Theresa or Teresa Yolando, but the City did employ a custodian named Theresa Luyando.

23.     At the time David Chavez was hired by the City, he had been a Facilities Manager at DPS for 22 years.

24.     Viola Chacon, a Custodian, received a termination notice on June 15, 2017, which

included violations of five Career Service Rules, including Rule 16-29(D), prohibiting any act of

dishonesty. Ex. 43.

25.    Danielle Garcia, a Utility Worker, received a demotion after violating Career

Service Rules. At the time of her demotion, Ms. Garcia had only received one verbal reprimand in

2014. Ex. 44.

26.    After Ms. Gerovic's termination, her position was not filled.

I declare on this 20th day of May, 2021, under penalty of perjury that the contained herein

is true and correct.



LeRoy Lemos

**RULE 16**
**CODE OF CONDUCT**
**AND DISCIPLINE**
(Revised February 12, 2016; Rule Revision Memo 18D)

Purpose statement:

The purpose of this rule is to provide Career Service employees clear expectations for their conduct in an effort to maintain the public trust; to promote both public and workplace safety; to promote equal employment opportunity without regard to race, color, religion, national origin, sex, sexual orientation, gender identity and expression, disability, genetic information, military status, age, marital status, political affiliation, or any other status protected under federal, state and/or local law; and to establish a progressive discipline process that is governed by the principles of due process, personal accountability, reasonableness and sound business practice.  This rule contains information on the following topics:

A.    Delegation of authority

B.    Compliance with Code of Ethics and Executive Orders

C.    Harassment and discrimination

D.    Employee responsibility to report charges, convictions, and nolo contendere pleas

E.    Use of City facilities

F.    Political activities

G.    Employee organization and representation

H.    Recording devices in the workplace

I.    Grounds for discipline

J.    Investigatory leave

K.    Disciplinary process

(Revised September 21, 2017; Rule Revision Memo 28D)

Section 16-10 Service of Written Notice and Computation of Time
(Emergency Rule Revision Effective March 26, 2020, expires September 22, 2020; Effective September 17, 2020; Rule Revision Memo 58D)

A.    Written notices required to be served on an employee under this Rule 16 shall be served on the employee by one or more of the following:

1.    In person with a certificate of hand delivery;

2.    By first class U.S. mail, with a certificate of mailing to the employee's last known address; or

3.    By email, delivery receipt requested, to the employee's City email address or the employee's personal email address. This rule does not require that a delivery receipt be received in order to effect service.

**108**

4.     Any Executive Orders governing employee conduct including, but not
limited to:

   a.     Executive Order No. 16 – Use of Electronic and Communication
   Devices and Services
   Sets terms of employee use of computers, cell phones, Internet
   and e-mail

   b.     Executive Order No. 55 – Department Information Centers
   Regulates employee use of bulletin boards.

   c.     Executive Order No. 94 – City and County of Denver Alcohol and
   Drug Policy
   Covers testing, training and discipline regarding employee drug
   and alcohol use.

   d.     Executive Order No. 112 – Violence in the Workplace
   Defines improper behavior, establishes management
   responsibility, and discipline.

16-22 Harassment, Discrimination, and Retaliation
(Revised June 22, 2018; Rule Revision Memo 43D)

A.     Protected Characteristics

Career Service employees have a right to work in an environment free of
discrimination and harassment based on their race, color, religion, creed, national
origin/ancestry, sex, sexual orientation, transgender status, gender identity and
expression, disability, genetic information, military status, age, marital status,
political affiliation, pregnancy or related condition, or any other status protected
under federal, state, and/or local law. These characteristics are referred to as
"Protected Characteristics". The following definitions are intended to provide
assistance in interpreting the above terminology:

- Creed: a system or doctrine of religious beliefs, or a formal system or
  codification of beliefs about how people should live or behave.

- National origin/ancestry: the country where an employee was born, the place
  of origin of the employee's ancestors, the employee's ethnicity, or the
  physical, cultural, ethnic, or linguistic characteristics of a particular national
  origin or ethnic group.

- Sexual orientation: an employee's orientation toward heterosexuality,
  homosexuality, or bisexuality, or an employer's perception thereof.

- Gender identity: an employee's innate sense of the employee's own gender.

**109**

B.    <u>Discrimination</u>

Discrimination occurs when an employee experiences an adverse employment action based on one or more of an employee's Protected Characteristics. Adverse employment actions include, but are not limited to, termination, suspension, involuntary demotion, and failure to promote.  Adverse employment actions that are taken for any reason other than an employee's Protected Characteristic(s) are not discrimination.

Behavior may violate this Rule 16-22 B even if it would not constitute a violation of federal, state, or local law.

C.    <u>Harassment</u>

Harassment based on one or more of an employee's Protected Characteristics is a form of prohibited discrimination. There are two types of harassment:

1.    <u>Hostile Work Environment</u>: This type of harassment exists when an employee is subjected to unwelcome and offensive conduct by someone the employee interacts with on the job when such conduct is based on a Protected Characteristic and is sufficiently severe or pervasive as to create an intimidating, hostile, or offensive work atmosphere.  In order to constitute a hostile work environment, the conduct must be:

- based on one or more Protected Characteristics; and

- subjectively offensive to the employee; and

- objectively offensive to a reasonable person; and

- severe or pervasive.

However, harassing conduct does not have to rise to the level of a hostile work environment to warrant discipline under these rules. Harassing conduct may be verbal, visual, or physical in nature, and may include derogatory comments, mocking, imitating, slurs, jokes, photographs, posters, cartoon drawings, social media content, gestures, unwanted touching, and blocking normal movement, among other forms of conduct.

2.    <u>Quid Pro Quo ("This for that")</u>: This type of harassment exists when a supervisor takes or threatens to take an adverse employment action or withholds or threatens to withhold an employment benefit based upon a subordinate employee engaging or refusing to engage in certain behaviors (typically sexual favors). The behavior must be based on, or related to, a Protected Characteristic.

Behavior may violate this Rule 16-22 C even if it would not constitute a violation of federal, state, or local law.

**110**

D.    <u>Retaliation</u>

Retaliation against employees for reporting or threatening to report harassment or discrimination or assisting the City in the investigation of any complaint is strictly prohibited. Retaliation can include, but is not limited to, unwarranted discipline or unfavorable performance ratings, hostility from co-workers, and escalating harassment. Any employee engaging in retaliation may be subject to discipline, up to and including dismissal.

Behavior may violate this Rule 16-22 D even if it would not constitute a violation of federal, state, or local law.

E.    <u>Reporting Alleged Discrimination, Harassment, or Retaliation</u>

1.    **Experiencing Discrimination, Harassment, or Retaliation**

a.    If an employee is subjected to discriminatory, harassing, or retaliatory behavior from a co-worker, another City employee not in the employee's chain of command, or an individual the employee encounters while performing their duties who is not employed by the City, the employee is strongly encouraged to:

i.    Make it clear to that person the behavior is offensive or makes the employee uncomfortable and ask that individual to stop; if the inappropriate behavior happens again, the employee must report the behavior to a supervisor and/or a human resources representative, or both; or

ii.    Report the behavior to a supervisor, a human resource representative, or through any mechanism set up by the City for reporting such complaints, or all the above; or

If the individual alleged to have committed the discriminatory, harassing, or retaliatory behavior is a City employee:

iii.    Request mediation by contacting OHR (see CSR §18-20); or

iv.    File a grievance by completing the OHR grievance form and delivering the grievance form to the appointing authority or an HR representative of the employee's department or agency (see CSR § 18-30), unless the adverse employment action is subject to direct appeal (see CSR § 19-20 or § 20-20 (Deputy Sheriffs)).

b.    If an employee is subjected to discriminatory, harassing, or retaliatory behavior from a supervisor in the employee's chain of command, the employee is encouraged to:

**111**

     i.      If the employee feels comfortable doing so, address the behavior with that supervisor directly, explain that the behavior is offensive or makes the employee uncomfortable, and ask the supervisor to stop; or

     ii.     If the employee doesn't feel comfortable speaking to the supervisor directly about the behavior, or has done so already and either the behavior hasn't stopped or the employee is being subjected to retaliation, promptly contact a human resource representative or another supervisor to report the behavior; or

     iii.     Request mediation by contacting OHR (see CSR §18-20); or

     iv.     File a grievance by completing the OHR grievance form and delivering the grievance form to the appointing authority or an HR representative of the employee's department or agency (see CSR § 18-30), unless the adverse employment action is subject to direct appeal (see CSR § 19-20 or § 20-20 (Deputy Sheriffs)).

   c.     Department of Safety employees may also report discriminatory, harassing, or retaliatory behavior to Safety HR or their department's Internal Affairs division.

   d.     Employees who experience an adverse employment action based on or resulting from discrimination, harassment, or retaliation by a supervisor that is subject to direct appeal may only file a direct appeal to the Hearings Office by following the procedures set forth in Rules 19 or 20 (Deputy Sheriffs). Actions that are subject to direct appeal cannot be grieved.

2.     **Witnessing Discrimination, Harassment, or Retaliation**

If an employee witnesses discrimination, harassment, or retaliation in violation of this rule by or against any City employee, the employee must report such behavior to a supervisor, human resource representative, or both.  Department of Safety employees may also report such behavior to Safety HR or their department's Internal Affairs division.

3.     **Receiving a Complaint of Discrimination, Harassment, or Retaliation as a Supervisor**

   a.     A supervisor who receives a report of discrimination, harassment, or retaliation must notify a human resource representative immediately or as soon as practicable.

   b.     Supervisors are also strongly encouraged (and may be required by their department's policy) to notify their department's appointing authority or a supervisor in their chain of command

**112**

about the report, particularly if the allegation involves discrimination, harassment or retaliation by a supervisor against a subordinate employee.

    c.    Supervisors should not investigate the allegations unless directed to do so by human resources, or as required by their department's policy.

    d.    Supervisors should keep allegations as confidential as possible and only share information about the reported allegations on a need-to-know basis, such as with their department's appointing authority, a supervisor in their chain of command, or a human resource representative. Supervisors in the Department of Safety that receive complaints of discrimination, harassment, or retaliation may share that information with their department's Internal Affairs division.

F.    <u>Actions Taken in Response to Allegations of Discrimination, Harassment or Retaliation</u>

All allegations of discrimination, harassment, and retaliation will be promptly investigated in accordance with Rule 18-40.  Pending the outcome of the investigation, appropriate precautionary steps may be taken to separate and/or restrict contact between the alleged perpetrator and alleged victim, which may include placing the alleged perpetrator on paid investigatory leave.  Absent extenuating circumstances and approval of the City Attorney's Office, the alleged victim shall not be negatively impacted by those precautionary steps.  After the investigation is concluded, appropriate remedial action will be taken, which may include discipline or dismissal of the employee who engaged in the discrimination, harassment or retaliation.

16-23 <u>Employee Responsibility to Report Charges, Convictions, and Nolo Contendere Pleas</u>
    (Re-numbered June 22, 2018; Rule Revision Memo 43D)

The employee or the employee's representative shall report criminal charges and convictions, and nolo contendere pleas (no contest pleas) to the employee's appointing authority as soon as possible as required by this section, but no later than three (3) calendar days after the occurrence.

A.    <u>Offenses that must be reported</u>:

    1.    All employees who are charged with, have entered a plea of guilty or nolo contendere on, or are convicted of any felony, misdemeanor, or any other offense which involves violence against persons, destruction of property, dishonesty, theft, or the sale or possession of illegal drugs, must report such charges, pleas, or convictions to their appointing authority.

16-27 <u>Recording Devices in the Workplace</u>
(Re-numbered June 22, 2018; Rule Revision Memo 43D)

Employees shall not record audio or video during work hours, when on City premises, when speaking to a City employee by phone, or when on City business without the prior permission of the employee's appointing authority.

16-28 <u>Grounds for Discipline</u>
(Re-numbered June 22, 2018; Rule Revision Memo 43D)

The following may be cause for the discipline or dismissal of a Career Service employee:

A.    Neglect of duty or carelessness in performance of duties and responsibilities.

B.    Theft, destruction, or neglect in the use of City property; or property or materials of any other person or entity.

C.    Unauthorized operation or use of any vehicles, machines, or equipment of the City, or of any entity having a contract with the City, including, but not limited to, the unauthorized use of the internet, e-mail, or telephones.

D.    Any act of dishonesty, which may include, but is not limited to, lying, or improperly altering or falsifying records, examination answers, or work hours.

E.    Accepting, soliciting, or making a bribe, or using official position or authority for personal profit or advantage, including kickbacks.

F.    Failing to comply with the lawful orders of an authorized supervisor or failing to do assigned work which the employee is capable of performing.

G.    1.    Failing to meet established standards of performance including either qualitative or quantitative standards.  When citing this subsection, a department or agency must describe the specific standard(s) the employee has failed to meet, such as standards in the employee's individual goals or in a Performance Improvement Plan (PIP).  (Revised May 12, 2017; Rule Revision Memo 26D)

      2.    Any employee who receives an "Unacceptable" performance rating and fails to correct his or her performance in the subsequent PIP (or PIPs), is considered to have been given an adequate opportunity to correct his or her behavior and may be dismissed without his or her appointing authority first being required to resort to progressive discipline. (Revised May 12, 2017; Rule Revision Memo 26D)

H.    Intimidation or retaliation against an individual who has been identified as a witness, party, or representative of any party to any hearing or investigation relating to any disciplinary procedure, or any violation of a city, state, or federal rule, regulation or law, or against an employee who has used the dispute resolution process in good faith.

I.       Failure to maintain satisfactory working relationships with co-workers and other individuals the employee interacts with as part of his or her job.

J.       Being charged with or convicted of a crime, or entering a plea of guilty or nolo contendere to a crime.  Before imposing discipline under this subsection, the department or agency shall follow the guidelines contained in subsection 16-23.

K.       Failure to report charges of, pleas to, or convictions of crimes as required by this Rule 16.

L.       Discrimination or harassment as defined in this Rule 16.  This includes making derogatory statements based on race, color, religion, national origin, sex, sexual orientation, gender identity and expression, disability, genetic information, military status, age, marital status, political affiliation, or any other status protected under federal, state, and/or local law. This prohibited conduct need not rise to the level of a violation of any relevant local, state or federal law before an employee may be disciplined and the imposition of such discipline does not constitute an admission that the City violated any law. (Revised September 21, 2017; Rule Revision Memo 28D)

M.       Unauthorized absence from work; or abuse of paid time off, sick leave, or other types of leave; or violation of any rules relating to any forms of leave.

N.       Unauthorized deviation from scheduled shift including reporting to work after the scheduled start time of the shift, leaving work before the end time of the shift, or working unauthorized overtime.

O.       Failure to use safety devices or failure to observe safety regulations.

P.       Engaging in a strike, sabotage, or work slowdown.

Q.       Divulging confidential or otherwise sensitive information to unauthorized individuals.

R.       Conduct which violates the Career Service Rules, the City Charter, the Denver Revised Municipal Code, Executive Orders, written departmental or agency regulations, policies or rules, or any other applicable legal authority.  When citing this subsection, a department or agency must cite the specific regulation, policy or rule the employee has violated.

S.       Refusal to cooperate, including refusing to provide requested information and materials relevant to the investigation.

T.       Conduct which is or could foreseeably:

         1.       Be prejudicial to the good order and effectiveness of the department or agency;

         2.       Bring disrepute on or compromises the integrity of the City; or

         3.       Be unbecoming of a City employee.

Section 16-30 Investigatory Leave with Pay

A.   An appointing authority may place an employee on investigatory leave with pay for up to forty-five (45) days pending an investigation of a possible rule violation or failure to meet standards of performance when it is determined by the appointing authority that it is in the best interest of the City.  It may include the period of time required to complete the investigation, to conduct a contemplation of discipline meeting, and to render a decision regarding discipline.

B.   If the investigation has not been completed within the forty-five (45) calendar day time period, the appointing authority may request from the OHR Executive Director an extension of time appropriate to complete the investigation and render a decision. The OHR Executive Director may approve a request for an extension for good cause shown. Additional extensions may be granted at the discretion of the OHR Executive Director. The appointing authority shall notify the employee of any extension that is granted by the OHR Executive Director.

C.   The appointing authority may require the employee to remain at home and/or be available by telephone; to participate in the investigatory process and/or to perform work during their normal work hours; or to return to work prior to the end of the period of investigatory leave.  Normal work hours may be changed when an employee on investigatory leave needs to be available at a time the employee is not normally scheduled to work.  If an employee is unable to meet these requirements, or chooses to attend to personal business during his or her normal hours of work, the appointing authority's regular procedures regarding the use of leave shall apply.

Section 16-40 Disciplinary Process

16-41 Purpose of discipline

The purpose of discipline is to correct inappropriate behavior or performance, if possible. The type and severity of discipline depends on the gravity of the offense.  The degree of discipline shall be reasonably related to the seriousness of the offense and take into consideration the employee's past record. The appointing authority shall impose the type and amount of discipline he or she believes is needed to correct the situation and achieve the desired behavior or performance.

16-42 Progressive Discipline

A.   1.   Whenever practicable, discipline shall be progressive.  However, any measure of discipline may be used in any given situation as appropriate.

2.   Failure to correct behavior or committing additional violations after progressive discipline has been taken may subject the employee to further discipline, up to and including dismissal from employment.

3.   An employee may be dismissed without prior discipline if the facts of that employee's case warrant dismissal.

**116**

B.    In order of increasing severity, the disciplinary actions which an appointing authority may take against an employee for violation of the Career Service Rules, the City Charter, or the Denver Revised Municipal Code, Executive orders, or any other applicable legal authority include:

    1.    Written reprimand.

    2.    Suspension without pay, or involuntary temporary reduction of pay.

    3.    Involuntary demotion pursuant to Rule 9 **PAY ADMINISTRATION**.

    4.    Dismissal.

C.    Nothing in this rule should be interpreted to preclude an appointing authority from counseling and coaching employees about performance and discipline issues. Appointing authorities are encouraged to document the date and subject of the conversation in the supervisor's file.

16-43 Form for Written Reprimand

A.    Written reprimands shall contain the following:

    1.    The specific conduct or omission committed by the employee which the department or agency believes is in violation of the Career Service Rules, with sufficient specificity and detail so as to enable the employee to correct his or her behavior and to enhance future performance; and

    2    A notice that the employee may file a grievance on the written reprimand and may also seek mediation in accordance with Rule 18 **DISPUTE RESOLUTION**.

B.    A written reprimand shall be sent to the OHR for inclusion in the employee's personnel file.

16-44 Guidelines for Involuntary Temporary Reduction of Pay
(Revised October 19, 2018; Rule Revision Memo 47D)

When an involuntary temporary reduction in pay is imposed on an employee, the employee's pay shall not be reduced

A.    More than fifteen percent (15%); or

B.    If the employee is in a classification with a range minimum, below the range minimum of the employee's pay range; or

C.    For less than one (1) pay period; or

D.    For more than thirteen (13) pay periods; or

E.    Below the minimum wage.

Any merit increase or merit payment shall be based on the employee's normal rate of pay, not the employee's temporarily reduced rate of pay.

16-45 Procedure for Dismissal

A.    The appointing authority shall give an employee written notice of dismissal on or before the employee's last day as a City employee.

B.    Dismissed employees are not eligible for future employment in the Career Service for a minimum of five years following such dismissal.  The OHR Executive Director shall establish procedures governing how dismissed employees may be placed on eligible lists after the five years have elapsed.

C.    Current address:  It is the responsibility of each Career Service employee to ensure that official personnel records of the City reflect the employee' s current mailing address, current residence address and telephone number at all times.

D.    1.    An employee holding on call, paid trainee, paid intern, or employment probationary status may be dismissed at any time.  Such action may only be appealed when the employee has alleged a violation of the "Whistleblower Protection" ordinance, in accordance with Rule 19 **APPEALS**.

      2.    The notice of dismissal for an on call, paid trainee, paid intern, or employment probationary status employee shall identify the violations or failures to meet performance standards with sufficient detail so as to enable the employee to understand the basis for the dismissal.  The notice of dismissal shall also contain a statement that the employee may appeal the dismissal only on the ground of an alleged violation of the "Whistleblower Protection" ordinance.

      3.    The appointing authority is not required to hold a contemplation of discipline meeting before dismissing an employee holding on call, paid trainee, paid intern, or employment probationary status.

16-46 Contemplation of Discipline

A.    Before an employee with career status is suspended, given an involuntary temporary reduction in pay, involuntarily demoted, or dismissed, the appointing authority shall hold a contemplation of discipline meeting. A contemplation of discipline meeting is not required for written reprimands.

B.    The purposes of the contemplation of discipline meeting are to allow an employee to:

      1.    Correct any errors in the department or agency's information or facts upon which it contemplates taking disciplinary action; and

**118**

2.      Tell his or her side of the story and present any mitigating information as to why the disciplinary action should not be taken

C.      Since a contemplation of discipline meeting is not an administrative hearing, witness testimony is not allowed.

D.      Employees must be served with written notice seven (7) calendar days before the contemplation of discipline meeting.  The seven (7) calendar day notice period starts on the day after the date shown on the certificate of hand delivery or mailing, or on the e-mail.

E.      The written notice of the contemplation of discipline meeting shall contain the following information:

1.      That disciplinary action is contemplated;

2.      The specific conduct or omission committed by the employee which the department or agency believes is in violation of the Career Service Rules with sufficient specificity and detail so as to enable the employee to correct his or her behavior and to enhance future performance;

3.      The purpose of the contemplation of discipline meeting as described in this Rule 16;

4.      The date, time, and location of the contemplation of discipline meeting; and

5.      That the employee is entitled to have a representative of his or her own choosing present at the meeting.

F.      The department or agency may approve or deny requests to re-schedule contemplation of discipline meetings.

16-47 <u>Notices of Discipline</u>

A.      In addition to the information that must be part of written reprimands, written notices of suspension, involuntary temporary reduction of pay, involuntary demotion, or dismissal shall also:

1.      Contain a  reference to the opportunity afforded the employee to tell his or her side of the story in accordance with this Rule 16 and that the information presented at the contemplation of discipline meeting was considered by the department or agency in reaching a determination.

2.      Contain a notice that the employee may appeal the suspension, involuntary temporary reduction of pay, involuntary demotion, or dismissal pursuant to Rule 19 **APPEALS**.

B.    The specific conduct or omissions listed on the written notice of discipline shall be the same as those listed in the contemplation of discipline letter, except for any charges or violations which were subsequently dropped.

C.    A notice of suspension, involuntary temporary reduction of pay, involuntary demotion, and dismissal shall be sent to the OHR for inclusion in the employee's personnel file, along with a completed personnel action form.

D.    Failure of a supervisor or appointing authority to comply strictly with the provisions of this section shall not constitute a basis for reversing a disciplinary action on appeal unless the employee shows that his or her rights were substantially violated by the lack of compliance.

16-48 Disciplinary Action Following Contemplation of Discipline Meeting

A.    Personnel decisions relating to progressive discipline may take into account prior disciplinary action, including documented coaching and counseling.

B.    A written notice of the disciplinary decision and the reasons for the disciplinary action based on the contemplation of discipline meeting and other pertinent information obtained by the appointing authority shall be served on the employee within twenty-one (21) calendar days after the meeting.  The notice shall be considered served on the date shown on the certificate of hand delivery or mailing, or on the e-mail.

C.    If an appointing authority presents to the OHR Executive Director documented extenuating circumstances requiring additional time, the OHR Executive Director may extend the date for taking disciplinary action for an additional seven (7) calendar days.  A request for an extension of time must be sent to the OHR Executive Director before the expiration of the time for taking disciplinary action. If disciplinary action is not taken within the initial time period and a request for extension of time is not timely submitted to the OHR Executive Director, the agency must repeat the steps contained in section 16-40 before disciplinary action may be taken.

D.    1.    An employee may file a grievance of a written reprimand in accordance with Rule 18 **DISPUTE RESOLUTION**.  An employee may not appeal a written reprimand to the Career Service Hearings Office.

2.    An employee may directly appeal a suspension, involuntary temporary reduction of pay, involuntary demotion, or dismissal in accordance with Rule 19 **APPEALS**.

**120**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 19-cv-03710-RM-NRN

EMINA GEROVIC,

Plaintiff,

v.

CITY AND COUNTY OF DENVER, et al.

_____

**DECLARATION OF ANNE CARTER PURSUANT TO 28 U.S.C. § 1746**
_____

Pursuant to 28 U.S.C. § 1746, Declarant, Anne Carter states upon personal knowledge as follows:

1.      I am a white female.   I am a Human Resources ("HR") Supervisor for the City and County of Denver.   I worked with the City in HR in January 1997 and then came back in December 1999 and have been employed in human resources with the City since.

2.      In my HR role, I was involved in the hiring process for Emina Gerovic and her disciplinary matters.

3.      I was involved in Ms. Gerovic's written reprimand issued on May 4, 2017 when Ms. Gerovic let a white male member of the public into the Arie P. Taylor building before it was open.   I conducted interviews of witnesses for the written reprimand and collected written witness statements regarding the incident. I received witness statements from Sequoya Palin, Stanford Pollard, and an email from Bruce Kinsey (Ex. 46, CCD_1857-1858).   I kept these statements in the ordinary course of business.

4.      Sequoya Palin, security employee, reported in her statement that Ms. Gerovic told her she let a man into the building. Ex. 14.

**EXHIBIT 6**
**121**

5.      I also spoke with witness Jerrick Perkins. Mr. Perkins told me that Ms. Gerovic spoke with him and that she was crying. She told him she was hurt by the incident and thought she would get into trouble for letting the customer into the building. She told him that Stanford Pollard, security employee, betrayed her and stabbed her in the back by giving out her supervisor's phone number.

6.      Mr. Perkins stated that he was busy during this time going in and out of the building, but that he gave Ms. Gerovic a hug.

7.      Mr. Perkins stated that he told Sequoya Palin, security agent, about Ms. Gerovic's statements to him.

8.      Mr. Lemos and I met with Ms. Gerovic about the incident on March 17, 2017.   Ms. Gerovic told us that she did not let the white man into the building, that she did not talk to any HSS employees about the incident and that she did not talk to Jerrick Perkins about the incident. We asked Ms. Gerovic for a written statement regarding the incident, but she never provided one.

9.      I did not find Ms. Gerovic credible because her statements were contrary to all of the other witnesses about how the white man got into the building and who she talked to about the incident.

10.      I received information from Anna Forsberg that Ms. Gerovic was holding herself out as a police officer on Facebook.

11.      I reviewed Ms. Gerovic's Facebook pages.   On her Facebook profile, Ms. Gerovic listed her occupation as "Police Officer" and her employer as "Denver Police Department," (Ex. 19, CCD_5331-5333).   She also posted pictures of herself wearing a t-shirt with a "DPD" emblem (Ex. 19, CCD_5337), wearing a DPD patrol person's hat (Ex. 19, CCD_5334-35); her DPD-issued access card that also features a DPD badge (Ex. 19, CCD_5336); and her wearing a hooded

sweatshirt with a "DPD" emblem (Ex. 19,  CCD_5338).  Several of the photos were taken in police facilities. The different photographs were posted on multiple dates in 2014 and 2015 but were still available in 2017.

12.    I translated some of the Bosnian language on Ms. Gerovic's Facebook posts using Google translate.  The term "MILICIONERKA" was used which translates to "policewoman" (Ex, 19, CCD_5334-35); a friend commented that she could not forget that Ms. Gerovic was military, and that the jacket looks good. Another comment wishes Ms. Gerovic lots of luck and congratulations, to which Ms. Gerovic replied "thanks," along with other loving comments.

13.    I did not find any comments on the posts I reviewed and was able to translate that stated the posts were just for fun or were just a joke.

14.    During her contemplation of discipline meeting and the administrative appeal hearing of her termination, Ms. Gerovic did not state that my translations were incorrect.

15.    Ms. Gerovic was issued a Contemplation of Discipline letter regarding the Facebook posts on September 19, 2017 setting a Contemplation of Discipline meeting to take place on September 28, 2017.

16.    On September 21, 2017, I was asked to assist with Ms. Gerovic in Murphy Robinson's office.   I was told that while meeting with Mr. Robinson, Ms. Gerovic told him that she wanted to kill herself.

17.    I met with Ms. Gerovic and Mr. Robinson. I advised Ms. Gerovic we were concerned about her and that we needed to determine appropriate next steps in order to best support her. Mr. Robinson explained that once she told him she wanted to kill herself he couldn't take it lightly and needed to do something to help her to be safe.

18.    I spoke with Ms. Gerovic and she stated that she used the wrong word, that she was not planning on hurting herself.

19.    The police responded and determined that they trusted Ms. Gerovic's statements that she was safe but advised her to go home for the day. We agreed and Ms. Gerovic was sent home for the day.

20.    I contacted the Employee Assistance Program on Ms. Gerovic's behalf and they attempted to contact Ms. Gerovic.

21.    The City placed Ms. Gerovic on paid administrative leave because she threatened to kill herself. I sent her the paid administrative leave notice (Ex. 30), told her she was being placed on paid administrative leave, and I instructed her she was not return to the workplace until she was cleared to return.  Despite that, the next morning she was found at one of the police stations. Therefore, a BOLO was issued because she wasn't supposed to be in the workplace until she was cleared to return to work.   The BOLO did not result in a loss of pay, benefits, or any change in job status.

22.    Because Ms. Gerovic threatened to kill herself, while she was on paid administrative leave, the City scheduled and had Ms. Gerovic attend a fitness for duty evaluation to ensure her safety and her ability to return to work in secure and sensitive police and human services facilities.

23.    After the fitness for duty evaluation determined it was safe for Ms. Gerovic to return to work, she returned to her regular custodial duties with no change in pay or other benefits.

24.    Plaintiff was placed on administrative leave with pay for nine days from September 22, 2017, through October 3, 2017, and then was returned to her work as a custodian on the same shift with the same pay and no other change in benefits.

25.     Because Ms. Gerovic was on paid administrative leave pending her fitness for duty examination, her September 19, 2017, contemplation letter was rescinded, and the contemplation meeting cancelled.

26.     I met with Amber Escobedo. She told me that she had worked with Ms. Gerovic on a number of occasions and that Ms. Gerovic's attitude and language were generally quite inappropriate, vulgar, and offensive. I prepared a written statement based on Ms. Escobedo response's that she signed (Ex. 35) which was used for Ms. Gerovic's termination letter (Ex. 22, CCD_50).

27.     With my assistance, the Contemplation of Discipline letter of September 19, 2017, was subsequently revised to include additional information regarding the Facebook posts, Ms. Gerovic's 9/20/17 meeting with Mr. Lemos, her 9/21/17 meeting with Mr. O'Neil, her 9/21/17 meeting with Mr. Robinson, her 9/22/17 appearance at Police District 5, and the information relayed by Ms. Escobedo.   The revised contemplation letter was issued on October 18, 2017 with a contemplation of discipline meeting set for October 31, 2017.   Ex. 37.

28.     In accordance with the Career Service Rules, a contemplation of discipline meeting was held on October 31, 2017, where Ms. Gerovic was represented by an attorney and had the opportunity to discuss all allegations in the Contemplation of Discipline Letter.

29.     Under the City's Career Service Rules, a verbal warning or counselling session does not result in a demotion, loss of pay, or any other change in employment status.

30.     A written reprimand does not result in a reduction in pay or benefits, or any other change in employment status.

31.     During Ms. Gerovic's employment, only Mr. Williams and Mr. Murphy, when he became employed, could issue discipline above a written reprimand to General Services employees.

I declare on this 20th day of May, 2021, under penalty of perjury that the contained herein is true and correct.

_____
Anne Carter

TO:          Agency file on **Gerovic, Emina**
             Supervisor's file on  Gerovic

FROM         Stigall, James J. Custodial Supervisor (FPM)

DATE:        09/21/2015

SUBJECT:     Verbal reprimand

CC:          **L. Lemos, T.Rios**

---

Today I provided Ms. Emina Gerovic, **Custodian,** with a verbal reprimand for violation of the following Career Service Rules:

Career Service Rule16-60   <u>Discipline and dismissal</u>

The following may be cause for discipline or dismissal of a Career Service employee:

**Career Service Rule 16-60**
**L. Failure to observe written departmental or agency regulations, policies or rules.**
**(Out of Uniform in observance of failure to be in issued Safety shoes issued)**

**V. Failure to use safety devices or failure to observe safety regulations which: results in injury to self or others; jeopardizes the safety of self or others; or results in damage or destruction of City property.**

**Ms. Gerovic** was given a verbal reprimand for engaging in the following misconduct:

On Monday September 21, 2015, during the General Services 3rd Quarter All-Staff Mtg., you were observed wearing other than your issued Safety Shoe footwear. After the meeting I was directed to have the both of us report to Mr. Lemos on the 9th floor, Facilities Management offices. Mr. Lemos met with this writer and yourself, stating that you were not wearing you're issued safety shoes and that you had been given a voucher for a second pair. Mr. Lemos advised you that when you are on the clock you must wear your safety shoes at all times as this was unacceptable. You stated you had changed shoes for the meeting but had your safety shoes in your locker at Police Admin.
 Mr. Lemos then reiterated that if something were to fall on your feet when walking over to the Webb Building, there would be a liability issue because of your failure to be in your full uniform. Mr. Lemos further stated that if observed again without your proper safety shoes on, progressive discipline would be followed.

> **Exhibit**
> **Dep 0005**
> 1/13/2021
> Emina Gerovic

CCD_1846
19-cv-03710-RM-NRN

I also advised **Ms. Gerovic** that further misconduct may be cause for additional disciplinary action which may include dismissal.

Pursuant to Career Service Rule 16-71, I notified Ms. Emina Gerovic that this verbal reprimand was documented to their file by virtue of copying the employee on this memorandum.

This reprimand was hand delivered to Ms. Gerovic on 9/21/2015 at Denver Police Administration Building 1331 Cherokee St.


cc:     Department file
        Supervisor file

TO:     Emina Gerovic, Custodian

FROM:  Tony Rios, Custodial Supervisor

Date:   October 1, 2015

Subject: Verbal Warning

---

This is a notification that verbal warning has been provided to you for violation of the following Career Service Rules:

Career Service Rules 16-60 <u>Discipline and Dismissal</u>

<u>The following may be cause for discipline or dismissal of a Career Service employee:</u>

Career Service Rule 16-60

1. Gross negligence or willful neglect of duty

L. Failure to observe written departmental or agency regulations, policies or rules.

Ms. Gerovic was given a verbal warning on September 30, 2016 for the following. On September 29, 2015, the 1st floor located at the Denver Police Administration building was inspected. The inspection report total rating score was a 1 to 2(poor to fair) rating. Another inspection report will follow Friday afternoon, October 2nd, by which your assigned areas are expected to be brought back up to agency standards.

Additionally, you are to cease and desist from responding to requests for service by bringing the requestor the tools/supplies to complete the task rather than completing the task/request yourself.  This is totally unacceptable behavior and will not be tolerated further.

Please be advised that any further misconduct may result in additional disciplinary action up to and including dismissal.

Cc: LeRoy Lemos, Operations Supervisor

Employee File

**Exhibit
Dep 0006**
1/13/2021
Emina Gerovic



**DENVER**
THE MILE HIGH CITY

Michael Hancock
Mayor

Facilities Management
201 W. Colfax Avenue Dept. 904
Denver, CO 80202
p: 720-865-8680
f: 720-865-7585

# Memo

| | |
|---|---|
| To: | Emina Gerovic, Custodian |
| From: | LeRoy Lemos, Operations Supervisor |
| CC: | Office of Human Resources agency personnel file |
| Date: | June 13, 2016 |
| Re: | Documented Counseling Conversation |

This memorandum is to document the counseling conversation I had with Emina Gerovic -136832 on April 1, 2016 to address concerns regarding performance and/or behavior in the workplace.

These concerns are affecting your ability to perform at your full potential, be efficient in your work, complete tasks in a timely manner and to be successful and follow the agency or division policies and practices.

Specifically, I reviewed you City/Facilities Management issued cell phone records from August 1, 2015-February 28, 2016. The review determined that you use your cell phone for personal use often. In fact, over 75% of usage during the period reviewed was for personal use.

It is important to remember FM's Administrative Polices, Page 7-USE OF CELL PHONE (PERSONAL OR CITY PROVIDED) states, "Personal calls, test messaging or other cell phone usage for personal reasons are to be limited to break periods.

You stated during our meeting April 1st at the Webb Building that you understand the expectations moving forward. We expect you to follow all FM Administrative Policies during your tenure with FM.

Further misconduct may be cause for disciplinary action. Personnel decisions relating to progressive discipline may take into account prior disciplinary action, including this documented counseling conversation.

_____
Supervisor signature – confirming the contents in this document

**Exhibit
Dep 0007**
1/13/2021
Emina Gerovic

CCD_0106
19-cv-03710-RM-NRN

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.:      1:19-cv-03710-RM-NRN

EMINA GEROVIC,

      Plaintiff,

v.

CITY AND COUNTY OF DENVER, a Body politic and corporate of the State of
Colorado, acting by and through its DEPARTMENT OF GENERAL SERVICES
and FACILITIES MANAGEMENT OPERATIONS;
LEROY LEMOS, in his official capacity as Facilities Management Operations
Supervisor at the Department of General Services, and in his individual capacity;
MURPHY ROBINSON, in his official capacity as Executive Director of General
Services, and in his individual capacity;
JAMES E. WILLIAMSON, in his official capacity as Facilities Management
Operations Director at the Department of General Services, and in his individual
capacity;
KEVIN O'NEIL, in his official capacity as Facilities Management Operations
Deputy Director at the Department of General Services, and in his individual
capacity;
JOEL WOMICK, in his official capacity as DGS Contingent Worker at HSS Inc.,
and in his individual capacity;
KYLE KNOEDLER, in his official capacity as DGS Facility Supervisor of HSS
Inc., and in his individual capacity; and
HSS, INC., a Colorado Corporation, acting as a hired agent by the City and County
of Denver, by and through their contingent workers, Joel Womick, Kyle Knoedler,
and others.

Defendants.

_____

**PLAINTIFF'S RESPONSE TO CITY DEFENDANTS'
DISCOVERY REQUESTS TO PLAINTIFF**

_____

      COMES NOW, Plaintiff, Emina Gerovic, by and through her attorney, Nathan

Davidovich and hereby submits her responses to City Defendants' Discovery Requests

to Plaintiff as follows:

different from the definitions of common use, or more extensive then the definitions of common use, or seek to impose burdens, requirements or obligations not expressly required by the Federal Rules of Civil Procedure, Plaintiff objects to those definitions or instructions as being unreasonable, overly broad, abusive, harassing, and exceeding the scope of permissible discovery under the Federal Rules. To the extent the discovery requests, or their preamble seek to require disclosure of attorney work product, attorney-client communication, and other information exempt from discovery, objection is made thereto.

## **INTERROGATORIES**

**INTERROGATORY NO. 1**. Regarding the statement in paragraph 13 of your Amended Complaint, identify all non-Hispanics or others of different ethnic and racial background than Leroy Lemos that suffered a hostile work environment or were subject to discrimination, their ethnic and racial backgrounds, the actions they suffered, by whom and on what dates.

**RESPONSE:** Plaintiff objects to this interrogatory for reason that it is overly broad and burdensome, as set forth in General Objection No. 6 above, and is not calculated to lead to the discovery of relevant evidence. Without waiving said objection, Plaintiff states as follows:

The following non-Hispanics or others of different ethnic and racial background that Leroy Limos, subjected to a hostile work environment or were subject to discrimination, as far as I can recall, were the following:

a.      James Stigall, address unknown, telephone number 303 829-9055,  who was previously employed by the City , working as a supervisor under the supervision of

Leroy Lemos.  He was a white male, who endured daily harassment from his superior, Leroy Lemos, and verbal and written reprimands for discriminatory and not legitimate reasons, and denied a pay cut. Because of the bogus write-ups, which were continuing in severity, and the feeling of being treated differently because he was white, he felt that he had no choice but to resign, which he did in 2015. At the time he was a supervisor, all of the other supervisors were Hispanic, and they were treated much more favorably than he was on a regular basis.

b.    Keith Dockman(sp)  address unknown, who was previously employed by the City, working under the supervision of Leroy Lemos. He was a white male,  and verbally harassed by Leroy Lemos frequently, for no legitimate reasons other than discrimination, and due to his fear of being improperly fired because of discriminatory motives, he decided to voluntarily resign from employment in 2016.

**INTERROGATORY NO. 2**. Regarding paragraph 13 of your Amended Complaint, identify all persons that received more favorable working conditions.

**RESPONSE:** Plaintiff objects to this interrogatory for reason that it is overly broad and burdensome, as set forth in General Objection No. 6 above, and is not calculated to lead to the discovery of relevant evidence. Without waiving said objection, Plaintiff states as follows:

The following persons, all of whom are believed to be Hispanic, are the ones that I can currently remember as receiving more favorable working conditions.

a.    John Gandera, address unknown, was a custodian working for the City, who received more favorable working conditions than myself and other non-Hispanic employees.

b.      Lucia (Last name and address unknown), was a custodian working for the City, who received more favorable working conditions than myself and other non-Hispanic employees.

c.      Yvonne Chavez, address unknown, was a supervisor working for the City, who received more favorable working conditions than myself and other non-Hispanic employees.

d.      Sharon Romero, address unknown, was a supervisor working for the City, who received more favorable working conditions than myself and other non-Hispanic employees.

e.      Danielle Garcia, address unknown, was a custodian working for the City, who received more favorable working conditions than myself and other non-Hispanic employees.

f.      Teresa (Last name and address unknown), was a custodian working for the City, who received more favorable working conditions than myself and other non-Hispanic employees.

g.      David Chavez, address unknown, was a custodian working for the City, who received more favorable working conditions than myself and other non-Hispanic employees, and even though he had been employed for one year less than I was, his hourly wage was higher than mine.

**INTERROGATORY NO. 3.** Regarding all allegations that you reported discrimination, identify the dates of those reports, to whom you reported the discrimination, the contents of those reports, whether the reports were written or verbal, whether you received a response and, if yes, from whom and on what date.

**RESPONSE:** Plaintiff objects to this interrogatory for reason that it is overly broad and burdensome, as set forth in General Objection No. 6 above, and is not calculated to lead to the discovery of relevant evidence. Without waiving said objection, Plaintiff states as follows:

I do not remember all of the specific dates and times that I reported discrimination, but I do remember the following:

a.      I verbally complained to Murphy Robinson, the Facilities Management Director for the City, in September 2017, for the unfair and discriminatory treatment that I was experiencing from Leroy Lemos.

b.      I remember going to Human resources in August or September of 2016 and verbally complaining about my unfair discriminatory treatment by Leroy Lemos, to Kevin O'Neil, my direct manager and James Williamson, the Director.

c.      I also remember sending an email to Kevin O'Neil on May 3,2017 (E.GEROVIC 0324) and also speaking to him in person, regarding setting up a meeting in response to the writeups I received from Leroy Lemos.

d.      I also remember complaining to Anne  Carter and Christine Howard of the Human Resource Department, that I was being treated unfairly and being discriminated against, repeatedly by Leroy Lemos, and that I was being treated less favorably then Hispanic employees. I do not remember the dates of those complaints.

e.      On about October 5, 2017 I complained to Leroy Lemos, about BOLO  (be on the lookout) posters being posted in the building I was working in.

**INTERROGATORY NO. 4.**  Identify the Hispanic employees referred to in paragraph 15 of your Amended Complaint.

**RESPONSE:** The two Hispanics that I remember were Teresa Yolanda (address unknown) who was a custodian and Danielle Garcia (address unknown) who was also a custodian.

**INTERROGATORY NO. 5.**  As referred to in paragraph 16(c) of your Amended Complaint, identify Hispanic employees who did not wear safety shoes and were not disciplined for their failure to wear safety shoes.

**RESPONSE:**   The one I can remember is John Gandera (address unknown) who was a custodian.

**INTERROGATORY NO. 6.**  Identify the co-workers and the Hispanic employees referred to in paragraphs 16(d) and 16(e) of your Amended Complaint.

**RESPONSE**:  Both supervisors, Tony Rios, address unknown, telephone number 720-985-9118 and James Stigall, address unknown, telephone number 303-829-9055, told me that I was covering more area and the white glove test was only done on me versus any of the Hispanic employees.  Chris (last name and address unknown) who was a white male and a City employee, was the co-worker I spoke to regarding the toilets. Janet (last name and address unknown) who was a Hispanic female and a custodian, was the co-worker that was not disciplined for use of cell phones during work time.

**INTERROGATORY NO. 7.**  Identify the Hispanic employees referred to in paragraph 16(f) of your Amended Complaint as well as all reports you made to Mr.

Lemos that DPD District 5 has poor cell phone reception, whether those reports were written or verbal, and the dates of those complaints.

RESPONSE:  Plaintiff objects to this interrogatory for reason that it is overly broad and burdensome, as set forth in General Objection No. 6 above, and is not calculated to lead to the discovery of relevant evidence. Without waiving said objection, Plaintiff states as follows:

In 16(f) I was referring to all Hispanic employees, no one else was reprimanded for cell phone issues.  Division Chief Ron Thomas sent an email to Leroy Lemos (address unknown) my supervisor, in March 2017 regarding poor cell phone reception in the building. To the best of my recollection, I also reported poor cell phone reception to Mr. Lemos.

INTERROGATORY NO. 8.   As referred to in paragraph 16(i) of your Amended Complaint, identify who informed you that you were being reassigned to another location and a new shift, how you were told, the date you were told, and what your reassigned location was.

RESPONSE:   In September 2017 I was in an in-person meeting with Leroy Lemos (Address unknown), my supervisor and Russ Vander Kooy (unknown address) another supervisor. I was given a sheet of paper with my new assignment during that meeting to report to 12th and Federal, which was the human services building at the time.

INTERROGATORY NO. 9.   As referred to in paragraph 16(i) of your Amended Complaint, identify the date you attempted to file a complaint, who you spoke with about

filing a complaint, who told you that you could not file a complaint, and if you did file a

complaint, who you filed it with and the date it was filed.

**RESPONSE:**   In September 2016, I spoke with both Ann Carter (address

unknown) an HR worker and Christine Howard (unknown address) also an HR worker.

Both women told me I could not file any complaints and therefore I was unable to file a

complaint.

**INTERROGATORY NO. 10.**   As referred to in paragraph 16(i) of your Amended

Complaint, identify who denied your request to schedule a meeting with Murphy

Robinson and the date and manner in which this occurred.

**RESPONSE:**   In September 2016, I approached Kevin O'Neil (address

unknown), who was a manager, in his office, in person for a meeting with Murphy

Robinson.  He denied my in-person request to have a meeting.

**INTERROGATORY NO. 11.**   As referred to in paragraph 16(j), identify who you

inquired of that led you to discover the BOLO posters and identify where the posters

were posted in the building.

**RESPONSE:**  While I was working, some employees of DHS started pointing at

me and whispering about me.  I approached them and asked, "what is going on".  Their

response was "what are you doing in the building, you shouldn't be here".  The group of

people mentioned that there were BOLO pictures with my face on them.   I approached

a supervisor named Edward (last name and address unknown), and we went upstairs to

talk to a security person (name and address unknown).  That security person pulled up

the BOLO picture on the computer but claimed he didn't know anything else about the

posters.  He also said the posters were placed behind the security area where security personnel could see  them.

**INTERROGATORY NO. 12.**   As stated in paragraphs 18(a)-(c) and (e) of your Amended Complaint, identify the "non-Hispanic and ethnic minority" individuals that you claim were discriminated against; identify their race, ethnicity, or color; and identify those that suffered a hostile and offensive work environment and their race, ethnicity, or color.

**RESPONSE**:   James Stigall (address unknown), Telephone number 303-829-9055, my supervisor, was a white male and he was both discriminated against as well as suffered a hostile and offensive work environment.   Keith Dockman (unknown spelling of last name and address) was a fellow custodian and also a white male who suffered discrimination and a hostile and offensive work environment.

**INTERROGATORY NO. 13.**   As referred to in paragraphs 21 through 23 of the Amended Complaint, identify who you complained to, the date of each complaint, the contents of each complaint, whether each complaint was verbal or in writing, and who was aware of those complaints.

**RESPONSE:**  All of my complaints were verbal complaints and while I do not remember all of the specifics, what I remember is listed below to the best of my knowledge:

a.  Kevin O'Neil (address unknown) was a manager and the complaints were in the Fall of 2016;

b.  James Williamson (address unknown) was a director and the complaints were in the  Fall of 2016;

c.  Ann Carter (address unknown) was an HR worker and the complaints were in 2017;

d.  Christine Howard (unknown address) was an HR worker and the complaints were also in 2017;

e.  Tony Rios, (address unknown), Telephone number 720-985-9118, was a supervisor and I complained to him in 2016 and 2017 multiple times;

f.  James Stigall, (address unknown), Telephone number 303-829-9055, was also a supervisor and I complained to him in  2016 and 2017 multiple times;

g.  Lt. Ken Chavez, (address unknown), Telephone number 720-913-6165, was a Lieutenant in the  Police Station and I complained to him both in 2016 and 2017;

h.  Lt. Paul Berdal (unknown spelling of last name and address), was a Lieutenant in the Police Station and I complained to him both in 2016 and 2017;

i.  Commander Ron Thomas (unknown address), was the Division Chief of Police at the Police Station and I complained to him in both 2016 and 2017; and

j.  Susan Tessler, 303-809-2377 worked in police administration and I complained to her both in 2016 and 2017.

**INTERROGATORY NO. 14.**  Describe all your searches for employment from November 27, 2017 through the present, including the name and address of each and every potential employer, employment agency, placement agency or temporary agency; the position applied for and rate of pay; how you learned of each potential opening; whether you completed a formal written application; the reason given for your non-selection; and the name of the person conducting the interview.

**RESPONSE**: Plaintiff objects to this interrogatory for reason that it is overly

broad and burdensome, as set forth in General Objection No. 6 above, and is not calculated to lead to the discovery of relevant evidence. Without waiving said objection, Plaintiff states as follows:

I saw an opening online on a job search website (unknown).  I applied digitally online for a custodian position at the School of Mines in 2018 that paid $14.75 an hour. I interviewed with David (unknown last name and unknown address) and Christina (unknown last name and unknown address) but I was told I could not get hired there because of my back and hip injuries from the City of Denver employment.  This was the only job I applied for.

**INTERROGATORY NO. 15.**   Describe your employment history in the last ten (10) years, including periods of unemployment, self-employment, including the names and addresses of each employer; the dates of each such employment or period of unemployment; the title or titles you held at such employment; the general nature of your duties at such employment; the name of your immediate supervisor at the time of your termination at such employment; your gross monthly/hourly earnings (designate which); the number of hours you worked monthly; the reason for your leaving such employment; the benefits provided by each employer; any unemployment benefits received, including the nature of such payments; the dates you received such benefits/income; and by whom paid.

**RESPONSE**:   Plaintiff objects to this interrogatory for reason that it is overly broad and burdensome, as her employment history for the past 10 years is not calculated to lead to the discovery of relevant evidence. Without waiving said objection, Plaintiff states as follows:

From 2010-2014, I worked for the City of Broomfield (One DesCombes Drive,

Broomfield, CO 80020, 303-469-3301) as a part-time custodian at $14.75 with zero

benefits.  I do not remember the name of my supervisor and my hours varied greatly.   I

left because I needed more hours.

From 2014-2017, I worked for the City of Denver in the job discussed here.

**INTERROGATORY NO. 16.**   Identify all medical or mental health providers from

whom you have sought any treatment for any emotional distress or mental anguish that

you allege in your Amended Complaint.

**RESPONSE:** Plaintiff objects to this interrogatory for reason that it is overly

broad and burdensome, as set forth in General Objection No. 6 above, and is not

calculated to lead to the discovery of relevant evidence. Without waiving said objection,

Plaintiff states as follows:

a.    Dorothy Hansen, 1777 S. Harrison St., Suite 800, Denver, CO 80210,

303-619-3087, is my psychologist;

b.    Darcie Conelly,1420 W Midway Blvd, Broomfield, CO 80020, 303-466-

1866, is my primary doctor;

c.    Robert Kawasaki, 1536 Cole Blvd. #120, Lakewood, CO 80401, 3030-

423-8334, was the workers compensation doctor.  I visited him one time

and he told me the pain was in my head and I needed to go see a

psychologist.

**INTERROGATORY NO. 17.**   Describe with specificity any medical or mental

health conditions you claim to have suffered in the last ten (10) years including a

description of condition or similar problem you claim to have suffered; the name and

**NOT APPLICABLE.  I do not have such documents, but my personnel file was provided with Rule 26(a) stamped as E. GEROVIC 0284-0295.**

7.      Provide copies of all documents and data of any kind provided to and received from any expert to be designated pursuant to F.R.C.P. 26.

An expert has not yet been selected or designated. Upon such designation, expert reports will be served in accordance with F.R.C.P. 26.

8.      Provide the doctor's note referred to in paragraph 16(c) of the Amended Complaint.

**NOT APPLICABLE.  I gave my only copy to my supervisor and do not know what they did with it.**

9.      Provide any documents referred to in your responses to the above Interrogatories.

**NOT APPLICABLE.**

Dated this 27th day of July 2020.

/s/ Nathan Davidovich
 Nathan Davidovich
 Davidovich Law Firm, LLC
 501 South Cherry Street,
 Suite 1100
 Denver, Colorado 80246-1325
 Tel: (303) 825-5529
 Fax: 720-409-3668
 nathandavidovich@talk-law.com

## VERIFICATION

Emina Gerovic affirms that the above Responses to City Defendants'

discovery requests to Plaintiff are true and correct to the best of his knowledge, information

and belief.

**JESSICA BURT**
**NOTARY PUBLIC**
**STATE OF COLORADO**
NOTARY ID 20134028689
MY COMMISSION EXPIRES MAY 07, 2021

_Emina Gerovic_
Emina Gerovic

CITY AND COUNTY OF DENVER        )
                                )ss.
STATE OF COLORADO                )

SUBSCRIBED AND SWORN TO BEFORE ME, on this 27. day of July 2020, by Emina

Gerovic, to certify which, witness my hand and seal of office

5·7·2021
_____        _____
My Commission Expires               Notary Public

AS TO OBJECTIONS ONLY:

s/ Nathan  Davidovich
Nathan Davidovich
Davidovich Law Firm, LLC
3773 Cherry Creek North Drive
Suite 575
Denver, Colorado 80209
303-825-5529
720-409-3668 (fax)
nathandavidovich@talk-law.com

Attorney for Plaintiff

21

**144**

**CERTIFICATE OF SERVICE**

I hereby certify that on this 27th day of July, 2020, I served the foregoing on Defendants by

sending same to the following e-mail addresses:

Shelby Fenton
Assistant City Attorney
Shelby.fenton@denvergov.org

Natalia S. Ballinger
Assistant City Attorney
Natalia.ballinger@denvergov.org

Michael A Watts
Retherford, Mullen and Moore, LLC
mwatts@rmmattys.com

s/ Nathan  Davidovich
 Nathan Davidovich
 Davidovich Law Firm, LLC
 3773 Cherry Creek North Drive
 Suite 575
 Denver, Colorado 80209
 303-825-5529
 720-409-3668 (fax)
 nathandavidovich@talk-law.com
 Attorney for Plaintiff

# Memo

**To:**     Emina Gerovic, Custodian

**From:**   Tony Rios, Custodial Supervisor

**Date:**   March 17, 2017

**Re:**     Documented Counseling Conversation

This memorandum is to document the counseling conversation, I had with Emina Gerovic, 136832, on March 16, 2017 to address regrading job performance and/behavior in the work place.

These concerns are effecting your ability to perform at your full potential, be effective in your work and follow the agency or division policies and practices.

On March 16, 2017 Operations Supervisor LeRoy Lemos tried to call your city cell phone to discuss an incident that happen at District 5 Police station.  Leroy called me and stated he could not reach you on your assign city phone and your voice mail had not been activated, for me to contact you to call him. Per our conversation, I directed you to ensure you have your city phone turn on and to activate your voice mail. You called me back and stated you have your cell phone on and you have activated your voice mail.

Further misconduct may be cause for disciplinary action. Personnel decisions relating to progressive discipline may consider prior discipline action, including this documented counseling conversation.

_____

Supervisor signature- confirming the contents in this document

**Exhibit**
**Dep 0008**
1/13/2021
Emina Gerovic

CCD_0105
19-cv-03710-RM-NRN



**DENVER**
THE MILE HIGH CITY

Department of General Services
Facilities Management
201 W. Colfax Avenue Dept. 904
Denver, CO 80202
p: 720-865-8680
f: 720-865-7585

May 4, 2017
(Revised from May 2, 2017)

Ms. Emina Gerovic
6514 Benton Circle
Arvada, CO 80003
Employee ID #136832

**RE: Written Reprimand Disciplinary Action**

Dear Ms. Gerovic:

This is a written reprimand for misconduct which violates the following Career Service Rule(s):

**Career Service Rule 16-60, Discipline and Dismissal**

The following may be cause for discipline or dismissal of a Career Service employee:

    A.  Neglect of duty or carelessness in performance of duties and responsibilities.

    D.  Any act of dishonesty, which may include, but is not limited to, lying, or improperly altering or falsifying records, examination answers, or work hours.

    F.  Failing to comply with the lawful orders of an authorized supervisor or failing to do assigned work which the employee is capable of performing.

    G.  1.  Failing to meet established standards of performance including either qualitative or quantitative standards. When citing this subsection, a department or agency must describe the specific standard(s) the employee has failed to meet, such as standards in a Performance Enhancement Program (PEP) Plan or in a Performance Improvement Plan (PIP).

    Facilities Management Administrative Policies

    **USE OF WORK/BREAK TIME**
    All employees must make necessary arrangements to transact their personal business outside of scheduled work hours.
    The Division encourages you to take your authorized breaks away from the work area to give you some time to re-energize and to minimize disruption and distraction to others. You are encouraged to use the City break room areas and not use other agency facilities (courtrooms, conference rooms, etc.).

    **RESPECTFUL WORKPLACE**

            Emina Gerovic – Page 1



Exhibit
Dep 0009
1/13/2021
Emina Gerovic

CCD_0089
19-cv-03710-RM-NRN

City policies prohibit and do not tolerate any violence or threats of violence in the workplace, including but not limited to:  intimidating, threatening or hostile behavior; physical assault; vandalism; arson; sabotage; bringing unauthorized weapons onto City property; unauthorized use of weapons; jokes or comments about violent acts; and, encouraging others to engage in violent behaviors. Workplace bullying will also not be tolerated.

I.  Failure to maintain satisfactory working relationships with co-workers and other individuals the employee interacts with as part of his or her job.

R.  Conduct which violates the Career Service Rules, the City Charter, the Denver Revised Municipal Code, Executive Orders, written departmental or agency regulations, policies or rules, or any other applicable legal authority. When citing this subsection, a department or agency must cite the specific regulation, policy or rule the employee has violated.

Facilities Management Administrative Policies, February 2014

**EMPLOYEE CONDUCT**

As a representative of General Services/Facilities Management and the CCD, you are a public servant and a role model for all community members. That means that you are held to a high standard of excellence and professionalism. All Division staff are expected to comply with the CCD standards at all times.

- The expectation is that you are inclusive and respectful of the differences in all cultures and people, and that you display professionalism by using appropriate and civil language, tone, and affect. Your demeanor, verbal and non-verbal communication should be business-like, respectful and appropriate.

- Employees must not disturb other City employees or the public.  While employees are expected to be pleasant to building tenants and the public, they should not initiate lengthy personal conversations with other City employees or the public, except when all parties are on scheduled lunch periods or breaks. Loud talking, loud laughing and/or noise, swearing, inappropriate jokes and/or remarks are prohibited at all times.

- Employees are expected to behave in a professional manner at all times, whether during their regular shift or overtime, and treat the public, building tenants, their co-workers and supervisors with respect. Arguments, constant complaining, gossip and/or a consistently negative attitude towards the job, supervisors or other employees is not appropriate.

T.  Conduct which is or could foreseeably:
1. Be prejudicial to the good order and effectiveness of the department or agency;
2. Bring disrepute on or compromises the integrity of the City; or
3. Be unbecoming of a City employee.

You are employed by Facilities Management within the Department of General Services with the City and County of Denver (CCD), as a Custodian. Your original hire date with CCD was August 11, 2014.  According to your Career Service job specification, the general duties of your position

Emina Gerovic –  Page 2

CCD_0090
19-cv-03710-RM-NRN

are to perform standard level interior and exterior janitorial/minor maintenance duties involving cleaning and disinfecting all areas assigned, including restrooms, locker rooms, break rooms, holding cells and all office areas. Your normal work hours are from 6:00 AM. to 2:30 PM. except when your schedule is adjusted for other coverage. You are assigned to work Police District Five. You have personal accountability for carrying out assigned functions within the scope of established guidelines and objectives.

Per the Facilities Management (FM) Policy manual, as a representative of General Services/Facilities Management and of the City and County of Denver (CCD), you are a public servant and a role model for all community members. That means that you are held to a high standard of excellence and professionalism. All Division staff are expected to comply with the CCD standards at all times. Employees are expected to behave in a professional manner at all times, whether during their regular shift or overtime, and treat the public, building tenants, their co-workers and supervisors with respect.

Following is a summary, but not an exhaustive description, of the facts and circumstances surrounding the misconduct on which this Contemplation of Discipline is based:

In the past, you have been coached, counseled, and disciplined for not meeting performance expectations, not following FM Administrative Policies, not following City Safety Policies, personal/inappropriate use of your City-issued cell phone and not providing acceptable level of customer service.

On Monday, March 16, 2017, I, LeRoy Lemos, FM Operations Supervisor, received a phone call from an irate Denver Motor Vehicles (DMV) office customer Brian J. who was calling on his phone with Daniel G. (witness to incident) standing next to him so that he could hear the complaint to verify and correct anything Brian was saying.  Brian reported to me the following:

- On March 16, 2017, at approximately 7:15AM, he entered the Arie P. Taylor Building (APT) via the <u>unlocked</u> East entrance.
- He proceeded down the stairs to the 1st floor lobby to await the DMV office to open, where he encountered another gentleman, Daniel G. also waiting.
- They began talking, with Daniel telling the Brian he was smart to be waiting inside instead of outside in the cold.
- Daniel said he got lucky and the nice city worker (you) let him in to wait inside the lobby.
- Moments later, you came into the lobby from the Police Department door, you saw Brian also in the lobby and immediately told him the building was not open yet and he needed to wait outside in a loud demanding voice.
- Brian responded, "Why do I have to leave?  You let the other guy in but I have to leave?"
- You responded to Brian, "Yes, he can stay, but you have to get out NOW!"
- Brian responded, "That is not right?  Is it because I'm black?"
- At that point, according to Brian, you walked toward him, getting very close to his face visibly upset and said "It's not a black thing, I know a lot of black people and you need to leave!"
- Brian responded, "FxxK no. If he doesn't have to leave neither do I, you racist bxxch."
- You then yelled back at him, "I'm going to get the police if you don't get out!"
- Daniel then told Brian, "Maybe we both should just wait outside, this is crazy"
- So they both went outside to wait.
- Brian saw the police in the lobby and you pointing them out to the police, who told them to stay outside and wait.

<div align="center">Emina Gerovic –  Page 3</div>

- Brian then went around the building, back to the 2nd floor building entrance, went to the security desk to file a complaint.
- The HSS security supervisor gave Brian my number, and he then called me.

I then called you on your City issued cell phone, which immediately went to a recording indicating you were unavailable and you did not have your voice mail set up, so I was unable to contact you or leave a message.  I then called your supervisor, Tony Rios, who said, "Emina doesn't use her City cell phone and to call her on her personal cell phone."  I questioned why you would not be using the City issued phone and directed Tony to get ahold of you, have you call me, and for you to use your City phone as previously instructed for City business and to set up your voice mail box.

You called me back after 10:30AM and told me you understood and would begin using your City cell phone and set up your voice mail immediately.  However, rather than call me from your City cell phone, you were again using your personal cell phone.

I then asked HSS security to provide statements regarding the incident from their staff who were on duty that day.  HSS Agent Sequoia stated that around 7:25 AM she heard a verbal altercation coming from the first floor.  She was at the 2nd floor landing and observed from there. She observed an individual yelling at you, using profanity, as he exited the building with another male who was not yelling.  You then proceeded up the stairs toward her.  Sequoia asked you what happened and she reported, "She (Emina) told me she let a gentleman in the building because he was shivering and cold. She said the gentleman was from New York and all he needed was a new driver's license. So Emina said she had let him into the downstairs lobby to warm up and at 7:30 AM, he would have to go back outside to get in line and the guy said okay, no problem."

HSS Agent Sequoia further stated, "The guy that was yelling had come around the building to the front doors and asked to speak with security and HSS Agent Stanford walked over to speak with him.  After a couple of minutes, they came out of the DHS Food Stamp office and the customer yelled out to Emina to say "I will be giving your boss a call." Then Emina said to me (Sequoia), "Why did he (Stanford) give him a number to call?" Then Emina told Sequoia, she was going to call her supervisor (LeRoy Lemos).  However, you did not call me until a couple hours later at 11:20 AM, after I tried to call you.

Sequoia also reported, "As the day progressed Emina kept coming to my podium saying things like, 'since I got a call from my boss, Stanford will get a call from his boss.' Emina said she had been written up and she couldn't believe Stanford did that." However, this was incorrect, at that time, you had only been counseled about your failure to use your City phone as instructed. Sequoia added, "I feel this situation could have been eliminated if she did not let the man she was trying to be nice to because he was cold into the building at all."

Per Incident Report 17-03-041, a review of the APT security camera footage by HSS Security personnel shows Brian entering via the East/2nd floor entrance. However, Daniel is never seen entering nor exiting the East/2nd floor entrance at any time on March 16, 2017. This matches the information provided that you allowed Daniel to enter through the other door.

A separate email was received from HSS Agent Sequoia stating, "I was told by one of the ResCare employees [later identified as Jerrick] that Emina told him that Stanford stabbed her in the back and that with the same knife she wanted to stab in the front."  Later, after being questioned further about the incident, HSS Agent Sequoia wrote in an email on March 28, 2017, "Amina (sic) the custodian was doing a lot of complaining on March 16, 2017.  After the incident happened, she kept coming up the stairs saying things like, 'Stanford stabbed me in the back, if it was you, I know you would not have done that to me.'"  Agent Sequoia stated Emina kept crying and complaining

Emina Gerovic – Page 4

CCD_0092

19-cv-03710-RM-NRN

and she tried to calm her down by telling her several times to "let it go." She also said she would have done the same and provided Emina's supervisor's phone number as it is protocol.

A report provided by HHS Agent Stanford states, in part, "The black man that got kicked out walked around the building and wanted to talk to someone. I went out there, thinking I could calm him down. Then he let me have it. He said there was someone already downstairs. He said that is racism to kick me out and let the white man stay. He then went on to ask for the supervisor's phone number."

ResCare employee, Jerrick, reported that you talked to him about the incident and that you were crying and told him you were hurt about the incident and you thought you might get in trouble for letting the customer into the building. Jerrick said you told him that Stanford betrayed you and stabbed you in the back by giving your supervisor's phone number. Jerrick said he was busy during this time, going in and out of the building, but he gave you a hug. Jerrick said he told HSS agent Sequoia about your statements to him.

Based on the HSS reports and the conversations you were having with HSS Agent Sequoia and the ResCare employee (Jerrick), it is assumed Agent Stanford was advised of your comments regarding him.

Agent Stanford added, "On the morning of 17 March 2017 at 0810 hrs. Ms. Emina waited for Mr. Leroy Redding, HSS Security Manager to walk away. Then she came to me and said she wanted to talk. I told her 'I cannot talk right now; I am not mad.' She said, 'What if need a door open?' I told her to call my boss or her boss."

On the afternoon of Friday, March 17, 2017, you were asked to come to a meeting with Anne Carter from the Office of Human Recourses and myself to discuss the incidents. You were asked to provide a written statement regarding the incident on March 16, 2017. You indicated you had eye drops in your eyes that prevented you from seeing well at that time. Ms. Carter stated that she would take notes and we would do a verbal interview regarding the incident and that you needed to follow up the interview with a written statement.

You stated you noticed two guys in the DMV lobby and questioned how they got there and asked them both to leave. You discussed the profane language from the one gentleman and said he said you were prejudice. You said HSS didn't do anything. When asked if you had further interactions with HSS you said no, you didn't talk to HSS or the two guys again and that you went back to work. When asked if you let the first gentleman (Daniel) you said no, you did not. Based on the other evidence available, your statements are not credible.

You deflected the conversation away from your actions to your alleged concerns about the door being open and the homeless getting into the building. You said your supervisor should have come there after the incident occurred, but Tony did come to meet with you when I couldn't reach you on the city phone. You then brought up HSS Agent Stanford and that you asked him to unlock the door and he said "Go away, not allowed to talk to you, only your supervisor." When asked why he would say this to you, you said you didn't know why and you just walked away from him.

When asked if you talked to HSS Agents Sequoia or Stanford, Lt. Chavez or a ResCare employee about the incident, you said no. When asked if you were angry with Stanford, you said no. When asked if you talked about Stanford to others, you said no. When asked if you said Stanford stabbed you in the back, you again said no. You said, "I am not angry, no reason to be upset. I would let you know." You added Stanford told you, not to worry, he gave the complaining person the wrong phone number.

Emina Gerovic – Page 5

Other than Daniel using profanity towards you, your statements regarding what occurred on March 16, 2017, are contrary to all of the other witness statements.

I advised you not to report to the Arie P. Taylor building on Monday and instead to report to Police Administration Building while I looked into the matter further. I also advised you not to discuss the matter with others while we did some fact finding.

The DMV employee who was getting ready to open the office and HSS information received regarding the incident outside the DMV office with you and the two gentlemen was consistent in regards to the man using inappropriate language with you. However, based on other statements and information surrounding the entire incident and what lead up to the man getting angry and how you behaved afterwards, contradicted what you told me.

When we were later able reach and speak to the ResCare employee, Jerrick, he said he recalled you talking to him and that you were crying and told him you were hurt about the incident, you thought you might get in trouble for letting the customer in. You also discussed Stanford. He said he was busy during this time, going in and out of the building, but he gave you a hug. He said you told him that Stanford betrayed you and stabbed you in the back by giving your supervisor's phone number. He said he talked with HSS agent Sequoia about it.

Since then, you complained to multiple DPD staff and discussed the incident of the rude client. You stated you were concerned about the facility, but you were being treated unfairly because you were moved from the building/District Five.  On March 23rd, after the GS All Staff meeting, you complained to another FM employee about the incident and said you were moved because I thought you were racist. You spoke with Ms. Carter on April 10 asking why were you being punished. When asked why you felt you were being punished, you stated, "because my station was taken away from me." Ms. Carter reminded you that the agency has the authority to place you at different facilities and that we would meet later that week to discuss the incident further.

On April 14th I advised you that you were to report back to District Five on Monday, but there were serious concerns regarding your behavior, comments made, use of work time, and not being truthful. I added that discipline was being contemplated and would be in the form of this written reprimand. During this discussion you still did not take responsibility for your actions. Specifically, letting the first person into the building when you shouldn't have and making inappropriate comments, as well as the other items outlined in this letter. When asked for specific responses regarding the incident and your earlier responses, you continually tried to change the subject.  You also stated that you were prepared to accept the written reprimand because, "I deserve it." When I asked you why you felt you deserved the written reprimand but have continued to deny any wrongdoing, you again diverted your answer away from the question and replied, "I have learned my lesson; I will be quiet and just do my job, I am not going to talk to anyone anymore and just do my job." You apologized to us and said you wanted to apologize to Stanford for what you might have said to him or about him that you cannot remember.

On April 24th you and your supervisor met with Stanford, you stated to him, "I am very sorry, I apologize for the misunderstanding we had, I never had a problem with you, I want peace and happiness, I apologize for the misunderstanding, it will never happen again."

These incidents are extremely troubling and unacceptable.  In your position as a custodian, you routinely interact with members of the public.  Your demeanor, behavior and language is expected to be professional and courteous at all times.  You are expected to follow all FM Administrative Policies.

Emina Gerovic – Page 6

CCD_0094
19-cv-03710-RM-NRN

You should never breach security and allow not-authorized persons into restricted or controlled access areas at any time. You are expected to treat your co-workers, including contract personnel, and the public with respect and professionalism.

Most important you are expected to be truthful and forthcoming when asked for information or a report on an incident. Not only did you not provide a written statement on the incident, as directed, you avoided providing one at the interview by claiming you could not "see nothing" despite having driven to meet with me. Your continued failure to be honest, truthful and/or forthcoming with false and mis-directing statements will not be tolerated.

Your disciplinary history includes:

|  |  |  |
|---|---|---|
| 9/21/15 | Verbal Reprimand | Multiple violations of failure to follow safety policies |

You have also had several documented issues as noted below:

|  |  |  |
|---|---|---|
| 10/1/15 | Verbal Warning | Poor work performance, poor customer service |
| 6/13/16 | Documented Counseling | Excessive personal use of cell phone and inappropriate use of work time |
| 3/17/17 | Documented Counseling | Using personal cell phone for City business and not having City cell phone charged, on person nor voice mail box set up. |

Further misconduct may be cause for additional disciplinary action, up to and including dismissal.

You may initiate a grievance of this written reprimand and/or seek mediation in accordance with Career Service Rule 18, Dispute Resolution. If you request mediation be advised that this action does not suspend the time limit for filing a grievance.

Please be advised that you are not to take any retaliatory action against anyone as a result of this disciplinary action. If any such action is taken, further discipline may be taken, up to and including dismissal.

Respectfully,

LeRoy Lemos
Facilities Management Operations Supervisor


cc:    Penny May, General Services Interim Executive director
       James Williamson, Facilities Director
       Kevin O'Neil, Facilities Administrative Officer
       Anne Carter, Office of Human Resources (OHR) Business Partner
       OHR Personnel File


Emina Gerovic – Page 7

CCD_0095
19-cv-03710-RM-NRN

**CERTIFICATE OF SERVICE**

I hereby certify that I have (hand delivered / sent by first class mail) a true and correct copy of the foregoing **REVISED Written Reprimand Disciplinary Action** on the _____4TH_____ day of May, 2017 to:

Ms. Emina Gerovic
201 W. Colfax Ave
Denver, CO 80202

Or hand delivered at: _201 WEST COLFAX AVE 11TH Floor_

_____        LeRoy Lomos
Print name / Signature

Emina Gerovic –  Page 8

CCD_0096
19-cv-03710-RM-NRN

ON THE 16 MARCH 2017 AT APPROXIMATE 0715 HRS.
I SECURITY OFFICE STANFORD L. POLLARD WAS
IN PATROL GOING THROUGH THE FOOD STAMP
AREA. WHEN I RETURNED I HERD LOUD
VOISIS. I WENT OUT THE FOOD STAMP LOBBY.
AND SAW THE JANITOR EMMA THE NEW
SECURITY OFFICE SEQUOYA. THEY WAS TALKING
ABOUT SOME ONE GETTING INTO THE
BUILDING. AS I LISTEN. THE JANITOR EMMA
I SAID THAT SHE WAS NOT PREJUDICE:
SHE SAID THAT THE MAN ~~THIS~~ CAME THROUGH &
SAID THE REASON THAT SHE THE JANITOR
PUT HIM OUT ~~WAS~~ ~~COMES~~ HE ~~WAS~~ IS BLACK THERE
WAS A WHITE MAN THAT WAS SETTING
DOWN IN THE CHAIR ON THE FIRST FLOOR.
I THE ~~AND~~ BLACK MAN THAT GOT KICK
OUT ~~WALKED~~ ~~AROUND~~ A ROUND THE BUILDING AND
WANTED TO TALK TO SOMEONE. I S/O POLLARD
WANT OUT THERE; THINKING I COULD CAME
HIM DOWN. THEN HE LET ME HAVE IT.

HE SAID THAT THERE IS ~~ALL RIGHT~~ ALREADY SOME
ONE DOWN STAIRS. HE SAID THAT THIS IS
RACISM. TO KICK ME OUT AND LET THIS
WHITE MAN STAY. THEN HE ASKED
ME FOR THE JANITOR'S BOSSES PHONE
NUMBER. I THOUGHT I HAD POB'S
PHONE NUMBER BUT I DID NOT. I ONLY
HAD THE WORK ORDER NUMBER THAT
NUMBER IS 720-944-4172.

It TURNED OUT THAT IT WAS THE
CORRECT NUMBER. "I DID NOT KNOW."
HE SAID HE WILL FILL A COMPLAINT.

THIS MORNING ON THE 17 MARCH 2017 AT 0810HRS.
MS. EMINA WAITED FOR MR. LEROY REDDING TO
WALK AWAY. THEN SHE CAME UP TO ME AND
SAID SHE WANTED TO TALK. I TOLD HER "I
CAN NOT TALK RIGHT NOW, I AM NOT MAD."
SHE SAID WHAT IF I NEED A DOOR OPEN? I
TOLD HER TO CALL HER BOSS OR MY BOSS."

STANFORD L. POLLARD

**Exhibit
Dep 0010**
1/13/2021
Emina Gerovic

3.17.17

At approximately 7.20AM 725AM I came out
of the restroom and I heard the yelling of a customer
inside of the building downstair area waiting ~~today~~
for Driver's Licsense, yelling at the ~~#~~ janitor (Amina)
What I heard out of the customers mouth is that
"You need to fix your attitude and Fuck you!" Then
the customer shut the door. I was watching the
guy from the upstairs as he stood outside talking to
another customer out there waiting. Then I seen the
Janitor (Amina) come up the stairs. I asked her what
happened and she told me that at maybe a quarter
to seven that she let a gentlemen in the building because
he was shivering and cold. She said that the gentlemen
said that he was from NewYork and all he needed was
to get his Drivers Licsense, So Amina said that she
had let him in the downstairs Lobby to warm up and
at 7.30AM he would have to go back Outside to get in line
and the guy said ~~##~~ OK no problem. After she explained that

CCD_1849
19-cv-03710-RM-NRN

I asked her why was that guy yelling at her? Amina said he was upset because she told him that he had to wait outside until the DL office opened at 8:00AM. She said she asked the guy how did he get in the building and said that he came in through the doors upstairs and came down the stairs to the lobby waiting area. She said that after she told him to leave and wait outside the guy said it's because I'm black. She said that his race didn't have anything to do with it, and that nobody could be waiting down there at all. I tried to explain to her that she was OK that guy was probably having a bad morning already and for her to let it go. Then as I was explaining Stanford walked up and the security guard from DL office walked in the building upstairs and stopped to listen to what happened. Then the guy that was yelling had came around the building to the front doors and asked speak to one of us security guards and Stanford walked over to speak with him. Stanford and the customer went outside in the front of the building to speak to one another

After about 5 or 10 minutes Stanford came back in and went his to desk ~~with~~ with guy. After a couple of minutes they both came out of the DHS food stamp office and the customered yelled out Singking out Amina say I will be giving your boss a call. Then She ~~and~~ asked me that ~~xxxx~~ "why did he gave him a (Stanford) number to call?" If it was me (Sequoya) that I wouldn't have gave the customer a number. So After that I explained to her again to let it go. So she said She was going to talk to her boss and that she wanted to call Leroy herself. As the day progressed, Amina kept coming upstairs to my podium and saying things like "Since I got a call from my boss, Stanford will get a call from his boss!" Amina said. The she said she got ~~x~~ written up and she couldn't believe Standford did that. I explained to her if she needed ~~xxxxx~~ me to write a ~~state~~ ment on what I heard then that's fine. She had tears in her eyes as if she was crying. Then she walked away. As the day progressed more, at about 200pm I saw I Lieutenant Kenneth Chavez come up the stair walking towards me. I asked him how

Can I help you? ~~was~~ Lieutenant Chavez asked me if
(7900 5 District 5)
I was the one that unlocks the doors in the morning, I
explained to him that Stanford ~~was~~ is the one that unlock
the doors because he get's her before me at 6:00 Am
And I get here at 7:00 Am. So Lieutenant Chavez
came in and spoke to Standford and the pulled him
in the lobby to finish the conversation at my
podium. Lieutenant Chavez explained to Stanford
that the doors should be locked until 8:00 Am.
Stan ford explained to him that it was unlocked
for the employees to come in freely without any
hassle. Lieutenant chavez said no the doors need
to be lock up until 8:00 Am. Stanford agreed with
him and explained that he has to follow his
chain of command and that he needed his business
card to give to leroy. So Chavez left and went
downstairs to go and get a business card and brought it
back up. Shortly after that Stanford called ~~Leroy~~ Leroy
back and explained to him a little of what happened with
whole situation. The I spoke to ~~Leroy~~ Leroy. Explained to

CCD_1852
19-cv-03710-RM-NRN

that I was into the restroom when the beginning of Amina and the customers argument occured, ~~caught~~ caught the end of argument. I didnt hear Amina saying anything out character to that Guy. Then Leroy told me he would be at APT Building in the morning around 700Am.

This Situation occured on 3·16·17·

FYI
I feel this whole situation could have been eliminated if She did let the man she was trying to be nice to ~~bea~~ because he was cold, in the building at all. She could have told the man to wait up stair by walking around the building and coming in through the front doors.

*[signature]*
March 17, 2017

**Redding, Leroy - GS FPMFM Operations & Project Mgmt**

| | |
|---|---|
| **From:** | Ajanae Rankin <valentinegirl829@gmail.com> |
| **Sent:** | Tuesday, March 28, 2017 3:24 PM |
| **To:** | Redding, Leroy - GS FPMFM Operations & Project Mgmt |
| **Subject:** | Re: Statement |

To whom it may concern,
Amina the custodian was doing a lot of complaining on the March 16, 2017. After the incident happened, she
kept coming up the stairs and saying things like "Stanford stabbed me in my back, if was you, I know you
wouldn't have done that to me." I kept telling her that it would be OK and not to worry about it. That guy should
not have talked to you like that, but try and let it go. She was more in her feelings about being written up for
letting the guy in the building so early.

On Fri, Mar 17, 2017 at 3:35 PM, Redding, Leroy - GS FPMFM Operations & Project Mgmt
<Leroy.Redding@denvergov.org> wrote:

**Thanks**

**From:** Ajanae Rankin [mailto:valentinegirl829@gmail.com]
**Sent:** Friday, March 17, 2017 3:31 PM
**To:** Redding, Leroy - GS FPMFM Operations & Project Mgmt <Leroy.Redding@denvergov.org>
**Subject:** Fwd: Statement

---------- Forwarded message ----------
From: "Ajanae Rankin" <valentinegirl829@gmail.com>
Date: Mar 17, 2017 3:18 PM
Subject: Statement
To: <leyrodreddings@denvergov.org>
Cc:

Hi this is Sequoya. I was told by one of the ResCare employees that she said that Stanford stabbed her in the
back and that with the same knife that she wanted to stab him in the front is what I was told. I do not know the
name of that employee but he is a ReCare employee.

1

**162**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 19-cv-03710-RM-NRN

EMINA GEROVIC,

Plaintiff,

v.

CITY AND COUNTY OF DENVER, et al.

_____

**DECLARATION OF PATRICIA LORMAN PURSUANT TO 28 U.S.C. § 1746**
_____

Pursuant to 28 U.S.C. § 1746, Declarant, Patricia Lorman states upon personal knowledge as follows:

1.      I am a Hispanic female.  I am a Senior Claims Adjuster for the Department of Finance, Workers' Compensation, City and County of Denver ("CCD").   I have been employed in a workers' compensation role with CCD since 2004.

2.      In my role as a workers' compensation claims adjuster, I work with employees injured on the job.  I communicate regularly with the employee, the medical providers, and the supervisors to ensure that the employee is receiving the necessary care, whether the employee can perform the essential functions of the position, offered modified duty work when appropriate, and is brought back to work when released.   I ensure that injured employees receive proper wages and I work with payroll to ensure that their leave is coded appropriately.   I complete state forms that are shared with payroll so that FMLA leave can be applied when employees are unable to work or only able to work part-time.   In my role, I worked on Emina Gerovic's claim, WC# 5-052-038.

3.      Ms. Gerovic was originally injured at work and placed on continuous workers' compensation leave from July 11, 2017, through August 14, 2017, and the City paid Ms. Gerovic's

wage replacement benefits during that period of time. Ex. 17. Ms. Gerovic was on continuous concurrent workers' compensation leave/FMLA leave from July 24, 2017 through August 14, 2017. Ex. 16, CCD_269-270.

4.     Ms. Gerovic went back on concurrent workers' compensation leave/FMLA leave for the same injury on October 20, 2017 (Ex. 40) through December 6, 2017 (Ex. 41).  Ex. 16, CCD_275-277.

5.     Ms. Gerovic was offered and accepted temporary modified duty (not her usual custodian duties) of four-hours a day or 20 hours per week.   She worked 2.5 hours on November 20, 2017, and four hours each on November 21 and 22, 2017; she also received workers' compensation leave/FMLA leave on those days and wage replacement benefits. Ex. 16, CCD_277, Ex. 17.

6.     Ms. Gerovic never returned from concurrent workers' compensation leave/FMLA leave because she was terminated on November 27, 2017.

7.     Because Ms. Gerovic was not released to return to full duty by her medical provider until December 6, 2017, she received workers' compensation wage replacement benefits from the City until that time. Ex. 17.

I declare on this 19th day of May, 2021, under penalty of perjury that the contained herein is true and correct.

_____

Patricia E. Lorman

## Time Detail

| Time Period: | 4/01/2017 - 1/31/2018 | | | Data Up to Date: | 2/15/2018 4:12:15 PM |
| Query: | Previously Selected Employee(s) | | | Executed on: | 2/15/2018 4:12PM GMT-07:00 |
| | | | | Printed for: | salaztd |
| Actual/Adjusted: | Show hours credited to this period only. | | | Insert Page Break After Each Employee: | No |

| Date/Time | Apply To | In Punch | In Exc | Out Punch | Out Exc | Override Amount | Adj/Ent Amount | Money Amount | Day Amount | Totaled Amount | Cum. Tot. Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|
| *Xfr/Move: Account* | | *Comment* | | | *Xfr: Work Rule* | | | | | | |
| 6/29/2017 | | 4:01:00 AM | | 2:21:00 PM | | | | | | 10:15 | 592:45 |
| | | | EV | | EV | | | | | | |
| 6/30/2017 | | 4:07:00 AM | | 12:16:00 PM | | | | | | 8:15 | 601:00 |
| | | | EV | | | | | | | | |
| 6/30/2017 | | 12:50:00 PM | | 2:32:00 PM | | | | | | 1:45 | 602:45 |
| 7/3/2017 | 6:00 AM | Personal Holiday | | | | | 8:00 | | | | 610:45 |
| 7/4/2017 | 8:00 AM | Holiday Pay | | | | | 8:00 | | | | 618:45 |
| 7/5/2017 | | 4:56:00 AM | | 11:28:00 AM | | | | | | 6:30 | 625:15 |
| | | | EV | | | | | | | | |
| 7/5/2017 | | 11:56:00 AM | | 2:22:00 PM | | | | | | 2:15 | 627:30 |
| | | | | | EV | | | | | | |
| 7/6/2017 | | 4:00:00 AM | | 12:10:00 PM | | | | | | 8:15 | 635:45 |
| | | | EV | | | | | | | | |
| 7/6/2017 | | 12:30:00 PM | | 2:35:00 PM | | | | | | 2:00 | 637:45 |
| 7/7/2017 | | 4:26:00 AM | | 10:28:00 AM | | | | | | 6:00 | 643:45 |
| | | | EV | | | | | | | | |
| 7/7/2017 | | 10:52:00 AM | | 1:46:00 PM | | | | | | 2:45 | 646:30 |
| | | | | | EV | | | | | | |
| 7/10/2017 | | 5:44:00 AM | | 3:11:00 PM | | | | | | 9:30 | 656:00 |
| | | | EV | | LV | | | | | | |
| 7/11/2017 | 12:00 AM | PTO Used | | | | | 8:00 | | | | 664:00 |
| 7/12/2017 | 12:00 AM | PTO Used | | | | | 8:00 | | | | 672:00 |
| 7/13/2017 | 12:00 AM | PTO Used | | | | | 8:00 | | | | 680:00 |
| 7/24/2017 | 8:00 AM | LV-DisabWC 80PCT | | | | | 8:00 | | | | 688:00 |
| 7/24/2017 | 8:00 AM | LV-FMLA | | | | | 8:00 | | | | 688:00 |
| 7/24/2017 | 8:00 AM | LV-WC | | | | | 8:00 | | | | 688:00 |
| 7/25/2017 | 8:00 AM | LV-DisabWC 80PCT | | | | | 8:00 | | | | 696:00 |
| 7/25/2017 | 8:00 AM | LV-FMLA | | | | | 8:00 | | | | 696:00 |
| 7/25/2017 | 8:00 AM | LV-WC | | | | | 8:00 | | | | 696:00 |
| 7/26/2017 | 8:00 AM | LV-DisabWC 80PCT | | | | | 8:00 | | | | 704:00 |

Exhibit
Dep 0020
1/13/2021
Emina Gerovic

## Time Detail

| | | | | |
|---|---|---|---|---|
| Time Period: | 4/01/2017 - 1/31/2018 | | Data Up to Date: | 2/15/2018 4:12:15 PM |
| Query: | Previously Selected Employee(s) | | Executed on: | 2/15/2018 4:12PM GMT-07:00 |
| Actual/Adjusted: | Show hours credited to this period only. | | Printed for: | salaztd |
| | | | Insert Page Break After Each Employee: | No |

| Date/Time | Apply To | In Punch | In Exc | Out Punch | Out Exc | Override Amount | Adj/Ent Amount | Money Amount | Day Amount | Totaled Amount | Cum. Tot. Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Xfr/Move: | Account | | Comment | | Xfr: Work Rule | | | | | | |
| 7/26/2017 | 8:00 AM | LV-FMLA | | | | | 8:00 | | | | 704:00 |
| 7/26/2017 | 8:00 AM | LV-WC | | | | | 8:00 | | | | 704:00 |
| 7/27/2017 | 8:00 AM | LV-DisabWC 80PCT | | | | | 8:00 | | | | 712:00 |
| 7/27/2017 | 8:00 AM | LV-FMLA | | | | | 8:00 | | | | 712:00 |
| 7/27/2017 | 8:00 AM | LV-WC | | | | | 8:00 | | | | 712:00 |
| 7/28/2017 | 8:00 AM | LV-DisabWC 80PCT | | | | | 8:00 | | | | 720:00 |
| 7/28/2017 | 8:00 AM | LV-FMLA | | | | | 8:00 | | | | 720:00 |
| 7/28/2017 | 8:00 AM | LV-WC | | | | | 8:00 | | | | 720:00 |
| 7/31/2017 | 8:00 AM | LV-DisabWC 80PCT | | | | | 8:00 | | | | 728:00 |
| 7/31/2017 | 8:00 AM | LV-FMLA | | | | | 8:00 | | | | 728:00 |
| 7/31/2017 | 8:00 AM | LV-WC | | | | | 8:00 | | | | 728:00 |
| 8/1/2017 | 8:00 AM | LV-DisabWC 80PCT | | | | | 8:00 | | | | 736:00 |
| 8/1/2017 | 8:00 AM | LV-FMLA | | | | | 8:00 | | | | 736:00 |
| 8/1/2017 | 8:00 AM | LV-WC | | | | | 8:00 | | | | 736:00 |
| 8/2/2017 | 8:00 AM | LV-DisabWC 80PCT | | | | | 8:00 | | | | 744:00 |
| 8/2/2017 | 8:00 AM | LV-FMLA | | | | | 8:00 | | | | 744:00 |
| 8/2/2017 | 8:00 AM | LV-WC | | | | | 8:00 | | | | 744:00 |
| 8/3/2017 | 8:00 AM | LV-DisabWC 80PCT | | | | | 8:00 | | | | 752:00 |
| 8/3/2017 | 8:00 AM | LV-FMLA | | | | | 8:00 | | | | 752:00 |
| 8/3/2017 | 8:00 AM | LV-WC | | | | | 8:00 | | | | 752:00 |
| 8/4/2017 | 8:00 AM | LV-DisabWC 80PCT | | | | | 8:00 | | | | 760:00 |
| 8/4/2017 | 8:00 AM | LV-FMLA | | | | | 8:00 | | | | 760:00 |
| 8/4/2017 | 8:00 AM | LV-WC | | | | | 8:00 | | | | 760:00 |
| 8/7/2017 | 8:00 AM | LV-DisabWC 80PCT | | | | | 8:00 | | | | 768:00 |
| 8/7/2017 | 8:00 AM | LV-FMLA | | | | | 8:00 | | | | 768:00 |
| 8/7/2017 | 8:00 AM | LV-WC | | | | | 8:00 | | | | 768:00 |
| 8/8/2017 | 8:00 AM | LV-DisabWC 80PCT | | | | | 8:00 | | | | 776:00 |
| 8/8/2017 | 8:00 AM | LV-FMLA | | | | | 8:00 | | | | 776:00 |
| 8/8/2017 | 8:00 AM | LV-WC | | | | | 8:00 | | | | 776:00 |
| 8/9/2017 | 8:00 AM | LV-DisabWC 80PCT | | | | | 8:00 | | | | 784:00 |
| 8/9/2017 | 8:00 AM | LV-FMLA | | | | | 8:00 | | | | 784:00 |
| 8/9/2017 | 8:00 AM | LV-WC | | | | | 8:00 | | | | 784:00 |
| 8/10/2017 | 8:00 AM | LV-DisabWC 80PCT | | | | | 8:00 | | | | 792:00 |
| 8/10/2017 | 8:00 AM | LV-FMLA | | | | | 8:00 | | | | 792:00 |
| 8/10/2017 | 8:00 AM | LV-WC | | | | | 8:00 | | | | 792:00 |
| 8/11/2017 | 8:00 AM | LV-DisabWC 80PCT | | | | | 8:00 | | | | 800:00 |
| 8/11/2017 | 8:00 AM | LV-FMLA | | | | | 8:00 | | | | 800:00 |
| 8/11/2017 | 8:00 AM | LV-WC | | | | | 8:00 | | | | 800:00 |
| 8/14/2017 | 8:00 AM | LV-DisabWC 80PCT | | | | | 8:00 | | | | 808:00 |
| 8/14/2017 | 8:00 AM | LV-FMLA | | | | | 8:00 | | | | 808:00 |
| 8/14/2017 | 8:00 AM | LV-WC | | | | | 8:00 | | | | 808:00 |
| 8/15/2017 | | 5:53:00 AM | | 12:00:00 PM | | | | | | 6:00 | 814:00 |
| 8/15/2017 | | 12:28:00 PM | | 2:30:00 PM | | | | | | 2:00 | 816:00 |

## Time Detail

| | | |
|---|---|---|
| Time Period: | 4/01/2017 - 1/31/2018 | |
| Query: | Previously Selected Employee(s) | |
| Actual/Adjusted: | Show hours credited to this period only. | |

| | |
|---|---|
| Data Up to Date: | 2/15/2018 4:12:15 PM |
| Executed on: | 2/15/2018 4:12PM GMT-07:00 |
| Printed for: | salaztd |
| Insert Page Break After Each Employee: | No |

| Date/Time | Apply To | In Punch | In Exc | Out Punch | Out Exc | Override Amount | Adj/Ent Amount | Money Amount | Day Amount | Totaled Amount | Cum. Tot. Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|
| *Xfr/Move: Account* | | *Comment* | | | *Xfr: Work Rule* | | | | | | |
| 8/16/2017 | | 5:51:00 AM | | 12:00:00 PM | | | | | | 6:15 | 822:15 |
| | | | EV | | | | | | | | |
| 8/16/2017 | | 12:26:00 PM | | 2:30:00 PM | | | | | | 2:00 | 824:15 |
| 8/17/2017 | | 5:43:00 AM | | 12:03:00 PM | | | | | | 6:15 | 830:30 |
| | | | EV | | | | | | | | |
| 8/17/2017 | | 12:31:00 PM | | 2:24:00 PM | | | | | | 2:00 | 832:30 |
| 8/18/2017 | | 5:40:00 AM | | 10:58:00 AM | | | | | | 5:15 | 837:45 |
| | | | EV | | | | | | | | |
| 8/18/2017 | | 11:25:00 AM | | 2:28:00 PM | | | | | | 3:00 | 840:45 |
| 8/21/2017 | | 5:46:00 AM | | 11:59:00 AM | | | | | | 6:15 | 847:00 |
| | | | EV | | | | | | | | |
| 8/21/2017 | | 12:25:00 PM | | 2:30:00 PM | | | | | | 2:00 | 849:00 |
| 8/22/2017 | | 5:30:00 AM | | 11:31:00 AM | | | | | | 6:00 | 855:00 |
| | | | EV | | | | | | | | |
| 8/22/2017 | | 11:58:00 AM | | 2:30:00 PM | | | | | | 2:30 | 857:30 |
| 8/23/2017 | | 5:33:00 AM | | 12:01:00 PM | | | | | | 6:30 | 864:00 |
| | | | EV | | | | | | | | |
| 8/23/2017 | | 12:30:00 PM | | 2:24:00 PM | | | | | | 2:00 | 866:00 |
| 8/24/2017 | | 5:31:00 AM | | 2:58:00 PM | | | | | | 9:30 | 875:30 |
| | | | EV | | | LV | | | | | |
| 8/25/2017 | | 5:43:00 AM | | 11:00:00 AM | | | | | | 5:15 | 880:45 |
| | | | EV | | | | | | | | |
| 8/25/2017 | | 11:29:00 AM | | 2:01:00 PM | | | | | | 2:30 | 883:15 |
| | | | EV | | | | | | | | |

## Time Detail

| | | | |
|---|---|---|---|
| Time Period: | 4/01/2017 - 1/31/2018 | Data Up to Date: | 2/15/2018 4:12:15 PM |
| Query: | Previously Selected Employee(s) | Executed on: | 2/15/2018 4:12PM GMT-07:00 |
| Actual/Adjusted: | Show hours credited to this period only. | Printed for: | salaztd |
| | | Insert Page Break After Each Employee: | No |

| Date/Time | Apply To | In Punch | In Exc | Out Punch | Out Exc | Override Amount | Adj/Ent Amount | Money Amount | Day Amount | Totaled Amount | Cum. Tot. Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Xfr/Move: Account | | Comment | | | Xfr: Work Rule | | | | | | |
| 8/28/2017 | | 5:31:00 AM | | 12:01:00 PM | | | | | | 6:30 | 889:45 |
| | | | EV | | | | | | | | |
| 8/28/2017 | | 12:26:00 PM | | 2:29:00 PM | | | | | | 2:00 | 891:45 |
| 8/29/2017 | | 5:31:00 AM | | 12:10:00 PM | | | | | | 6:45 | 898:30 |
| | | | EV | | | | | | | | |
| 8/29/2017 | | 12:41:00 PM | | 2:27:00 PM | | | | | | 1:45 | 900:15 |
| 8/30/2017 | | 5:28:00 AM | | 11:30:00 AM | | | | | | 6:00 | 906:15 |
| | | | EV | | | | | | | | |
| 8/30/2017 | | 11:57:00 AM | | 2:26:00 PM | | | | | | 2:30 | 908:45 |
| 8/31/2017 | | 5:27:00 AM | | 11:06:00 AM | | | | | | 5:30 | 914:15 |
| | | | EV | | | | | | | | |
| 8/31/2017 | | 11:34:00 AM | | 2:35:00 PM | | | | | | 3:00 | 917:15 |
| 9/1/2017 | | 5:29:00 AM | | 11:26:00 AM | | | | | | 6:00 | 923:15 |
| | | | EV | | | | | | | | |
| 9/1/2017 | | 12:08:00 PM | | 2:03:00 PM | | | | | | 1:45 | 925:00 |
| | | | | | EV | | | | | | |
| 9/4/2017 | 8:00 AM | Holiday Pay | | | | | 8:00 | | | | 933:00 |
| 9/5/2017 | | 5:25:00 AM | | 10:57:00 AM | | | | | | 5:30 | 938:30 |
| | | | EV | | | | | | | | |
| 9/5/2017 | | 11:27:00 AM | | 2:30:00 PM | | | | | | 3:00 | 941:30 |
| 9/6/2017 | | 5:13:00 AM | | 12:06:00 PM | | | | | | 6:45 | 948:15 |
| | | | EV | | | | | | | | |
| 9/6/2017 | | 12:33:00 PM | | 2:29:00 PM | | | | | | 2:00 | 950:15 |

## Time Detail

| | | | |
|---|---|---|---|
| Time Period: | 4/01/2017 - 1/31/2018 | Data Up to Date: | 2/15/2018 4:12:15 PM |
| Query: | Previously Selected Employee(s) | Executed on: | 2/15/2018 4:12PM GMT-07:00 |
| | | Printed for: | salaztd |
| Actual/Adjusted: | Show hours credited to this period only. | Insert Page Break After Each Employee: | No |

| Date/Time | Apply To | In Punch | In Exc | Out Punch | Out Exc | Override Amount | Adj/Ent Amount | Money Amount | Day Amount | Totaled Amount | Cum. Tot. Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Xfr/Move: Account | | Comment | | | Xfr: Work Rule | | | | | | |
| 9/7/2017 | | 5:26:00 AM | | 11:28:00 AM | | | | | | 6:00 | 956:15 |
| | | | EV | | | | | | | | |
| 9/7/2017 | | 11:58:00 AM | | 2:34:00 PM | | | | | | 2:30 | 958:45 |
| 9/8/2017 | | 5:34:00 AM | | 2:17:00 PM | | | | | | 8:45 | 967:30 |
| | | | EV | | EV | | | | | | |
| 9/11/2017 | | 5:32:00 AM | | 11:01:00 AM | | | | | | 5:30 | 973:00 |
| | | | EV | | | | | | | | |
| 9/11/2017 | | 11:29:00 AM | | 2:30:00 PM | | | | | | 3:00 | 976:00 |
| 9/12/2017 | | 5:27:00 AM | | 2:26:00 PM | | | | | | 9:00 | 985:00 |
| | | | EV | | | | | | | | |
| 9/13/2017 | | 5:26:00 AM | | 11:28:00 AM | | | | | | 6:00 | 991:00 |
| | | | EV | | | | | | | | |
| 9/13/2017 | | 11:57:00 AM | | 2:29:00 PM | | | | | | 2:30 | 993:30 |
| 9/14/2017 | | 5:40:00 AM | | 2:13:00 PM | | | | | | 8:30 | 1002:00 |
| | | | EV | | EV | | | | | | |
| 9/15/2017 | | 5:20:00 AM | | 11:31:00 AM | | | | | | 6:15 | 1008:15 |
| | | | EV | | | | | | | | |
| 9/15/2017 | | 11:56:00 AM | | 2:06:00 PM | | | | | | 2:00 | 1010:15 |
| | | | | | EV | | | | | | |
| 9/18/2017 | | 5:30:00 AM | | 11:00:00 AM | | | | | | 5:30 | 1015:45 |
| | | | EV | | | | | | | | |
| 9/18/2017 | | 11:30:00 AM | | 2:31:00 PM | | | | | | 3:00 | 1018:45 |
| 9/19/2017 | | 5:30:00 AM | | 11:00:00 AM | | | | | | 5:30 | 1024:15 |
| | | | EV | | | | | | | | |

## Time Detail

| | | | |
|---|---|---|---|
| Time Period: | 4/01/2017 - 1/31/2018 | Data Up to Date: | 2/15/2018 4:12:15 PM |
| Query: | Previously Selected Employee(s) | Executed on: | 2/15/2018 4:12PM GMT-07:00 |
| | | Printed for: | salaztd |
| Actual/Adjusted: | Show hours credited to this period only. | Insert Page Break After Each Employee: | No |

| Date/Time | Apply To | In Punch | In Exc | Out Punch | Out Exc | Override Amount | Adj/Ent Amount | Money Amount | Day Amount | Totaled Amount | Cum. Tot. Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|
| *Xfr/Move:* Account | | Comment | | | *Xfr:* Work Rule | | | | | | |
| 9/19/2017 | | 11:27:00 AM | | 2:30:00 PM | | | | | | 3:00 | 1027:15 |
| 9/20/2017 | | 5:35:00 AM | | 11:01:00 AM | | | | | | 5:30 | 1032:45 |
| | | | EV | | | | | | | | |
| 9/20/2017 | | 11:28:00 AM | | 1:08:00 PM | | | | | | 1:45 | 1034:30 |
| 9/20/2017 | | 1:09:00 PM | | 2:30:00 PM | | | | | | 1:15 | 1035:45 |
| 9/21/2017 | | 5:45:00 AM | | 10:45:00 AM | | | | | | 5:00 | 1040:45 |
| | | | EV | | EV | | | | | | |
| 9/21/2017 | 12:00 AM | ALV Business | | | | | 3:00 | | | | 1043:45 |
| 9/22/2017 | 12:00 AM | ALV Business | | | | | 6:30 | | | | 1050:15 |
| 9/25/2017 | 12:00 AM | ALV Business | | | | | 8:00 | | | | 1058:15 |
| 9/26/2017 | 12:00 AM | ALV Business | | | | | 8:00 | | | | 1066:15 |
| 9/27/2017 | 12:00 AM | ALV Business | | | | | 8:00 | | | | 1074:15 |
| 9/28/2017 | 12:00 AM | ALV Business | | | | | 8:00 | | | | 1082:15 |
| 9/29/2017 | 12:00 AM | ALV Business | | | | | 8:00 | | | | 1090:15 |
| 10/2/2017 | 12:00 AM | ALV Business | | | | | 8:00 | | | | 1098:15 |
| 10/3/2017 | 12:00 AM | ALV Business | | | | | 8:00 | | | | 1106:15 |
| 10/4/2017 | | 5:59:00 AM | | 12:00:00 PM | | | | | | 6:00 | 1112:15 |
| 10/4/2017 | | 12:30:00 PM | | 2:30:00 PM | | | | | | 2:00 | 1114:15 |
| 10/5/2017 | | 5:55:00 AM | | 11:59:00 AM | | | | | | 6:00 | 1120:15 |
| 10/5/2017 | | 12:30:00 PM | | 1:40:00 PM | | | | | | 1:15 | 1121:30 |
| | | | | | EV | | | | | | |
| 10/5/2017 | 12:00 AM | PTO Used | | | | | 1:00 | | | | 1122:30 |
| 10/6/2017 | | 5:58:00 AM | | 12:24:00 PM | | | | | | 6:30 | 1129:00 |
| 10/6/2017 | | 12:51:00 PM | | 2:30:00 PM | | | | | | 1:30 | 1130:30 |
| 10/9/2017 | | 5:56:00 AM | | 12:00:00 PM | | | | | | 6:00 | 1136:30 |
| 10/9/2017 | | 12:30:00 PM | | 2:00:00 PM | | | | | | 1:30 | 1138:00 |
| | | | | | EV | | | | | | |

CCD_0274
19-cv-03710-RM-NRN

## Time Detail

| | | | |
|---|---|---|---|
| Time Period: | 4/01/2017 - 1/31/2018 | Data Up to Date: | 2/15/2018 4:12:15 PM |
| Query: | Previously Selected Employee(s) | Executed on: | 2/15/2018 4:12PM GMT-07:00 |
| | | Printed for: | salaztd |
| Actual/Adjusted: | Show hours credited to this period only. | Insert Page Break After Each Employee: | No |

| Date/Time | Apply To | In Punch | In Exc | Out Punch | Out Exc | Override Amount | Adj/Ent Amount | Money Amount | Day Amount | Totaled Amount | Cum. Tot. Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Xfr/Move: | Account | | Comment | | Xfr: Work Rule | | | | | | |
| 10/10/2017 | | 5:54:00 AM | | 10:39:00 AM | | | | | | 4:45 | 1142:45 |
| | | | | | EV | | | | | | |
| 10/10/2017 | 12:00 AM | PTO Used | | | | | 3:30 | | | | 1146:15 |
| 10/11/2017 | 12:00 AM | PTO Used | | | | | 8:00 | | | | 1154:15 |
| 10/12/2017 | 12:00 AM | PTO Used | | | | | 8:00 | | | | 1162:15 |
| 10/13/2017 | 12:00 AM | PTO Used | | | | | 8:00 | | | | 1170:15 |
| 10/16/2017 | | 5:55:00 AM | | 11:59:00 AM | | | | | | 6:00 | 1176:15 |
| 10/16/2017 | | 12:28:00 PM | | 2:30:00 PM | | | | | | 2:00 | 1178:15 |
| 10/17/2017 | | 5:55:00 AM | | 12:00:00 PM | | | | | | 6:00 | 1184:15 |
| 10/17/2017 | | 12:30:00 PM | | 2:30:00 PM | | | | | | 2:00 | 1186:15 |
| 10/18/2017 | | 5:55:00 AM | | 11:53:00 AM | | | | | | 6:00 | 1192:15 |
| | | | | | EV | | | | | | |
| 10/18/2017 | 12:30 PM | PTO Used | | | | | 2:00 | | | | 1194:15 |
| 10/19/2017 | | 5:55:00 AM | | 11:38:00 AM | | | | | | 5:45 | 1200:00 |
| 10/19/2017 | | 12:07:00 PM | | 2:30:00 PM | | | | | | 2:15 | 1202:15 |
| 10/20/2017 | | 5:54:00 AM | | 8:00:00 AM | | | | | | 2:00 | 1204:15 |
| | | | | | EV, SE | | | | | | |
| 10/29/2017 | 12:00 AM | LV-FMLA (historical date: 10/20/2017) | | | | | 6:00 | | | | |
| 10/29/2017 | 12:00 AM | LV-FMLA (historical date: 10/26/2017) | | | | | 8:00 | | | | |
| 10/29/2017 | 12:00 AM | LV-FMLA (historical date: 10/25/2017) | | | | | 8:00 | | | | |
| 10/29/2017 | 12:00 AM | LV-FMLA (historical date: 10/27/2017) | | | | | 8:00 | | | | |
| 10/29/2017 | 12:00 AM | LV-FMLA (historical date: 10/23/2017) | | | | | 8:00 | | | | |
| 10/29/2017 | 12:00 AM | LV-FMLA (historical date: 10/24/2017) | | | | | 8:00 | | | | |
| 10/29/2017 | 12:00 AM | LV-Leave wo Pay (historical date: 10/26/2017) | | | | | 8:00 | | | | |
| 10/29/2017 | 12:00 AM | LV-Leave wo Pay (historical date: 10/24/2017) | | | | | 8:00 | | | | |
| 10/29/2017 | 12:00 AM | LV-Leave wo Pay (historical date: 10/25/2017) | | | | | 8:00 | | | | |
| 10/29/2017 | 12:00 AM | LV-Leave wo Pay (historical date: 10/23/2017) | | | | | 8:00 | | | | |
| 10/29/2017 | 12:00 AM | LV-Leave wo Pay (historical date: 10/27/2017) | | | | | 8:00 | | | | |

CCD_0275
19-cv-03710-RM-NRN

**171**

## Time Detail

| | |
|---|---|
| Time Period: | 4/01/2017 - 1/31/2018 |
| Query: | Previously Selected Employee(s) |
| Actual/Adjusted: | Show hours credited to this period only. |

| | |
|---|---|
| Data Up to Date: | 2/15/2018 4:12:15 PM |
| Executed on: | 2/15/2018 4:12PM GMT-07:00 |
| Printed for: | salaztd |
| Insert Page Break After Each Employee: | No |

| Date/Time | | Apply To | In Punch | In Exc | Out Punch | Out Exc | Override Amount | Adj/Ent Amount | Money Amount | Day Amount | Totaled Amount | Cum. Tot. Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *Xfr/Move:* | *Account* | | *Comment* | | | *Xfr:* | *Work Rule* | | | | | |
| 10/29/2017 | 12:00 AM | | LV-Leave wo Pay (historical date: 10/20/2017) | | | | | 6:00 | | | | |
| 10/29/2017 | 12:00 AM | | LV-WC (historical date: 10/26/2017) | | | | | 6:00 | | | | |
| 10/29/2017 | 12:00 AM | | LV-WC (historical date: 10/27/2017) | | | | | 8:00 | | | | |
| 10/29/2017 | 12:00 AM | | LV-WC (historical date: 10/23/2017) | | | | | 8:00 | | | | |
| 10/29/2017 | 12:00 AM | | LV-WC (historical date: 10/24/2017) | | | | | 8:00 | | | | |
| 10/29/2017 | 12:00 AM | | LV-WC (historical date: 10/25/2017) | | | | | 8:00 | | | | |
| 10/30/2017 | 6:00 AM | | LV-FMLA | | | | | 8:00 | | | | 1204:15 |
| 10/30/2017 | 6:00 AM | | LV-Leave wo Pay | | | | | 8:00 | | | | 1212:15 |
| 10/30/2017 | 6:00 AM | | LV-WC | | | | | 8:00 | | | | 1212:15 |
| 10/31/2017 | 6:00 AM | | LV-FMLA | | | | | 8:00 | | | | 1212:15 |
| 10/31/2017 | 6:00 AM | | LV-Leave wo Pay | | | | | 8:00 | | | | 1220:15 |
| 10/31/2017 | 6:00 AM | | LV-WC | | | | | 8:00 | | | | 1220:15 |
| 11/1/2017 | 6:00 AM | | LV-FMLA | | | | | 8:00 | | | | 1220:15 |
| 11/1/2017 | 6:00 AM | | LV-Leave wo Pay | | | | | 8:00 | | | | 1228:15 |
| 11/1/2017 | 6:00 AM | | LV-WC | | | | | 8:00 | | | | 1228:15 |
| 11/2/2017 | 6:00 AM | | LV-FMLA | | | | | 8:00 | | | | 1228:15 |
| 11/2/2017 | 6:00 AM | | LV-Leave wo Pay | | | | | 8:00 | | | | 1236:15 |
| 11/2/2017 | 6:00 AM | | LV-WC | | | | | 8:00 | | | | 1236:15 |
| 11/3/2017 | 6:00 AM | | LV-FMLA | | | | | 8:00 | | | | 1236:15 |
| 11/3/2017 | 6:00 AM | | LV-Leave wo Pay | | | | | 8:00 | | | | 1244:15 |
| 11/3/2017 | 6:00 AM | | LV-WC | | | | | 8:00 | | | | 1244:15 |
| 11/6/2017 | 6:00 AM | | LV-FMLA | | | | | 8:00 | | | | 1244:15 |
| 11/6/2017 | 6:00 AM | | LV-Leave wo Pay | | | | | 8:00 | | | | 1252:15 |
| 11/6/2017 | 6:00 AM | | LV-WC | | | | | 8:00 | | | | 1252:15 |
| 11/7/2017 | 6:00 AM | | LV-FMLA | | | | | 8:00 | | | | 1252:15 |
| 11/7/2017 | 6:00 AM | | LV-Leave wo Pay | | | | | 8:00 | | | | 1260:15 |
| 11/7/2017 | 6:00 AM | | LV-WC | | | | | 8:00 | | | | 1260:15 |
| 11/8/2017 | 6:00 AM | | LV-FMLA | | | | | 8:00 | | | | 1260:15 |
| 11/8/2017 | 6:00 AM | | LV-Leave wo Pay | | | | | 8:00 | | | | 1268:15 |
| 11/8/2017 | 6:00 AM | | LV-WC | | | | | 8:00 | | | | 1268:15 |
| 11/9/2017 | 6:00 AM | | LV-FMLA | | | | | 8:00 | | | | 1268:15 |
| 11/9/2017 | 6:00 AM | | LV-Leave wo Pay | | | | | 7:45 | | | | 1276:00 |
| 11/9/2017 | 6:00 AM | | LV-WC | | | | | 8:00 | | | | 1276:00 |
| 11/9/2017 | 1:45 PM | | LV-PTO | | | | | 0:15 | | | | 1276:15 |
| 11/10/2017 | 6:00 AM | | LV-FMLA | | | | | 8:00 | | | | 1276:15 |
| 11/10/2017 | 6:00 AM | | LV-Holiday | | | | | 8:00 | | | | 1284:15 |
| 11/10/2017 | 6:00 AM | | LV-WC | | | | | 8:00 | | | | 1284:15 |
| 11/13/2017 | 6:00 AM | | LV-FMLA | | | | | 8:00 | | | | 1284:15 |
| 11/13/2017 | 6:00 AM | | LV-PTO | | | | | 0:15 | | | | 1284:30 |
| 11/13/2017 | 6:00 AM | | LV-WC | | | | | 8:00 | | | | 1284:30 |
| 11/13/2017 | 6:15 AM | | LV-Leave wo Pay | | | | | 7:45 | | | | 1292:15 |
| 11/14/2017 | 6:00 AM | | LV-FMLA | | | | | 8:00 | | | | 1292:15 |
| 11/14/2017 | 6:00 AM | | LV-Leave wo Pay | | | | | 8:00 | | | | 1300:15 |
| 11/14/2017 | 6:00 AM | | LV-WC | | | | | 8:00 | | | | 1300:15 |

## Time Detail

| Time Period: | 4/01/2017 - 1/31/2018 | Data Up to Date: | 2/15/2018 4:12:15 PM |
| Query: | Previously Selected Employee(s) | Executed on: | 2/15/2018 4:12PM GMT-07:00 |
| | | Printed for: | salaztd |
| Actual/Adjusted: | Show hours credited to this period only. | Insert Page Break After Each Employee: | No |

| Date/Time | Apply To | In Punch | In Exc | Out Punch | Out Exc | Override Amount | Adj/Ent Amount | Money Amount | Day Amount | Totaled Amount | Cum. Tot. Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|
| *Xfr/Move: Account* | | *Comment* | | | *Xfr: Work Rule* | | | | | | |
| 11/15/2017 | 6:00 AM | LV-FMLA | | | | | 8:00 | | | | 1300:15 |
| 11/15/2017 | 6:00 AM | LV-Leave wo Pay | | | | | 8:00 | | | | 1308:15 |
| 11/15/2017 | 6:00 AM | LV-WC | | | | | 8:00 | | | | 1308:15 |
| 11/16/2017 | 6:00 AM | LV-FMLA | | | | | 8:00 | | | | 1308:15 |
| 11/16/2017 | 6:00 AM | LV-Leave wo Pay | | | | | 8:00 | | | | 1316:15 |
| 11/16/2017 | 6:00 AM | LV-WC | | | | | 8:00 | | | | 1316:15 |
| 11/17/2017 | 6:00 AM | LV-FMLA | | | | | 8:00 | | | | 1316:15 |
| 11/17/2017 | 6:00 AM | LV-Leave wo Pay | | | | | 8:00 | | | | 1324:15 |
| 11/17/2017 | 6:00 AM | LV-WC | | | | | 8:00 | | | | 1324:15 |
| 11/20/2017 | 6:00 AM | LV-FMLA | | | | | 4:00 | | | | 1324:15 |
| 11/20/2017 | 6:00 AM | LV-Leave wo Pay | | | | | 4:00 | | | | 1328:15 |
| 11/20/2017 | 6:00 AM | LV-WC | | | | | 4:00 | | | | 1328:15 |
| 11/20/2017 | | 7:54:00 AM | | 10:30:00 AM | | | | | | 2:30 | 1330:45 |
| | | | LV | | EV, SE | | | | | | |
| 11/21/2017 | 6:00 AM | LV-FMLA | | | | | 4:00 | | | | 1330:45 |
| 11/21/2017 | 6:00 AM | LV-Leave wo Pay | | | | | 4:00 | | | | 1334:45 |
| 11/21/2017 | 6:00 AM | LV-WC | | | | | 4:00 | | | | 1334:45 |
| 11/21/2017 | | 7:54:00 AM | | 12:00:00 PM | | | | | | 4:00 | 1338:45 |
| | | | LV | | EV | | | | | | |
| 11/22/2017 | 6:00 AM | LV-FMLA | | | | | 4:00 | | | | 1338:45 |
| 11/22/2017 | 6:00 AM | LV-Leave wo Pay | | | | | 4:00 | | | | 1342:45 |
| 11/22/2017 | 6:00 AM | LV-WC | | | | | 4:00 | | | | 1342:45 |
| 11/22/2017 | | 8:00:00 AM | | 11:53:00 AM | | | | | | 4:00 | 1346:45 |
| | | | LV | | EV | | | | | | |
| 11/23/2017 | 6:00 AM | Holiday Pay | | | | | 8:00 | | | | 1354:45 |
| 11/24/2017 | 6:00 AM | LV-FMLA | | | | | 4:00 | | | | 1354:45 |
| 11/24/2017 | 6:00 AM | LV-Leave wo Pay | | | | | 3:45 | | | | 1358:30 |
| 11/24/2017 | 6:00 AM | LV-WC | | | | | 4:00 | | | | 1358:30 |
| 11/24/2017 | 9:45 AM | LV-Admin Leave Ex Perf | | | | | 0:15 | | | | 1358:45 |
| 11/27/2017 | 12:00 AM | ALV Exemp Perf Adj | | | | | -3:45 | | | | 1358:45 |
| | | *Separation* | | | | | | | | | |
| 11/27/2017 | 12:00 AM | ALV Exemplary Perf | | | | | 4:00 | | | | 1362:45 |
| 11/27/2017 | 12:00 AM | PTO Adjustment | | | | | -65:15 | | | | 1362:45 |
| | | *Separation* | | | | | | | | | |
| 11/28/2017 | 12:00 AM | LV-FMLA | | | | | 4:00 | | | | 1362:45 |
| 11/29/2017 | 12:00 AM | LV-WC | | | | | 4:00 | | | | 1362:45 |
| 11/30/2017 | 12:00 AM | LV-Leave wo Pay | | | | | 4:00 | | | | 1366:45 |
| Labor Account Summary | | | | Pay Code | | | Hours | | Money | | Days |

# FINAL ADMISSION OF LIABILITY

| | |
|---|---|
| Workers' Compensation (WC) # 5-052-038 | Average Weekly Wage $ 587.20 |
| Claimant's Name EMINA GEROVIC | Date First Payment of TTD SUBJECT TO C.R.S. 8-42-124(2) |
| Social Security # XXX-XX-7728 | Date of MMI 03/05/2018 |
| Date of Injury 07/07/2017 | Date First Payment of PPD 05/16/2018 |
| Carrier Claim # 17-2125 | Employer City and County of Denver - GENERAL SERVICES |
| Insurance Carrier Self-Insured | Third Party Administrator N/A |

**RECEIVED APR 16 2019 BY:** _(stamp)_

## NOTICE TO CLAIMANT:

This Final Admission of Liability is a legal document listing benefits that have been or will be paid. You have the right to disagree or object to benefits admitted or not admitted. If you do not object to this admission within 30 calendar days of the date of the final admission, your file will automatically close. Objection information is attached.

If you disagree with the benefits admitted or not admitted you must do the following:

1.  Within 30 days, complete the attached objection form or write a letter to the Division of Workers' Compensation, 633 17th St., Suite 400, Denver, CO 80202-3660 with a copy to the insurance carrier or self-insured employer stating that you object to this admission. You must also file an application for hearing with the Office of Administrative Courts on any disputed issues.
2.  Within the same 30 days, if you disagree with the date of MMI or whole person impairment rating, complete the attached I. Notice and Proposal and II. Application for a Division Independent Medical Examination (DIME) and send it to the insurance carrier or self-insured employer and the Division.
3.  If a DIME is requested, you are not required to file an application for hearing until after the DIME is completed.

See page 2 for codes, definitions and other important notices.

| BENEFIT SUMMARY (Check box & list amount for admitted benefits) | | PPD CALCULATION: 208 x $297.56 x 14% = 8,664.94 | | | |
|---|---|---|---|---|---|
| | | Permanent Partial Disability (PPD): | | | |
| ☑ Medical to Date (total) $ 16,650.65 | | | | | |
| ☑ Disfigurement (total) $ 2,275.00 | | Whole Person Impairment -0- | % | Age N/A | |
| ☐ Vocational Rehabilitation Services (total) $ -0- | | or | | | |
| ☑ Temporary Total Disability (TTD) (total) $ 5,816.13 | | Scheduled Impairment 14 | % | Part of Body Code L-23 | |
| ☑ Temporary Partial Disability (TPD) (total) $ 634.72 | | Scheduled Impairment -0- | % | Part of Body Code N/A | |
| ☐ Stipulation $ N/A | | (See page 2 for Part of Body Codes) | | | |
| ☐ Permanent Total Disability (PTD) $ -0- | | | | | |
| ☐ Safety Rule Violation  ☐ Offset (Attach Calculation) | | Waiting Period Dates: | | | |

Admit to Maintenance Care after MMI? ☐ Yes ☑ No Pursuant to Dr. LINDENBAUM 's medical report dated 10/19/2018

Remarks and basis for permanent disability award:

PER ATTACHED FINDINGS OF FACT, CONCLUSIONS, AND ORDER BY ADJ MECHECK DATED 3/19/19.

ANY AND ALL BENEFITS AND PENALTIES NOT SPECIFICALLY ADMITTED IN THIS FINAL ADMISSION OF LIABILITY ARE HEREBY SPECIFICALLY DENIED.

(Attach additional pages, if needed)

### BENEFIT HISTORY

| Type of Benefits | | Time Periods | | Weeks | | Rate per Week | | Totals |
|---|---|---|---|---|---|---|---|---|
| **TTD | 07/11/2017 | through | 08/14/2017 | = 5 | x | $ 391.47 | = $ | 1,957.35 |
| TPD | 10/20/2017 | through | 10/22/2017 | = 3/7 | x | $ 371.89 | = $ | 159.38 |
| TTD | 10/23/2017 | through | 11/19/2017 | = 4 | x | $ 391.47 | = $ | 1,565.88 |
| TPD | 11/20/2017 | through | 12/06/2017 | = 2 3/7 | x | $ 195.73 | = $ | 475.34 |
| TTD | 01/24/2018 | through | 03/05/2018 | = 5 6/7 | x | $ 391.47 | = $ | 2,292.90 |
| PPD | 03/05/2018 | through | 09/24/2018 | = 29 1/7 | x | $ 297.56 | = $ | 8,664.94 |
| DSF | 03/22/2019 | through | 3/22/2019 | = | x | $ | = $ | 2,275.00 |

The above time periods include the dates specified.

| | Amount of Interest Paid $ -0- |
|---|---|
| | Amount of Penalties Paid $ -0- |
| (Attach additional pages, if needed) | Amount Overpaid $ -0-    (See Remarks) |

| Claims Representative PATRICIA LORMAN | Phone # 720-913-3330 | Toll-Free Phone # 1-877-430-5515 |
|---|---|---|
| Address 201 W. Colfax Avenue, Dept 1105, Denver, CO 80202 | | |

CERTIFICATE OF MAILING: Copies of this document were placed in the U.S. mail or delivered to the following parties this 16th day of APRIL , 2019 .

Agency: 201 W. COLFAX AVE.   ATTN: CLAUDIA CHAVEZ (VIA EMAIL)

List names and addresses of all persons copied:

| | | | | |
|---|---|---|---|---|
| Claimant: EMINA GEROVIC | 6514 BENTON CIR. | ARVADA | CO | 80003 |
| Claimant's Attorney: DAVID L. WORSTELL | 1626 WASHINGTON ST., DENVER, CO 80203 | | | |
| Employer: City and County of Denver - GENERAL SERVICES | 201 W. Colfax Avenue #1105, Denver, CO 80202 | | | |
| Carrier's Attorney: J.P. MOON | 201 W. COFAX AVENUE #1108, DENVER, CO 80202 | | | |

Division of Workers' Compensation, 633 17th St., Suite 400, Denver, CO 80202-2616

By: _(signatures)_

Signature

| | |
|---|---|
| Block # 976 | Adj. Code |

WC4 Rev 01/15/19

Page 1 of 7 See page 2 for important notices and codes

**174**

000044

1   she made any threats to Mr. Robinson.  She was begging for

2   her job to stay where she was working, because she knew that

3   the removal had nothing to do with staffing.  It was

4   punitive.

5          When she was sent on administrative leave, there

6   were posters that were put up in the office buildings of the

7   City.  BOLO posters, be on the look-out posters.  And the

8   evidence will show that on a date of a BOLO poster, October

9   the 3rd, at the bottom of the poster it indicates, "This

10  person no longer works for the Agency."

11         Our position is that it's true.  That decision's

12  been made.  She no longer worked for the Agency.  They just

13  didn't terminate her until they went through the proper

14  channels and had an October 31st disciplinary meeting in

15  which not one member that attended said a word.

16         This was a person that had been out, that had a bad

17  injury.  This was a person whose intent by the Agency was to

18  find a way in which to have her exit, and that is what

19  happened.  She was terminated on November 27th.

20         Thanks.

21         THE HEARING OFFICER:  First witness for the Agency,

22  please.

23         MS. FELTON:  Anna Forsberg, please.

24         THE HEARING OFFICER:  Good morning, Ms. Forsberg.

25  Have a seat over there, please.

**000045**

```
 1              And would you raise your right hand for me?
 2              ANNA FORSBERG, having been called as a witness,
 3     after being duly sworn, testified as follows:
 4              THE HEARING OFFICER:  Thank you.  And feel free to
 5     adjust the chair.  I saw you starting to do that.  And
 6     there's water there.
 7              And your witness.
 8              MS. FELTON:  Thank you.
 9                       DIRECT EXAMINATION
10     BY MS. FELTON:
11         Q    Would you please state your name for the record and
12     spell your last name?
13         A    Anna Forsberg, F-O-R-S-B-E-R-G.
14         Q    Ms. Forsberg, what's your current position?
15         A    I am the recruiting manager for the City and County
16     of Denver.
17         Q    Are you part of Human Resources?
18         A    I am.
19         Q    And how long have you been in that position?
20         A    About two years.
21         Q    What are your duties in that position?
22         A    I lead the recruiting team, and we fill all the
23     vacancies for the City and County of Denver.
24         Q    Do you have any relationship to the Facilities
25     Management Agency?
```

**176**

000046

```
 1      A      No.

 2      Q      Did you have an occasion to review the Facebook

 3 page of Emina Gerovic?

 4      A      Yes.

 5      Q      How did you come to do that?

 6      A      The information came to me randomly.  I verified--

 7 or I looked at it, saw that the--what the information was all

 8 about, that someone misrepresented themselves publicly on

 9 Facebook as a law enforcement officer, and I gave it to the

10 HR representative that helped that group.

11      Q      How did that information come to your attention?

12      A      Randomly through my daycare provider.

13      Q      Are you aware of any relationship between your

14 daycare provider and Ms. Gerovic?

15      A      No.

16      Q      Did you provide any documentation that you found on

17 the Facebook page?

18      A      Yeah, I took a screenshot and emailed it to Anne

19 Carter.

20      Q      If you will look at Exhibit 14-1 at the bottom.  Is

21 that the email that you sent to Ms. Carter?

22      A      Yes.

23      Q      Was there an attachment or--you said a screenshot,

24 I think?

25      A      Yeah.  I don't know if it's an attachment or if
```

**Subject:** RE: OHR internal policies/info

Anne,

Typical City protocol in this instance?
- Contact manager to discuss
  - Determine next steps (i.e. talk with employee, or contemplation process)

Christina

---

**From:** Carter, Anne M. - OHR Service Group GS OED C&R
**Sent:** Friday, September 8, 2017 2:58 PM
**To:** Howard, Christina - OHR CA2992 Senior Human Resources Business <Christina.Howard@denvergov.org >
**Subject:** FW: OHR internal policies/info

Christina,
This is the facebookinformaton that came to Anna Forebergs attention rgarding Emina Gerovic, as a misrepresentation. She is a custodain for FM that works at a Police District.
**Anne Carter** | Senior HR Business Partner
Office of Human Resources | City and County of Denver
p: (720) 913-0757 | c: (720) 236-2862 | anne.carter@denvergov.org
PRIVILEGED AND CONFIDENTIAL COMMUNICATION

---

**From:** Forsberg, Anna M. - OHR Talent Acquisition
**Sent:** Friday, September 08, 2017 1:44 PM
**To:** Carter, Anne M. - OHR Service Group GS OED C&R <Anne.Carter@denvergov.org >
**Subject:** RE:

Here you go:





02617

Enes Emina Gerovic

Follow

Timeline About Friends Photos More ▾

DO YOU KNOW ENES EMINA?

Follow Enes Emina to get her public posts in your News Feed.

Intro

Works at Denver Police District 5

Works at Denver Police Department : Traffic Operations

Police Officer at Denver Police Department (Colorado)

Went to Gimnazija "Mesa Selimovic"

Married

From Donja Tuzla, Federation Of Bosnia And Herzegovina, Bosnia And Herzegovina

Enes Emina Gerovic

5 hrs

My loves

Enes Emina's August Memories

02346

Appellate Case: 22-1148     Document: 010110728980     Date Filed: 08/23/2022     Page: 181



9/11/2017                                                          Enes Emina Gerovic

**Enes Emina Gerovic**

**Enes Emina Gerovic**

Timeline   About   Friends   Photos   More

DO YOU KNOW ENES EMINA?

Follow Enes Emina to get her public posts in your News Feed.

**Intro**

Works at Denver Police District 5

Works at Denver Police Department : Traffic Operations

Police officer at Denver Police Department (Colorado)

Went to Gimnazija "Mesa Selimovic"

Married

From Donja Tuzla, Federation Of Bosnia And Herzegovina, Bosnia And Herzegovina

Followed by 40 people

**Photos**

Enes Emina Gerovic shared NatashasKitchen.com's video.
13 hrs ·

576,443 Views

NatashasKitchen.com added a new video: Zucchini Fritters.    Like Page
July 7 ·

Zucchini Fritters
RECIPE: http://bit.ly/zucchinifrittersrecipe

Like          Share

2

Enes Emina Gerovic shared NatashasKitchen.com's video.
13 hrs ·

Turn on chat to see who's available.

Search

02348

**181**

Appellate Case: 22-1148   Document: 010110728980   Date Filed: 08/23/2022   Page: 182



9/11/2017                              Enes Emina Gerovic

**Enes Emina Gerovic**

Timeline   **About**   Friends   Photos   More

## About

Follow Enes Emina to get her public posts in your News Feed.

Overview
**Work and Education**
Places She's Lived
Contact and Basic Info
Family and Relationships
Details About Enes Emina
Life Events

**WORK**

**Denver Police District 5**

**Denver Police Department : Traffic Operations**

**Denver Police Department (Colorado)**
Police officer · Denver, Colorado

**Tuzla Canton**

**EDUCATION**

**Gimnazija "Mesa Selimovic"**
Tuzla Canton

## Friends

All Friends   Recently Added   Current City   Hometown   Followers   Following      Search Friends

**Edina Muslimovic**        Add Friend

**Nasiha Ramadanovic**        Add Friend
Works at Oriflame

**Luis R Sprayberry**        Add Friend
Vysokolan

**Jasmine Sprayberry**
Longmont, Colorado

Turn on chat to see who's
available.

Search

https://www.facebook.com/enes.gera/about?lst=100004169769390%3A100004871851095%3A1505148263&section=education&pnref=about        1/2

02349

**182**

Appellate Case: 22-1148      Document: 010110728980      Date Filed: 08/23/2022      Page: 183

9/11/2017                                            Enes Emina Gerovic





Enes Emina Gerovic
Follow · May 28, 2015 ·

Like      Share

46

View 13 more comments

Edžavit Winkler-Žapčanin Soon i hope
Like · May 28, 2015 at 9:36pm

Enes Emina Gerovic Ma ja ne vjerujem dok te ne
vidim
See Translation
Like · 1 · May 28, 2015 at 9:37pm

Enes Emina Gerovic

Like · 1 · May 28, 2015 at 9:37pm
Alisa Atic ljubav moja draga ♥
See Translation
Like · May 28, 2015 at 10:33pm

Edžavit Winkler-Žapčanin Nepaši dođe tebi tvoj
medeni
See Translation
Like · May 28, 2015 at 10:55pm

Shamsul Huda Nisto mogli zaboravili da ste

02350

Appellate Case: 22-1148     Document: 010110728980     Date Filed: 08/23/2022     Page: 184

9/11/2017                                    Enes Emina Gerovic



02351

**184**

Appellate Case: 22-1148     Document: 010110728980     Date Filed: 08/23/2022     Page: 185

9/11/2017                                                Enes Emina Gerovic



02352

Appellate Case: 22-1148 Document: 010110728980 Date Filed: 08/23/2022 Page: 186

Enes Emina Gerovic
Follow · September 14, 20

Share

53

View 7 more comments

Enisa Mujagic Poljubac za n
See Translation
September 15, 2014 at 3:00p

Enes Emina Gerovic Poljub
Enisu
September 15, 2014 at 7:54p

Enisa Mujagic Tebi i tvojima
Tuzle od moje mame,Sende,
See Translation
September 15, 2014 at 11:00

Enes Emina Gerovic Ljepoti
slike kazi him vidimo se u ma
drage
See Translation
September 16, 2014 at 6:23a

Sahza Zimic Sneho nemoj d
tom znackom...
See Translation
September 17, 2014 at 1:19p

Enes Emina Gerovic Ma ne
rodice. Ljubim ja tebe
See Translation
September 17, 2014 at 5:52p

Appellate Case: 22-1148   Document: 010110728980   Date Filed: 08/23/2022   Page: 187

9/11/2017                                        Enes Emina Gerovic





Enes Emina Gerovic
Follow · October 21, 2015 ·

Works all day

Like        Share

22

Jasmine Sprayberry My beautiful mama
Like ·   1 · October 21, 2015 at 10:23am

Enes Emina Gerovic I love you my pretty princess
Like · October 21, 2015 at 12:22pm

Ivana Jakovljevic ♡♡♡♡♡
Like ·   1 · October 21, 2015 at 1:45pm

Buy and Sell Groups Near You

NUEVO MIL ANUNCIOS(the Original)                    Join
25,021 members

https://www.facebook.com/photo.php?fbid=511437223362002&set=pb.100004871851095.-2207520000.1505148434.&type=3&theater                    1/1

02354



**DENVER**
THE MILE HIGH CITY

Department of General Services
Facilities Management
201 W. Colfax Avenue Dept. 904
Denver, CO 80202
p: 720-865-8680
f: 720-865-7585

September 19, 2017

Ms. Emina Gerovic, Employee ID #136832
6514 Benton Circle
Arvada, CO 80003

**RE: Notification of Contemplation of Disciplinary Action**



Dear Ms. Gerovic:

This is official notification that disciplinary action is being contemplated against you for alleged misconduct that may violate the following Career Service Rules:

<u>16-29, Grounds for Discipline</u>

The following may be cause for the discipline or dismissal of a Career Service employee:

A.    Neglect of duty or carelessness in performance of duties and responsibilities.

D.    Any act of dishonesty, which may include, but is not limited to, lying, or improperly altering or falsifying records, examination answers, or work hours.

I.    Failure to maintain satisfactory working relationships with co-workers and other individuals the employee interacts with as part of his or her job.

R.    Conduct which violates the Career Service Rules, the City Charter, the Denver Revised Municipal Code, Executive Orders, written departmental or agency regulations, policies or rules, or any other applicable legal authority.  When citing this subsection, a department or agency must cite the specific regulation, policy or rule the employee has violated.

<u>Facilities Management Administrative Policies, February 2014</u>

**EMPLOYEE CONDUCT**

As a representative of General Services/Facilities Management and the CCD, you are a public servant and a role model for all community members. That means that you are held to a high standard of excellence and professionalism. All Division staff are expected to comply with the CCD standards at all times.

- Every City employee shall conscientiously fulfill the duties and responsibilities of their position. The conduct of every employee shall reflect credit on Career Service (CS) and the CCD during work hours or at any time while representing the agency, Division, or CCD

Emina Gerovic – Page 1

CCD_0075
19-cv-03710-RM-NRN

S.    Refusal to cooperate, including refusing to provide requested information and materials relevant to an investigation.

T.    Conduct which is or could foreseeably:

1.    Be prejudicial to the good order and effectiveness of the department or agency;

    2.    Bring disrepute on or compromises the integrity of the City; or

3.    Be unbecoming of a City employee.

You are employed by Facilities Management within General Services for the City and County of Denver (CCD), as a Custodian. Your original hire date with CCD was August 11, 2014.  According to your Career Service job specification, the general duties of your position are to perform standard level interior and exterior janitorial/minor maintenance duties involving cleaning and disinfecting all areas assigned, including restrooms, locker rooms, break rooms, holding cells and all office areas. Your normal work hours are from 6:00 A.M. to 2:30 P.M. except when your schedule is adjusted for other coverage. You are currently assigned to work Police District Five.  You have personal accountability for carrying out assigned functions within the scope of established guidelines and objectives.

Per the Facilities Management (FM) Policy manual, as a representative of General Services/Facilities Management and of the City and County of Denver (CCD), you are a public servant and a role model for all community members. That means that you are held to a high standard of excellence and professionalism. All Division staff are expected to comply with the CCD standards at all times.

The following is a summary but not an exhaustive description of the alleged misconduct for which discipline is being contemplated:

You have previously been coached, counseled, and disciplined for not meeting performance expectations, not following FM Administrative Policies, being out of uniform, not following City Safety Policies, personal/inappropriate use of your City-issued cell phone, not providing acceptable level of customer service, acts of dishonesty and conduct that may bring disrepute on or compromises the integrity of the City.

Your disciplinary history includes:

| | | |
|---|---|---|
| 9/21/15 | Verbal Reprimand | Multiple violations of failure to follow safety policies |

You have also had several documented issues as noted below:

| | | |
|---|---|---|
| 10/1/15 | Verbal Warning | Poor work performance, poor customer service |
| 6/13/16 | Documented Counseling | Excessive personal use of cell phone and inappropriate use of work time |
| 3/17/17 | Documented Counseling | Using personal cell phone for City business and not having City cell phone charged, on person nor voice mail box set up. |
| 5/4/2017 | Written Reprimand | Dishonesty, violating respectful workplace, misconduct, unprofessional and discourteous conduct toward the public. |

Emina Gerovic –  Page 2

On Monday, September 11, 2017, I was notified by Office of Human Resources (OHR) of concerning content on your public Facebook profile which had been brought to the attention of the OHR (See Attachment 1).

Your profile is of concern as you list the Denver Police Department as your employer and list your occupation as "Police Officer". Upon reviewing your public Facebook profile, I noticed you also posted several pictures in 2015 showing yourself wearing a sweatshirt with a Denver Police Department embroidered badge, wearing a patrolman's hat, wearing a t-shirt with an embroidered DPD patch and a close-up photo of your DPD-issued access card that also features a DPD badge.

On September 12, 2017, you were asked to come to the Webb Building for a discussion with me. Upon showing you the print-outs from your Facebook profile, your first reply was, "I don't know what the problem is, I am in my Facilities Managment uniform, look I even have my safety shoes on." I informed you that we are addressing the fact that you list the Denver Police Department as your employer and have identified your occupation as a Police Officer. When I asked about your self-identification as a Police Officer, you replied, "I do not know how that got there". When asked about the pictures in DPD uniforms, you replied, "Those were just for fun a long time ago".

I then informed you that you are expected to remove the inaccurate employment information and if you are going to list your employment information, it is factual to state that you are a custodian with Facilities Management. I then instructed you to return to work. While in route, I called you to request you to report instead to the Internal Affairs office at the Police Administration Building regarding the content on your Facebook profile.

You were interviewed by Sgt. Steinke on September 12, 2017 and the report is attached (Attachment 2). The report indicates you received the sweatshirt from an unidentified Police Officer as a gift. You state that the pictures with you wearing a patrolman's hat were the result of you being "told" to put on the hat on by Officer Ray. You also state that picture of you in a gray t-shirt displays a DPD sticker given to you.

In 2015, you were given a verbal warning for wearing a gray DPD sweatshirt while on the clock at the PAB, as it is not part of your FM uniform and it could create problems if you were misidentified as a police officer. At the time, you indicated you wore it because you were so proud to work for the DPD. I clarified to you that you do not work for DPD, you are assigned to clean a police building. You implied you were following a police order to put on the hat and then a picture was taken. You state the badge on the gray shirt was a sticker, when, in fact, it is clearly an embroidered patch. There is no acceptable explanation to list your employer as DPD Traffic Operations. In fact, you have not been assigned there at any time during your employment, as we have contractors cleaning that facility.

False public self-identification as a Police Officer is both troubling and unacceptable. In your position as a custodian, you routinely interact with members of the public. By wearing clothing items that have police badges, posting pictures of you in various police issued clothing and posting a copy of your police building access card, you can create public confusion regarding your role, responsibilities and duties. It can also be dangerous to you and the public, should someone need police assistance or intervention and come to you for help.

Representing yourself as a police officer, for whatever reason whether for a joke, or to impress others, is not only deceitful but could be perceived as impersonating a police officer which is a serious offense. I would expect that it would be enough of an honor to work for the City and County of Denver and provide support services to the Denver Police Department.

Emina Gerovic –  Page 3

CCD_0077
19-cv-03710-RM-NRN

Most important you are expected to accurately represent your role with the City and County of Denver and provide truthful and forthcoming when asked for information or provide information during a report on an incident.  It is the expectation of FM Management and DPD that any inaccurate information be removed from your Facebook Profile.

The Contemplation of Discipline meeting will be held on 28, September 2017 at 1:00 p.m. at the Webb building, in the 6.H.16 conference room on the 6th floor.

The purposes of this meeting are to allow you to correct any errors in our information or facts, to tell your side of the story and to present any mitigating information as to why possible disciplinary action should not be taken.  You are entitled to have a representative of your own choosing present at this meeting.  To ensure an accurate record of this meeting, it will be audio recorded.

You may present a written and/or verbal statement at this meeting.  Your statement, prior disciplinary history and work record will be given full consideration before a final decision is made regarding any disciplinary action.  Please note, no decision regarding any action has been made nor will be made until the meeting has concluded.

If you and/or your representative fail to appear at the scheduled time, I may consider such failure to appear as a waiver of your right to a Contemplation of Discipline meeting under the Career Service Rules.

Please be advised that you are not to take any retaliatory action against anyone as a result of this contemplation of discipline letter.  If any such action is taken, further discipline may be contemplated and taken, up to and including dismissal.

Respectfully,

LeRoy Lemos
Facilities Management Operations Supervisor

Enclosure(s):  Public Facebook profile, public Facebook pages, DPD inter-office memo, written reprimand.

cc:    Kevin O'Neil, Facilities Administrative Officer
       James Williamson, Facilities Director
       Murphy Robinson, General Services Executive Director
       Human Resources
       OHR Personnel File
       Department/Agency Personnel File

Emina Gerovic –  Page 4

CCD_0078
19-cv-03710-RM-NRN

CERTIFICATE OF SERVICE

I hereby certify that I have (hand delivered / sent by first class mail) a true and correct copy of the foregoing **NOTICE OF CONTEMPLATION OF DISCIPLINARY ACTION** on the ___19___ day of ___September___, _2017_ to:

Ms. Emina Gerovic, Employee ID #136832
6514 Benton Circle
Arvada, CO 80003

By: _____
Issuer Signature

_LEROY LEMOS / OPERATIONS SUPERVISOR_
Issuer Printed Name/Title

Emina Gerovic –  Page 5



**DENVER**
THE MILE HIGH CITY

Facilities Management
201 W. Colfax Avenue Dept. 904
Denver, CO 80202
p: 720-865-8680
f: 720-865-7585

Michael B. Hancock
Mayor

September 20, 2017

Emina Gerovic – Employee ID #136832
Custodian
4685 Peoria Street
Denver, CO 80239

### Re: NOTICE OF CHANGE IN WORK LOCATION

Ms. Gerovic:

Please consider this formal written notification that effective Wednesday, September 27, 2017, your report to work location is changing.

You are being assigned to the Castro Building, located at 1200 Federal Boulevard, in Denver, CO 80204. Your work schedule will be 1:30 p.m. to 10:00 p.m., Monday through Friday, with a ½ hour lunch break.

Your immediate supervisor continues to be Josh Montour, Custodial Supervisor.

If you have any questions, please speak with Josh at 720-944-1401. Thank you.

Respectfully,

LeRoy Lemos
Operations Supervisor

cc:    Josh Montour, Custodial Supervisor, DHS
       Russell Vander Kooy, Custodial Supervisor, PAB
       Kevin O'Neil, Facilities Administrative Officer
       HR Services
       Payroll Central

**Exhibit
Dep 0015**
1/13/2021
Emina Gerovic

CCD_0306
19-cv-03710-RM-NRN



**DENVER**
THE MILE HIGH CITY

Department of General Services
Facilities Management
201 W. Colfax Avenue Dept. 904
Denver, CO 80202
p: 720-865-8680
f: 720-865-7585

November 27, 2017

Ms. Emina Gerovic
6514 Benton Circle
Arvada, CO 80003
Employee ID #136832

### RE:  Notification of Dismissal

Dear Ms. Gerovic:

This is official notification that that you are being dismissed from your employment with the City and County of Denver for engaging in misconduct in violation of the following Career Service Rules.  Your last day of employment with the City and County of Denver will be today, November 27, 2017.

<u>16-29, Grounds for Discipline</u>

The following may be cause for the discipline or dismissal of a Career Service employee:

A.      Neglect of duty or carelessness in performance of duties and responsibilities.

D.      Any act of dishonesty, which may include, but is not limited to, lying, or improperly altering or falsifying records, examination answers, or work hours.

G.      1.      Failing to meet established standards of performance including either qualitative or quantitative standards.  When citing this subsection, a department or agency must describe the specific standard(s) the employee has failed to meet, such as standards in a Performance Enhancement Program (PEP) Plan (Performance outcomes/goals) or in a Performance Improvement Plan (PIP).

2017 Performance Management/Goals:

STARS Values/Goals:

**Teamwork:** Works cooperatively with others to achieve team goals. Actively fosters commitment and team spirit and works with others to meet business objectives.

**Accountability & Ethics:** Follows through on commitments made and takes ownership for results and subsequent outcomes. Contributes to maintaining the integrity of the organization and displays high standards of ethical conduct.

**Respect for Self & Others:**  Treats others with consideration and high regard.  Demonstrates respect for the differences that exist among fellow employees and recognizes that those differences are an important source of innovation, progress and interpersonal awareness.

Emina Gerovic – Page 1

**EXHIBIT 22**

**194**

CCD_0044
19-cv-03710-RM-NRN

Performance Goals:

Respectful Workplace: Ensures all interactions with the public, peers, supervisors/management and customer/tenants are conducted in a professional and courteous manner

2016 Performance Management/Outcomes (includes Stars values):

Ethics and Accountability: Follows both the letter and the spirit of all the City of Denver, General Services and Facilities Management, Ethic codes, Career Service rules, Administrative Policies and all other Departmental and Management directives

Respect for Self & Others: Treats all people in a professional and courteous manner including subordinates, peers, supervisor and the public.

I. Failure to maintain satisfactory working relationships with co-workers and other individuals the employee interacts with as part of his or her job.

R. Conduct which violates the Career Service Rules, the City Charter, the Denver Revised Municipal Code, Executive Orders, written departmental or agency regulations, policies or rules, or any other applicable legal authority. When citing this subsection, a department or agency must cite the specific regulation, policy or rule the employee has violated.

<u>Facilities Management Administrative Policies, February 2014</u>

**EMPLOYEE CONDUCT**

As a representative of General Services/Facilities Management and the CCD, you are a public servant and a role model for all community members. That means that you are held to a high standard of excellence and professionalism. All Division staff are expected to comply with the CCD standards at all times.

- Every City employee shall conscientiously fulfill the duties and responsibilities of their position. The conduct of every employee shall reflect credit on Career Service (CS) and the CCD during work hours or at any time while representing the agency, Division, or CCD

- Employees must not disturb other City employees or the public. While employees are expected to be pleasant to building tenants and the public, they should not initiate lengthy personal conversations with other City employees or the public, except when all parties are on scheduled lunch periods or breaks. Loud talking, loud laughing and/or noise, swearing, inappropriate jokes and/or remarks are prohibited at all times.

- Employees are expected to behave in a professional manner at all times, whether during their regular shift or overtime, and treat the public, building tenants, their co-workers and supervisors with respect. Arguments, constant complaining, gossip and/or a consistently negative attitude towards the job, supervisors or other employees is not appropriate.

Emina Gerovic – Page 2

**USE OF WORK/BREAK TIME**

All employees must make necessary arrangements to transact their personal business outside of scheduled work hours.

The Division encourages you to take your authorized breaks away from the work area to give you some time to re-energize and to minimize disruption and distraction to others. You are encouraged to use the City break room areas and not use other agency facilities (courtrooms, conference rooms, etc.).

T.      Conduct which is or could foreseeably:

1.      Be prejudicial to the good order and effectiveness of the department or agency;
2.      Bring disrepute on or compromises the integrity of the City; or
3.      Be unbecoming of a City employee.

You are employed by Facilities Management within General Services for the City and County of Denver (CCD), as a Custodian. Your original hire date with CCD was August 11, 2014.  According to your Career Service job specification, the general duties of your position are to perform standard level interior and exterior janitorial/minor maintenance duties involving cleaning and disinfecting all areas assigned, including restrooms, locker rooms, break rooms, holding cells and all office areas. Your normal work hours are from 6:00 A.M. to 2:30 P.M. except when your schedule is adjusted for other coverage. You are currently assigned to work at Denver Human Services (DHS) and previously worked at Denver Police District Five.  You have personal accountability for carrying out assigned functions within the scope of established guidelines and objectives.

Per the Facilities Management (FM) Policy manual, as a representative of General Services/Facilities Management and of the City and County of Denver (CCD), you are a public servant and a role model for all community members. That means that you are held to a high standard of excellence and professionalism. All Division staff are expected to comply with the CCD standards at all times.

The following is a summary but not an exhaustive description of the alleged misconduct for which discipline is being contemplated:

You have previously been coached, counseled, and disciplined for not meeting performance expectations, not following FM Administrative Policies, being out of uniform, not following City Safety Policies, personal/inappropriate use of your City-issued cell phone, not providing acceptable level of customer service, failure to take responsibility for your actions, acts of dishonesty and conduct that may bring disrepute on or compromises the integrity of the City.

You received a written reprimand in May of 2017. In the reprimand, it stated, "You are expected to treat your co-workers, including contract personnel, and the public with respect and professionalism. Most important you are expected to be truthful and forthcoming when asked for information or a report on an incident… Your continued failure to be honest, truthful and/or forthcoming with false and mis-directing statements will not be tolerated." It also included that your use of work time was inappropriate and you were involving and disturbing others by initiating lengthy personal conversations.

On Monday, September 11, 2017, LeRoy Lemos, Facility Operations Supervisor, was notified of concerning content on your public Facebook profile which had been brought to the attention of the Office of Human Resources (OHR). See Attachment 1.

Your profile is of concern as you list the Denver Police Department as your employer and list your occupation as "Police Officer."  Upon reviewing your public Facebook profile, Mr. Lemos noticed you

Emina Gerovic – Page 3

CCD_0046
19-cv-03710-RM-NRN

also posted several pictures in 2015 showing yourself wearing a sweatshirt with a Denver Police Department embroidered badge, wearing a patrolman's hat, wearing a t-shirt with an embroidered DPD patch and a close-up photo of your DPD-issued access card that also features a DPD badge.

On September 12, 2017, you were asked to come to the Webb Building for a discussion with Mr. Lemos. Upon showing you the print-outs from your Facebook profile, your first reply was, "I don't know what the problem is, I am in my Facilities Management uniform, look I even have my safety shoes on." He informed you that we were addressing the fact that you list the Denver Police Department as your employer and have identified your occupation as a Police Officer. When he asked about your self-identification as a Police Officer, you replied, "I do not know how that got there." When asked about the pictures in DPD uniforms, you replied, "Those were just for fun a long time ago."

Mr. Lemos then informed you that you were expected to remove the inaccurate employment information and if you are going to list your employment information, it is factual to state that you are a custodian with Facilities Management. He instructed you to return to work. While in route, he called you to request you to report instead to the Internal Affairs office at the Police Administration Building regarding the content on your Facebook profile.

You were interviewed by Denver Police Department (DPD) Sgt. Steinke on September 12, 2017 and the report is attached. See attachment 2. The report indicates you received the sweatshirt from an unidentified Police Officer as a gift. You state that the pictures with you wearing a patrolman's hat were the result of you being "told" to put on the hat on by Officer Ray. You also state that the picture of you in a gray t-shirt displays a DPD sticker given to you.

You implied you were following a police order to put on the hat and then a picture was taken. You state the badge on the gray shirt was a sticker, when, in fact, it is clearly an embroidered patch. There is no acceptable explanation for listing your employer as DPD Traffic Operations. In fact, you have not been assigned there at any time during your employment, as we have contractors cleaning that facility.

The report also states you advised the Sergeant that the pictures were "more of a joke." However, the different photographs of you in clothing with DPD reference are on multiple dates spanning a long period of time (August 2014 through October 2015). While reviewing the translation of the saved Facebook conversations, along with the multiple photographs of you displaying a police uniform, the term "MILIČIONERKA" is used which refers to policewoman; a friend commented that she could not forget that you are military, and that the jacket looks good. Another comment wishes you lots of luck and congratulations, to which you replied "thanks," along with other loving comments. We did not see any comments which indicated this was a joke. Instead, it appears you were representing yourself as a police officer and continued to do so after these posts by listing your job as a police officer up until we requested you remove it in September 2017.

In 2015, you were given a verbal warning for wearing a gray DPD sweatshirt while on the clock at the PAB, as it is not part of your FM uniform and it could create problems if you were misidentified as a police officer. At the time, you stated you wore it because you were so proud to work for the DPD. Mr. Lemos clarified to you that you do not work for DPD, you are assigned to clean a police building. Despite that, you posted pictures of yourself identifying yourself as a police officer.

Falsely identifying yourself to the public as a police officer is both troubling and unacceptable. In your position as a custodian, you routinely interact with members of the public. By wearing clothing items that have police badges, posting pictures of yourself in police issued clothing and posting a copy of your police building access card, you can create public confusion regarding your role, responsibilities and duties. It can also be dangerous to you and the public, should someone need police assistance or intervention and come to you for help. Representing yourself a police officer, as a joke or to impress

<div align="center">Emina Gerovic – Page 4</div>

CCD_0047
19-cv-03710-RM-NRN

others, is not only deceitful, but could be perceived as impersonating a police officer, which is a serious offense.

You are expected to accurately represent your role with the City and County of Denver and be truthful and forthcoming when providing or being asked for information. It is the expectation of FM Management and DPD that any inaccurate information be removed from your Facebook Profile.

On September 19, 2017, you received a contemplation of discipline letter for these concerns. On September 20, 2017, in the afternoon, Mr. Lemos met with you to provide notice of your work location change to Denver Human Services (DHS) effective September 27th with your work hours changing to 1:30 pm to 10 pm. He explained that it was in the best interest of FM's Operations to reassign you to the DHS team effective Wednesday, September 27th, making your last day at District 5, the 26th. Your first response was "NO! You can't do this! Why are you taking away my station?" He replied, "Emina, the issue is not up for debate, the decision has been made." You said, "No, I can't do it, I need to pick up my grandchild from school." He replied, "We understand you may have some personal logistics that need to be addressed and that is why we are giving you a week to make the adjustments you need to make at home." You replied, "No, I won't do it! I am not going to quit, but I am not changing my work!" He replied, "Emina, you are expected to report to Josh Montuor at the Castro Building next Wednesday." You responded, "We'll see!" and stormed out of the room.

The below documentation explains the incidents that followed:

> On September 20th, you went to Terrie Gathron's, FM Directors' assistant, cube and said you wanted Mr. Robinson's (Executive Director of General Services) phone number to call him about a personnel issue. You were advised to go through your chain of command and first schedule a meeting with Mr. O'Neil (FM Deputy Director and LeRoy Lemos' supervisor; your Operations Supervisor) for the next morning at 9 am.

> That afternoon, you went to Christina Howard with OHR and asked about immediately obtaining a copy of your personnel file. Ms. Howard explained that the contemplation of discipline meeting would be your opportunity to address your concerns related to the letter. You said you wanted to meet because a lot of things were going on, but that you would wait until after the contemplation meeting.  You also stated you may file a complaint. Ms. Howard provided you with information on how to request your records and file a complaint.

> On September 21st at 9:10 am, you met with Kevin O'Neil. Per Mr. O'Neil:

>> "Emma said she was promised a permanent job at Police District #5. I explained to Emma that nobody in our organization is guaranteed or would ever be guaranteed a permanent shift assignment. I told her we move people where our business needs dictate. Emma was quiet for a short while and then changed the subject; she went on to say that when she was hired she only signed up for a first shift and that nobody ever gave her a copy of our policies or went over them with her. I responded by telling her that every employee was given a copy of our policies at the time we hired them and that each employee initialed each page and signed the document to acknowledge they had been given a copy. Emma was quiet a little longer and then changed the subject again stating that she can't and will not work 2nd shift. Emma said, 'I am the only care-giver for a grandson from my daughter's side of the family, he has a brain tumor and I need to pick him up at school every day at 3:15 pm.' I advised Emma that I would speak with LeRoy Lemos to see if we had any available spots on the first shift at the Castro building. Emma said she wanted to speak to James (James Williamson, Facility Management Director) and Murphy (Murphy Robinson, newly appointed Executive Director of General

Emina Gerovic – Page 5

CCD_0048
19-cv-03710-RM-NRN

Services). I said she should walk over to Terrie's desk and make an appointment first. Emma said she would. The meeting ended and she left."

Instead of allowing Mr. O'Neil to look at the earlier shift or following directions, at approximately 9:30 am, you appeared in Mr. Robinson's office without notice and tried to hug him. He didn't know who you were and didn't recall meeting you before. You called him "brother" (Mr. Robinson is African-American), and claimed you were not being treated fairly. You stated you wanted to speak to management before filing an EEOC complaint and that you would not file if we made you "happy" again. You also made a statement about caring for your grandchild (your statement to Mr. Robinson about your grandchild was different than the statement you made to Mr. O'Neil about caring for your grandchild).  Knowing of the pending contemplation of discipline, Mr. Robinson explained that he was sorry you felt that way, but we have a process to ensure all employees are treated fairly.  You interrupted him and said that he knew what it was like to be part of the police family. You stated, "I am the best employee in the City and everyone makes mistakes. I know what I did was a mistake…"

You then told Mr. Robinson that he would be getting a call from City Council, the DPD Commander at District 5, and the manager of the Department of Safety and they would be supporting you. Mr. Robinson asked you if you had met with your managers and directors about your concerns. You told him you had not yet met with them, but you were here to schedule a meeting. Later, however, Mr. Robinson found out you had just met with the FM deputy director, Mr. O'Neil.

FM determined to make some staff adjustments. Lee Nuanez, Custodial Supervisor, delivered a revised notice of work change stating you would still report to DHS but your hours would change back to 6 am to 2:30 pm starting September 25th. Lee Nuanez requested your DPD badge and keys. You said you did not have your DPD badge and keys, they were at the A. P. Taylor building. This did not make sense as you would not be able to enter the facilities at 6:00 am without your badge.

On September 22, 2017, at 8:30 am, Russ Vander Kooy, Custodial Supervisor, went to DPD District 5 to advise them that the custodian assignment would be changing. You were supposed to be on leave at that time for unrelated reasons.  However, when Mr. Vander Kooy entered, you were in the facility talking with a lieutenant and you seemed surprised to see him. When asked what you were doing, you said you were getting your personal things. He asked if you had all your items and you said yes. However, you did not have anything in your hands or that you were carrying.

During this time, without request from the FM, emails were sent to Murphy Robinson from DPD officials stating what a great employee you are and how you should be treated fairly and you do a good job. Stephanie O'Malley and Chief White were copied in the emails. Councilman Herndon reached out to Mr. Robinson stating you contacted him and said you were being "fired" on Thursday (original contemplation of discipline date) and how unfair that was. Mr. Williamson also received unsolicited phone calls stating that you shouldn't be moved from the DPD assignment.

According to Career Service Rules, duty assignments may be temporary or regular, incidental or essential, and may include changes in location of work and changes in equipment and tools. According to the FM Administrative Policies, the supervisor is responsible for establishing daily work assignments and may adjust scheduled work shifts, lunch hours and breaks (either for entire crews or for individual employees) temporarily as workload demands. Work locations may also be altered in order to meet business needs. Employees will be given at least 48 hours written notice of any permanent shift or work location changes.

Emina Gerovic –  Page 6

CCD_0049
19-cv-03710-RM-NRN

You never had to report to the later shift as a change was made in your hours, giving you your earlier shift. You just needed to report to a different location. You even told Mr. Lemos that DHS was just a few miles from your home and that you will do a good job at DHS. Despite that, you continued to recruit high level officials to assist you, providing inaccurate, false, and incomplete information regarding your current situation.

Coincidentally, on October 5, 2017, a city employee stopped by regarding the vacant custodian position at Arie Taylor/District 5. During that conversation, she mentioned she had concerns regarding the FM custodian who previously worked there and described you to Mr. Lemos. He asked her to share her concerns with OHR. The employee told OHR that she worked with you on several occasions for a few needs at the facility. She stated that you seemed very proud of your work and showed her around DPD offices. However, your attitude and language use was very inappropriate on a consistent basis. You had lengthy personal conversations while she was working and were very opinionated. One instance in particular is when you were speaking with her and two male team members while they were working and spoke in a very derogatory manner to the men telling them they weren't doing enough work and inserting yourself and your opinions. One became annoyed and walked out, the other tried to ignore your comments. Another time you made the employee feel very uncomfortable as you were gossiping about the OED management team that worked there and that they were going to lose their jobs, you also shared negative inappropriate comments regarding Mr. Lemos.

This employee further stated, "She didn't know us well and just spouted out about these things. I told her if she really felt that way then she needed to go to HR to resolve her issues, she said he (LeRoy) is already out to get me and get contractors instead." She added that you complained about an Asian couple that were contactors. The employee thought that you seemed like a hard worker and you were proud of your job, but you were toxic and unhappy and shared a negative attitude and ideas. The employee stated that your use of vulgar vocabulary was very consistent when she worked with you during this time. She said you dropped "F-bombs" consistently and that you had a very aggressive communication style. The employee recalled these incidents as it was very uncomfortable for her when working with you, but she needed your help to get the job done.

Your activities do not follow protocols, were not completely truthful and were disrespectful to FM management. Your use of worktime and involving others in your personnel matters was disruptive to the workplace. You have been advised of this inappropriate activity in the past yet continued to take worktime to spread rumors and complain about your management team.

<u>Your disciplinary history includes:</u>

| | | |
|---|---|---|
| 5/4/2017 | Written Reprimand | Dishonesty, violating respectful workplace, misconduct, unprofessional and discourteous conduct toward the public. |
| 9/21/15 | Verbal Reprimand | Multiple violations of failure to follow safety policies |

You have also had several documented issues as noted below:

| | | |
|---|---|---|
| 3/17/17 | Documented Counseling | Using personal cell phone for City business and not having City cell phone charged, on person nor voice mail box set up. |

<div align="center">Emina Gerovic – Page 7</div>

CCD_0050
19-cv-03710-RM-NRN

| 6/13/16 | Documented Counseling | Excessive personal use of cell phone and inappropriate use of work time |
| 10/1/15 | Verbal Warning | Poor work performance, poor customer service |

A contemplation of discipline meeting was held on Tuesday, October 31, 2017 at 1:30 p.m., in the Wellington Webb building, in the 6.G.7 conference room located on the 6th floor. Present at the meeting were: Shelby Felton, Senior City Attorney; LeRoy Lemos, Facilities Management Operations Supervisor; Kevin O'Neil, Facilities Administrative Officer; Anne Carter, Senior HR Business Partner; Thalia Karny, your attorney; you and I. The purposes of the contemplation meeting were to allow you to correct any errors in our information or facts, to tell your side of the story, and to present any mitigating information as to why possible discipline should not be taken. Your statements were given full consideration before the decision to discipline you was made.

In the contemplation meeting, your attorney addressed the statements in the contemplation letter and on your behalf, denied any wrongdoing of any kind; despite your statements to several others acknowledging that you had made mistakes. By not taking accountability for your actions, it is unreasonable for us to believe that your behavior would improve if you continued working in this Agency. We have determined that dismissal from your position is warranted based on your failure to accept any responsibility for your actions and your insistence on downplaying and refusing to acknowledge your intentions. Honesty, integrity and trustworthiness are critical traits that an employee must hold in order to perform his or her job duties effectively. We cannot in good conscience continue to employ someone who has demonstrated a lack of accountability and who can no longer be trusted to perform her duties with integrity, to be truthful, and to exercise good judgment.

Please be advised that in accordance with Career Service Rule 3-32, B, 5, Disqualification of Applicants and Candidates, and 16-45 Procedure for Dismissal, employees dismissed from the Career Service are not eligible to be assessed for open jobs and are not eligible for future employment within the Career Service for a minimum of five (5) years after the date of dismissal.

You may appeal this discipline in accordance with Office of Human Resource Rule 19, Appeals. You may also initiate dispute resolution pursuant to Office of Human Resource Rule 18, Dispute Resolution.

Please be advised that you are not to take any retaliatory action against anyone as a result of this letter.

Respectfully,

James E. Williamson
Director Facilities Management

Enclosure(s): Attachment 1: Public Facebook profile, public Facebook pages
Attachment 2: DPD inter-office memo

cc:     Kevin O'Neil, Facilities Administrative Officer
        LeRoy Lemos, Facilities Management Operations Supervisor
        Murphy Robinson, General Services Executive Director
        OHR Personnel File

Emina Gerovic – Page 8

CCD_0051
19-cv-03710-RM-NRN

## CERTIFICATE OF SERVICE

I hereby certify that I have ☐ hand delivered / ☒ sent by first class mail / ☒ sent via email a true and correct copy of the foregoing **Notification of Dismissal Disciplinary Action** on the 27th day of _____November_____, _2017_ to:

Delivered via mail:
Ms. Emina Gerovic
6514 Benton Circle
Arvada, CO 80003

*& email:*
*geramail@yahoo.com*

Emailed representative:
Thalia Karny, Esq. at: tkarny@1626washingtonlaw.com
Karla Carrigan, Esq. at: karla.carrigan@1626washingtonlaw.com

By: _____
**Issuer Signature**

*Anne Carter, OHR, Sr HR Professional*
**Issuer Printed Name/Title**

Emina Gerovic – Page 9

CCD_0052
19-cv-03710-RM-NRN

**000196**

```
 1              THE HEARING OFFICER:  All right, so we now have a
 2   schedule, and I assume the check marks are our availability.
 3              MS. FELTON:  Oh, okay.
 4              THE HEARING OFFICER:  So that leaves that up to
 5   counsel and their respective clients and witnesses.
 6              (Pause.)
 7              MS. FELTON:  I'd like to do it the 4th if we can.
 8              MS. KARNY:  Ms. Carrigan's away.  That's when
 9   you're away, right?  She's away that week.
10              How about the 14th?  Is everyone available on the
11   14th?
12              MS. FELTON:  We can't do it any sooner than that?
13              MS. KARNY:  I'm sorry, what was that?
14              MS. FELTON:  No sooner than that?
15              MS. KARNY:  Well, I mean there are only two dates
16   before that and one of them is not good and--
17              THE HEARING OFFICER:  How about the other one?
18              MS. KARNY:  (Inaudible.)  How about the 11th.
19              MS. FELTON:  Okay.
20              THE HEARING OFFICER:  All right.  Okay.  Let's
21   recall--
22              MS. KARNY:  8:30 start time again, right?
23              THE HEARING OFFICER:  Yes.
24              All right, Mr. Lemos.  Well, actually I'll just
25   re-swear you.  Raise your right hand.
```

000197

 1         LEROY LEMOS, having been called as a witness, after

 2    being duly re-sworn, testified as follows:

 3              THE HEARING OFFICER:  All right.

 4              MS. FELTON:  I'm sorry.  Just one second.

 5                   DIRECT EXAMINATION RESUMES

 6    BY MS. FELTON:

 7         Q    Did you meet with Ms. Gerovic on September 20th,

 8    2017?

 9         A    I believe so, yes.

10         Q    Do you recall what that meeting was about?

11         A    Was that the day we gave her her discipline letter?

12              MS. KARNY:  Objection; the witness is asking a

13    question.

14              THE HEARING OFFICER:  Sustained to the extent that

15    it's a real objection.

16              MS. FELTON:  If you'll look at exhibit--

17              THE HEARING OFFICER:  Non-responsive.

18              MS. KARNY:  Thank you.

19         Q    (by Ms. Felton)  If you will look at Exhibit 4,

20    this is a notice of change in work location.  Did you have a

21    meeting with Ms. Gerovic regarding this change in work

22    location?

23         A    Yes.

24         Q    During this meeting did she complain about being

25    relocated to the Castro Building?

**000198**

 1    A    She did.

 2    Q    What was her complaint about being moved to the

 3  Castro Building?

 4    A    She stated emphatically that she was not going to

 5  agree to the move, that she was not going to lose her

 6  station.  I was not taking her station away from her.  No,

 7  basically was her response.

 8    Q    Did she complain about the change in hours?

 9    A    She did.  She indicated that she provided some

10  caregiving for her grandson, I believe.

11        MS. KARNY:  I'm sorry; I didn't hear that.

12        THE WITNESS:  Grandson, I believe.

13    Q    (by Ms. Felton)  How did you respond to her

14  complaint regarding the shift change?

15    A    At that meeting I told her that the expectation was

16  that she report to Denver Human Services and Josh Montour's

17  (phonetic) team on the date stated on the letter, that that

18  was her new assignment.

19    Q    Did that decision subsequently change, the decision

20  about the hours of her shift?

21    A    It did.

22    Q    Why did the hours of her shift change?

23    A    Well, I hadn't heard--or I didn't know of the issue

24  related to her grandson, and so I talked with Kevin and asked

25  him if we could put her on the morning shift so that we

**000151**

 1   have much to say until overtime kicked in at 2 o'clock.

 2              MR. STEINKE:  Well--thank you.  I'm just going to

 3   walk out on that one.

 4              THE HEARING OFFICER:  Have a good afternoon.

 5              MR. STEINKE:  Have a good day.

 6              THE HEARING OFFICER:  Thank you.

 7              Next--well, I guess we're back on track now with

 8   the Agency's case.

 9              MS. FELTON:  Right.

10              THE HEARING OFFICER:  Next witness for the Agency,

11   please.

12              MS. FELTON:  We're going to go back to Leroy

13   Lemos--

14              THE HEARING OFFICER:  Right.

15              MS. FELTON:  --who I told to be here at 1:30.

16              (Pause.)

17              (Off the record.)

18              THE HEARING OFFICER:  Did Mr. Lemos decide he'd had

19   enough of this hearing?

20              MS. FELTON:  Apparently, yes.  Yes.  He's nowhere

21   to be found in the building.

22              THE HEARING OFFICER:  All right.

23              Good afternoon.

24              MR. O'NEIL:  Good afternoon.

25              THE HEARING OFFICER:  Raise your right hand,

**000152**

```
 1  please.

 2            KEVIN O'NEIL, having been called as a witness,

 3  after being duly sworn, testified as follows:

 4            THE HEARING OFFICER:  Thank you.

 5            Ms. Felton, proceed.

 6            MS. FELTON:  Thank you.

 7                       DIRECT EXAMINATION

 8  BY MS. FELTON:

 9       Q    Could you please state your name for the record and

10  spell your last name?

11       A    It's Kevin O'Neil, and it's O apostrophe-N-E-I-L.

12       Q    Thank you.  Can you give us your current position,

13  please?

14       A    My current position is I'm Deputy Director of

15  Facilities Management.

16       Q    How long have you held that position?

17       A    Approximately three years.

18       Q    Who is your supervisor?

19       A    James Williamson.

20       Q    And who do you supervise?

21       A    I supervise Leroy Lemos, Robin Hinton (phonetic),

22  Dan Ide (phonetic).

23       Q    What are you duties as the Deputy Director?

24       A    Have many duties, and I am over groups of project

25  management, janitorial, security, Infor EAM, which is our
```

**000158**

```
 1       A      I couldn't recite that right off the top of my
 2  head.
 3       Q      Do you know if she was out on leave for a workman's
 4  compensation injury?
 5       A      I believe she was.
 6       Q      Do you know the dates of that leave?
 7       A      I couldn't tell you right off the top of my head.
 8       Q      Were you involved in a notice to move Ms. Gerovic
 9  to a different location?
10       A      Yes, I was.
11       Q      Were you a part of that decision?
12       A      Yes, I was.
13       Q      Why was that decision made?
14       A      Given the past history and documentation of Emina
15  wearing a police uniform, or part of a uniform, and some of
16  the interactions that she's had out at A. P. Taylor Building
17  where her current assignment was, that I felt it best to take
18  her out of that environment and move her to an environment
19  where certain issues wouldn't occur--I believed they wouldn't
20  occur.
21       Q      Is there a policy that allows the Agency to move
22  employees to different locations?
23       A      I couldn't quote you the direct policy, but it's--
24  the way we operate is that we put employees where we have a
25  business need, and our staff is subject to change.  I
```

000159

1    couldn't quote you the exact policy.

2        Q    If you will look at Exhibit 9, and you can look in

3    the notebook on your right as well at Exhibit 9.

4        A    Okay.  Exhibit 9.

5        Q    Do you recognize Exhibit 9?

6        A    Yes, I do.

7        Q    If you will look at page 9-14, does it indicate who

8    signed this document?

9        A    Let's see.  Yes, it does.

10       Q    And whose signature is on page 9-14?  The page

11   numbers are on the bottom in bold.

12       A    Okay.  It's Emina signed it.

13       Q    Are her initials at the bottom as well?

14       A    Yes, they are.

15       Q    Are her initials at the bottom of each page of

16   Exhibit 9?  I'm sorry.  Her initials are on the bottom of

17   each page 9-3?

18       A    Yes, they are.

19       Q    What is Exhibit 9?

20       A    Exhibit 9 is our policies, basically City and

21   County of Denver General Services Facilities Management

22   Administrative policies.

23       Q    Page Exhibit 9-9 does it identify information

24   regarding work schedules and work locations?

25       A    Yes, it does.

**209**

**000160**

```
 1      Q    And does it--what does it state regarding movement
 2  of employees to different locations?
 3      A    Let's see.  It says, "The Division Director
 4  establishes the daily hours of operation for the Division.
 5  Maintenance hours of operation are Monday through Friday.
 6  The work shall begin on Sunday and end Saturday."
 7      Q    I'm going to have you--sorry, I'm going to
 8  interrupt you and have you skip down to the next paragraph
 9  about--
10      A    Okay.  Okay, I got you.
11      Q    --language about work location.
12      A    All right.  Yeah.  "The supervisor is responsible
13  for establishing daily work assignments and it may adjust the
14  work schedule shifts, lunch hours, breaks, either for the
15  entire crew or individual employees temporarily or as
16  workload demands.  Work locations may be altered to meet the
17  business needs.  Employees will be given at least 48 hours
18  written notice in a permanent shift or work location
19  changes."
20      Q    Was Ms. Gerovic provided with 48 hours' notice
21  before movement?
22      A    Yes she was.
23      Q    Is moving employees from location to location a
24  disciplinary action?
25      A    No, it's not.
```

**210**

000161

1    Q    Did you have an opportunity to meet with Ms.

2   Gerovic about the change in her location?

3    A    Yes, I did.

4    Q    Do you recall what day you met with her?

5    A    I believe it was about September 23rd.

6    Q    Do you know if you requested the meeting or if she

7   did?

8    A    She requested the meeting.

9    Q    Did you know why she requested the meeting?

10    A    I believe she wanted to talk about her change in

11   work location.

12    Q    What did she say about the change in her work

13   location?

14    A    Basically she said she wouldn't do it.  She

15   wouldn't--didn't want to change her work location.  And that

16   she said that when she was hired, she was told--or she said

17   that she was hired for District 6--I mean District 5 only and

18   that--she said that she only agreed to ever work first shift.

19    Q    Is any employee assigned a permanent job at

20   District 5?

21    A    No.  We're not--I told Emina that that was never

22   our policy.  And I also mentioned to her--this is bringing

23   back in my memory what happened there was that I said I--when

24   you come on board we go over those policies with you and you

25   sign off on them.

000162

1    Q    Did she admit to receiving the policies?

2    A    No.

3    Q    Did she make any comment about what shift she had

4    been assigned?

5    A    She made a comment to--when she came into the

6    office, she made a comment about being assigned to second

7    shift.  And she said she could not absolutely work that shift

8    because her grandson had a brain tumor and she was

9    responsible for her grandson, picking him up from school and

10   taking care of him.

11   Q    What was your response to her statement?

12   A    After hearing that statement, I said I would speak

13   to Leroy Lemos and see what I could do about getting her

14   assigned on a first shift.

15   Q    Was moving her shift like that part of the normal

16   course of business?

17   A    I would say no.  I felt, given the circumstances,

18   that I would ask Leroy to see if we could find a volunteer on

19   the first shift that would move to second shift, open a

20   space.  Given her situation--I didn't want to tell anybody

21   what the situation was, but I felt it was within my

22   discretion to do that, and I thought it was appropriate to

23   do.

24   Q    Did she make any complaints during that meeting

25   with you about her workman's compensation injury?

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-03710-RM-NRN

EMINA GEROVIC,

Plaintiff,

v.

CITY AND COUNTY OF DENVER, et al.

---

**DECLARATION OF KEVIN O'NEIL PURSUANT TO 28 U.S.C. § 1746**

---

Pursuant to 28 U.S.C. § 1746, Declarant, Kevin O'Neil states upon personal knowledge as follows:

1.      I am a white male.  I became employed with the City and County of Denver on July 5, 2005, as a facilities superintendent. I was promoted to an Administrator 3 and was a facilities administrative officer. During Ms. Gerovic's employment I was the facilities administrative officer.    I supervised Leroy Lemos and I was supervised by James Williamson. I retired from the City August 31, 2020, as the deputy director of facilities management.

2.      I reviewed Ms. Gerovic's written reprimand and based on the evidence collected, I honestly believed that Ms. Gerovic improperly let the man into a secure building before business hours, lied about doing it, spent work time interrupting the work time of other employees to talk to them about the incident, lied about talking to those other employees, treated one of those employee disrespectfully, and failed to provide a written statement of

the incident. Ex. 12.

3.      I made the decision to move Ms. Gerovic from the Police District 5 Building to the

Castro Building in September 2017.

4.      Ms. Gerovic met with me on September 21, 2017, regarding her location and shift

change. After that meeting, I prepared the attached statement regarding the meeting. Ex.

26, CCD 0259.

5.      During the September 21, 2017, meeting, Ms. Gerovic falsely told  me that she

was hired specifically for Police District 5 and only for first shift.   I told her that would

not have happened because it is against our policies which allow employees to be moved

with 48-hours' notice. Ex. 45  CCD_l07-116, 120. Then, she falsely told me that she did

not receive the agency policies even though she signed for the policies. *Id.* Then she told

me she was the only care giver for her grandson who had a  brain tumor and needed  to

pick him up at 3:15 p.m. I told  her I would speak with Mr. Lemos to see if there were

spots available on the first shift at Castro. Ms. Gerovic asked to meet with Mr . Robinson

and Mr. Murphy, and I told her to make an appointment.

6.      Based on the evidence presented in the  contemplation of discipline letter and the

response by Ms. Gerovic and her attorney  during her contemplation of discipline meeting

(Ex.  22), I  honestly  believe  Ms. Gerovic (a) was  holding herself out as a  police

officer, (b)  posted her occupation as police officer and lied  about how that got on her

Facebook page,  (c) posted the pictures of herself in  police attire and lied about them

being a joke or being just for fun, (d) posted the picture and lied about the badge on her

clothes being a sticker, (e) posted the pictures of her in the police hat and lied about being

"told" to put it on, (f) posted the picture of her police access badge, (g) was insubordinate when Defendant Lemos told her her location would change, (h) lied that she was promised a permanent post, (i) lied that she was promised first shift, (10) lied that no one ever went over the policies with her, (j) lied that her grandson had a brain tumor, (k) lied to Mr. Robinson that she hadn't met with me, (l) ignored the paid administrative leave directive and went to District 5, (m) lied when she claimed that she went to District 5 to pick up personal items, (n) lied to Councilperson Herndon that she had been fired, (o) spoke in a derogatory manner telling two male employees they were not doing enough work, (p) gossiped about a management team losing their jobs, (q) gossiped about Defendant Lemos, and (r) used vulgar vocabulary with another employee including "F-bombs."

I declare on this $\underline{19}$ day of May, 2021, under penalty of perjury that the contained herein is true and correct.

Kevin O'Neil

3

**215**

Appellate Case: 22-1148    Document: 01011072898O    Date Filed: 08/23/2022    Page: 216



Facilities Management
201 W. Colfax Avenue Dept. 904
Denver, CO 80202
p: 720-865-8680

**CONFIDENTIAL**

To:     Personal File, Emina Gerovic
From:  Kevin O'Neil
Date:   September 22, 2017
RE:     Documented Conversation with Emina Gerovic on Sept 21, 2017

At approximate 9:10 a.m. on September 21, 2017 Emina Gerovic came to my office to talk about her getting transferred to the Castro building's second shift. Emina said she was promised a permanent job at Police District #5.  I explained to Emina that nobody in our organization is guaranteed or would ever be guarantee a permanent shift assignment. I told her we move people where our business needs dictate.  Emina was quiet for a short while and then changed the subject; she went on to say that when she was hired she only signed up for a first shift and that nobody ever gave her a copy of our policies or went over them with her.  I responded by telling her that every employee was given a copy of our policies at the time we hired them and that each employee initialed each page and signed the document to acknowledge they had been given a copy. Emina was quiet a little longer and then changed the subject again stating that she can't and will not work 2nd shift.  Emina said, "I am the only care-giver for a grandson from my daughter's side of the family, he has a brain tumor and I need to pick him up at school every day at 3:15 pm".

I advised Emina that I would speak with LeRoy Lemos to see if we had any available spots on the first shift at the Castro building.  Emina said she wanted to speak to James and Murphy. I said she should walk over to Terrie's desk and make an appointment first. Emina said she would. The meeting ended and she left.

**STATEMENT REGARDING EMPLOYEE MEETING / INCIDENT**

September 21, 2017

TO: OFFICE OF HUMAN RESOURCES

FROM: MURPHY ROBINSON, EXECUTIVE DIRECTOR OF GENERAL SERVICES

On Thursday, September 21, 2017 at approximately 09:30 hours I was sitting in my office when Mrs. Emina Gerovic came into my office and said, "Hey boss I just wanted to come on and chat with you, how are you doing brother." Emina came in and took a seat in one of my chairs.

This was my first real interaction with Emina, and I had not had a conversation with her prior to today, so I thought that the interaction was quite odd. I asked her where she worked and what her name was. After she told me, Emina went on to explain how she felt that she has been treated unfairly. She told me James, Kevin, and her managers wont treat her fairly and that she wanted to speak with all of us before she filed an EEOC complaint. Emina also stated that she didn't want to file, but she would file if we didn't make her happy again. Emina then showed me a folder with unknown documentation within it.

I told Emina, that I was sorry she felt that way, but that is why we have defined processes to assure that all employees are treated fairly. Emina then interrupted me and said that I knew what it was like to be a part of the police family. That she is a part of their family and she is considered a police employee and we cannot take her out of general services.

I then reminded Emina once more, that all the issues she is talking about will be discussed during the disciplinary process. Emina then went on to describe how she is so upset about what is happening. Emina told me that she is the best employee in the city, and that everyone makes mistakes. Emina said, "I know what I did was a mistake. But it can't be that bad because they haven't fired me yet." I then told Emina that we need to go through the process to figure out what happened.

Emina then told me that she went to the ER due to her stress, and how she is being treated. Emina then started to cry and said, "I can't do this anymore, it makes me want to kill myself." I asked Emina what she meant by that statement. Emina told me, "it hurts so much, that I just feel like killing myself." I told Emina, that her safety was my number 1 concern, and that I was going to go find someone from OHR to speak to so that we can ensure that she stays safe.

I then asked my assistant Terri Gathron to call OHR immediately and tell them to get someone to our floor. OHR arrived and escorted Emina into an office. Soon after the Police Arrived and evaluated the situation.

After the Police spoke to Emina, they told me that she is not currently a credible threat to herself or others, but they recommended that we send her home for the day, and do not allow access back to the Police Department. After speaking with HR and the Facilities Management team, I decided that it was within the best interest of the employee and the City for Emina to go home for the day due to her emotional state, and for staff to make sure they have a plan for Emina that eliminates as much stress as possible while setting her up for success in her job duties in the future.

02582

Nothing further.

02583

**SUPPLEMENTAL STATEMENT REGARDING EMPLOYEE MEETING / INCIDENT**

September 22, 2017

TO: OFFICE OF HUMAN RESOURCES

FROM: MURPHY ROBINSON, EXECUTIVE DIRECTOR OF GENERAL SERVICES

After processing the incident with Emina I wanted to include the following to my statement:

During the conversation with Emina in my office she told me that I was going to receive a call from Council Member Chris Herdon, Commander Thomas at District 5, and Stephanie O'Malley because they were all supporting her. Emina Also told me that she was going to be represented in her contemplation of discipline by a police lieutenant. Emina told me that I knew what it was like to be apart of the Police family, and that she is apart of the Police family.

After Emina told me all of this, I asked Emina if she had met with her managers and directors about her issues. Emina told me that she had not met with them yet, but that's why she was here to schedule a meeting with the directors.

Later I found out that Emina met with the Deputy Director Kevin O'Neil 5 minutes before she came into my office. This dishonesty made me very concerned about Emina's behavior.

Nothing further.

02300

**219**

**000228**

 1          THE HEARING OFFICER:  You can step down, Mr. Lemos.

 2   Thank you.

 3          Next witness?

 4          MS. FELTON:  Murphy Robinson.

 5          THE HEARING OFFICER:  Take a seat over there.

 6          MR. ROBINSON:  Thank you, sir.

 7          THE HEARING OFFICER:  When you're settled in I'll

 8   have you raise your right hand, please.

 9          MURPHY ROBINSON, having been called as a witness,

10   after being duly sworn, testified as follows:

11          THE HEARING OFFICER:  Thank you.  Your witness.

12                     DIRECT EXAMINATION

13   BY MS. FELTON:

14      Q    Can you please state your name for the record?

15      A    Hi, there.  Murphy Robinson--Murphy Robinson.

16      Q    Can you spell your last name, please?

17      A    R-O-B-I-N-S-O-N.

18      Q    Mr. Robinson, what's your current position?

19      A    I'm the Executive Director of General Services.

20      Q    When did you start this position?

21      A    Good question.  September 11th I believe it was.

22      Q    Of what year?

23      A    Of 2017.

24      Q    What are your duties in your current position?

25      A    I'm a cabinet member, County Commissioner, and lead

**000229**

 1    of the General Services Agency.

 2         Q    Have you had any opportunity to meet Emina Gerovic?

 3         A    I have.

 4         Q    Do you recall when you first met with her

 5    individually?

 6         A    I don't recall the date.  I believe it was the

 7    21st.  I think it was about a week after--a week or so after

 8    I started.

 9         Q    Did you have a scheduled appointment with Ms.

10    Gerovic?

11         A    I did not.

12         Q    How did you happen to meet with her?

13         A    Ms. Gerovic came to my office.  She walked in and

14    said to me, Hi, boss.  I--happy to meet you or something, and

15    then she said, Good to see you brother, or something like

16    that.

17         Q    Did you know her name?

18         A    I did not.

19         Q    Did you know where she worked?

20         A    No.

21         Q    Did you know if she was an employee?

22         A    I did not.

23         Q    Did you find out any of that information?

24         A    I did.  Yeah, so I just--I did.

25         Q    How did you find out?

000230

1      A    I just asked her.  I said, Hi, what's your name and

2    where do you work?  And she told me, and we started to have a

3    conversation.

4      Q    What was that conversation?

5      A    Ms. Gerovic sat down and we started to talk, and

6    she told me that she felt like she was being treated unfairly

7    by her managers.

8      Q    Did she say who those managers were?

9      A    I believe she did mention Kevin and James.  I asked

10   her where she worked, actually, and in that she was telling

11   me she worked for Kevin and James and Leroy, I believe.  But

12   I think she was just saying she was treated unfairly by her

13   managers.

14     Q    Did she provide any additional detail about how she

15   was being unfairly?

16     A    Not necessarily.  Our conversation stayed pretty

17   vague, I think.  So, it went pretty fast and it--she just

18   kind of said she was being treated unfairly and she just

19   couldn't handle how she was being treated.

20          THE HEARING OFFICER:  So, Mr. Robinson, I'm a

21   little bit confused about a piece of the response.

22          THE WITNESS:  Sir.

23          THE HEARING OFFICER:  She told you that she was

24   being treated unfairly by her managers and was not very

25   specific about it was my understanding, but then you

**222**

000231

1  mentioned three specific names.  So I'm not clear if she

2  specified those were the managers who were treating her

3  unfairly or if she didn't mention them or if you're not sure.

4         THE WITNESS:  Thank you, sir.  No--and I apologize

5  that I was confusing.  So, I think--when I was trying to

6  establish who she worked for and where she worked, because I

7  run about three or four different divisions, I said, So where

8  do you work?  Who do you work for?  And she said, I work for

9  Leroy, James--you know, she established she worked for

10  Facilities.  And so that's when she then said--and I believe

11  I'm being treated unfairly from my managers.

12         THE HEARING OFFICER:  Proceed.

13         THE WITNESS:  Does that answer the question?

14         THE HEARING OFFICER:  Go ahead.

15    Q    (by Ms. Felton)  How did you respond to her?

16    A    I told her that--she knows that I'm brand new and

17  said, I know that there's a process that we have to follow.

18  I told her that I knew that there was some type of

19  discipline, but we--I will insure to her that the process

20  will be followed and she will have due process in our HR

21  process.

22    Q    Did she explain to you why she was coming to you?

23    A    No.  Actually, she didn't.  I believe I did ask--

24  oh, I'm sorry.  Can I expound on that a little bit?

25    Q    What did you ask Ms. Gerovic?

**223**

000232

1    A    I did ask Ms. Gerovic if she talked to her
2    managers, and she told me, "No."
3    Q    When she said to you that she was being treated
4    unfairly, did she make any reference to having a workers'
5    compensation claim?
6    A    Not having one, but Ms. Gerovic did tell me that
7    she had had conversation with council members, with other
8    executive directors and with folks in power and that they'd
9    be giving me a call.  And also that she--she could file a
10   EEOC claim, but she would rather that we make her happy and
11   that she wouldn't file a EEOC claim.  And she actually had a
12   file folder with her and was showing that she had paperwork,
13   which we never opened the paperwork; I never asked to see it.
14   But I told her--I advised her at that time, you know, the
15   EEOC claim, if you're going to file a claim, file the claim.
16   There is nothing that I can do to stop that or start that.
17   But I believe if you feel like you need to file a EEOC claim,
18   please do.
19   Q    During this meeting did she mention anything about
20   workers' compensation?
21   A    Oh, I'm sorry, workers' compensation.  No.
22   Q    Did she mention anything about FMLA?
23   A    No.
24   Q    Did she make any complaints about moving locations?
25   A    Not at that moment, no.  I think later on we had a

**224**

000233

1    conversation, but not at that--not in that piece of the

2    conversation.

3        Q    Okay.  Did you have a meeting with her with Mr.

4    Williamson and Ms. Carter--

5        A    I did.

6        Q    --where there was a discussion about her moving

7    locations?

8        A    I did.

9        Q    Did she express any concern about that?

10       A    She did.

11       Q    What were her concerns with that?

12       A    I believe Ms. Gerovic said that she was taking care

13   of her grandson and so any type of--not necessarily moving

14   locations, but she was expressing grievance about her shift

15   hours being changed.  And so while I was meeting with Mr.

16   Williamson and Ms. Carter, I told them by all means we should

17   make sure we can accommodate her shift change, because that

18   would upend her--upend taking care of her grandson.

19            MS. FELTON:  I don't have anything further.

20            THE HEARING OFFICER:  Cross.

21                        CROSS-EXAMINATION

22   BY MS. CARRIGAN:

23       Q    Hello, Mr. Robinson.

24       A    Hi.

25       Q    You mentioned that Emina showed up without an

**225**

000238

```
 1              THE WITNESS:  Thank you.  It was a chaotic, hot
 2    mess.
 3              MS. CARRIGAN:  All right.  I have nothing further.
 4              THE HEARING OFFICER:  Redirect?
 5                         REDIRECT EXAMINATION
 6    BY MS. FELTON:
 7         Q    You were asked if she said anything to you about
 8    talking to her managers and they wouldn't listen.  Did you
 9    find out after the fact that she had just come to you after
10    being in Kevin O'Neil's office?
11         A    I did.
12              MS. FELTON:  I don't have anything further.
13              THE HEARING OFFICER:  Thank you, Mr. Robinson.
14    Appreciate your time.
15              MR. ROBINSON:  Thank you.
16              THE HEARING OFFICER:  Are you finished for today?
17              MS. FELTON:  Yes.
18              THE HEARING OFFICER:  All right.  We will see you
19    on May 11th.
20              MS. FELTON:  May 11th.
21              THE HEARING OFFICER:  We are adjourned.
22              MS. KARNY:  We're adjourned?  Oh.  Okay.  Thank
23    you.
24              (Whereupon, the proceedings were concluded.)
25
```

Anne Carter - April 29, 2021

```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLORADO
 2
      Civil Action Number 1:19-cv-03710-RM-NRN
 3
      EMINA GEROVIC,
 4
 5         Plaintiff,
 6    vs.
 7    CITY AND COUNTY OF DENVER, a Body politic and corporate
      of the State of Colorado, acting by and through its
 8    DEPARTMENT OF GENERAL SERVICES and FACILITIES
      MANAGEMENT OPERATIONS; LEROY LEMOS, in his official
 9    capacity as Facilities Management Operations Supervisor
      at the Department of General Services, and in his
10    individual capacity; MURPHY ROBINSON, in his official
      capacity as Executive Director of General Services, and
11    in his individual capacity; JAMES E. WILLIAMSON, in his
      official capacity as Facilities Management Operations
12    Director at the Department of General Services, and in
      his individual capacity; KEVIN O'NEIL, in his official
13    capacity as Facilities Management Operations Deputy
      Director at the Department of General Services, and in
14    his individual capacity; JOEL WOMICK, in his official
      capacity as DGS Contingent Worker at HSS Inc., and in
15    his individual capacity; KYLE KNOEDLER, in his official
      capacity as DGS Facility Supervisor of HSS Inc., and in
16    his individual capacity; and HSS, INC., a Colorado
      Corporation, acting as a hired agent by the City and
17    County of Denver, by and through their contingent
      workers, Joel Womick, Kyle Knoedler, and others.
18
           Defendants.
19
      ----------------------------------------------------------
20          VIDEOCONFERENCED DEPOSITION OF ANNE CARTER
                           April 29, 2021
21    ----------------------------------------------------------
22
23
24
25
                                                     Page 1
```

**EXHIBIT 29**

**227**

Anne Carter - April 29, 2021

| | |
|---|---|
| 1 your understanding? | 1 not held? |
| 2      MS. FELTON: Object to form. | 2      A. For my understanding, as I recall, was |
| 3      A. That's my understanding. | 3 for a couple of reasons. One was the incident of the |
| 4      Q. (By Mr. Davidovich) And, in fact, is it | 4 threat for harm after she received the letter. So they |
| 5 also your understanding that she did remove those | 5 didn't want to hold that meeting right away because I |
| 6 things? | 6 believe it was scheduled shortly after that. And |
| 7      MS. FELTON: Object to form. | 7 secondly, additional information was found and added to |
| 8      A. Again, I think you asked earlier, I was | 8 the revised letter, and they wanted to include all of |
| 9 not managing the case at this time. I did not go back | 9 it together. |
| 10 to look at the Facebook post. At the time that I did, | 10      Q. Do you remember, as you sit here today, |
| 11 it was no longer public, so I was not able to access | 11 what the additional information was that was added? |
| 12 it. | 12      MS. FELTON: Object to form. |
| 13      MR. DAVIDOVICH: Please put up the next | 13      A. I believe it had to do with additional |
| 14 exhibit, 110. | 14 information on the Facebook post. |
| 15      (Exhibit 110 was marked.) | 15      Q. (By Mr. Davidovich) Do you know what |
| 16      A. It is open. | 16 that information was? |
| 17      Q. (By Mr. Davidovich) Okay. This is an | 17      A. It had to do with relooking at the |
| 18 email from yourself, October 2nd, to yourself, | 18 letter and adding some more detail about the content of |
| 19 Mr. Lemos and Mr. O'Neil. I want to ask you what you | 19 the post. |
| 20 meant in the second paragraph that starts, "Please | 20      Q. Who decided that the letter needed more |
| 21 forward to Ed." | 21 content? |
| 22      A. "Please forward to Ed," would have been | 22      MS. FELTON: Object to form. |
| 23 her new supervisor for her work location change. | 23      Q. (By Mr. Davidovich) If you know. |
| 24      Q. Okay. Yeah, that's not what I'm asking. | 24      A. I don't recall. I don't recall. I -- |
| 25 Later on that same -- the same line, the end of that | 25 because, again, I was not involved in the original |
| Page 102 | Page 104 |

| | |
|---|---|
| 1 line, it says, "Remember that this meeting is just | 1 contemplation. I became involved again with her threat |
| 2 about expectations...anything about the other situation | 2 to harm and then revising the new letter. Christina |
| 3 is for her new meeting." | 3 Howard was also leaving. |
| 4      What do you mean by that statement? | 4      Q. Do you know if an exit interview was |
| 5      A. So a few different things were | 5 conducted with Christina Howard before she left? |
| 6 happening. Not everyone was aware, certainly, of | 6      A. I don't know. |
| 7 course, about her threat to harm herself. I did not | 7      Q. That's not part of your job, to conduct |
| 8 advise them about this. All they knew is that she was | 8 exit interviews? |
| 9 going to be returning to work and that we worked on | 9      A. She was a peer, so I would do them on |
| 10 some expectations for her return to work, and they were | 10 employees of agencies I supported, but not of peers. |
| 11 having her report to a different supervisor. | 11      Q. Okay. |
| 12      So they were not to discuss any changes | 12      MR. DAVIDOVICH: Let's go to the next |
| 13 in a revised contemplation of discipline letter, just | 13 exhibit, Exhibit 112. |
| 14 about her work location and the expectations. | 14      MS. FELTON: 112 or 111? |
| 15      Q. Was there another new meeting that was | 15      MR. DAVIDOVICH: Didn't we just |
| 16 set up in addition? I'm not sure what you mean by | 16 finish 111? |
| 17 that. | 17      MS. BURT: No. It's 111. |
| 18      A. So the initial Contemplation of | 18      MR. DAVIDOVICH: 111? I skipped one. |
| 19 Discipline letter that Christina Howard worked on was | 19 So hold on. |
| 20 rescinded. That meeting was never held based on the | 20      (Exhibit 111 was marked.) |
| 21 incidents that occurred. So that same letter was | 21      Q. (By Mr. Davidovich) 111, tell me when |
| 22 reissued with additional information added to it or the | 22 it's open on your screen. |
| 23 contemplation of discipline for her to respond to with | 23      A. It's open. |
| 24 a representative. | 24      Q. What is this Administrative Leave |
| 25      Q. Why was the first contemplation meeting | 25 Action -- what is this Administrative Leave Action |
| Page 103 | Page 105 |

27 (Pages 102 - 105)

Anne Carter - April 29, 2021

1 Notice relating to?
2      A.  It's relating to her -- to placing her
3 on a paid administrative leave due to -- which we don't
4 describe it in the letter, but it was based on her --
5 the incident on the 21st of her threat for harm and
6 ensuring that we did due diligence and ensuring she was
7 okay and ready to return to work.  So this placed her
8 on paid leave until that decision was made.
9      Q.  At the time of this incident on
10 September 21st, were the police called to talk to her
11 at that time?
12      A.  Yes.
13      Q.  And to your knowledge, do the police
14 have authority to put a mental hold on somebody that
15 they think is a danger to themselves?
16      MS. FELTON:  Object to form.
17      A.  I believe so.
18      Q.  (By Mr. Davidovich)  Did they put a
19 mental hold on her when they talked to her?
20      A.  They did not.
21      Q.  Did you have any discussion with the
22 police?
23      A.  Briefly.
24      Q.  And what did they say to you?
25      A.  I believe that's all in my statement.
Page 106

1      Q.  (By Mr. Davidovich)  Okay.  All right.
2 This is an email on October 5th, 2017.  Do you recall
3 this -- the details of this email looking at each word,
4 or do you have any recall of the incidents?
5      A.  Vaguely.  Let's see.  What's the date
6 again?
7      Q.  October 5th, 2017.
8      A.  Okay.  Vaguely.
9      Q.  Okay.  What do you recall happened?
10      A.  Well, again, Christina is copied on
11 this.  She was supporting them.  I was just involved
12 with the incident of her threat to harm herself at that
13 point in time, but they're stating that -- I mean, it's
14 their words, their email that she was stating that she
15 had a concern about -- about the -- her picture being
16 placed up in the facility with security only.
17      Q.  Did she express a concern, to your
18 knowledge, about other people seeing that picture and
19 causing her great distress as a result?
20      A.  I did not speak to her about this.  This
21 is a conversation she had with HSS security.
22      Q.  Did you do anything to find out who the
23 two women were that told her about the BOLO poster?
24      A.  I was not supporting the agency at this
25 time.  I don't know what Christina Howard may have
Page 108

1      Q.  I don't have your statement in front of
2 me.  What did they say to you, as far as you can
3 remember?
4      MS. FELTON:  Object to form.
5      A.  What did they say to me?  They were --
6      Q.  (By Mr. Davidovich)  As far as you
7 remember.
8      A.  I guess I'm confused because there's
9 different things that occurred during that incident.  I
10 contacted them based on her threat to kill herself.  I
11 met them in the lobby, brought them to the room to talk
12 with her.  They asked her a series of questions as part
13 of their testing process.  And I believe they -- what
14 they said to me they said to her at the same time was
15 they felt that she was okay to go home.  They felt she
16 should go home and to follow up as appropriate.
17      So they didn't have, like, a separate
18 conversation with me.  The conversation included Emina
19 in the room.
20      Q.  That's fine.  That's all I wanted to
21 know.
22      MR. DAVIDOVICH:  All right.  Let's go to
23 the next exhibit, 112, please.
24      (Exhibit 112 was marked.)
25      A.  It's open.
Page 107

1 done.  I'm perplexed at who would even have access to
2 see that, but I was not involved in any response to
3 this.
4      MR. DAVIDOVICH:  All right.  Let's go to
5 Exhibit 113, please.
6      (Exhibit 113 was marked.)
7      A.  Okay.
8      Q.  (By Mr. Davidovich)  Exhibit 113 is an
9 email from you, October 5th, to LeRoy Lemos, Kevin
10 O'Neil, saying, "Please ensure these are removed from
11 all locations."
12      You're referring to the BOLO posters;
13 right?
14      A.  Yes.  I appear to be.
15      Q.  Why were you directing them to ensure
16 that they be removed?
17      A.  Because she was already cleared to
18 return to work.
19      Q.  She was cleared to return to work
20 several days before October 5th, wasn't she?
21      MS. FELTON:  Object to form.
22      Q.  (By Mr. Davidovich)  Are you aware of
23 whether or not she was given permission to return to
24 work several days before October 5th?
25      MS. FELTON:  Object to form.
Page 109

28 (Pages 106 - 109)

Anne Carter - April 29, 2021

| Page 110 | Page 112 |
|---|---|

**Page 110**

1      A.  I know she was approved because we had
2  the results back, but I wouldn't manage the BOLO
3  process from there, but -- so I'm not sure what
4  happened internally with that process --
5      Q.  (By Mr. Davidovich)  So why did you
6  then --
7      A.  -- at that point.
8      Q.  Sorry.  So why did you then give a
9  directive to remove the BOLO posters?
10      MS. FELTON:  Objection, form.
11      A.  My understanding at that point time
12  would have been they weren't needed.
13      Q.  (By Mr. Davidovich)  Did you have any
14  understanding at that point in time whether or not they
15  were erroneously placed there and left there at a time
16  when she was permitted to be at work?
17      MS. FELTON:  Object to form.
18      A.  My recollection was when I spoke with
19  her on the 21st and 22nd, she was instructed not to
20  return to the workplace, and she was found at I believe
21  one of the police stations the next morning talking to
22  people about it, and there was a concern.  So
23  recollection is that's when the initial BOLO was
24  placed, that she wasn't supposed to be in the workplace
25  until cleared to return to work.

**Page 111**

1      Q.  (By Mr. Davidovich)  Do you know when
2  she was cleared to return to work?
3      A.  I'd have to look at the document.  It
4  was after she had her evaluation.
5      Q.  Did you discover if the BOLO poster that
6  was up on October 15th was there by virtue of an error
7  that somebody made?
8      MS. FELTON:  Object to form.
9      A.  I'm not aware.  When I saw the email, I
10  thought, well, why is that still up, is my recollection
11  based on my response.
12      Q.  (By Mr. Davidovich)  So you felt it
13  should not have been up at that point anyway?
14      MS. FELTON:  Object to form.
15      A.  Excuse me.  Not at that point in time.
16      MR. DAVIDOVICH:  Let's go to
17  Exhibit 114, please.
18      (Exhibit 114 was marked.)
19      A.  It's up.
20      Q.  (By Mr. Davidovich)  This is a
21  contemplation -- Notice of Contemplation of Discipline
22  Action dated October 18th, 2017.  Did you have any part
23  in preparing this document?
24      A.  Yes, I did.
25      Q.  What part did you take?

**Page 112**

1      A.  The usual parts I've explained before in
2  helping management, once they have a narrative, adding
3  the correct rule pieces; and as I scroll through, there
4  were -- there was information added about
5  September 20th.  We specifically kept the threat to
6  harm as a need to -- on a need to know.  So that is not
7  included in here, but there was other details of her
8  not following protocol.
9      Let's see.  Her showing back up at the
10  facility after she was advised not to.  Again, that had
11  to do with following protocol.  And then it discusses
12  that on October 5th, a City employee stopped by
13  regarding the custodial positions, that she was moved,
14  asking if it was vacant and mentioned that she had
15  concerns with the custodian who worked there.  I had
16  met with that individual, which you later named as
17  Amber Escobedo.  I don't remember the exact name.  And
18  so I had met with her, and a summary of that incident
19  is in there.
20      Q.  With regard to your meeting with Amber
21  Escobedo, did she tell you her husband was looking
22  to get a job as a custodian with the City and County of
23  Denver, and that in the -- in that area that Emina
24  Gerovic was working in?
25      A.  No.  That was not brought up in our

**Page 113**

1  discussion at all.
2      Q.  Do you know whether her husband was ever
3  hired as a custodian to work in any of the police
4  buildings?
5      A.  I don't know.  I don't believe so.
6      Q.  Do you know whether he applied?
7      A.  I have no idea.
8      Q.  Okay.  Did she mention to you that --
9  Amber Escobedo, did she mention to you that her husband
10  worked as a -- worked out of DIA?
11      A.  My conversation with her did not talk
12  about her husband at all.  It was specifically about
13  the concerns she had with her interactions with Emina.
14      Q.  Where in this document do you recite
15  those facts?
16      A.  Let me see.
17      MS. FELTON:  Object to form.
18      Q.  (By Mr. Davidovich)  I'm sorry?
19      A.  I'm -- I'm looking.
20      Q.  Okay.  I'm also looking.
21      A.  It looks like it's on Page 0059, which
22  is Page 7 of -- listed as Page 7 in the document
23  itself.  The paragraph starts with, "Coincidentally."
24      Q.  Yes.  I see that.  Do you recall if --
25  when she's talking about concerns she had, she was

29 (Pages 110 - 113)

Anne Carter - April 29, 2021

| | |
|---|---|
| 1    Q.  (By Mr. Davidovich)  That is a | 1    A.  Okay. |
| 2 duplicate, so I'm going to skip through that. | 2    Q.  That BOLO is issued October 3rd, 2017; |
| 3    MR. DAVIDOVICH:  Let's go to 117.  The | 3 correct? |
| 4 problem is that the exhibits are automatically | 4    MS. FELTON:  Object to form. |

1     Q.  (By Mr. Davidovich)  That is a
2 duplicate, so I'm going to skip through that.
3         MR. DAVIDOVICH:  Let's go to 117.  The
4 problem is that the exhibits are automatically
5 premarked once I load them.  So I have no way of
6 changing the exhibit number once it's on there, which
7 happens when it's loaded automatically.
8     A.  No worries.  I have it open.
9         (Exhibit 117 was marked.)
10     Q.  (By Mr. Davidovich)  Okay.  We're on
11 Number 117 now.  Do you know who Kyle Knoedler or Joel
12 Womick is?
13     A.  I knew who Joel was.  I'm not on this
14 email, I don't believe.
15     Q.  Do you recall -- well, strike that.
16         This email refers to a BOLO poster of
17 September 22nd of 2017, and it's on the second page of
18 the document, which is -- I can't really read it.  It's
19 blurry.  Second page starts with from Joel Womick and
20 then goes, "Hello, Everyone."  Do you see that?
21     A.  It looks like there are other HSS
22 employees?
23     Q.  Okay.
24     A.  For the most part.  I don't know who
25 these people are.

Page 118

1     A.  Okay.
2     Q.  That BOLO is issued October 3rd, 2017;
3 correct?
4         MS. FELTON:  Object to form.
5     Q.  (By Mr. Davidovich)  Upper left-hand
6 corner.
7     A.  According to this document, again, I
8 don't see these emails.  I'm not on this email.  I
9 would say there's one above it that has a different
10 date that --
11     Q.  Yes.  We talked about that.  That's
12 September 22nd.
13     A.  Well, my concern with that is the whole
14 email itself is dated September 22nd from 2017, and
15 then the attachment is stated September 22nd, 2017.  So
16 if these are on the same attachment, I would assume
17 it's in error.
18     Q.  Actually, it originally came from the PO
19 that was held with the City.  I don't know whose
20 exhibit they were originally.  That's how they came to
21 me.
22         MS. FELTON:  Those are your exhibits.
23         MR. DAVIDOVICH:  Okay.  There weren't
24 mine.  I wasn't involved.
25         MS. FELTON:  It's plaintiff's exhibit.

Page 120

1     Q.  Okay.  Did you have any conversation
2 with Joel Womick about preparing a BOLO or directing
3 him to prepare it on September 22nd, 2017?
4     A.  I briefly remember, as I stated
5 previously, the incident occurred on the 21st.  Emina
6 was instructed to stay home on the 22nd when her boss
7 went to -- her first-level supervisor went to talk to
8 the police station to say Emina would not be coming in.
9 She was there, and so it was determined at that time to
10 place a BOLO.  I don't recall my full involvement with
11 that.  I don't recall if I talked to Joel.  I just
12 recall that that was the decision made at that time.
13     Q.  Would LeRoy Lemos have had authority to
14 order a BOLO?
15     A.  I'm not sure of the protocol for that.
16 He did work with a contract, I believe, but normally
17 it's a discussion with HSS, I'm assuming.  I'm not -- I
18 don't know the full protocol for that.
19     Q.  Okay.  Go down a couple of pages to
20 E. Gerovic 0228 -- E. Gerovic 0028.  I'm sorry.  0229.
21     A.  On this same document?
22     Q.  On this same document.
23     A.  It's kind of written over something
24 else.  228 or 229?
25     Q.  229.

Page 119

1         MR. DAVIDOVICH:  Okay.  I wasn't
2 involved.
3     Q.  (By Mr. Davidovich)  But in any event,
4 let's look at the -- that page I'll refer you to,
5 October 3rd, 2017, and assuming it wasn't on that
6 email, there's a BOLO that says that, October 3rd,
7 2017.  My question is, was that a date in which Emina
8 Gerovic was authorized to be back at work?
9         MS. FELTON:  Object to form.
10     Q.  (By Mr. Davidovich)  If you know.
11     A.  I don't recall all the dates.  I don't
12 remember when she came back to work exactly.
13     Q.  Okay.  Let's go to -- sorry.  I have to
14 refresh my screen because I lost part of my exhibits.
15     A.  There's a lot of them.
16         (Exhibit 118 was marked.)
17     Q.  (By Mr. Davidovich)  There are.
18         Okay.  I believe our next exhibit is
19 Exhibit 118.  Please open Exhibit 118.
20     A.  It's open.
21     Q.  Okay.  This is the -- this is the
22 incident on September 21st that you referred to before;
23 correct?
24     A.  Yes.
25     Q.  You said in there the -- it's Page 6601.

Page 121

31 (Pages 118 - 121)

Anne Carter - April 29, 2021

| | |
|---|---|
| 1    A. I'm sorry? | 1 different location. The shift change was adjusted. |
| 2    Q. On Page 6601, the second paragraph from | 2 Sorry. That was a long answer. |
| 3 the bottom, middle of the paragraph starts, "And that | 3    Q. I got it. |
| 4 she has stated in the past that she is from Bosnia and | 4    A. This is a statement of what occurred in |
| 5 was involved with the difficulties of a war-torn | 5 my words that day. So there's a lot of information |
| 6 country, so potential with PTSD." | 6 there. |
| 7        Are those your words? | 7    Q. Okay. I see that. |
| 8    A. I'm trying to find that. I'm sorry. | 8        MR. DAVIDOVICH: Let's go to the next |
| 9 You said 6601 and which paragraph? | 9 exhibit, Exhibit 119. |
| 10    Q. Second from the bottom of that page. | 10        (Exhibit 119 was marked.). |
| 11    A. Gotcha. One second. Sorry. I had to | 11    A. Open. |
| 12 put eyedrops in. This little print, trying to read it | 12    Q. (By Mr. Davidovich) Okay. This is |
| 13 is hard. | 13 Notification of Contemplation of Disciplinary Action, |
| 14    Q. You can make it bigger. | 14 October 18th, 2017. There was a previous one in |
| 15    A. No. It is, but -- so that is my | 15 September, was there not, and is this sort of a -- |
| 16 statement, yes. | 16    A. Yeah. Christina worked on the first one |
| 17    Q. Did you believe that she was suffering | 17 in September. That was rescinded because the incident |
| 18 with PTSD? | 18 of her threat occurred after receiving it. And then |
| 19    A. I was giving the police officers just | 19 additional information was provided, and it was added |
| 20 any potential. Many times when I've talked with Emina, | 20 to the initial letter and reinstated on October 18th. |
| 21 she tends to be emotional. She tends to go from crying | 21        MS. FELTON: Nate, this is a duplicate |
| 22 to anger. I don't know. I'm not a psychiatrist. I | 22 of 114. |
| 23 was simply wanting them to have all the information. I | 23        MR. DAVIDOVICH: Okay. Sorry about |
| 24 recalled that she had said that she had a war-torn | 24 that. It's a duplicate. Let's go on to the next one, |
| 25 country that she came from and that it was very hard | 25 then. Sorry. |
| Page 122 | Page 124 |
| 1 and that's why I indicated she has emotional up and | 1        THE DEPONENT: That's okay. |
| 2 down reactions. | 2        MR. DAVIDOVICH: Let's go to the next |
| 3        So I was just providing some background | 3 one, which is 120. |
| 4 for when DPD talked to her. I was concerned for her | 4        (Exhibit 120 was marked.) |
| 5 well-being. She threatened to kill herself. I was | 5    A. Open. |
| 6 just providing what I thought might be helpful. | 6    Q. (By Mr. Davidovich) All right. Now 120 |
| 7    Q. Go down to the next page, top of the | 7 is your request for extension of time for |
| 8 next page where -- the end of the second line says, | 8 Contemplation, Contemplation of Discipline Action. I |
| 9 "She said she tried to talk to people, but everyone | 9 should make that clear. A lot of us need time for |
| 10 shut the door on her. They say, "no" to her. No one | 10 contemplation, right? Contemplation of Disciplinary |
| 11 will listen to her." | 11 Action. You say in the first paragraph that you |
| 12    A. I'm repeating what she indicated. | 12 conducted a discipline meeting on October 31st, 2017. |
| 13    Q. Did you ever question her further on | 13 So you did, in fact, have such a meeting on |
| 14 that, other than what you've already testified to? | 14 October 31st; correct? |
| 15    A. I said in the next sentence, I stated | 15    A. Based on this, we must have. In |
| 16 what you just read is what she stated to me. She makes | 16 referring back to your earlier question on the FML, |
| 17 mistakes. Everyone makes mistakes. She brought up et | 17 she, for whatever reason, something would have changed |
| 18 cetera, et cetera, which you read partial of that. And | 18 because I believe that letter was sent earlier. So |
| 19 then I wrote, "I said I would talk with management | 19 perhaps the dates changed. So we must have held the |
| 20 regarding her scheduled hour change and reminded her | 20 meeting on the 31st, if that's what I have in this |
| 21 that the Contemplation of Discipline meeting was for | 21 document; but I don't recall exactly whether she had |
| 22 her to tell her side of the story of the situation in | 22 returned from leave sooner than anticipated or what the |
| 23 the letter." | 23 details were, but she and her attorneys were present, |
| 24        Her overall concern that she was | 24 and neither one objected to the date or asked for an |
| 25 stating, again, was the shift change and working at a | 25 extension. |
| Page 123 | Page 125 |

32 (Pages 122 - 125)



**DENVER**
THE MILE HIGH CITY

Department of General Services
Facilities Management
201 W. Colfax Avenue Dept. 904
Denver, CO 80202
p: 720-865-8680
f: 720-865-7585

September 22, 2017

Ms. Emina Gerovic,
6514 Benton Circle
Arvada, CO 80003
Employee ID #136832

> **Exhibit**
> **Dep 0018**
> 1/13/2021
> Emina Gerovic

**RE:  ADMINISTRATIVE LEAVE ACTION NOTICE**

Dear Ms. Gerovic,

This is official notification that you are being placed on administrative leave with pay effective yesterday afternoon, September 21, 2017, and until further notice, pursuant to <u>Career Service Rule 10-72, Administrative Leave</u>.  It has been determined that it is in the best interest of the City to place you on administrative leave pending a fitness for duty evaluation.  This administrative leave will continue until further notice.

The Department of General Services is concerned about your well-being. Due to recent events, we feel it is in the best interest of the city that you remain away from the workplace until an evaluation can be made to determine your ability to safely and effectively perform the essential functions of your position.

During this administrative leave, you are required to abide by the following requirements, until further notice from the Office of Human Resources (OHR) Anne Carter or Suzanne Iversen:

- You shall not report to the workplace, nor will you be permitted in the workplace, except as instructed by OHR or me.  If you need to enter City facilities for personal reasons, you are to notify OHR or me and receive approval in advance.

- You are directed not to discuss this matter with any other City and County of Denver (CCD) employees unless given permission in advance by OHR or me.

- You are also directed to refrain from contacting and/or speaking to anyone at the CCD regarding this matter or work related matters, unless first given permission in advance by OHR or me.

- During this leave, you shall be available by telephone (your assigned work cell phone: 720-357-8536) and for any requested meetings during your regularly scheduled work hours, unless otherwise instructed. Scheduled hours are:  Monday through Friday, 6:00 am through 2:30 pm with a half hour lunch break from 10:30 am – 11:00 am.

- If you attend to personal business during your normal work hours, the regular procedures regarding the use of leave shall apply in accordance to <u>Career Service Rule 16-30C</u>.  For example, if you need to attend a doctor's appointment or other personal business during your regular work hours which would render you unavailable to the agency, you need to advise your supervisor to account for the time via the Kronos timekeeping system during your leave.

Emina Gerovic – Page 1

- On <u>Tuesday, September 26, 2017 at 10:00 am</u>, you shall report for your fitness for duty evaluation.  You are directed to report to:

  Nicoletti-Flater Associates
  3595 S Teller St,
  Lakewood, CO 80235
  (303) 989-1617

Be advised that if the Facilities Management team and/or Human Resources needs to contact you as part of the on-going evaluation, you must make arrangements to be available to either meet with or talk via telephone with these representatives during your normal work hours.  Accordingly, you need to be available during your work schedule at the telephone number at your address of record.  As an alternative, you may provide the number of a working cell phone where you may be reached during this leave.

Violation of these directives may lead to discipline up to and including dismissal. If you have any questions, please contact Anne Carter, OHR at 720-913-0757 or me.

Sincerely,

James E. Williamson
Facilities Management Director

cc: Murphy Robinson, Executive Director of General Services
    Kevin O'Neil, Facilities Management Administrator
    Office of Human Resources

Emina Gerovic – Page 2

CCD_0133
19-cv-03710-RM-NRN

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that I have sent by first class mail and emailed a true and correct copy of the foregoing **ADMINISTRATIVE LEAVE ACTION NOTICE** on the _____ day of September 2017 to:

Ms. Emina Gerovic,
6514 Benton Circle
Arvada, CO 80003

And

Email: geramail@yahoo.com

_____
Signature/Title

*Please note: Suite 310 for Tuesday evaluation*

Emina Gerovic – Page 3

CCD_0134
19-cv-03710-RM-NRN

September 22, 2017

This morning I decided to go over to District 5 to try to talk to the Commanders Assistant to try to smooth things over and reassure her that I would be putting a quality employee over there to replace Emina. Upon arrival at around 8:30am, I went into District 5 and was let in the door by the desk Sargent and as soon as I opened the door there was Emina talking to a Lieutenant. I believe she was shocked to see me and said I am here getting all my personal things. I said do you have everything and she said yes. I said let's go out to the parking lot and talk and we did. I explained to her that it was ok for her to come get her personal things, but now that she had her personal things there was no reason to be at over at District 5.  She said she understood. I told her I wanted her to be a good employee for Ed her new supervisor and she said she would. I told her I needed to check on Janet and Johnny and had to go. I watched her get into her car and drive out of the parking lot.

Russ Vander Kooy – custodial supervisor



To:　HSS Employees in ALL Buildings
Subject:　BOLO
Date:　September 22, 2017

## BE ON THE LOOK OUT FOR



# Emina Gerovic

If she is seen entering **ANY** Building contact your **supervisor** immediately.

Supervisors, please contact the following in order:

Leroy Lemos at 720-275-5375

Joel Womick at 720-641-6783

Leroy Redding at 720-641-5273

Garth Heth at 720-641-7911

**237**

CCD_0333
19-cv-03710-RM-NRN



**DENVER**
THE MILE HIGH CITY

Facilities Management
201 W. Colfax Avenue Dept. 904
Denver, CO 80202
p: 720-865-8680
f: 720-865-7585

Michael B. Hancock
Mayor

October 3, 2017

Emina Gerovic – Employee ID #136832
Custodian
6514 Benton Circle
Arvada, CO 80003

Re: **NOTICE OF CHANGE IN WORK LOCATION**

Ms. Gerovic:

Please consider this formal written notification that effective Wednesday, October 4, 2017, your report to work location is changing.

You are being assigned to the Castro Building, located at 1200 Federal Boulevard, in Denver, CO 80204. Your work schedule will continue to be 6:00 a.m. to 2:30 p.m., Monday through Friday, with a ½ hour lunch break.

Your immediate supervisor will be Ed Montour, Custodial Supervisor.

If you have any questions, please speak with Ed at 720-944-1401. Thank you.

Respectfully,

LeRoy Lemos
Operations Supervisor

cc:   Ed Ortiz Custodial Supervisor, DHS
      Russell Vander Kooy, Custodial Supervisor, PAB
      Kevin O'Neil, Facilities Administrative Officer
      HR Services
      Payroll Central

**Exhibit**
**Dep 0019**
1/13/2021
Emina Gerovic



**DENVER**
THE MILE HIGH CITY

Facilities Management
201 W. Colfax Avenue Dept. 904
Denver, CO 80202
p: 720-865-8680
f: 720-865-7585

Michael B. Hancock
Mayor

September 21, 2017

Emina Gerovic – Employee ID #136832
Custodian
6514 Benton Circle
Arvada, CO 80003

Re: **NOTICE OF CHANGE IN WORK LOCATION**

Ms. Gerovic:

Please consider this formal written notification that effective Monday, September 25, 2017, your report to work location is changing.

You are being assigned to the Castro Building, located at 1200 Federal Boulevard, in Denver, CO 80204. Your work schedule will continue to be 6:00 a.m. to 2:30 p.m., Monday through Friday, with a ½ hour lunch break.

Your immediate supervisor continues to be Josh Montour, Custodial Supervisor.

If you have any questions, please speak with Josh at 720-944-1401. Thank you.

Respectfully,

LeRoy Lemos
Operations Supervisor

cc:   Josh Montour, Custodial Supervisor, DHS
      Russell Vander Kooy, Custodial Supervisor, PAB
      Kevin O'Neil, Facilities Administrative Officer
      HR Services
      Payroll Central

**Exhibit
Dep 0016**
1/13/2021
Emina Gerovic

## Incident Statement/Fact Finding Questions

**Name:  Amber Escobedo**

**Job Title:  Senior Systems IT Analyst**
1/7/08 hired as Agency Support Tech OED - DWD, promoted, moved to TS (transition in July 2017)

**Interviewed By:  Anne Carter**         **Date: 10/11/2017**

---

- Our role during this interview is to focus on fact finding. You may or may not have relevant facts, and the purpose of this interview is to determine whether you have any relevant facts and, if so, to find out those facts.
- During the interview, I/we do not want you to guess.   It is important that you provide us with factual information that you actually remember to the best of your recollection.

**When answering the following questions, please explain in as much detail as possible, including dates, places and persons involved, if applicable.**

1. **Where do you currently work?**

TS, 3rd floor Webb since July 2017. OED paying funding though end of year but report to TS now. Worked on projects at Montbello until July, now less frequently.

2. **Did you work at the Arie Taylor building and if so, when?**

See above. Interactions were March 2016 to August 2016

3. **It was reported to me that on Thursday, October 5th, you met with LeRoy Lemos, Ops Supervisor with Facilities Management. You were providing him a reference for a custodian candidate. Understanding that the custodial position could be working at the Arie Taylor building on Peoria which house's DHS, OED, DMV, food bank, council offices, and DPD. During that conversation, you stated you had concerns regarding the FM custodian who previously worked there and described a European woman. She cleaned the DPD and helped us.**

   **Is the above statement correct? If not, please explain.**

   Russian or Ukrainian. Yes

## Incident Statement/Fact Finding Questions

**4. Is this the woman you were referring to (see pictures)?**

Yes. She lost weight and told me about it.

**5. Please describe in detail, including time frames (approximate if needed), any witnesses, persons involved and the circumstances regarding your concerns with this custodian employee.**

Interactions were March 2016 to August 2016. Worker with her during transition of workforce centers, nice to her because I needed her to assist. She was nice but had a vulgar mouth and talked badly about LeRoy.

She was very vulgar and two other people could verify this and I will give names, told him he wasn't a man, used curse words.

Vulgar? Every cuss word you can think of. Very opinionated. Jerrick got upset and walked out.

Names: tech services contractor – Jerrick Perkins, OED/TS: Billy Baldwin (out sick today).

Contractor custodians and she worked there. We were needing custodians to help with trash and dumpsters. She would claim its contractor work. Gave her chairs to use at DPD. Gave me tour of DPD showed me where she cleans. Nice to me, proud of her work, introduced me to DPD officers. Very inappropriate to the guys I worked with.

How so? Demeaning, talking smack to them. Billy at first took it, said wow. Jerrick got upset and left.

<u>Example week of May 16, 2016:</u> telling Jerrick he is not a man, should do more – maybe when he took a break, we were all working. Not appropriate or her place and didn't know him. Cussing. Maybe she thought she was funny but off-putting to guys and me. Very surprised she would say these types of things, it was uncomfortable for all of us.

She was gossiping to us and told us she heard workforce director (Denise Bryant) was going to Washington, she is going to convert jobs to vendors, then she is going to leave. I felt she must she must of have been talking to others about this. This is when we were going through layoff and employees were disgruntled. We knew what was happening so we didn't pay attention. Don't know who else she was talking to.

Around same time frame. What made me incredibly uncomfortable, she claimed LeRoy is an activist and hates police. He is her boss, I didn't understand why she said that. She said he was discriminatory against her and the police. He hates police and a community activist. I kind of knew LeRoy and was surprised she said that as I never got that impression. He has been nice and helpful. She didn't know us well and just spouted out about these things.

## Incident Statement/Fact Finding Questions

Google

She was very open in sharing this type of information. Concerned she has this discussions with DPD about him. Told me to google him. I told her if you really feel this way then you need to go to HR to resolve her issues, she said he is already out to get me and get contractors instead. Complained about Asian couple contactors, they don't want to do anything and push back and not flexible. I just wanted to ensure the work got done.

Seems like hard worker and proud of job but toxic and unhappy. Sharing negative attitude and ideas.

Vulgar vocabulary was very consistent when I worked with her during this time.

Examples: drops "F" bombs as common language consistently. She has a very aggressive communication style and could use help with that.

**6. Is there anything else you would like to make us aware of?**

Anytime you are looking at disciplinary action for an employee, she is not a bad worker, she needs help with communication.

Communication help? I think she thinks it's okay. Vulgar language and gossiping about others and needs to manage her issues instead of having inappropriate negative conversations with people she barely knows. Wants to share with the world all of the injustices done to her. The world is against her.

Any interactions since then? No, been there a few times but didn't see her.

Signature: _____Escobedo 10/10/17_____

Signature: _____Carter 10/10/17_____

Page 3 of 3

**242**

**000096**

```
 1              THE HEARING OFFICER:  Let's get started again.
 2   Next witness for the Agency?
 3              MS. FELTON:  Amber Escobedo.
 4              THE HEARING OFFICER:  Very good.
 5              Morning.
 6              MS. ESCOBEDO:  Good morning.
 7              THE HEARING OFFICER:  Raise your right hand,
 8   please.
 9              AMBER ESCOBEDO, having been called as a witness,
10   after being duly sworn, testified as follows:
11              THE HEARING OFFICER:  Thank you.
12              And your witness.
13                      DIRECT EXAMINATION
14   BY MS. FELTON:
15        Q    Can you please state your name for the record?
16        A    Amber Escobedo.
17        Q    Can you spell your last name, please?
18        A    E-S-C-O-B-E-D-O.
19        Q    I apologize; I've been mispronouncing your last
20   name.
21        A    There's a couple of pronunciations.
22        Q    Ms. Escobedo, what is your current position?
23        A    I'm a senior IT systems analyst.
24        Q    What Agency are you employed with?
25        A    Technology Services.
```

000098

1    at the end of June of 2016, but then we had some leftover

2    items like signage, and I think some painting they ended up

3    stringing out till probably August of 2016.

4         Q    Did you have occasion to work with Emina Gerovic

5    during that time?

6         A    Yes.

7         Q    How did you have the occasion to work with her?

8         A    She worked on the facilities crew at this

9    particular location and was pretty helpful when we asked her

10   for her assistance to--we unboxed a lot of hardware.  I guess

11   that we were cleaning out desks, furniture came out, so we

12   needed access to the dumpster, which became full quite a bit.

13   She helped--she helped, and she also assigned staff to help

14   us.  And she called to have the dumpsters emptied as well.

15   And also had the areas cleaned for us as well.

16        Q    During your interactions with Ms. Gerovic did you

17   have any concerns?

18        A    I wouldn't necessarily say concerns with her work

19   ethic per se, because she is in my opinion, and what I

20   witnessed, she's an extremely good worker, extremely hard

21   worker, very proud of the work that she does and has a great

22   work ethic.  But maybe as far as communication style goes,

23   it's a little interesting and rough.

24        Q    All right.  Can you give me some examples of how

25   it's interesting and rough?

**244**

000099

```
 1     A    So, a lot of vulgarity as far as language goes.

 2    Interaction is very comfortable, and one of the guys that I

 3    was with found some of the things that she said to him

 4    offensive.

 5     Q    What were some of the vulgarities that you

 6    witnessed?

 7     A    Pretty much about every curse word, and just--the

 8    particular instance that I'm talking about was with Jared

 9    Perkins (phonetic), and he actually got up and left the room,

10    because I think it was maybe in fun but didn't appear to be

11    that way, and he was offended.  So, like, "You're not a man."

12    "You should be working harder."  "What are you doing?"

13    Things of that nature.

14     Q    Did you have any language barriers in communicating

15    with Ms. Gerovic?

16     A    No.

17     Q    All right.  You talked about the cussing and the

18    comments to other employees.  Were there any other concerns

19    that you had during your work with Ms. Gerovic?

20     A    Yes.  I did not bring them to anyone's attention,

21    to be really honest with you, because I didn't want to be in

22    the middle of it.  I had a job to do and I--

23          MS. KARNY:  Objection; non-responsive.

24          THE HEARING OFFICER:  Overruled on that basis.

25     Q    (by Ms. Felton) Go ahead.
```

**245**

000100

1      A     Okay.  She had made some comments about her

2    immediate supervisor, Leroy Lemos, who I knew sparingly, or

3    just on a business basis.  We had--my Agency had worked with

4    him for a number of years to conduct events and pick up

5    facilities, cleaning and trash, and things of that nature.

6    And she basically had said that he was a community activist,

7    he hated police officers, and that I should Google him and

8    check for myself, because I said I didn't feel like I had

9    ever had that feeling about him, but I don't know him

10   personally.  And, like I said, my interactions with him had

11   been strictly business at that point in time.

12          And so it was concerning to me as a fellow

13   supervisor, because those are pretty serious allegations.

14   It's not like somebody just saying, Hey, I don't like my

15   boss, he's a jerk or whatever the case is, other choice

16   words.  But that's pretty concerning.  That's serious

17   accusations to me.  But I also didn't feel like it was my

18   place to get in the middle of it nor did I want to insert

19   myself into any situation like that.

20     Q     Did she make any comments to you regarding the OED

21   workforce?

22     A     Yes.

23     Q     What comments were those?

24     A     Basically that she heard Denise Bryant was going to

25   be moving on to Washington--

**000101**

```
 1     Q    I'm going to stop you for one second.  Who's Denise
 2  Bryant?
 3     A    Denise Bryant is the Director of Workforce
 4  Development for the Office of Economic Development.
 5     Q    To your knowledge, while you were with the
 6  Workforce, was Ms. Gerovic ever an employee of Workforce?
 7     A    No.
 8     Q    Okay, I'm sorry.  Go on.  You were saying Denise
 9  Bryant.
10     A    Yeah.  So, she had mentioned Denise Bryant she had
11  heard was moving on to kind of bigger and better things in
12  Washington, DC, and I thought that was interesting that she
13  would know her by name and that she would know that she was
14  moving to Washington, because that was a rumor that was going
15  around at that time, but that was not a fact.  And obviously
16  she's still here years later.  So at the time, I will say
17  because we were turning the Workforce centers, there were a
18  lot of OED staff members that were laid off.  And so they
19  were very disgruntled at this point in time, and so it's very
20  possible that they could have relayed the information to her
21  because they worked in the same building.
22          MS. KARNY:  Objection as to speculation.
23          THE HEARING OFFICER:  Sustained.
24     Q    (by Ms. Felton)  Did you give any suggestions to
25  Ms. Gerovic while you worked with her?
```

**000102**

```
 1        A    I did.  Told her just to kind of destress and not
 2   take everything so seriously, that she did a great job taking
 3   care of particularly the police station downstairs.  She was
 4   very proud of her work.  All of the guys down there seemed to
 5   like her.  She gave me a tour of it.  I told her if she
 6   really did feel like there were HR issues and that someone
 7   was out to get her or was treating her unfairly, that we are
 8   governed by the CSA rules and that she should contact HR.
 9        Q    Did you have an opportunity to bring your concerns
10   to the attention of Leroy Lemos?
11        A    Yes.
12        Q    How did that occur?
13        A    So, I think it was in November of last year there
14   was a position open for like a--I don't think I even read the
15   position, so I'm not exactly sure.  It was some sort of
16   janitorial facilities maintenance position available at the
17   Arie P. Taylor Building from what I understand.  I was called
18   by my husband, who works at Denver International Airport, and
19   one of the guys on his crew had a relationship with an HSS,
20   bait security officer out at Denver International Airport.
21   She was looking to enquire about a job and wanted to know if
22   I knew anybody over there, if I could enquire more about what
23   they were looking for, and so she had applied directly to
24   that job.
25             I--like I said, I knew Leroy on a very business
```

**248**



**DENVER**
THE MILE HIGH CITY

Department of General Services
Facilities Management
201 W. Colfax Avenue Dept. 904
Denver, CO  80202
p: 720-865-8680
f: 720-865-7585

October 18, 2017

Ms. Emina Gerovic
6514 Benton Circle
Arvada, CO 80003
Employee ID #136832

**RE:  Notification of Contemplation of Disciplinary Action**

Dear Ms. Gerovic:

This is official notification that disciplinary action is being contemplated against you for alleged misconduct that may violate the following Career Service Rules:

<u>16-29, Grounds for Discipline</u>

The following may be cause for the discipline or dismissal of a Career Service employee:

A.       Neglect of duty or carelessness in performance of duties and responsibilities.

D.       Any act of dishonesty, which may include, but is not limited to, lying, or improperly altering or falsifying records, examination answers, or work hours.

G.       1.       Failing to meet established standards of performance including either qualitative or quantitative standards.  When citing this subsection, a department or agency must describe the specific standard(s) the employee has failed to meet, such as standards in a Performance Enhancement Program (PEP) Plan (Performance outcomes/goals) or in a Performance Improvement Plan (PIP).

2017 Performance Management/Goals:

STARS Values/Goals:

**Teamwork:** Works cooperatively with others to achieve team goals. Actively fosters commitment and team spirit and works with others to meet business objectives.

**Accountability & Ethics:** Follows through on commitments made and takes ownership for results and subsequent outcomes. Contributes to maintaining the integrity of the organization and displays high standards of ethical conduct.

**Respect for Self & Others:** Treats others with consideration and high regard. Demonstrates respect for the differences that exist among fellow employees and recognizes that those differences are an important source of innovation, progress and interpersonal awareness.

EXHIBIT
22

CCD_0053
19-cv-03710-RM-NRN

**Performance Goals:**

**Respectful Workplace:** Ensures all interactions with the public, peers, supervisors/management and customer/tenants are conducted in a professional and courteous manner

2016 Performance Management/Outcomes (includes Stars values):

**Ethics and Accountability:** Follows both the letter and the spirit of all the City of Denver, General Services and Facilities Management, Ethic codes, Career Service rules, Administrative Policies and all other Departmental and Management directives

**Respect for Self & Others:** Treats all people in a professional and courteous manner including subordinates, peers, supervisor and the public.

I.     Failure to maintain satisfactory working relationships with co-workers and other individuals the employee interacts with as part of his or her job.

R.     Conduct which violates the Career Service Rules, the City Charter, the Denver Revised Municipal Code, Executive Orders, written departmental or agency regulations, policies or rules, or any other applicable legal authority. When citing this subsection, a department or agency must cite the specific regulation, policy or rule the employee has violated.

<u>Facilities Management Administrative Policies, February 2014</u>

**EMPLOYEE CONDUCT**

As a representative of General Services/Facilities Management and the CCD, you are a public servant and a role model for all community members. That means that you are held to a high standard of excellence and professionalism. All Division staff are expected to comply with the CCD standards at all times.

- Every City employee shall conscientiously fulfill the duties and responsibilities of their position. The conduct of every employee shall reflect credit on Career Service (CS) and the CCD during work hours or at any time while representing the agency, Division, or CCD

- Employees must not disturb other City employees or the public. While employees are expected to be pleasant to building tenants and the public, they should not initiate lengthy personal conversations with other City employees or the public, except when all parties are on scheduled lunch periods or breaks. Loud talking, loud laughing and/or noise, swearing, inappropriate jokes and/or remarks are prohibited at all times.

- Employees are expected to behave in a professional manner at all times, whether during their regular shift or overtime, and treat the public, building tenants, their co-workers and supervisors with respect. Arguments, constant complaining, gossip and/or a consistently negative attitude towards the job, supervisors or other employees is not appropriate.

**USE OF WORK/BREAK TIME**

Emina Gerovic –  Page 2

CCD_0054
19-cv-03710-RM-NRN

All employees must make necessary arrangements to transact their personal business outside of scheduled work hours.

The Division encourages you to take your authorized breaks away from the work area to give you some time to re-energize and to minimize disruption and distraction to others. You are encouraged to use the City break room areas and not use other agency facilities (courtrooms, conference rooms, etc.).

S.    Refusal to cooperate, including refusing to provide requested information and materials relevant to an investigation.

T.    Conduct which is or could foreseeably:

1.    Be prejudicial to the good order and effectiveness of the department or agency;
2.    Bring disrepute on or compromises the integrity of the City; or
3.    Be unbecoming of a City employee.

You are employed by Facilities Management within General Services for the City and County of Denver (CCD), as a Custodian. Your original hire date with CCD was August 11, 2014.  According to your Career Service job specification, the general duties of your position are to perform standard level interior and exterior janitorial/minor maintenance duties involving cleaning and disinfecting all areas assigned, including restrooms, locker rooms, break rooms, holding cells and all office areas. Your normal work hours are from 6:00 A.M. to 2:30 P.M. except when your schedule is adjusted for other coverage. You are currently assigned to work at Denver Human Services (DHS) and previously worked at Denver Police District Five.  You have personal accountability for carrying out assigned functions within the scope of established guidelines and objectives.

Per the Facilities Management (FM) Policy manual, as a representative of General Services/Facilities Management and of the City and County of Denver (CCD), you are a public servant and a role model for all community members. That means that you are held to a high standard of excellence and professionalism. All Division staff are expected to comply with the CCD standards at all times.

The following is a summary but not an exhaustive description of the alleged misconduct for which discipline is being contemplated:

You have previously been coached, counseled, and disciplined for not meeting performance expectations, not following FM Administrative Policies, being out of uniform, not following City Safety Policies, personal/inappropriate use of your City-issued cell phone, not providing acceptable level of customer service, failure to take responsibility for your actions, acts of dishonesty and conduct that may bring disrepute on or compromises the integrity of the City.

You received a written reprimand in May of 2017. In the reprimand, it stated, "You are expected to treat your co-workers, including contract personnel, and the public with respect and professionalism. Most important you are expected to be truthful and forthcoming when asked for information or a report on an incident… Your continued failure to be honest, truthful and/or forthcoming with false and mis-directing statements will not be tolerated." It also included that your use of work time was inappropriate and you were involving and disturbing others by initiating lengthy personal conversations.

On Monday, September 11, 2017, I was notified of concerning content on your public Facebook profile which had been brought to the attention of the Office of Human Resources (OHR). (See Attachments 1 and 2: Public Facebook profile, public Facebook pages).
.

Emina Gerovic –  Page 3

CCD_0055
19-cv-03710-RM-NRN

Your profile is of concern as you list the Denver Police Department as your employer and list your occupation as "Police Officer." Upon reviewing your public Facebook profile, I noticed you also posted several pictures in 2015 showing yourself wearing a sweatshirt with a Denver Police Department embroidered badge, wearing a patrolman's hat, wearing a t-shirt with an embroidered DPD patch and a close-up photo of your DPD-issued access card that also features a DPD badge.

On September 12, 2017, you were asked to come to the Webb Building for a discussion with me. Upon showing you the print-outs from your Facebook profile, your first reply was, "I don't know what the problem is, I am in my Facilities Management uniform, look I even have my safety shoes on." I informed you that we are addressing the fact that you list the Denver Police Department as your employer and have identified your occupation as a Police Officer. When I asked about your self-identification as a Police Officer, you replied, "I do not know how that got there." When asked about the pictures in DPD uniforms, you replied, "Those were just for fun a long time ago."

I then informed you that you are expected to remove the inaccurate employment information and if you are going to list your employment information, it is factual to state that you are a custodian with Facilities Management. I then instructed you to return to work. While in route, I called you to request you to report instead to the Internal Affairs office at the Police Administration Building regarding the content on your Facebook profile.

You were interviewed by Denver Police Department (DPD) Sgt. Steinke on September 12, 2017 and the report is attached. (See attachment 3). The report indicates you received the sweatshirt from an unidentified Police Officer as a gift. You state that the pictures with you wearing a patrolman's hat were the result of you being "told" to put on the hat on by Officer Ray. You also state that the picture of you in a gray t-shirt displays a DPD sticker given to you.

You implied you were following a police order to put on the hat and then a picture was taken. You state the badge on the gray shirt was a sticker, when, in fact, it is clearly an embroidered patch. There is no acceptable explanation for listing your employer as DPD Traffic Operations. In fact, you have not been assigned there at any time during your employment, as we have contractors cleaning that facility.

The report also states you advised the Sergeant that the pictures were "more of a joke." However, the different photographs of you in clothing with DPD reference are on multiple dates spanning a long period of time (August 2014 through October 2015). While reviewing the translation of the saved Facebook conversations, along with the multiple photographs of you displaying a police uniform, the term "MILIČIONERKA" is used which refers to policewoman; friends commented that she could not forget that you are military, and that the jacket looks good. Another comment wishes you lots of luck and congratulations, to which you replied "thanks," along with other loving comments. We did not see any comments which indicated this was a joke. Instead, it appears you were representing yourself as a police officer and continued to do so after these posts by listing your job as a police officer up until we requested you remove it in September 2017.

In 2015, you were given a verbal warning for wearing a gray DPD sweatshirt while on the clock at the PAB, as it is not part of your FM uniform and it could create problems if you were misidentified as a police officer. At the time, you stated you wore it because you were so proud to work for the DPD. I clarified to you that you do not work for DPD, you are assigned to clean a police building. Despite that, you posted pictures of yourself identifying yourself as a police officer.

Falsely identifying yourself to the public as a police officer is both troubling and unacceptable. In your position as a custodian, you routinely interact with members of the public. By wearing clothing items that have police badges, posting pictures of yourself in police issued clothing and posting a copy of your police building access card, you can create public confusion regarding your role, responsibilities and

Emina Gerovic – Page 4

CCD_0056
19-cv-03710-RM-NRN

duties.  It can also be dangerous to you and the public, should someone need police assistance or intervention and come to you for help.  Representing yourself a police officer, as a joke or to impress others, is not only deceitful, but could be perceived as impersonating a police officer, which is a serious offense.

You are expected to accurately represent your role with the City and County of Denver and be truthful and forthcoming when providing or being asked for information.  It is the expectation of FM Management and DPD that any inaccurate information be removed from your Facebook Profile.

On September 19, 2017, you received a contemplation of discipline letter for these concerns. On September 20, 2017, in the afternoon, I met with you to provide notice of your work location change to Denver Human Services (DHS) effective September 27th with your work hours changing to 1:30 pm to 10 pm. I explained that it was in the best interest of FM's Operations to reassign you to the DHS team effective Wednesday, September 27th, making your last day at District 5, the 26th. Your first response was "NO! You can't do this! Why are you taking away my station?" I replied, "Emina, the issue is not up for debate, the decision has been made." You said, "No, I can't do it, I need to pick up my grandchild from school." I replied, "We understand you may have some personal logistics that need to be addressed and that is why we are giving you a week to make the adjustments you need to make at home." You replied, "No, I won't do it! I am not going to quit, but I am not changing my work!" I replied, "Emina, you are expected to report to Josh Montour at the Castro Building next Wednesday." You responded, "We'll see!" and stormed out of the room.

The below documentation explains the incidents that followed:

On September 20th, you went to Terrie Gathron's, FM Directors' assistant, cube and said you wanted Mr. Robinson's (Executive Director of General Services) phone number to call him about a personal issue. You were advised to go through your chain of command and first schedule a meeting with Mr. O'Neil (FM Deputy Director and LeRoy Lemos' supervisor; your Operations Supervisor) for the next morning at 9 am.

That afternoon, you went to Christina Howard with OHR and asked about immediately obtaining a copy of your personnel file. Ms. Howard explained that the contemplation of discipline meeting would be your opportunity to address your concerns related to the letter. You said you wanted to meet because a lot of things were going on, but that you would wait until after the contemplation meeting.  You also stated you may file a complaint.  Ms. Howard provided you with information on how to request your records and file a complaint.

On September 21st at 9:10 am, you met with Kevin O'Neil. Per Mr. O'Neil:

"Emina said she was promised a permanent job at Police District #5. I explained to Emina that nobody in our organization is guaranteed or would ever be guaranteed a permanent shift assignment. I told her we move people where our business needs dictate. Emina was quiet for a short while and then changed the subject; she went on to say that when she was hired she only signed up for a first shift and that nobody ever gave her a copy of our policies or went over them with her. I responded by telling her that every employee was given a copy of our policies at the time we hired them and that each employee initialed each page and signed the document to acknowledge they had been given a copy. Emina was quiet a little longer and then changed the subject again stating that she can't and will not work 2nd shift. Emina said, 'I am the only care-giver for a grandson from my daughter's side of the family, he has a brain tumor and I need to pick him up at school every day at 3:15 pm.' I advised Emina that I would speak with LeRoy Lemos to see if we had any available spots on the first shift at the Castro building. Emina said she wanted

Emina Gerovic –  Page 5

CCD_0057
19-cv-03710-RM-NRN

to speak to James (James Williamson, Facility Management Director) and Murphy (Murphy Robinson, newly appointed Executive Director of General Services). I said she should walk over to Terrie's desk and make an appointment first. Emina said she would. The meeting ended and she left."

Instead of allowing Mr. O'Neil to look at the earlier shift or following directions, at approximately 9:30 am, you appeared in Mr. Robinson's office without notice and tried to hug him. He didn't know who you were and didn't recall meeting you before. You called him "brother" (Mr. Robinson is African American), and claimed you were not being treated fairly. You stated you wanted to speak to management before filing an EEOC complaint and that you would not file if we made you "happy" again. You also made a statement about caring for your grandchild (your statement to Mr. Robinson about your grandchild was different than the statement you made to Mr. O'Neil about caring for your grandchild). Knowing of the pending contemplation of discipline, Mr. Robinson explained that he was sorry you felt that way, but we have a process to ensure all employees are treated fairly. You interrupted him and said that he knew what it was like to be part of the police family. You stated, "I am the best employee in the City and everyone makes mistakes. I know what I did was a mistake…"

You then told Mr. Robinson that he would be getting a call from City Council, the DPD Commander at District 5, and the manager of the Department of Safety and they would be supporting you. Mr. Robinson asked you if you had met with your managers and directors about your concerns. You told him you had not yet met with them, but you were here to schedule a meeting. Later, however, Mr. Robinson found out you had just met with the FM deputy director, Mr. O'Neil.

FM determined to make some staff adjustments. Lee Nuanez, Custodial Supervisor, delivered a revised notice of work change stating you would still report to DHS but your hours would change back to 6 am to 2:30 pm starting September 25th. Lee Nuanez requested your DPD badge and keys. You said you did not have your DPD badge and keys, they were at the A. P. Taylor building. This did not make sense as you would not be able to enter the facilities at 6:00 am without your badge.

On September 22, 2017, at 8:30 am, Russ Vander Kooy, Custodial Supervisor, went to DPD District 5 to advise them that the custodian assignment would be changing. You were supposed to be on leave at that time for unrelated reasons. However, when Mr. Vander Kooy entered, you were in the facility talking with a lieutenant and you seemed surprised to see him. When asked what you were doing, you said you were getting your personal things. He asked if you had all your items and you said yes. However, you did not have anything in your hands or that you were carrying.

During this time, without request from the FM, emails were sent to Murphy Robinson from DPD officials stating what a great employee you are and how you should be treated fairly and you do a good job. Stephanie O'Malley and Chief White were copied in the emails. Councilman Herndon reached out to Mr. Robinson stating you contacted him and said you were being "fired" on Thursday (original contemplation of discipline date) and how unfair that was. Mr. Williamson also received unsolicited phone calls stating that you shouldn't be moved from the DPD assignment.

According to Career Service Rules, duty assignments may be temporary or regular, incidental or essential, and may include changes in location of work and changes in equipment and tools. According to the FM Administrative Policies, the supervisor is responsible for establishing daily work assignments and may adjust scheduled work shifts, lunch hours and breaks (either for entire crews or for individual employees) temporarily as workload demands. Work locations may also be altered in order to meet

Emina Gerovic – Page 6

CCD_0058
19-cv-03710-RM-NRN

business needs. Employees will be given at least 48 hours written notice of any permanent shift or work location changes.

You never had to report to the later shift as a change was made in your hours, giving you your earlier shift. You just needed to report to a different location. You even told me that DHS was just a few miles from your home and that you will do a good job at DHS.  Despite that, you continued to recruit high level officials to assist you, providing inaccurate, false, and incomplete information regarding your current situation.

Coincidentally, on October 5, 2017, a city employee stopped by regarding the vacant custodian position at Arie Taylor/District 5. During that conversation, she mentioned she had concerns regarding the FM custodian who previously worked there and described you. I asked her to share her concerns with OHR. The employee told OHR that she worked with you on several occasions for a few needs at the facility. She stated that you seemed very proud of your work and showed her around DPD offices. However, your attitude and language use was very inappropriate on a consistent basis. You had lengthy personal conversations while she was working and were very opinionated. One instance in particular is when you were speaking with her and two male team members while they were working and spoke in a very derogatory manner to the men telling them they weren't doing enough work and inserting yourself and your opinions. One became annoyed and walked out, the other tried to ignore your comments. Another time you made the employee feel very uncomfortable as you were gossiping about the OED management team that worked there and that they were going to lose their jobs, your also shared negative inappropriate comments regarding me, your operations supervisor.

This employee further stated, "She didn't know us well and just spouted out about these things. I told her if she really felt that way then she needed to go to HR to resolve her issues, she said he (LeRoy) is already out to get me and get contractors instead." She added that you complained about an Asian couple that were contactors.  The employee thought that you seemed like a hard worker and you were proud of your job, but you were toxic and unhappy and shared a negative attitude and ideas. The employee stated that your use of vulgar vocabulary was very consistent when she worked with you during this time.  She said you dropped "F-bombs" consistently and that you had a very aggressive communication style.  The employee recalled these incidents as it was very uncomfortable for her when working with you, but she needed your help to get the job done.

Your activities do not appear to follow protocols, were not completely truthful and were disrespectful to FM management. Your use of worktime and involving others in your personnel matters was disruptive to the workplace. You have been advised of this inappropriate activity in the past yet continued to take worktime to spread rumors and complain about your management team.

Your disciplinary history includes:

| | | |
|---|---|---|
| 5/4/2017 | Written Reprimand | Dishonesty, violating respectful workplace, misconduct, unprofessional and discourteous conduct toward the public. |
| 9/21/15 | Verbal Reprimand | Multiple violations of failure to follow safety policies |

You have also had several documented issues as noted below:

Emina Gerovic – Page 7

CCD_0059
19-cv-03710-RM-NRN

| 3/17/17 | Documented Counseling | Using personal cell phone for City business and not having City cell phone charged, on person nor voice mail box set up. |
| 6/13/16 | Documented Counseling | Excessive personal use of cell phone and inappropriate use of work time |
| 10/1/15 | Verbal Warning | Poor work performance, poor customer service |

**The Contemplation of Discipline meeting will be held on Tuesday, October 31, 2017 at 1:30 p.m. at the Wellington Webb building, in the 6.G.7 conference room located on the 6th floor.**

The purposes of this meeting are to allow you to correct any errors in our information or facts, to tell your side of the story and to present any mitigating information as to why possible disciplinary action should not be taken. You are entitled to have a representative of your own choosing present at this meeting. To ensure an accurate record of this meeting, it will be audio recorded.

You may present a written and/or verbal statement at this meeting. Your statement, prior disciplinary history and work record will be given full consideration before a final decision is made regarding any disciplinary action. Please note, no decision regarding any action has been made nor will be made until the meeting has concluded.

If you and/or your representative fail to appear at the scheduled time, I may consider such failure to appear as a waiver of your right to a Contemplation of Discipline meeting under the Career Service Rules.

Please be advised that you are not to take any retaliatory action against anyone as a result of this contemplation of discipline letter. If any such action is taken, further discipline may be contemplated and taken, up to and including dismissal.

Respectfully,

LeRoy Lemos
Facilities Management Operations Supervisor

Enclosure(s):  Attachment 1 and 2: Public Facebook profile, public Facebook pages
              Attachment 3: DPD inter-office memo

cc:   Kevin O'Neil, Facilities Administrative Officer
      James Williamson, Facilities Director
      Murphy Robinson, General Services Executive Director
      OHR Personnel File

Emina Gerovic – Page 8

CCD_0060
19-cv-03710-RM-NRN

## CERTIFICATE OF SERVICE

I hereby certify that I have ☒ hand delivered / ☐ sent by first class mail / ☐ sent via email a true and correct copy of the foregoing **NOTICE OF CONTEMPLATION OF DISCIPLINARY ACTION** on the ___18TH___ day of ___October___, ___2017___ to:

Mailed:
Ms. Emina Gerovic
6514 Benton Circle
Arvada, CO 80003

Hand delivered:
201. W. Colfax Ave
Denver, CO 80202

Emailed representative:
Thalia Karny, Esq. at: tkarny@1626washingtonlaw.com
Karla Carrigan, Esq. at: karla.carrigan@1626washingtonlaw.com

By: _____
        Issuer Signature

_LeRoy Lemos / Operations Supervisor_
Issuer Printed Name/Title

Emina Gerovic – Page 9

CCD_0061
19-cv-03710-RM-NRN

**000244**

```
1              THE HEARING OFFICER:  Rebuttal as to?

2              MS. KARNY:  The testimony today from the Agency

3    side.

4              THE HEARING OFFICER:  Well, on what claim?  On the

5    disciplinary claim?

6              MS. KARNY:  On both claims.

7              THE HEARING OFFICER:  Well, there wouldn't be any

8    rebuttal on the disciplinary side.  On retaliation, since

9    that's your burden of proof, then I would allow perhaps a

10   rebuttal witness but not on the disciplinary side.  So

11   granted in part and denied in part.

12             Anything else?

13             MS. KARNY:  No.

14             THE HEARING OFFICER:  Okay.  Very good.

15             And, Ms. Felton.

16             MS. FELTON:  All right.  The Agency calls James

17   Williamson, please.

18             THE HEARING OFFICER:  And good morning to you.

19             MR. WILLIAMSON:  Good morning.

20             THE HEARING OFFICER:  Raise your right hand for me

21   please.

22             JAMES WILLIAMSON, having been first duly sworn, was

23   examined and testified as follows:

24             THE HEARING OFFICER:  Proceed.

25             MS. FELTON:  Thank you.
```

000245

```
 1                      DIRECT EXAMINATION
 2   BY MS. FELTON:
 3        Q    Would you please state your name and spell your
 4   last name for the record?
 5        A    James Williamson, W-I-L-L-I-A-M-S-O-N.
 6        Q    Mr. Williamson, what's your current position?
 7        A    I am the Director of Facilities Management at the
 8   Department of General Services.
 9        Q    How long have you been in that position?
10        A    Eight years.
11        Q    What are your duties in that position?
12        A    We're responsible for maintaining all city
13   facilities, about 130 buildings, a little over 6 million
14   square feet, all human services facilities, district court,
15   county court, public works and safety, police, sheriff, and
16   fire.
17             MS. KARNY:  I'm having a hard time hearing.
18             THE HEARING OFFICER:  Mr. Williamson, the
19   microphone doesn't amplify, so you'll have to do it all
20   yourself.
21             THE WITNESS:  That's not going to be a problem.
22   Okay.  Do you want me to repeat?
23             MS. KARNY:  No, no, no.  I just missed the first
24   sentence.  But--
25             THE WITNESS:  Okay.
```

**000260**

1  Ms. Gerovic offer to provide more complete pages of the

2  Facebook postings?

3       A    State that--ask that again.

4       Q    During the contemplation of discipline meeting--

5       A    Right.

6       Q    Did Ms. Gerovic offer to provide more complete

7  pages of the Facebook posts?

8       A    No.

9       Q    During the contemplation of discipline meeting, was

10  there any complaint about the use of FMLA in conjunction with

11  workmen's compensation?

12       A    No, there wasn't.

13       Q    Was there any statement during the contemplation of

14  discipline meeting of retaliation?

15       A    No.

16       Q    Did you make a decision regarding what discipline

17  to impose at the contemplation meeting?

18       A    No.

19       Q    When did you make that decision?

20       A    Weeks later.

21       Q    And let me start, I should have laid a better

22  foundation for that.  Were you the one that decided what

23  discipline was going to be imposed?

24       A    Yes.

25       Q    Are you the only one that has the authority to

**260**

**000261**

 1   impose discipline above a written reprimand?

 2        A    Yes.

 3        Q    Was there any discussion after the contemplation

 4   meeting regarding what discipline to impose?

 5        A    Yes.

 6        Q    What discussions were there?

 7        A    I talked to staff, and we talked--and they gave me

 8   recommendations.

 9        Q    Exhibit 1 is the termination letter.  And if it's

10   easier for you to view it, again, you can view it in the

11   notebook.  Going through the violations then in the

12   termination letter, are you finding that?

13        A    It's 17; right?

14        Q    No.  Exhibit 1.

15        A    Oh, 1, okay.

16        Q    So the first one is neglect of duty and

17   carelessness, or carelessness in the performance of duties

18   and responsibilities, 16-29 A.  Did you find a violation of

19   this based on the information that you received up until and

20   including the contemplation of discipline meeting?

21        A    Yes.

22        Q    How did you determine there was a violation of A?

23        A    For all city employees we have a code, basically.

24   It's called STARS: Service, Teamwork, Accountability,

25   Respect, and Safety.  And I found that she violated--those

**261**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 19-cv-03710-RM-NRN

EMINA GEROVIC,

Plaintiff,

v.

CITY AND COUNTY OF DENVER, et al.

---

**DECLARATION OF JAMES WILLIAMSON PURSUANT TO 28 U.S.C. § 1746**

---

Pursuant to 28 U.S.C. § 1746, Declarant, James Williamson states upon personal knowledge as follows:

1.     I am a person of color. I became employed with the City and County of Denver on April 5, 1999, as a custodial contracts administrator. I then became an assistant director of Public Office Buildings, Manager I, acting Deputy Manager of General Services, and Manager II. For the last eight years of my employment, I was the Director of Facilities Management at the Department of General Services. I retired from the City effective January 10, 2019. During Ms. Gerovic's employment I supervised Kevin O'Neil.

2.     I reviewed Ms. Gerovic's written reprimand and based on the evidence collected, I honestly believed that Ms. Gerovic improperly let the man into a secure building before business hours, lied about doing it, spent work time interrupting the work time of other employees to talk to them about the incident, lied about talking to those other employees, treated one of those employee disrespectfully, and failed to provide a written statement of the incident. Ex 12.

3.     I made the decision to terminate Ms. Gerovic's employment. Mr. Lemos was not

**262**

involved and the decision was not based on Ms. Gerovic's race, color, national origin, ancestry.

4.    Based on the evidence presented in the contemplation of discipline letter and the response by Ms. Gerovic and her attorney during her contemplation of discipJine meeting, I honestly believe Ms. Gerovic (a) was holding herself out as a police officer, (b) posted her occupation as police officer and lied about how that got on her Facebook page, (c) posted the pictures of herself in police attire and lied about them being a joke, (d) posted  the picture and lied about the badge on her clothes being a sticker, (e) posted the pictures of her in the police hat and lied about being "told" to put it on, (t) posted the picture of her police access badge, (g) was insubordinate when Mr. Lemos told her her location would change, (h) lied that she was promised a permanent post, (i) lied that she was promised first shift, (10) lied that no one ever went over the policies with her, (j) lied that her grandson had a brain tumor, (k) lied to Mr. Robinson about meeting with Mr. O'Neil, ()) ignored the paid administrative leave directive and went to District 5, (m) lied when she claimed that she went to District 5 to pick up persona) items, (n) lied to Councilperson Herndon that she had been fired, (o) spoke in a derogatory manner telling two male employees they were not doing enough work, (p) gossiped about a management team losing their jobs, (q) gossiped about Defendant Lemos, and (r) used vulgar vocabulary with another employee including "F-bombs."

I declare on this 20th day of May, 2021, under penalty of perjury that the contained herein is true and correct.

James Williamson

**Exhibit
0054**
Leroy Lemos

**Date:**      Tue, 21 Nov 2017 5:15:00 PM (UTC)
**Sent:**      Tue, 21 Nov 2017 5:12:07 PM (UTC)
**Subject:**   Gerovic, Emina - 136832 : FMLA Approval Letter (Workers Comp) - General Services
**From:**      Nicholas Sterner <denver@mails.itimebank.com>
**To:**        Gerovic, Emina - GS Custodian, Vander Kooy, Russell W. - GS FPMFM Operations Supv; Howard, Christina -
               OHR Senior Human Resources Business Partner; Payroll Division
**CC:**        OHR FMLA/ADA Team

November 21, 2017

Emina Gerovic

## RE: FMLA Leave Approval

Dear Emina:

This is to notify you that the required certification was received on 11/02/2017. At this time, your certification is considered complete and your FMLA leave request is approved as outlined below:

| Employee ID: | 136832 |
| Leave Reference ID: | 122042I |
| Reason: | Serious Health Condition |
| Relationship: | Self |
| Leave Approved as: | Intermittent Associated with Workers' Compensation |
| Eligibility Determination: | The Family and Medical Leave Act: Eligible |

Leave Dates Determination:

| Leave Dates | Hours | Type | Pay Indicator | Status |
|---|---|---|---|---|
| 10/20/2017 - 10/20/2017 | 6.00 | Intermittent | Not Used | Approved |
| 10/23/2017 - 11/19/2017 | 160.00 | Continuous | Not Used | Approved |

All leave taken for this reason will be designated as FMLA leave and will be deducted from your FMLA leave entitlement.

If this leave is for future dates, this approval may be affected by additional leave requests made prior to the start date of this leave.

To cancel or change any of the leave dates, please contact the OHR Leave Team.



**264**

0|2

Please note that absences lasting longer than two weeks may affect your Denver Employee Retirement Plan (DERP) contribution.  Please contact DERP directly with any questions via phone (303)839-5419 or  email mbrsvs@derp.org.  You can also find information at www.derp.org.

If you have any questions, please contact me at (720) 913-0807.

Sincerely,

Nicholas Sterner
HR Professional

Enclosed:

013

**Exhibit 0055**

Leroy Lemos

**266**

**Date:** Fri, 15 Dec 2017 4:30:14 PM (UTC)

**Sent:** Fri, 15 Dec 2017 4:30:02 PM (UTC).

**Subject:** Updated Approval: Gerovic, Emina - 136832 : FMLA Approval Letter (Workers Comp) - General Services

**From:** Nicholas Sterner <denver@maills.itimebank.com >

**To:** Gerovic, Emina - GS Custodian, Vander Kooy, Russell W. - GS FPMFM Operations Supv; Howard, Christina - OHR Senior Human Resources Business Partner; Payroll Division

**CC:** OHR FMLA/ADA Team

December 15, 2017

Emina Gerovic

### RE: FMLA Leave Approval

Dear Emina:

This is to notify you that the required certification was received on 12/06/2017. At this time, your certification is considered complete and your FMLA leave request is approved as outlined below:

| | |
|---|---|
| Employee ID: | 136832 |
| Leave Reference ID: | 120421 |
| Reason: | Serious Health Condition |
| Relationship: | Self |
| Leave Approved as: | Intermittent Associated with Workers' Compensation |
| Eligibility Determination: | The Family and Medical Leave Act: Eligible |

Leave Dates Determination:

| Leave Dates | Hours | Type | Pay Indicator | Status |
|---|---|---|---|---|
| 11/20/2017 - 11/22/2017 | 12.00 | Intermittent | Not Used | Approved |
| 11/24/2017 - 12/06/2017 | 36.00 | Intermittent | Not Used | Approved |

All leave taken for this reason will be designated as FMLA leave and will be deducted from your FMLA leave entitlement.

If this leave is for future dates, this approval may be affected by additional leave requests made prior to the start date of this leave.

To cancel or change any of the leave dates, please contact the OHR Leave Team.



0148

Please note that absences lasting longer than two weeks may affect your Denver Employee Retirement Plan (DERP) contribution.  Please contact DERP directly with any questions via phone (303)839-5419 or  email mbrsvs@derp.org.  You can also find information at www.derp.org.

If you have any questions, please contact me at (720) 913-0807.

Sincerely,

Nicholas Sterner
HR Professional

Enclosed:

0149

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form.

| Charge Presented To: | Agency(ies) Charge |
|---|---|
| ☐ FEPA | |
| ☒ EEOC | 541- 2018 -02650 |

Colorado Civil Rights Division
*State or local Agency, if any*                                                                        and EEOC

| Name (indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| Mrs. Emina Cerovic | (b)(6);(b)(7)(C) | (b)(6);(b)(7)(C) |

| Street Address | City, State and ZIP Code |
|---|---|
| 6514 Benton Circle | Arvada, CO 80003 |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| Denver Career Services, Facilities Management | 500+ | 720-865-8680 |

| Street Address | City, State and ZIP Code |
|---|---|
| 201 W. Colfax Ave. | Denver, CO 80202 |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON (Check appropriate box(es).)

| | | DATE(S) DISCRIMINATION TOOK PLACE |
|---|---|---|
| ☒ RACE  ☒ COLOR  ☐ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN | | Earliest          Latest |
| ☒ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ GENETIC INFORMATION | | 11/27/2017 |
| ☐ OTHER (Specify) | | ☐ CONTINUING ACTION |

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

RECEIVED

SEP 21 2018

EEOC DENVER FIELD OFFICE

** PLEASE SEE ATTACHED ***

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| 08-31-2018   Emina Cerovic | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |
| Date      Charging Party Signature | |

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | |

**Colorado Civil Rights Division** and EEOC

*State or local Agency, if any*

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

**RECEIVED**

SEP 2 1 2018

EEOC DENVER FIELD OFFICE

** PLEASE SEE ATTACHED **

---

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the above is true and correct.

09-01-2018 *Emina Gerovic*

Date    Charging Party Signature

NOTARY – When necessary for State and Local Agency Requirements

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.
SIGNATURE OF COMPLAINANT

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE
(month, day, year)

CHARGE OF DISCRIMINATION
ATTACHED DESCRIPTION OF DETAILS & PARTICULARS
FOR EMINA GEROVIC

Emina Gerovic is a naturalized US citizen who arrived in America after enduring many years of war in her birthplace, Bosnia-Herzegovina. She procured employment in July, 2014, as a custodian in the Department of General Services with the City and County of Denver. Ms. Gerovic took enormous pride in her work as a custodial worker and received unsolicited praise repeatedly from the members of the departments who worked in the facilities that she cleaned.

Ms. Gerovic endured ongoing discriminatory behavior by a supervisor Leroy Lemos and the Department of General Services. Additionally, there existed a continued failure of OHR and the many individuals in management, of listening to Ms. Gerovic's complaints or at least investigating what she believed was a constant barrage of discipline and punishment. Ms. Gerovic's experience of discrimination and retaliatory discipline and, finally, termination of employment, has taken an enormous toll on her both physically and mentally.

Ms. Gerovic did her job, and did it extremely well, as is evidenced by numerous commendation letters and awards from those whose work areas she cleaned. However, she was terminated after three years of employment there. The issues that led up to her termination were documented in a lengthy and elaborate paper trail by her supervisor, Leroy Lemos, and consisted of various petty violations and clearly misrepresented situations.

Ms. Gerovic's supervisor Leroy Lemos, who authored the reports documenting her disciplinary action paperwork, is a Latino male who has a history of engaging in anti-police activism and identifying as a person who has been racially profiled and discriminated against by the Denver Police Department.

Mr. Lemos was aware that Ms. Gerovic constantly received commendations from the Denver Police Department employees for her work. From as early as October 6, 2014, Mr. Lemos and other supervisors of Ms. Gerovic were receiving emails from various members of the Denver Police Department lauding her work ethic, pleasant demeanor, and overall exemplary performance as a custodian.

Despite loving her job, Gerovic began to experience what she believed was singled out disciplinary action and punishment from her supervisor Mr. Lemos for matters that were seemingly trivial and unrelated to her actual job performance. In fact, her job performance was consistently praised.

On 9/21/15, Ms. Gerovic was disciplined at the request of Mr. Lemos and given a verbal warning for not wearing her safety shoes, despite a note from her doctor that she was unable to wear them due to a foot condition. After receiving the reprimand, she returned to using her safety shoes even though they made her feet bleed and caused her pain for multiple weeks.

1

On 10/1/15, Ms. Gerovic was given a verbal warning for willful neglect of duty regarding the inspection of an area behind some stairs. Her co-workers noted that she was covering more area than any other custodian and that the obscure "white glove test" behind the stairs seemed odd.

On 6/13/16, Ms. Gerovic received documented counseling after Mr. Lemos reported that she had used her cell phone for personal use during work time. She and a co-worker had been in contact regarding non-working toilets as well as discussing his personal and family problems. She corrected the problem immediately.

On 3/17/17, Ms. Gerovic was disciplined at the request of Mr. Lemos because he was unable to reach her on her city cell phone. She received a documented counseling conversation and ensured that her cell phone was on and voicemail set up. The area in which she worked, Denver Police District Five, had extremely poor cell phone reception.

On 5/4/17, Ms. Gerovic received a written reprimand disciplinary action letter from Mr. Lemos regarding an incident at the Arie P. Taylor building on 3/16/17, in which Ms. Gerovic asked two men to leave the building because it wasn't open yet. One of the men yelled at and cursed at Ms. Gerovic and allegedly made a complaint against her. Lt. Kenneth Chavez, who worked in the building with Ms. Gerovic, conducted an investigation and commended Ms. Gerovic for acting appropriately during the incident. Lt. Chavez contacted Mr. Lemos to provide him information regarding the incident but received no response.

On 9/11/17, Mr. Lemos confronted Ms. Gerovic about posts on her personal Facebook page telling her she was impersonating a police officer and indicating that was a serious offense. The posts included some photos from 3 years prior and included a photo of Ms. Gerovic wearing a police hat at a retirement party, as well as some photos of her outside of work hours wearing clothing with the Denver Police Department logo. Ms. Gerovic explained that the hat was in fun and the clothing was a gift. The profile information on Facebook listed her work location as Denver Police District 5 and listed two other police references as "Traffic Operations" and "Police Officer." Ms. Gerovic told Mr. Lemos that she had listed her work location as Denver Police District 5, which was accurate, but that she did not know how the terms "Traffic Operations" and "Police Officer" were added. She told Mr. Lemos she would have her daughter assist her to remove them immediately, which she did that same day. Mr. Lemos directed her to the Denver Police Department Internal Affairs Bureau for an investigation. Sgt. Randy Steinke conducted an investigation and found no wrongdoing by Ms. Gerovic. On 9/19/17, Ms. Gerovic was given a contemplation of discipline letter for her Facebook posts.

Less than one week later, Ms. Gerovic was reassigned to another location and was informed she would have a shift change from a morning shift to an evening shift (1:30 p.m. to 10 p.m.). Ms. Gerovic believed the shift change to be punitive in nature and was upset because she would be unable to care for her grandson in the afternoon, which she did daily to help her daughter with child care. Ms. Gerovic attempted to file a grievance with Anne Carter of OHR but was told she could not. Ms. Gerovic met with Kevin O'Neal, Mr. Lemos's supervisor, about the shift change. He informed her that anyone could be changed at any time. She tried to schedule a meeting with Mr. O'Neal's supervisor Murphy Robinson, the Facilities Management Director, but her request was denied. Ms. Gerovic recalled Mr. Robinson's statement at a staff meeting that he "had an

2

**271**

open door policy" so she went to his office to speak with him. After this meeting, Mr. Robinson was able to return Ms. Gerovic to her morning shift; however, Ms. Gerovic was then put on administrative leave and asked to undergo a mental health evaluation.

Ms. Gerovic was permitted to return to work after her mental health evaluation and upon her return in early October 2017, Ms. Gerovic noticed building patrons acting strangely toward her. When she inquired what was wrong, she discovered that "Be On the Lookout," or BOLO, posters were posted in the building with her picture on them. The posters were dated 10/3/17 and indicated that she had been terminated and to notify personnel immediately if she was seen in the building.

On 10/18/17, Ms. Gerovic received a Notification of Contemplation of Disciplinary Action citing the Facebook posts, failure to follow the chain of command by meeting with Facilities Management Director Murphy Robinson, and a recently received complaint that claimed she used vulgar language in the workplace nearly two years prior.

On 11/27/17, Ms. Gerovic received a Notification of Dismissal indicating she had been fired.

Throughout this process, Ms. Gerovic has felt discriminated against by her supervisor Leroy Lemos, and that his behavior was supported by his supervisors within Facilities Management as well as by OHR. She attempted to make a complaint through OHR but was denied the opportunity. She reported her concerns to various supervisors within DPD. Some of these individuals spoke out on Ms. Gerovic's behalf on their own initiative, which then sparked retaliation as her Notification of Dismissal listed these unsolicited contacts in the complaints against her. These included notifications from Division Chief Ron Thomas, former Director of Safety Stephanie O'Malley, and Lt. Kenneth Chavez. Neither Mr. Lemos nor his supervisors responded to discuss Ms. Gerovic's issues with any of them.

Ms. Gerovic believes that Mr. Lemos has a pattern of disciplining employees under him more harshly when the employee is not Latino. On or about May 2017, a Latino custodian named Danielle Garcia was disciplined for gesturing disrespectfully to other employees by putting up her middle finger, or "flipping them off." She was not terminated. Another Latino custodian, whom Ms. Gerovic only knows as Teresa, has been disciplined many times for treating both customers and co-workers badly. She is no longer allowed to work in the police stations but has not been terminated. Another Latino custodian named David Chavez complained to Ms. Gerovic about his hourly wage; however, according to Mr. Chavez, he was making $.50 per hour more than Ms. Gerovic and had been employed one year less.

In 2016, Ms. Gerovic's immediate supervisor James Stigall was receiving numerous disciplinary actions from Mr. Lemos for seemingly insignificant issues. Mr. Stigall is Caucasian. He appealed his disciplinary action and won, but resigned nonetheless to avoid further discriminatory treatment by Mr. Lemos. Keith Dochman was also a Caucasian custodian. He quit in 2017 after being subjected to similar treatment by Mr. Lemos. After Mr. Dochman left, Ms. Gerovic believes she was the only non-Latino custodian left and, as mentioned above, she was fired in November 2017.

3

**BEST AVAILABLE COPY**



Welcome, Emina | Log Out

Filing with EEOC

   

## My Charge

**EEOC Number: 541-2018-02650**                    **Status:**

The charge of employment discrimination filed on **09/21/2018** with the U.S. Equal Employment Opportunity Commission (EEOC) by Emina Gerovic against CITY AND COUNTY OF DENVER AND GENERAL SERVICES, FACILITIES M is available for you to view online

The Denver **Field** Office is handling this charge. Your point of contact at EEOC regarding this charge is **Lowell A. Pate** and can be reached at **lowell.pate@eeoc.gov**

Add/View Representative        Update My Information

**Position Statement Requested**

EEOC has received your request for the respondent's Position Statement. EEOC will notify you by email when the **Position Statement** is available for you to review.

## Mediation Status

Upon further review **this charge is** deemed **ineligible** for **mediation** at this time and will be transferred to EEOC's Enforcement Unit.

## My Documents

If you have documents supporting your charge, please upload them using this portal. Documents that you send and any that EEOC may send to you (including your Charge of Discrimination and the respondent's Position Statement, if you request a copy) are listed below. You can open a document to review it or download and save it.

Be sure you save all documents related to your charge, including **Email** correspondence. Your charge and documents related to it will be available to you online until 90 days after EEOC closes it.

---

**Exhibit
Dep 0004**

1/13/2021
Emina Gerovic

---

Attachment B
CCD_3175
19-cv-03710-RM-NRN

**273**



Department of General Services
Facilities Management
201 W. Colfax Avenue Dept. 904
Denver, CO  80202
p: 720-865-8680
f: 720-865-7585

June 15, 2017

Ms. Viola Chacon
████████████████
Denver, CO 80219
Employee ID #103313

**RE:  Notification of Dismissal Disciplinary Action**

Dear Ms. Chacon:

This is notification that you are being dismissed from your employment with the City and County of Denver for engaging in misconduct in violation of the following Career Service Rules.  Your last day of employment with the City and County of Denver will be effective Friday, June 16, 2017 (using your paid 8 hour personal leave day).

**Career Service Rule 16-29, Grounds for Discipline**

The following may be cause for discipline or dismissal of a Career Service employee:

A.  Neglect of duty or carelessness in performance of duties and responsibilities.

D.  Any act of dishonesty, which may include, but is not limited to, lying, or improperly altering or falsifying records, examination answers, or work hours

F.  Failing to comply with the lawful orders of an authorized supervisor or failing to do assigned work which the employee is capable of performing.

G.  1.  Failing to meet established standards of performance including either qualitative or quantitative standards.  When citing this subsection, a department or agency must describe the specific standard(s) the employee has failed to meet, such as standards in a Performance Enhancement Program (PEP) Plan or in a Performance Improvement Plan (PIP).

Performance Enhancement Plan

**General Interior Cleaning:**
Maintain a clean and safe environment in our facilities on a daily basis in accordance to Facilities Management quality standards and facility service level agreements. Actively participate in all Facilities Management sustainability efforts and support green cleaning standards.
**STARS Values:** Service, Teamwork, Accountability, Respect, Safety

**Respectful Workplace:**

Viola Chacon – Page 1

**CONFIDENTIAL**          **CCD_6706**
                        **19-CV-03710-RM-NRN**          **CONFIDENTIAL**

Ensures all interactions with the public, peers, supervisors/management and customers/tenants are conducted in a professional and courteous manner. **STARS Values:** Service, Teamwork, Accountability, Respect

Service to Customers: The goal is to continually exceed customer expectations by identifying and meeting needs, working collaboratively to solve problems and developing trusting constructive relationships with residents, employees, officials, vendors and contractors.

Teamwork: Works cooperatively with others to achieve team goals. Actively fosters commitment and team spirit and works with others to meet business objectives.

Accountability and Ethics: Follows through on commitments made and takes responsibility for results and subsequent outcomes. Contributes to maintaining the integrity of the organization and displays high standards of ethical conduct.

R.   Conduct which violates the Career Service Rules, the City Charter, the Denver Revised Municipal Code, Executive Orders, written departmental or agency regulations, policies or rules, or any other applicable legal authority.  When citing this subsection, a department or agency must cite the specific regulation, policy or rule the employee has violated.

Facilities Management Administrative Policies

**EMPLOYEE CONDUCT**

As a representative of General Services/Facilities Management and the CCD, you are a public servant and a role model for all community members. That means that you are held to a high standard of excellence and professionalism. All Division staff are expected to comply with the CCD standards at all times.

Every City employee shall conscientiously fulfill the duties and responsibilities of their position. The conduct of every employee shall reflect credit on Career Service (CS) and the CCD during work hours or at any time while representing the agency, Division, or CCD

You are employed by Facilities Management within the Department of General Services with the City and County of Denver (CCD), as a custodian. Your original hire date (not continuous service date) with CCD was August 8, 1988.  According to your Career Service job specification, the general duties of your position are to perform standard level interior and exterior janitorial/minor maintenance duties involving cleaning and disinfecting all areas assigned, including restrooms, locker rooms, break rooms, and all office areas. You are required to maintain a clean and safe environment. Your normal work hours are from 1:30 PM. to 10:00 PM. except when your schedule is adjusted for other coverage. You have personal accountability for carrying out assigned functions within the scope of established guidelines and objectives.

Per the Facilities Management (FM) Policy manual, as a representative of General Services/Facilities Management and of the City and County of Denver (CCD), you are a public servant and a role model for all community members. That means that you are held to a high standard of excellence and professionalism. All Division staff are expected to comply with the CCD standards at all times. Employees are expected to behave in a professional manner at all times,

Viola Chacon – Page 2

whether during their regular shift or overtime, and treat the public, building tenants, their co-workers and supervisors with respect.

Following is a summary, but not an exhaustive description, of the facts and circumstances surrounding the misconduct upon which this discipline is based:

On March 23, 2017, I LeRoy Lemos, FM Operations Supervisor, received a report from Custodial Supervisor Russell Vander Kooy regarding the events of March 22, 2017 in which you appeared to have not followed proper procedures, failed to do assigned work which you are capable of performing and have received training on, and lied in order to avoid doing the work.

After receving Mr. Vander Kooy's report, I also received a statement from another witness, Josh Montour (new cusotdial supervisor) which matched Mr. Vander Kooy's report. I also gathered additional information and provided the summary below.

- On March 22 at approximately 2:15pm Viola Chacon came to Mr. Vander Kooy's office and advised him that the security guard at the Family Crisis Center (FCC) had told her that they had a baby in the facility that had be diagnosed with Scabies. Scabies is a contagious, intensely itchy skin condition caused by a tiny, burrowing mite.
- Mr. Vander Kooy's instructed Viola to get the disinfectant gun and that she would need to disinfect all rooms where the child had been.
- Mr. Vander Kooy, Josh Montour, and Viola then went to the FCC to talk to the security guard and the onsite "social caseworker" (correction from contemplation letter which stated "nurse"), Irene Van C.
- The security guard verified that a child had been there and had been diagnosed with Scabies.
- The social caseworker listed all the rooms the child had been in. The social caseworker said that most these rooms were in use and all would be available at 5:30pm to clean. There were five rooms and the lobby that needed disinfecting.
- Mr. Vander Kooy confirmed the rooms which needed to be disinfected with Viola. He instructed Viola to go to the Castro building to work until after her break at 6:00 pm to disinfect all the infected rooms.
- Mr. Vander Kooy arrived at his home at 6:00pm. He checked his phone and noticed he received a message from Viola stating she couldn't complete the disinfecting because people were still in the rooms.
- He then received a phone call from Josh that Viola told him she could not do the FCC disinfecting because they were still using the rooms. Viola got on the phone and re-iterated to Mr. Vander Kooy that the rooms were still in use and would be until 8pm or 9pm, so she wouldn't have time to disinfect them.
- Mr. Vander Kooy asked Viola if all the infected rooms were occupied or just some of them. Viola said all the rooms that need disinfecting were occupied. At that time, Mr. Vander Kooy said it would then need to be taken care of first thing in the morning.
- Mr. Vander Kooy asked Josh to go to the FCC and to confirm this as the social caseworker stated they would all be vacant at 5:30pm for this important disinfecting.
- Josh called Mr. Vander Kooy at approximately 6:15pm and said all the rooms that needed to be disinfected were vacant and available to clean. The only room occupied was one that did not require the disinfecting.
- Viola was contacted and instructed to complete the disinfecting task that was assigned to her.

Viola Chacon – Page 3

- Mr. Vander Kooy received a voice message from Viola stating she had disinfected all the rooms. Viola left the message at 6:35pm.
- The next morning, after realizing that the rooms could not have been satisfactorily disinfected in that time frame, Mr. Vander Kooy had other custodians properly clean and disenfect the rooms.

On March 24, 2017, Russell met with you to ask some clarifying questions about what occurred. His provided your comments below.

1. Please tell me what happened when you went back over to the FCC on Wednesday night?

   Viola: I went over there and the lady said the child was in the room where the meeting was still going on, the one by the restrooms. The room had a ton of people, so I couldn't do that room. Then I sprayed the rooms that Josh told me to spray and trashed the area since you (Russ) had told me to go and get started at Castro.

2. Did you go check and see if everyone was out rooms that needed disinfecting?

   *Viola: Yeah that one room where the meeting was, it was full.*

3. Were you able to properly disinfect all the rooms the child had been in?

   *Viola: Yeah I believe it was done.*

4. There were five rooms and you believe completely disinfected?

   *Viola: Yes, there was five rooms and they were done.*

You have received safety training from our safety coordinator and custodial management to ensure you are able to safely perform the duties of your position including infectious disease, decontamination, and disinfecting. You attended and received the following trainings in 2016:

- Hazard Communication / Chemical Safety -  5/20/16
- Bloodborne Pathogens and Other Potentially Infectious Materials – 7/22/16
- Hazardous Waste – 8/19/16

This incident is very concerning for several reasons. You were dishonest with your supervisor regarding the rooms being occupied, you tried to avoid doing work that you are trained and able to do, and you failed to properly disinfect rooms which could cause safety concerns. In addition, you had four hours left on your shift which was more than sufficient time to conduct a thorough disinfection. Instead, you only spent a total of approximately 20 minutes (6:15pm – 6:35pm) to complete a cleaning process that should have taken approximately 12 – 15 minutes per room to properly disinfect. To do your work efficiently, including the regular responsibility of removing trash, should have taken at least 70 minutes.

This incident is extremely troubling and unacceptable.  You misrepresented the status of the rooms to avoid your work duties. In addition, your failure to fully perform your decontamination duties puts DHS employees, DHS clients and visitors, as well as our FM staff, at risk.  You have been a

Viola Chacon – Page 4

custodian for over 28 years and your actions have displayed disregard for the health, safety, and/or well-being of FCC visitors and staff. Your actions are negligent and contradict all instructions you received regarding safety and professional training. When asked direct questions, your responses were incomplete and evasive, rather than direct and forthcoming. Your disregard for public health and safety was unprofessional, and unacceptable.

In the past, you have been coached, counseled, and disciplined for not meeting performance expectations, not following supervisor directive, and dishonesty.

Your disciplinary history includes:

| | | |
|---|---|---|
| 4/10/2015 | Suspension10-day | Neglect of Duty, Theft, Dishonesty, Failure to follow policy |
| 8/1/2008 | Verbal Reprimand | Failure to follow supervisor directive |
| 6/2/2006 | Written Reprimand | Failure to follow supervisor directive/unauthorized leave |
| 7/15/2005 | Verbal Reprimand | Failure to follow supervisor directive |
| 3/1/2005 | Verbal Reprimand | Attendance/Punctuality |
| 5/18/04 | Verbal Reprimand | Failure to follow policy/unauthorized leave |
| 9/16/2003 | Verbal Reprimand | Failure to follow leave policy/unauthorized leave |
| 9/20/2002 | Written Reprimand | Failure to follow leave policy/unauthorized leave |

The contemplation of discipline meeting was held on Thursday, May 25, 2017 at 1:00 p.m. at the Wellington Webb Building. Present at the meeting were Kevin O'Neil, Facilities Administrative Officer, Josh Montour, Custodial Supervisor, Anne Carter, Office of Human Resources and me. You attended this meeting with your representative, Ed Bagwell. The purpose of the contemplation of discipline meeting was to allow you to correct any errors in our information or facts, to tell your side of the story and to present any mitigating information as to why disciplinary action should not be taken.

During the meeting, you and your representative stated that you disinfected all of the contaminated areas, five rooms and the lobby, in a one-hour period from 6:00pm to 7pm. You stated that when you arrived for the cleaning, only one of the six areas had people in it. You said you started you job at 6:00 pm and that you left Mr. Vander Kooy a message around 6pm to let him know that you cleaned some of the rooms. You denied that you left him a message stating that you told him you could not clean them because they were occupied. You said you had cleaned all but one of the rooms by 6:15pm and you were waiting for the one room to be vacated. You also said you did not call Russ at 6:35pm, and instead you called at 7:00pm stating they were all completed. You stated you properly disinfected all of the required rooms.

When asked for clarification regarding the phone calls and messages, your representative said we would need to get some clarification from the phone records on the timing of the calls. Based upon the recommendation of your representative, we reviewed Mr. Vander Kooy's phone and voice message, your phone records, and the relevant badge reports to confirm the timing of the phone calls, your voice messages, and times in which you badged in and out of the FCC on March 22, 2017.

The following clarifying information was collected in response to your requests during the contemplation of discipline meeting:

     5:30 Viola Chacon punches out for lunch (break)
     5:42 Viola Chacon badges into the parking Ext Garage

<div align="center">Viola Chacon – Page 5</div>

5:47 Viola Chacon badges out parking South Gate, Out
5:48 Viola Chacon badges into FCC.
5:51 Viola Chacon calls Joshua Montour
5:52 Viola Calls Russ Vander Kooy and leaves a voice mail message stating specifically:
> "Hey Russ they still have meeting, I came on my lunch break, to check to see if it was completely empty but they have meetings at 6:00pm and she said they didn't know if they were going to leave at 7:30 or 8:00 she don't know how long the meeting going to take so I don't know if I should I leave the chemical there for tomorrow. I left it in my area, for tomorrow or what, I don't know, what am I supposed to do? If you could please give me a call and let me know. Thank you."

5:56 Viola Chacon Badges into Castro Building East Elevator Lobby
5:56 Viola Chacon calls 720-422-3692 which appears to be a personal call
6:01 Viola Chacon clocks back in from lunch (break)
6:04 Viola Chacon calls Russ Vander Kooy.
6:06 Viola Chacon and Josh call (discuss if she is at the FCC)
6:09 Viola Chacon badges into  FCC and meets Joshua Montour.
6:15 Joshua Montour Exits FCC (after talking to Viola Chacon about the rooms that need to be disinfected).
6:19 Viola Chacon badges FCC through reception to hallway door (On Second Floor)
6:21 Viola Chacon calls 720-422-3692 which appears to be a personal call for five minutes
6:24 Viola Chacon badges FCC through reception to hallway door (On Second Floor)
6:26 Viola Badges for an elevator at FCC on the 2nd floor (janitor storage is on 1st floor)
6:27 Viola Badges for an elevator at FCC on the 1st floor (to return to second floor)
6:31 Viola Chacon Badges at Castro east Elevator Lobby (1st floor Castro)
6:31 Viola Chacon calls Russ Vander Kooy and leaves a voice message stating specifically:
> "Hey I already finished I sprayed it all, trashed what I had to do and I'll put the machine back."

6:43 Viola Badges into Castro - 4057 Door.  (4th floor entrance into Financial Services.)
7:58 Viola Chacon calls 720-422-3692 which appears to be a personal call for 13 minutes

There are no further badging for Viola at the FCC.

The above information directly contradicts your statement that you conducted the proper cleaning and that you did so in your stated time frame of 6:00pm to 7:00pm. Your voice messages dispute your statement that you advised Mr. Vander Kooy that you disinfected all but one of the rooms. Phone records also contradict your statement that you called Mr. Vander Kooy at 7:00pm when in fact, you called him at 6:31PM. This also demonstrates that you were moving in and out of the buildings, while on break, during the time you made the first call to Mr. Vander Kooy.

Instead, this information confirms the information presented in your contemplation of discipline letter and confirms that at most, you spent from 6:15pm to 6:26pm, 11 minutes, cleaning the required areas. During that time, you were also on a personal phone call for five minutes. This re-enforces the fact that you could not have done a sufficient job in that short period of time, and you were dishonest with your supervisor on March 22nd, and again in your statement at the contemplation of discipline meeting, with regard to the amount of time you spent cleaning the infected areas of the building.

The statements you made at the meeting and your employment history were given full consideration before the decision to discipline you was made. You work in a safety sensitive area which serves a vulnerable members of the public. You have been reprimanded for dishonesty in

<div align="center">Viola Chacon – Page 6</div>

the past and continued to do so with this incident. We therefore have concluded to end your employment with the City and County of Denver.

You may appeal this discipline in accordance with Career Service Rule 19, Appeals.  You may also initiate dispute resolution pursuant to Career Service Rule 18, Dispute Resolution.  Please note, however, that pursuit of dispute resolution will not suspend the time limitation for filing an appeal.

Please be advised that in accordance with Career Service Rule 3-32, B, 5, Disqualification of Applicants and Candidates, and 16-45 Procedure for Dismissal, employees dismissed from the Career Service are not eligible to be assessed for open jobs and are not eligible for future employment within the Career Service for a minimum of five (5) years after the date of dismissal.

Respectfully,

James E. Williamson
Facilities Director


cc:     Penny May, General Services Executive Director
        Kevin O'Neil, Facilities Administrative Officer
        LeRoy Lemos, Facility Management Operations Supervisor
        Josh Montour, Custodial Supervisor
        Anne Carter, Office of Human Resources (OHR) Business Partner

Viola Chacon – Page 7

**CERTIFICATE OF SERVICE**

I hereby certify that I hand delivered and/or- sent by First Class US Mail a true and correct copy of the foregoing **NOTICE OF DISMISSAL DISCIPLINARY ACTION** on the _15TH_ day of
_JUNE_, 20 _17_ to:

Viola Chacon hand delivered at:

201 W. Colfax Ave
Denver, CO 80202
11·H·7

LEROY LEMOS
Print name / Signature

Viola Chacon – Page 8



**DENVER**
THE MILE HIGH CITY

Department of General Services
Facilities Management
201 W. Colfax Avenue Dept. 904
Denver, CO 80202
p: 720-865-8680
f: 720-865-7585

June 2, 2017

Ms. Danielle Garcia

Denver, CO 80221
Employee ID #103313

RE:  Notification of Involuntary Demotion Disciplinary Action

Dear Ms. Garcia:

This is notification that you are being involuntarily demoted to the position classification of custodian at the hourly rate of pay of $15.96 (8%) effective June 6, 2017.  This disciplinary action is being imposed for your engagement in misconduct in violation of the Career Service Rules:

### Career Service Rule 16-29, Grounds for Discipline

The following may be cause for discipline or dismissal of a Career Service employee:

A.  Neglect of duty or carelessness in performance of duties and responsibilities.

G.  1.    Failing to meet established standards of performance including either qualitative or quantitative standards.  When citing this subsection, a department or agency must describe the specific standard(s) the employee has failed to meet, such as standards in a Performance Enhancement Program (PEP) Plan or in a Performance Improvement Plan (PIP).

### Performance Enhancement Plan

Ethics and Accountability:  Follows both the letter and the spirit of all City of Denver, General Services and Facilities Management Ethics code, Career Service rules, Administrations Policies and all other Department and Management directives.

Respectful Workplace: Ensures all interactions with the public, peers, supervisors/ management and customers/ tenants are conducted in a professional and courteous manner.

STARS Values are the guiding principles for employees of the City and County of Denver. Service, Teamwork, Accountability, Respect and Safety are the values that shape how we go about achieving our goals.

Service to Customers: The goal is to continually exceed customer expectations by identifying and meeting needs, working collaboratively to solve problems and developing trusting constructive relationships with residents, employees, officials, vendors and contractors.

Danielle Garcia – Page 1

**CONFIDENTIAL**                    **CCD_6715**
                    **19-CV-03710-RM-NRN**                    **CONFIDENTIAL**

**EXHIBIT 44**

Accountability and Ethics: Follows through on commitments made and takes responsibility for results and subsequent outcomes. Contributes to maintaining the integrity of the organization and displays high standards of ethical conduct.

Respect for Self and Others: Treats others with consideration and high regard. Demonstrates respect for the differences that exist among fellow employees and recognizes that those differences are an important source of innovation, progress and interpersonal awareness.

I.     Failure to maintain satisfactory working relationships with co-workers and other individuals the employee interacts with as part of his or her job.

L.     Discrimination or harassment as defined in this Rule 16.  This includes making derogatory statements based on race, color, creed, religion, national origin, sex, gender identity, sexual orientation, marital status, military status, age, disability, or political affiliation, or any status protected by federal, state, or local laws.  This prohibited conduct need not rise to the level of a violation of any relevant state or federal law before an employee may be disciplined and the imposition of such discipline does not constitute an admission that the City violated any law.

R.     Conduct which violates the Career Service Rules, the City Charter, the Denver Revised Municipal Code, Executive Orders, written departmental or agency regulations, policies or rules, or any other applicable legal authority.  When citing this subsection, a department or agency must cite the specific regulation, policy or rule the employee has violated.

<u>Facilities Management Administrative Policies</u>

**RESPECTFUL WORKPLACE**
City policies prohibit and do not tolerate any violence or threats of violence in the workplace, including but not limited to:  intimidating, threatening or hostile behavior; physical assault; vandalism; arson; sabotage; bringing unauthorized weapons onto City property; unauthorized use of weapons; jokes or comments about violent acts; and, encouraging others to engage in violent behaviors. Workplace bullying will also not be tolerated.

**EMPLOYEE CONDUCT**
Every City employee shall conscientiously fulfill the duties and responsibilities of their position. The conduct of every employee shall reflect credit on Career Service (CS) and the CCD during work hours or at any time while representing the agency, Division, or CCD.

As a representative of General Services/Facilities Management and the CCD, you are a public servant and a role model for all community members. That means that you are held to a high standard of excellence and professionalism. All Division staff are expected to comply with the CCD standards at all times.

Danielle Garcia – Page 2

- The expectation is that you are inclusive and respectful of the differences in all cultures and people, and that you display professionalism by using appropriate and civil language, tone, and affect. Your demeanor, verbal and non-verbal communication should be business-like, respectful and appropriate.

- Employees must not disturb other City employees or the public. While employees are expected to be pleasant to building tenants and the public, they should not initiate lengthy personal conversations with other City employees or the public, except when all parties are on scheduled lunch periods or breaks. Loud talking, loud laughing and/or noise, swearing, inappropriate jokes and/or remarks are prohibited at all times.

- Employees are not permitted to watch television or listen to radios in courtrooms, conference rooms or other agency spaces. Employees are not permitted to sleep, take breaks or eat in courtrooms, conference rooms, offices, closets or in public hallways or lobbies.

- Employees are expected to behave in a professional manner at all times, whether during their regular shift or overtime, and treat the public, building tenants, their co-workers and supervisors with respect. Arguments, constant complaining, gossip and/or a consistently negative attitude towards the job, supervisors or other employees is not appropriate.

T. Conduct which is or could foreseeably:
   1. Be prejudicial to the good order and effectiveness of the department or agency; 2. Bring disrepute on or compromises the integrity of the City; or
   3. Be unbecoming of a City employee.

You are employed by Facilities Management within the Department of General Services with the City and County of Denver (CCD), as a Utility Worker. Your original hire date with CCD was August 1, 2005 and have served in your current position since November 4, 2013. According to your Career Service job specification, the general duties of your position are to perform standard level interior and exterior janitorial/minor maintenance and grounds at the City and County Building, in addition to event set-up and surplus runs which require you to drive a City vehicle to transport cargo to multiple locations in all areas in City on a daily basis. Your normal work hours are from 7:00 a.m. to 3:30 p.m. except when your schedule is adjusted for events or other coverage. You have personal accountability for carrying out assigned functions within the scope of established guidelines and objectives.

Per the Facilities Management (FM) Policy manual, as a representative of General Services/Facilities Management and of the City and County of Denver (CCD), you are a public servant and a role model for all community members. That means that you are held to a high standard of excellence and professionalism. All Division staff are expected to comply with the CCD standards at all times. Employees are expected to behave in a professional manner at all times, whether during their regular shift or overtime, and treat the public, building tenants, their co-workers and supervisors with respect.

Following is a summary, but not an exhaustive description, of the facts and circumstances surrounding the misconduct upon which this discipline is based:

Danielle Garcia – Page 3

CONFIDENTIAL                    CCD_6717                    CONFIDENTIAL
                              19-CV-03710-RM-NRN

In the past, you have been coached and received a reprimand and counseling for not meeting performance expectations due to inappropriate attitude, outbursts and cell phone usage and not following directives.

You are dependable and do a good job with snow removal and other duties. However, in your 2016 performance evaluation delivered earlier this year, you received an overall successful, your supervisor provided the below comments:

> Professional/Personal Development - Danielle is still having some issues with controlling her anger when there are changes or if something does not go as planed (sic) but has shown big improvement's since previous years in this category. we (sic) also as a team needs to remember that we are all different and that sometime things don't go the way that we plan and to never take it as personal.

> Ethics and Accountability - Danielle has received and signed acknowledging that she received the General services polices hand book, and that she is aware of what is expected of her. Danielle has one of those jobs that puts her in the public eye and that we need to always be aware of who is listening and watching us, it is all about how we conduct our self's (sic) at any given moment.

> Respectful Workplace - Danielle has had an issue with this category every year to some degree  if not with her supervisor then with one of her co-workers, the use of fowl (sic) words are not acceptable at work , Danielle need (sic) to defuse the situation or she need to walk way (sic) from the situation, but other people hear  what's going on around them and they ( client's)should not be subject to a utility workers vocal dissatisfaction with something that the employee feels is not right, this should be dealt with in private.

> Supervisor comments - Danielle is still working on her urge's to voice her opinion on something that is not done properly or if she does not like the answer she got. But this year has been better then the last four.

> Employee comments – None at this time.

On Monday, March 20, 2017, I, LeRoy Lemos, the FM Operations Supervisor, received the following email between one of our facility superintendents and a DHS client:

> **From:** xxx, Gary - GS Facilities & Property Managment
> **Sent:** Monday, March 20, 2017 6:06 AM
> **To:** xxx, Pamela - DHS FAAD Analytics & Satellites
> **Cc:** Lemos, LeRoy M. - GS FPMFM Operations & Project Mgmt
> <Leroy.Lemos@denvergov.org>; Rios, Tony R. - GS FPMFM Operations Supv
> <Tony.Rios@denvergov.org>
> **Subject:** FW: Rude Denver facility workers
> **Importance:** High

> Pamela, my apologies for the inappropriate behavior, let me assure you that Facilities Management takes every inappropriate behavior by one of our employees very seriously and that corrective measures will be taken to keep this interaction from ever happening again.

Danielle Garcia – Page 4

**From:** xxx, Pamela - DHS FAAD Analytics & Satellites
**Sent:** Friday, March 17, 2017 6:06 PM
**To:** xxx, Gary - GS Facilities & Property Management; xxx Steve - DHS Support Services
**Cc:** xxx, Matthew E. - DHS FAAD Family & Adult Assistance
**Subject:** FW: Rude Denver facility workers
**Importance:** High

Hello, we had a client at Montbello this afternoon who wanted to utilize the handicap parking spots. The spots were occupied by a Denver Facilities truck. When she inquired about the amount of time they would be and when they would be moving one of the workers flipped her off. She took pictures of the interaction including the flip off and indicated the workers were rude throughout the interaction (in addition to flipping her off). The pictures are attached. Pam

**Pam xxx** | Satellite Operations Manager
Family and Adult Service Division, Denver Human Services | City and County of Denver

The attached pictures included as Exhibit pictures 1 – 3.
- Picture 1 - FM vehicle parked in handicap parking spot.
- Picture 2 – You and other co-worker at back of FM vehicle parked in handicap parking spot.
- Picture 3 – Picture from clients' vehicle of you flipping her off (includes inset of close up)

On March 20, 2017, I spoke with the customer (Valerie H.) who filed the complaint. She stated:

- She pulled into the lot on Friday, March 17, 2017 at the Arie P. Taylor Building, 4685 Peoria Street for an 11AM appointment. The lot was full and she was looking for a handicap parking spot due to a walking restriction on her foot.
- She observed a marked City of Denver truck parked in one of the handicap parking spots and stopped nearby to wait, hoping the City workers would be moving soon.
- After about 10-15 minutes, she saw two uniformed City workers approaching. She stated that both City workers were talking on their phones as they walked toward the truck. The woman City Worker {identified as you} said into her phone after she noticed the car waiting behind the truck. "Oh my god, this bxtch is going to start shit".
- Valerie then asked out her window, motioning to toward the truck, "Is this you guys? I would like to use the handicap spot."
- The male City worker replies, "Sorry, we will be out of here in 5 minutes". And began putting away his dolly and closing the truck door.
- Valerie replied, "Thanks, but why would you park in a handicap parking spot. People need those spots because of their disabilities. It is really disrespectful and illegal to park there."
- The woman City worker then said into her phone, "Oh my god, this bxtch is going crazy over something stupid."
- Valerie replied, "The only stupid bxtch here is the one who parked illegally."
- The male City worker then said, "Again, I'm sorry, we are leaving now."
- The woman City worker then said, "Shut your fucking mouth already and let us leave."
- The male City worker told the woman City worker, "Calm down and get in the truck so we can go."

Danielle Garcia – Page 5

- The female City worker responded, "Fxxk this stupid bxtch, it's not my fault she has a fxxking disability. I ain't the one here begging for free services and assistance, I have a job," as you began walking toward the front of the truck.
- Valerie responded, "How dare you, you don't know my situation or why I'm here, you are obviously the only stupid bxtch here."
- The woman City worker the stopped, turned around, and said "Then do something bxtch." while giving me the finger {flipped her off).
- Valerie said, "I hope you know I'm reporting you to the City."
- The woman City worker yelled back, "Complain to anyone you want to you stupid bxtch, I'm not worried about it; my job is secure so do whatever the fuck you want to do."
- Valerie then said the two City workers got into the truck and drove away.  As they passed her, walking and limping, the woman City worker was laughing and giving her the finger again as they drove away.

We requested a statement from you. In that statement, you wrote that there weren't any open parking spots available just two handicap spots so you and your coworker pulled in and parked on the crosswalk with part of one of the handicap spots and took out supplies you were delivering. When you got back to the truck not even five minutes later there was an irate Hispanic lady with a boot on her foot asking if it was our truck and went off yelling and screaming on how we weren't supposed to be parking there using profanity. You reported you told her, 'I'm sorry didn't think it was a problem being it wasn't even 5 min and there is an open handicap spot right in front available." She went off on me yelling and screaming nasty words such as bxtch and a cxnt then flipped us off so I raised my finger back to her...she really got to me with all the words she was yelling that made me react to flip her back off. You stated you reported this to your supervisor, Yvonne Chavez.

Since the pictures were taken from inside the customer's car, it is unknown how you would know she had a boot on. You admitted to flipping her off.

This incident is unacceptable.  You and your coworker have been advised to not park in unauthorized spaces. In your position as a Utility Worker, you routinely interact with members of the public, City workers, media, dignitaries and elected officials.  Your demeanor, behavior and language is expected to be professional and courteous at all times.    Not only have you been disciplined in the past for your behavior, you recently received your performance evaluation noting concerns in this area. In addition, you met with me on August 16, 2016 and received a verbal warning, when you again used profanity in speaking with your supervisor and did not follow policy around a fire drill

Your disciplinary history includes:

| | | |
|---|---|---|
| 1/30/14 | Verbal Reprimand | Misconduct-arguing with co-workers, non-satisfactory working relationships with co-workers. |

The contemplation of discipline meeting was held on Tuesday, May 16, 2017 at 10:00 a.m. at the Wellington Webb Municipal Building. Present at the meeting were Kevin O'Neil, Facilities Administrative Officer, LeRoy Lemos, Facilities Management Operations Supervisor, Yvonne Chavez, Facilities Management Utility Crew Supervisor, and Anne Carter, Office of Human Resources. You attended this meeting with your representative Regina Garcia. The purpose of the contemplation of discipline meeting was to allow you to correct any errors in our information or facts, to tell your side of the story and to present any mitigating information as to why disciplinary action should not be taken.

Danielle Garcia – Page 6

You provided a written statement which your representative also read aloud. In your statement, you admitted you acted inappropriately. You stated you reported the incident to your supervisor as soon as you could but you did not provide full details. You stated you both observed that there were two vacant parking spots in the parking lot and Daniel decided to use one of the reserved handicap spot. However, with the large facility, there would have been other spots available to include street parking for the small delivery you were making. In your statement, you said you are often compelled to voice your opinion about operational procedures, but chose not to do so when parking in this reserved handicap spot even after being reminded about not parking illegally just a few weeks earlier.

You stated that the use of bad language is acceptable in your work environment yet you have been counseled and disciplined for your inappropriate use of words and tone in the workplace. You were counseled for speaking to your supervisor in an inappropriate tone and language. You further stated that due to Denver's population growth that you now interact with a very diverse customer base and that training should be provided to deal with difficult customers. Appropriate behavior in the workplace refresher training was provided and you attended in 2013. You also stated that you were tired and stressed in your current work environment and your emotions took over and you made the obscene gesture. Vulgar hand gestures and inappropriate comments are still not appropriate.

You stated you regret how you reacted to the complainant. However, it is concerning that you chose to behave in this manner after multiple warnings, counseling sessions and performance evaluations from the prior Operations Supervisor, the current Operations Supervisor, and your immediate supervisor. Your performance review noting these types of concerns was given to you in February 2017, yet this incident occurred approximately one month later. It is concerning and demonstrates that after attempts to improve your behavior have failed.

Your position as a Utility Worker requires you to work around the public, Mayor's Office, City Council, media, children and dignitary's. We do not feel confident that you will behave appropriately in with these client groups. I have decided to demote you back to your custodial position where you will have less interaction with the public and less stress. Your supervisor will follow up with you on courses available to better manage dealing with others, customer service and managing stress.

You may appeal this discipline in accordance with Career Service Rule 19, Appeals. You may also initiate dispute resolution pursuant to Career Service Rule 18, Dispute Resolution. Please note, however, that pursuit of dispute resolution will not suspend the time limitation for filing an appeal.

Please be advised that you are not to take any retaliatory action against anyone as a result of this disciplinary action. If any such action is taken, further discipline may be contemplated and taken, up to and including dismissal.

Respectfully,

James E. Williamson
Facilities Director

Enclosure(s): Exhibit pictures 1 - 3

cc:    Penny May, General Services Interim Executive Director

Danielle Garcia – Page 7

CCD_6721
CONFIDENTIAL                    19-CV-03710-RM-NRN                    CONFIDENTIAL

Kevin O'Neil, Facilities Administrative Officer
LeRoy Lemos, Facilities Management Operations Supervisor
Yvonne Chavez, Facilities Management Utility Crew Supervisor
Anne Carter, Office of Human Resources (OHR) Business Partner

## CERTIFICATE OF SERVICE

I hereby certify that I have hand delivered -and/or- sent by First Class US Mail a true and correct copy of the foregoing NOTICE OF INVOLUNTARY DEMOTION DISCIPLINARY ACTION on the _5TH_ day of _JUNE_, 20_17_ to:

Hand delivered to:
Ms. Danielle Garcia
201 W. Colfax Ave., #904
Denver, CO 80202

Or mailed to:
Ms. Danielle Garcia
▬▬▬▬▬▬▬
Denver, CO 80221

_LeRoy Lemos_
Print name / Signature

Danielle Garcia – Page 8

CCD_6722
19-CV-03710-RM-NRN
CONFIDENTIAL                    CONFIDENTIAL

Appellate Case: 22-1148    Document: 010110728980    Date Filed: 08/23/2022    Page: 290

EMINA GEROVIC



CITY AND COUNTY OF DENVER
GENERAL SERVICES

FACILITIES MANAGEMENT
ADMINISTRATIVE POLICIES

James E. Williamson
Director of Facilities Management
*************************************************************************************

Approved by: _____

Effective Date: _____ February 2014
            Prior Revisions Sept 13, 2010 and June 23, 2003

____ Employee initials          FM Admin Policies 20140211          Page 1 of 14

Appellate Case: 22-1148     Document: 01011072980     Date Filed: 08/23/2022     Page: 291

## TABLE OF CONTENTS

Page number

I. Introduction ..... 3
II. Employee Responsibilities ..... 3
Employee Conduct ..... 3
- Drugs and Alcohol ..... 4
- Respectful Workplace ..... 4-5
Dispute Resolution ..... 5
Reporting Charges or Convictions ..... 5-6
Licensure Requirements ..... 6
Discipline ..... 6
Personal Use of City Provided Equipment ..... 6-9
- City ID Badges and Computer Security
- Use of Personal Vehicles or City Vehicles for City business
- Use of Cell Phones (Personal or City Provided)
- Work Area and Equipment
- Personal Possessions/Workspace
- Tools and Equipment
- Uniforms and Appearance
- Snow Boots/Safety Shoes And Eyewear

III. Work Schedules/Leave Usage ..... 9
Work Schedules ..... 9-10
- After Hours Schedule
- Mandatory Meetings and Other Sponsored Activities
- Use of Work/Break Time
- Snow Removal and Decontamination Duty
- Reporting Absences
Leave ..... 10
Overtime ..... 11
Kronos/Time Reporting ..... 11

IV. Miscellaneous ..... 11
Outside Employment ..... 11
INFOR EAM ..... 12
Lost or Misplaced Property ..... 12
Parking ..... 12
Safety ..... 12-13
V. Acknowledgment ..... 14

VI. Amendments/Additions ..... 14

Appellate Case: 22-1148   Document: 01011072980   Date Filed: 08/23/2022   Page: 292

CITY AND COUNTY OF DENVER, GENERAL SERVICES
FACILITIES MANAGEMENT ADMINISTRATIVE POLICIES

## I.   Introduction

### GENERAL SERVICES STRATEGIC PLAN

Goal 1:   Create an engaged workforce by investing in human capital
Goal 2:   Increase customer satisfaction
Goal 3:   Improve productivity through organizational realignment and business process improvement.

### FACILITIES MANAGEMENT MISSION STATEMENT

**Facilities Management, herein after referred to as "the Division's or Division"** is made up of a team of highly skilled operations workers, trades' workers, administrative and management staff that maintains buildings for the City and County of Denver (CCD). Our Mission is to provide quality service in an efficient and professional manner to ensure building safety and comfort. Our focus is to continually improve and ensure customer satisfaction, special event setups and provide a clean and safe working environment.

The purpose of these policies is to provide employees of the Division a better understanding of the expectations, personnel policies and procedures, and goals of the agency and Division. This is a set of written guidelines that is governed by the principles of personal accountability and reasonableness, and to achieve the desired behavior and performance. This is intended to guide employees in the efficient operation of this Division and to answer questions in regards to the overall policies, operations, and maintenance of facilities. The Division is committed to providing a respectful and productive workplace.

All provisions in this handbook are subject to Career Service Rules (CSR), Fiscal Accountability Rules (FAR), Executive Orders, Code of Ethics, and any other applicable law or policy. Employees must comply with all these rules/regulations/policies and procedures. Access to these applicable rules is available through Denver One Team (DOT). These policies may reference sections of the rules, policies and orders noted above.

These administrative policies are to provide additional clarification specific to the Division. It is each staff member's responsibility to abide by these administrative policies. If you need further explanation, please consult your supervisor, manager, or human resource representative. The Division reserves the right to unilaterally modify, rescind, or revise these policies at any time as the need arises. Every effort will be made to inform staff of any changes.

## II.   Employee Responsibilities

### EMPLOYEE CONDUCT

As a representative of General Services/Facilities Management and the CCD, you are a public servant and a role model for all community members. That means that you are held to a high standard of excellence and professionalism. All Division staff are expected to comply with the CCD standards at all times.

- Every City employee shall conscientiously fulfill the duties and responsibilities of their position. The conduct of every employee shall reflect credit on Career Service (CS) and

*EG* Employee initials          FM Admin Policies 20140211          Page 3 of 14

the CCD during work hours or at any time while representing the agency, Division, or CCD

- The expectation is that you are inclusive and respectful of the differences in all cultures and people, and that you display professionalism by using appropriate and civil language, tone, and affect. Your demeanor, verbal and non-verbal communication should be business-like, respectful and appropriate.

- Employees must not disturb other City employees or the public.  While employees are expected to be pleasant to building tenants and the public, they should not initiate lengthy personal conversations with other City employees or the public, except when all parties are on scheduled lunch periods or breaks. Loud talking, loud laughing and/or noise, swearing, inappropriate jokes and/or remarks are prohibited at all times.

- Employees are not permitted to watch television or listen to radios in courtrooms, conference rooms or other agency spaces.  Employees are not permitted to sleep, take breaks or eat in courtrooms, conference rooms, offices, closets or in public hallways or lobbies.

- Employees are expected to behave in a professional manner at all times, whether during their regular shift or overtime, and treat the public, building tenants, their co-workers and supervisors with respect. Arguments, constant complaining, gossip and/or a consistently negative attitude towards the job, supervisors or other employees is not appropriate.

- No CCD employee shall use their position or disclose or use confidential information in order to obtain personal or private gain for themselves or their immediate family.

**DRUGS AND ALCOHOL**

Certain drugs and/or alcohol can affect an employee's productivity and efficiency; jeopardize the safety of the employee, co-workers, and the public; and harm the reputation of the City and its employees. Employees may be subject to pre-employment, post accident and/or random drug and alcohol testing if there is reasonable suspicion that the employee is in violation of any internal or CS policy, Executive Order 94, or DOT regulations, for those employees who require a CDL. Employees should notify their supervisors if they are taking any prescription or over-the-counter drugs that may affect their ability to do their jobs.

Employees are prohibited from consuming, being under the influence of, subject to the effects of, or impaired by drugs or alcohol while performing City business, while driving a City vehicle or while on City property. Employees are also prohibited from selling, purchasing, transferring or possessing an illegal drug.

**RESPECTFUL WORKPLACE**

City policies prohibit and do not tolerate any violence or threats of violence in the workplace, including but not limited to:  intimidating, threatening or hostile behavior; physical assault; vandalism; arson; sabotage; bringing unauthorized weapons onto City property; unauthorized use of weapons; jokes or comments about violent acts; and, encouraging others to engage in violent behaviors. Workplace bullying will also not be tolerated.

In an emergency situation, call 9-911 (from most City landlines) or 911. Next, immediately contact the building security, division/department/office manager involved, and human resource and safety officers.

E.G. Employee initials        FM Admin Policies 20140211                Page 4 of 14

In a non-emergency situation, if the employee feels that he or she has been subjected to any type of violence or threat of violence, or has observed or has knowledge of any violation of this rule, the employee shall immediately report the incident to his or her supervisor, the Office of Human Resources (OHR) human resource representative or safety officer.

All City employees have a right to work in an environment free of unlawful discrimination and harassment. The City maintains a strict policy prohibiting discrimination, sexual harassment and harassment because of race, color, creed, religion, national origin, gender, sexual orientation, marital status, military status, age, disability, or political affiliation, or any other status protected by federal, state, or local laws. The City's anti-harassment policy applies to all persons involved in the operation of the City and prohibits unlawful harassment or discrimination by any employee of the City, including supervisors and co-workers.

Unlawful harassment in any form, including sexual, verbal, physical, and visual conduct (such as: derogatory posters, photographs), threats or demands to submit to sexual requests, and retaliation is prohibited. Sexual harassment includes behavior that is related to gender or sexuality, is intentional and/or repeated, is unwanted, or creates a hostile work environment and interferes with another person's ability to do his or her job.

Individuals who experience unlawful harassment are urged to make it clear that such behavior is offensive to them and request that such behavior be discontinued; and/or to report such conduct to their supervisor, manager and/or OHR representative so that the agency may investigate and resolve the problem.

### DISPUTE RESOLUTION

The CCD offers dispute resolution (open door policy, mediation, and grievance process) in an effort to ensure workplace conflicts are addressed at the lowest level possible when appropriate. If an employee has a problem or concern that arises in the scope or course of his or her employment, the employee should discuss the concern with his or her immediate supervisor, manager, appointing authority, or a human resource representative of the OHR. The CCD will not tolerate retaliation of any kind against any employee who utilizes the open door policy in good faith.

If you have a work-related issue which was not taken to or resolved through the open door policy or mediation, and you are a CS employee with a grievance as defined in Dispute Resolution Rule 18, Section 18-10C, you may prepare and complete the official CS grievance form and file it with your Agency designee (OHR or your Division Director) within the required time frame.

**Important:** Allegations of discrimination, harassment, or retaliation may not be grieved because there is a complaint process for these types of issues.

### REPORTING CHARGES OR CONVICTIONS

All employees who are charged with or convicted of any felony or misdemeanor, as well as any other offense which involves violence against persons, destruction of property, dishonesty, theft, or the sale or possession of illegal drugs, must report such charges or convictions to their supervisor and/or the Facilities Superintendent. Additionally, employees are required to report if they are party to a restraining order or order of protection, so appropriate safety measures can be taken.

If the employee is not scheduled to work on either of the next three calendar days following the arrest, charge or conviction, the employee is required to provide notice of the arrest, charge or conviction no later than the end of the third calendar day after the arrest, charge or conviction. This is a continuing

EG Employee initials               FM Admin Policies 20140211                    Page 5 of 14

Appellate Case: 22-1148     Document: 01011072898     Date Filed: 08/23/2022     Page: 295

and on-going responsibility. Thus, for instance, you must notify your supervisor of a conviction even if you have previously notified them of the charge and or arrest related to the conviction.

In addition, any employee who operates a motor vehicle as part of their job assignment must report any citation for traffic violations (including photo radar tickets), whether received on or off the job (this does not apply to parking violations). Driving records will be periodically reviewed for staff that are required to drive as part of their assigned duties. Background check will be conducted in compliance with City policies.

### LICENSURE REQUIREMENTS

Employees, in positions which require licensure or certificates, are required to keep them current at all times. They are required to update their supervisors on the status of their licensure or certificates which includes providing documentation when licensure or certificates are updated and/or upon Division request.

### DISCIPLINE

The Division practices corrective action and progressive discipline in accordance to the CSR. If possible and appropriate, in an attempt to avoid the formal discipline process, the responsible supervisor may use counseling as a pre-disciplinary measure to help you recognize and address a behavior, attendance or performance problem. The degree of discipline is related to the seriousness of the behavior and takes into consideration your past record. Whenever practicable, discipline is progressive. However, any measure of discipline may be used in any given situation, as appropriate.

### PERSONAL USE OF CITY PROVIDED EQUIPMENT

The City provides electronic media and services including E-mail, internet, and other mobile devices primarily for employees' business use. Limited, occasional or incidental use of electronic media for personal, non-business purposes is understandable as long as it is of a reasonable duration and frequency, does not interfere with the employee's performance of job duties, and is not in support of a personal business. Employees are expected to demonstrate a sense of responsibility and not abuse this privilege. Abuse of this privilege may result in corrective action, up to and including dismissal. Please also refer to the "Technology Services Acceptable Use Policies and Procedures" form signed by you prior to receiving access.

Employees will utilize e-mail in a professional manner, remembering that e-mail messages may be monitored by authorized City employees, considered public records or otherwise discoverable. Accessing any inappropriate Internet site is prohibited. City property cannot be taken home unless specifically authorized by a supervisor and/or manager.

It is every employee's responsibility to stay informed regarding Citywide or Division wide information by reading and reviewing email communications on a regular and timely basis to ensure they are aware of ongoing activities, changes and needs.

### CITY ID BADGES AND COMPUTER SECURITY

City ID badges are issued for your safety as well as the safety of your co-workers and allow access into secure areas. You are to always wear your badge in a position where it is visible at all times while working.  Take precautions when entering and exiting a secure area.

As a reminder, employees **must never share** their user IDs and passwords or their City ID badges with anyone as this activity violates the City's policies and will be grounds for disciplinary action. If you are asked to share your badge on behalf of another employee, please decline and speak with your supervisor or security immediately. The Division employees are not to use any workstation computer

---

*EG* Employee initials             FM Admin Policies 20140211             Page **6** of **14**

Appellate Case: 22-1148   Document: 01110728980   Date Filed: 08/23/2022   Page: 296

that another employee has already logged onto and will not use another person's User ID and Password to log onto a workstation computer for any reason. You are to practice adequate password management by keeping all passwords confidential. Employees will not attempt to install or attach any external hardware device (MP3 player, IPod, personal PDA, speakers, etc) to a CCD computer without prior written authorization from Technology Services.

## USE OF PERSONAL VEHICLES OR CITY VEHICLES FOR CITY BUSINESS

City employees who are either authorized to use or required to use as a condition of employment a personal vehicle on City business, must carry liability and property damage insurance with the minimum coverage limits specified by the "Colorado Auto Reparations Act," or any greater coverage selected by the employee. The City shall not be in the policy as the name insured. Motor vehicle operators must have and be in possession of a valid Colorado driver's license of the appropriate class for the type of vehicle being operated.

No City vehicle shall be used for personal business of any type while under the control, operation, direction or use by an employee of the agency; nor shall such vehicles be used for the transport of persons other than to conduct the Division's business.  Employees who are assigned vehicles are authorized to drive them to lunch when they are working away from the office, but must remain within a two mile radius of the job site.

For those agency trades and custodial personnel regularly assigned and using City vehicles in their official assignments, it is permissible for those staff to use the assigned vehicle to secure noon or evening meals, if traveling for work during their regularly scheduled meal breaks. The Division's staff is not authorized to utilize agency vehicles for luncheon or dinner meetings unless such luncheons, dinners or meetings involve official City business. In no instance are City vehicles to be used for the conduct of personal business or personal errands.

## USE OF CELL PHONE (PERSONAL OR CITY PROVIDED):

You are to adhere to the following guidelines when using the telephone while at work:

1. City telephones are intended for conducting the Division's business. You should keep personal calls to a minimum. This includes personal cell phone calls during work.
2. You should discourage your friends and relatives from calling during working hours except in cases of emergency.
3. Personal calls, text messaging or other cell phone usage for personal reasons are to be limited to break periods.

## WORK AREA AND EQUIPMENT

Employees are responsible for taking care of all City property assigned to them.  This includes but is not limited to radios, cellular phones, keys, custodial and snow removal equipment, vehicles, tools, computers, copy machines, fax machines and uniforms.

Employees are responsible for cleaning their work area daily to include carts, vehicles and all tools and equipment they use, janitor's closets, sinks, workbenches, shop areas and office cubicles should be kept free of debris and/or clutter.

Employees must make sure that job sites are kept clean.  All debris, tools, and equipment shall be removed or stored securely at the end of the work day. Safety signs and barricades should remain in place until the work has been completed or the dangerous situation eliminated.

EG Employee initials          FM Admin Policies 20140211          Page 7 of 14

Appellate Case: 22-1148   Document: 01110728980   Date Filed: 08/23/2022   Page: 297

## PERSONAL POSSESSIONS/WORKSPACE

CCD does not assume responsibility for the loss or theft of personal items. You are encouraged and expected to use safe places for your clothing and other personal possessions, such as lockers, locked desk drawers and cabinets. Parking lots, lockers, desks, files and all other Division property may be accessed by the Division's management for work related reasons. You are expected to maintain a clean and orderly work area in a manner that is conducive to a professional work environment.

## TOOLS AND EQUIPMENT

The Division has made a substantial investment in tools and equipment which employees use to perform their assigned duties.  Many items are expensive and difficult to repair or replace. The following policy outlines the employee's responsibility for the care and maintenance of assigned equipment.

1. Employees are responsible for the proper care and maintenance of equipment.  Such equipment includes, but is not limited to: keys, uniforms, hand tools, power tools, City vehicles, radios, cell phones, mobile devices, etc.

2. If a piece of equipment or tool is lost, stolen, or damaged, and it is determined that the employee was negligent in their handling of this equipment, disciplinary action may result.

3. When an employee separates (leaves Division and/or City), assigned equipment must be turned over to his/her supervisor.

4. It is the responsibility of each employee to be accountable for the tools assigned to them.  All tools shall be marked appropriately as Division's property.

5. Supervisors are responsible for inspection, maintenance and repair of all tools. Supervisors are to conduct inventory of all tools, at minimum, every quarter.

6. Tool responsibility and accountability is incorporated in maintenance staff Employee Performance Evaluation Plan (PEP).

All tools and equipment should be kept in a safe place to prevent loss, theft or damage.   Unattended vehicles and storage areas must be kept locked or otherwise secured.  Ladders, dollies, and all other tools and equipment should not be left unsecured.  Loss or theft of any keys, tools, materials or equipment shall be reported immediately to the appropriate supervisor.

Employees must immediately report to their supervisor any damage to property belonging to the Division or to another agency or employee, whether they are responsible for that damage or not. Employees must report any building problems to their supervisors. If an employee loses or damages any property due to carelessness or negligence, that employee may face disciplinary action.

## UNIFORMS AND APPEARANCE

All employees should exercise sound business judgment with regard to personal appearance, dress, and grooming to enable them to be most effective in the performance of their duties. Employees are expected to present a neat and clean appearance and are not permitted to wear clothing or uniforms that are missing buttons, ripped, frayed, disheveled, revealing, or otherwise inappropriate. Shirts and blouses are to be appropriately buttoned. Shirttails can be worn outside of pants if the shirttails are ironed. Only Division hats can be worn while on duty. Excessive jewelry is not appropriate and may be unsafe.

Employees who are provided uniforms (maintenance, utility workers and custodial staff) must wear the official uniforms issued by the Division.  Employees are not to alter the uniforms. Official uniforms

EG Employee initials          FM Admin Policies 20140211                    Page **8** of **14**

Appellate Case: 22-1148      Document: 010110728980      Date Filed: 08/23/2022      Page: 298

include all clothing provided, steel toe safety shoes, the employee's ID badge and any cellular phone, radio or keys that have been assigned. Employees are to be dressed in the appropriate uniform while on shift.

New uniforms will be issued every two (2) years. Upon receipt of the new uniforms, or separation from the Division or City, employees are required to turn in uniforms previously issued to them (excluding shoes). When ordering uniforms, it is the employee's responsibility to order their correct size. The Division uniform committee is responsible to obtain input from staff and ensure accurate sizes are ordered and purchased.

**SNOW BOOTS/ SAFETY SHOES AND EYEWEAR**

Maintenance, utility workers and custodial staff are authorized one (1) voucher for one (1) pair of safety shoes per year. Those who participate in snow removal activity are authorized to receive one (1) voucher for one (1) pair of snow shoes/boots every five (5) years. Employees will be responsible for paying any amount over the voucher amount directly to the authorized vendor at the time of purchase. The current voucher value is $90.00.

As part of the eye safety program, if your vision requires corrective lenses to perform your work, you will be provided a voucher for prescription safety spectacles once every two (2) years. This program does not provide additional vouchers as replacement for broken, lost, or stolen prescription safety spectacles.

## III.   Work Schedules/Leave Usage

### *WORK SCHEDULES*

The Division Director establishes the daily hours of operation for the Division. The maintenance hours of operation are Monday through Friday, 7:00 am to 5:00 pm. The work week shall begin on Sunday and end on Saturday unless otherwise designated by the Division Director. The workweek may be a combination of work, paid leave, leave without pay and paid holidays.

The supervisor is responsible for establishing daily work assignments and may adjust scheduled work shifts, lunch hours and breaks (either for entire crews or for individual employees) temporarily as workload demands. Work locations may also be altered in order to meet business needs. Employees will be given at least 48 hours written notice of any permanent shift or work location changes.

All Division employees must report to work, end work, and return from breaks and lunch **on time**. Failure to do so may result in any additional break/lunch time, tardiness, or overtime being considered unauthorized. Use of unauthorized leave may result in disciplinary action.

**AFTER HOURS ON-CALL SCHEDULE**

For emergency response maintenance operations, the Facilities Superintendents will rotate taking after hours calls weekly from 5 p.m. to 7 a.m. Monday through Sunday and including holidays. Refer to the After-Hours On-Call policy and schedule.

**MANDATORY MEETINGS AND OTHER SPONSORED ACTIVITIES**

Most Department and Division scheduled meetings are mandatory and should not be missed unless prior arrangements have been made with your supervisor. Other City or Division sponsored meeting attendance will be handled on a case by case basis.

## USE OF WORK/BREAK TIME

All employees must make necessary arrangements to transact their personal business outside of scheduled work hours. Employees are generally prohibited from using any City property for their own personal use. Employees are to be properly dressed, prepared, and ready to begin work when they clock in. Also refer to Kronos/time reporting section.

Breaks: Your supervisor or designee may grant work breaks. Work breaks are a privilege and granted if the workload of the unit permits. One 15-minute break is allowed in the first half of the work shift and one 15-minute break is allowed in the second half of the shift. You are not allowed to combine break times to extend your lunch time. Smoking breaks are to be limited to the 15 minute allowed break time, not in addition to this.

The Division encourages you to take your authorized breaks away from the work area to give you some time to re-energize and to minimize disruption and distraction to others. You are encouraged to use the City break room areas and not use other agency facilities (courtrooms, conference rooms, etc). Employees may eat in their trucks only when they are on a job site.

Smoking: Smoking is allowed in designated areas only. You are to dispose of cigarette butts, chewing tobacco and other waste in the waste containers provided.  Smoking is prohibited in City vehicles. Electronic (Smokeless) Cigarettes are to be treated the same as any other cigarettes or tobacco products.

## SNOW REMOVAL AND DECONTAMINATION DUTY

- All trades, utility workers. and custodial staff are considered essential personnel and are required to perform snow duty.
- Scheduling for decontamination duty may be voluntary, however, one employee must be available to respond to calls at all times. Once assigned to these duties, the employee is expected to promptly respond and report to all calls. Failure to do so may be cause for disciplinary action. Refer to Decontamination Duty policy.
- All Custodians performing decontamination must clock in to Kronos upon arrival and clock out upon completion of work, as well as sign in on the Police District front desk log book. The original Blood Borne Pathogens (BBP) forms must be submitted to the supervisor and a copy made for the custodian's file.

## REPORTING ABSENCES

When calling in to report tardiness or sick leave, employees MUST speak with their supervisor or member of the management team.  If the supervisor is not available, a detailed voice mail message may be left; however, the employee is required to call back and speak directly with a supervisor. You must call your supervisor a minimum of **one** hour prior to the start of your shift.  Employees must call in personally unless they are physically incapacitated and unable to call.

## *LEAVE*

If an employee is absent for more than three (3) consecutive days due to a serious health condition, they may be eligible for Family Medical Leave.  It is the employee's responsibility to contact their supervisor and Human Resources as soon as possible if they will be out for more than three days for a medical reason for self or immediate family member.

All employees are required to submit a doctor's excuse/release for any sick leave absence over three (3) days. Employees who are suspected of possible sick leave abuse may be required to submit special "Physicians Certificates" for all sick leaves or may be charged with unauthorized leave and possible disciplinary action.

E.G. Employee initials              FM Admin Policies 20140211                    Page 10 of 14

Appellate Case: 22-1148    Document: 010110728980    Date Filed: 08/23/2022    Page: 300

## ACKNOWLEDGEMENT

It is your responsibility to be aware of these policies. In some cases, failure to follow these policies may result in disciplinary action. If you have any questions about how these policies affect you or your work unit, contact your supervisor or your Human Resources Professional.

By my signature below, I acknowledge that I have read and fully understand these policies. Refusal to sign below does not relieve employees of their responsibility to adhere to these policies. I understand that the information contained in the handbook represents a set of guidelines and that the Division reserves the right to modify these guidelines at any time.

EMINA   GEROVIC
Printed Name

Gerovic
Signature

08-12-2014
Date

8/14/14

## V.    Amendments/Additions (reserved)

EG Employee initials        FM Admin Policies 20140211        Page 14 of 14

**From:** Lemos, LeRoy M. - GS FPMFM Operations & Project Mgmt
**Sent:** Monday, March 20, 2017 9:10 AM
**To:** Kinsey - DOR, Bruce <bruce.kinsey@state.co.us>; Carter, Anne M. - OHR Service Group GS OED C&R <Anne.Carter@denvergov.org>
**Subject:** RE: incident at Denver NE Dlo entrance

Thank you, Bruce, have a great week.



**LeRoy Lemos | Operations Supervisor**
General Services-Facilities Management
720.865.7527 Phone | 720.275.5375 Mobile | 720.865.7585 Fax
LeRoy.Lemos@denvergov.org | Dial 3-1-1 for City Services

**"Delivering a world-class city where everyone matters!"**

🌲🏞 Please consider the environment before printing this email.

*This e-mail transmission is intended only for the use of the individual or entity to whom it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law.  If you are not the intended recipient you are hereby notified that any dissemination, distribution or copying of this transmittal or the information it contains is strictly prohibited.  Mis-delivery of this transmittal does not constitute waiver of any applicable privilege.  If you have received this transmittal in error, please immediately notify the sender and delete the original and its attachments.*

**From:** Kinsey - DOR, Bruce [mailto:bruce.kinsey@state.co.us]
**Sent:** Friday, March 17, 2017 5:00 PM
**To:** Lemos, LeRoy M. - GS FPMFM Operations & Project Mgmt <Leroy.Lemos@denvergov.org>; Carter, Anne M. - OHR Service Group GS OED C&R <Anne.Carter@denvergov.org>
**Subject:** incident at Denver NE Dlo entrance

| This message was sent securely using ZixCorp. |
|---|

At about 07:30 on Thursday morning I entered the 4685 Peoria Drivers License office front door. Inside the building were 2 gentlemen and Amina (sp?). Amina was asking the two gentlemen to wait outside as the building was not open yet and a line always forms to get in at 08:00.
One of the gentlemen was fine with leaving and getting in line, but the other was VERY agitated and very verbal. He was verbal enough that I stayed outside of my office to offer Amina some backup and to be sure that nothing happened.
He was accusing Amina of discrimination (only kicking the "black guy" out) and telling her F___ You, etc.
Amina is not always understood and can sometimes communicate too abruptly, but I did not hear or see anything improper or inappropriate from her.
The gentlemen took their place in line and were serviced without incident.

--
## Bruce Kinsey

Office Manager Denver North East Drivers License

4685 Peoria St. #115 Denver, CO 80239

303-373-0203 Office 303-373-0789 Fax

bruce.kinsey@state.co.us

---------------------------------------------------------------------

This message was secured by **ZixCorp**[R].

## <u>CERTIFICATE OF DIGITAL SUBMISSION AND PRIVACY</u> <u>REDACTIONS</u>

I hereby certify that on August 23, 2022, a copy of the **CITY DEFENDANTS-APPELLEES' CORRECTED SUPPLEMENTAL APPENDIX, VOLUME I**, as submitted in digital form via the Court's ECF system, is an exact copy of the written document filed with the Clerk and has been scanned for viruses by McAfee VirusScan Enterprise + Anti Spyware Enterprise, Version 8.8.0 (8.8.0.1599), updated 08/22/2022 and according to the program is free of viruses.  In addition, I certify all required privacy redactions have been made.

*s/ Shelby A. Felton*
Shelby A. Felton
Office of the Denver City Attorney
Employment & Labor Law Section
201 West Colfax Ave., Dept. 1108
Denver, Colorado 80202.
Telephone   (720) 913-3125
Facsimile   (720) 913-3182
E-mail      shelby.felton@denvergov.org
            jonathan.saadeh@denvergov.org
*Attorneys for City Defendants-Appellees*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 23, 2022, I served a copy of **CITY DEFENDANTS-APPELLEES CORRECTED SUPPLEMENTAL APPENDIX, VOLUME I** electronically with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to the following:

Nathan Davidovich
Davidovich Law Firm, LLC
501 S. Cherry St., Suite 1100
Denver, Colorado 80246
nathandavidovich@talk-law.com

Michael A. Watts
Retherford, Mullen & Moore
2 N. Cascade, Suite 500
Colorado Springs, Colorado 80903
mwatts@rmmattys.com

*s/ Shelby A. Felton*
Shelby A. Felton
Office of the Denver City Attorney
Employment & Labor Law Section
201 West Colfax Ave., Dept. 1108
Denver, Colorado 80202.
Telephone    (720) 913-3125
Facsimile    (720) 913-3182
E-mail        shelby.felton@denvergov.org
                jonathan.saadeh@denvergov.org
*Attorneys for City Defendants-Appellees*